Joseph J. Joyce (Bar No. 4857)
Jeremy G. Knight (Bar No. 10722)
J. Joyce Law Firm
Attorneys for Walgreens Boots Alliance, Inc.
10813 South River Front Parkway, Suite 230
South Jordan, Utah 84095
Telephone: (801) 302-2255
jjj@jjoycelawfirm.com
jgk@jjoycelawfirm.com

Lester C. Houtz*
Alex J. Harris*
BARTLIT BECK LLP
1801 Wewatta Street
Denver, CO 80202
Tel: (303) 592-3177
Fax: (303) 592-3140
les.houtz@bartlitbeck.com
alex.harris@bartlitbeck.com

*denotes national counsel who will seek pro hac vice admission*

*Attorneys for Walgreens Boots Alliance, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SALT LAKE COUNTY,<br><br>                       Plaintiff,<br><br>v.<br><br>PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ALLERGAN FINANCE, LLC (f/k/a ACTAVIS, INC.); WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; | **NOTICE OF REMOVAL**<br><br>Civil No.<br><br>Judge: |

CEPHALON, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; SPECGX LLC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALMART INC. f/k/a WALMART STORES, INC.; WALGREENS BOOTS ALLIANCE, INC. a/k/a WALGREEN CO., LYNN R. WEBSTER, MD; RUSSELL K. PORTENOY, MD; AND DOES 1 THROUGH 100, INCLUSIVE,

Defendants.

# TABLE OF CONTENTS

Page

NATURE OF REMOVED ACTION ................................................................................ 2

TIMELINESS OF REMOVAL ..................................................................................... 4

PROPRIETY OF VENUE .............................................................................................. 5

BASIS OF REMOVAL .................................................................................................. 5

A.      FEDERAL QUESTION.......................................................................................... 5

B.      CLASS ACTION FAIRNESS ACT ("CAFA"), 28 U.S.C. §§ 1332(d); 1453(b) ............................................................................................................... 16

C.      DIVERSITY ......................................................................................................... 24

OTHER REMOVAL ISSUES ...................................................................................... 34

A.      FEDERAL QUESTION AND DIVERSITY...................................................... 34

B.      CAFA ................................................................................................................... 36

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446, and 1367, Defendant Walgreens Boots Alliance, Inc. ("Walgreens") has removed the above-captioned action from the Third Judicial District Court for Summit County, Utah to the United States District Court for the District of Utah.  As grounds for removal, Walgreens states:

1.      Removal is timely because it is made within 30 days of service.  Plaintiff served Walgreens on or about August 5, 2019 with a copy of the Second Amended Complaint filed in the Third Judicial District Court for Salt Lake County.

2.      Plaintiff's claims arise under federal law and in effect allege that Walgreens and all other Defendants violated and are liable under a federal statute, the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.* (the "CSA") and its implementing regulations.  *See* Am. Compl. ¶¶ 184, 186-87.

3.      This Court has original jurisdiction over the subject action pursuant to 28 U.S.C. § 1331 since there is a federal question.  As alleged, this suit falls within the CSA, which thus supplies this federal question.

4.      This Court also has jurisdiction over the subject action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453(b).

5.      This Court also has jurisdiction over the subject action pursuant to 28 U.S.C. § 1332 because there is complete diversity among all properly joined defendants and the amount in controversy is alleged to be greater than $75,000.

6.      Venue is proper.  Pursuant to 28 U.S.C. § 1441 *et seq.*, this case may be removed from the Third Judicial District Court for Summit County, to the United States District Court for the District of Utah as the action is pending within the district.

7.      Notice of this removal will promptly be served upon the Plaintiff and filed with

the Third Judicial District Court for Summit County.

**NATURE OF REMOVED ACTION**

1.     On April 10, 2018, Salt Lake County ("Plaintiff") filed *Salt Lake County v. Purdue Pharma L.P.*, et al., in the Third Judicial District Court for Salt Lake County. The state court assigned Case No. 180902421 to the action. The case was later consolidated with a number of other opioid cases for pre-trial proceedings on July 1, 2019 in the Third Judicial District for Summit County. The state court assigned Case No. 180500119 to the action. Copies of the state court dockets are attached hereto as **Exhibit A.** On July 26, 2019 Plaintiff filed its Second Amended Complaint and Jury Demand ("Am. Compl.") naming Walgreens for the first time. A copy of the Second Amended Complaint that was served on Walgreens is attached hereto as **Exhibit B**.

2.     The Second Amended Complaint asserts claims against three groups of defendants.

3.     The first group of defendants consists of Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Noramco, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals Inc.; Allergan plc f/k/a Actavis plc; Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Teva Pharmaceutical Industries Ltd. (incorrectly named as Teva Pharmaceuticals, Ltd. in the Complaint); Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Mallinckrodt plc; Mallinckrodt LLC; and SpecGX LLC (collectively, the "Manufacturer Defendants"). Am. Compl. ¶¶ 24-37.

4.     The second group of defendants consists of Dr. Lynn R. Webster and Dr. Russell

K. Portenoy (hereinafter referred to as the "Individual Physician Defendants"). Am. Compl. ¶¶ 38-39.

5.     The third and final group of defendants consists of AmerisourceBergen Drug Corporation; Cardinal Health, Inc.; McKesson Corporation; Walgreens Boots Alliance, Inc.; and Walmart Inc. f/k/a Wal-Mart Stores, Inc. (collectively, the "Distributor Defendants"). Am. Compl. ¶¶ 40-44.

6.     The Second Amended Complaint asserts four causes of action against Walgreens and the other Distributor Defendants: public nuisance under Utah Code Ann. § 76-10-801, *et seq.* (First Cause of Action); public nuisance under Utah common law (Second Cause of Action); common law negligence (Fifth Cause of Action); and civil conspiracy (Seventh Cause of Action). *See* Am. Compl. ¶¶ 311-381.

7.     All of the alleged causes of action against the Distributor Defendants arise from, and are dependent upon, purported violations of duties arising from the federal Controlled Substances Act ("CSA"). Plaintiff alleges that Distributor Defendants must register with the DEA, and fulfill "security, recordkeeping, monitoring and reporting requirements" pursuant to CSA. *Id.* Plaintiff further claims that "a central requirement of the CSA is that . . . Distributor Defendants design and operate a system that monitors and reports 'suspicious orders' to the DEA. *Id.* ¶ 186. In addition to expressly referring to the CSA, Plaintiff cites to guidance from the DEA and DOJ as the source of Distributor Defendants' duties. *Id.* ¶ 188-90. Plaintiff alleges as violations of these duties that Distributor Defendants "routinely increased customers' thresholds without adequate justification," *id.* ¶ 204, "sold an extraordinary amount of prescription opioids into Salt Lake Communities," *id.* ¶ 216, and "knew . . . monitoring system[s] did not comply with . . . CSA obligations," *id.* ¶ 228.

8.  Because the duties governing reporting and shipping "suspicious" opioid orders arise solely from the CSA and its implementing regulations, alleged violations of federal law form the basis for Plaintiff's claims.

9.  On December 5, 2017, the Judicial Panel on Multidistrict Litigation (JPML) formed a multidistrict litigation (MDL) and transferred opioid-related actions to Judge Dan Polster in the Northern District of Ohio pursuant to 28 U.S.C. § 1407.  *See In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375 (J.P.M.L. Dec. 5, 2017).  More than 2,100 opioid-related actions are pending in the MDL.

10.  In accordance with 28 U.S.C. § 1446(a), copies of the docket sheet and all process, pleadings, and orders served on Walgreens in the state court action are attached as **Exhibits A** and **B**.

## TIMELINESS OF REMOVAL

11.  Plaintiff served the Second Amended Complaint on Walgreens on or after August 5, 2019.

12.  In accordance with 28 U.S.C. § 1446(b), this notice of removal is timely filed within 30 days of service of Plaintiff's Second Amended Complaint.  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999) (30-day removal period begins to run upon service of summons and complaint).

13.  "If defendants are served at different times, and a later-served defendant files a notice of removal, any earlier-served defendant may consent to the removal even though that earlier-served defendant did not previously initiate or consent to removal."  28 U.S.C. § 1446(b)(2)(C).

14.  Walgreens has not responded to the Second Amended Complaint in state court.

## PROPRIETY OF VENUE

15.     Venue is proper in this district under 28 U.S.C. § 1441(a) because the state court where the suit has been pending is in this district.

## BASIS OF REMOVAL

### A.     FEDERAL QUESTION

16.     Removal is proper pursuant to 28 U.S.C. §§ 1441 and 1331 because Plaintiff's claims present a substantial federal question under the CSA, 21 U.S.C. §§ 801, *et seq.*

17.     The original jurisdiction of the district courts includes jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

18.     "Whether a case 'arises under' federal law for purposes of § 1331" is governed by the "well-pleaded complaint rule."  *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002).

19.     Even when state law creates the causes of action, a complaint may raise a substantial question of federal law sufficient to warrant removal if "vindication of a right under state law necessarily turn[s] on some construction of federal law."  *Merrell Dow Pharm. Inc., v. Thompson*, 478 U.S. 804, 808-09 (1986) (quoting F*ranchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 9 (1983)); *see Gully v. First Nat'l Bank*, 299 U.S. 109, 112 (1936) ("To bring a case within [§ 1441], a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.").[1]

_____

[1] Walgreens need not overcome any artificial presumptions against removal or in favor of remand.  In *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691 (2003), the Supreme Court unanimously held that the 1948 amendments to the general federal removal statute, 28 U.S.C. § 1441(a), trumped the Court's prior holdings in *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941), and its antecedents that federal jurisdictional statutes must be strictly construed against any recognition of federal subject matter jurisdiction, with every presumption indulged in favor of remand.  *Id*. at 697-98 ("[W]hatever apparent force this argument [of strict construction against removal] might have claimed when *Shamrock* was handed down has been qualified by

20.     "[F]ederal jurisdiction over a state law claim will lie if a federal issue is:  (1)

necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal

court without disrupting the federal-state balance approved by Congress."  *Gunn v Minton*, 568

U.S. 251, 258 (2013); *see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S.

308, 315 (2005).  "Where all four of these requirements are met . . . jurisdiction is proper

because there is a 'serious federal interest in claiming the advantages thought to be inherent in a

federal forum,' which can be vindicated without disrupting Congress's intended division of labor

between state and federal courts." *Gunn*, 568 U.S. at 258 (quoting *Grable*, 545 U.S. at 313-14).

21.     Where, like here, a purported state law claim is premised on violations of a duty

contained in a federal statute, a federal court has jurisdiction over that claim.  *Gilmore v.

Weatherford*, 694 F.3d 1160, 1176 (10th Cir. 2012) ("Although plaintiffs could lose their

conversion claim without the court reaching the federal question, it seems that they cannot win

unless the court answers that question. Thus, plaintiffs' 'right to relief necessarily depends on

resolution of a substantial question of federal law.'") (citation omitted).  *See Bd. of

Commissioners of Se. La. Flood Protection Authority-East v. Tenn. Gas Pipeline Co.*, 850 F.3d

714, 722-23 (5th Cir. 2017) (concluding that federal question jurisdiction exists because claims

were premised on failure to satisfy a standard of care established in federal statute).  Federal

jurisdiction is established if there is no "state law grounding for the duty that the [plaintiff]

---

later statutory development. . . . Since 1948, therefore, there has been no question that whenever
the subject matter of an action qualifies it for removal, the burden is on a plaintiff to find an
express exception." (emphasis added)); *see also Exxon Mobil Corp. v Allapattah Servs., Inc.*, 545
U.S. 546, 558 (2005) (construing 1990 enactment of 28 U.S.C. § 1367, authorizing supplemental
federal subject matter jurisdiction, and holding: "We must not give jurisdictional statutes a more
expansive interpretation than their text warrants; but it is just as important not to adopt an
artificial construction that is narrower than what the text provides . . . Ordinary principles of
statutory construction apply." (citation omitted)).

would need to establish for the Defendants to be liable," because the absence of any such state source "means that the duty would have to be drawn from federal law." *Id*. at 723. A claim premised on the breach of such a duty "cannot be resolved without a determination whether . . . federal statutes create [such] a duty," and therefore necessarily raises a federal question. *Id*.; *see also Hughes v. Chevron Phillips Chem. Co.,* 478 F. App'x 167, 170-71 (5th Cir. 2012) (plaintiff's state law claims gave rise to federal question jurisdiction because resolution of claims relied on duty contained in federal law).

22.     As set forth below, Plaintiff's tort claims meet all four requirements.

23.     Although Plaintiff ostensibly pleads some of its theories of recovery against Walgreens as state law claims, it bases the underlying theory of liability on Walgreens's alleged violations of federal law or alleged duties arising out of federal law, specifically the CSA.

24.     Specifically, Plaintiff pleads that Walgreens and the other Distributor Defendants violated federal law with, among others, the following allegations:

    a.   "Distributor Defendants here—have a common-law and statutory duty to prevent the diversion of opioids into illicit distribution channels. . . . Distributor Defendants failed to discharge these basic responsibilities and instead turned a blind eye to many suspicious opioid shipments directed into Salt Lake County communities." Am. Compl. ¶181.

    b.   "Distributor Defendants have failed to report and halt suspicious shipments into Salt Lake County. . . . Each Manufacturer and Distributor Defendant is aware that its anti-diversion systems are deficient . . . but none have cured the deficiencies" *Id.* ¶ 191.

    c.   "[R]ather than leverage their data to prevent opioid misuse and abuse, as is

required, Manufacturer and Distributor Defendants negligently disregarded suspicious activity to reap extraordinary profits." *Id.* ¶269.

d. "Distributor Defendants should have taken reasonable steps to monitor, investigate and, where warranted, report and halt suspicious orders to prevent diversion. Consistent with their prolonged failure to implement anti-diversion controls, . . . Distributor Defendants did not take these steps." *Id.* ¶ 272.

e. "Defendants' failure to monitor, investigate, report, and halt suspicious orders of prescription opioids are a direct and proximate cause of the widespread diversion of prescription of opioids for non-medical uses in Salt Lake County." *Id.* ¶ 273.

f. "Defendants violated their obligation to monitor, report and halt suspicious shipments affecting Salt Lake County." *Id.* ¶ 278.

g. "Defendants knew or should have known that their promotion of opioids, and failure to monitor and report opioid diversion, would create a public nuisance." *Id.* ¶¶ 315, 323.

25. The source of the asserted legal duties to prevent diversion and to monitor, investigate, and report suspicious orders of controlled substances is the CSA and its implementing regulations. *See* 21 U.S.C. § 823(b), (e); *id.* § 832; *id.* § 842(c)(1)(B); 21 C.F.R. §§ 1301.71,.74(b).

26. The source of the asserted legal duty to suspend shipments of suspicious orders is 21 U.S.C. § 823(b) and (e), as interpreted by the Drug Enforcement Administration ("DEA") of the United States Department of Justice. Specifically, the DEA interprets the public interest factors for registering distributors under the CSA, 21 U.S.C. § 823(b) and (e), to impose a

responsibility on distributors to exercise due diligence to avoid filling suspicious orders that might be diverted to unlawful uses. *See Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212-13 (D.C. Cir. 2017) (citing *In re Southwood Pharm., Inc., Revocation of Registration*, 72 Fed. Reg. 36,487, 36,501, 2007 WL 1886484 (DEA July 3, 2007), as source of DEA's "Shipping Requirement").

27.     Indeed, Plaintiff's own Second Amended Complaint cites to federal law as the basis for these duties. *See, e.g.*, Am. Compl. ¶ 184 ("Distributors of prescription opioids must register both with the federal DEA and the Utah Division of Occupational and Professional Licensing. Pursuant to the Federal Controlled Substances Act (CSA), aspects of which are incorporated into Utah law, all DEA registrants must fulfill security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion"); *see also id.* ¶ 186 ("[A] central requirement of the CSA is that Manufacturer and Distributor Defendants design and operate a system that monitors and reports "suspicious orders" to the DEA").

28.     Additionally, in apparent recognition of the federal source of the alleged duties, Plaintiff expressly relies on federal enforcement actions as evidence of Distributor Defendants' alleged misconduct. *See* Am. Compl. ¶¶ 196, 198, 208, 227, 232 (citing McKesson, Cardinal, and Walgreens settlements).

29.     Plaintiff's theories of liability against Walgreens and the other Distributor Defendants, as pleaded in the Second Amended Complaint, are thus predicated on allegations that they breached alleged duties under the CSA to implement effective controls against diversion and to detect and report "suspicious" orders for prescription opioids.

30.     The federal question presented by Plaintiff's claims therefore is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without

disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.[2]

31.     *First*, Plaintiff's state law claims "necessarily raise" a federal question because

the asserted right to relief under state law necessarily requires resolution of a federal question.

*Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 467 (7th

Cir. 2015); *see also N. Carolina ex rel. N. Carolina Dep't of Admin. v. Alcoa Power Generating,*

*Inc.*, 853 F.3d 140, 146 (4th Cir. 2017) ("Regardless of the allegations of a state law claim,

where the vindication of a right under state law necessarily turns on some construction of federal

law, the claim arises under federal law and thus supports federal question jurisdiction under 28

U.S.C. § 1331.") (alteration and internal quotation omitted); *Virgin Islands Hous. Auth. v.*

*Coastal Gen. Constr. Servs. Corp.*, 27 F.3d 911, 916 (3d Cir. 1994) ("[A]n action under 28

U.S.C. § 1331(a) arises only if the complaint seeks a remedy expressly granted by federal law or

---

[2] On August 7, 2018, Judge Shelby of this Court issued an order remanding two substantially similar opioid cases that were removed solely on federal question grounds. *See Weber Cty v. Purdue Pharma, L.P., et al.*, 2018 WL 3747846 (D. Utah Aug. 7, 2018); *Uintah Cty v. Purdue Pharma, L.P., et al.*, 2018 WL 3747847 (D. Utah Aug. 7, 2018). For the reasons stated herein, Walgreens believes a federal question is stated by Plaintiff's complaint and respectfully disagrees with Judge Shelby's decisions. Indeed, in denying defendants' motion to stay in *Weber*, Judge Shelby observed that at the time defendants had only identified "three other cases" raising the same jurisdictional issue then-pending in the federal MDL and therefore did not believe there was a "significant" risk of "inconsistencies with Judge Polster's determination of jurisdictional issues." (*Weber Cty*, Dkt. No. 16 at 3.) Since that time, numerous cases have been transferred raising precisely the jurisdictional issues raised in this notice and other Courts have found it more appropriate to allow opioid cases pending before them to transfer to the MDL to allow the federal MDL court to decide jurisdictional issues. Such an outcome is especially appropriate here given that Walgreen's notice presents two grounds—diversity jurisdiction and the Class Action Fairness Act—which were not previously presented to Judge Shelby for consideration. *See*, e.g., *Noble Cty, Ohio by the Noble Cty Comm'r v. Cardinal Health, Inc., et al.*, No. 2:18-cv-01379-EAS-EPD, (S.D. Ohio, Nov. 6, 2018) ("Plaintiff's jurisdictional concern is capable of arising in several of these prescription opioid cases across the country. . . . As such, this Court declines to rule on the merits of Plaintiff's Motion to Remand and defers that decision to Judge Polster . . . to determine where the case should be."); *Prince George Cty, Virginia v. Purdue Pharma L.P., et al.*, No. 3:19-cv-458 (E.D. Va., June 21, 2019); *Cty of Walker v. OptumRx, Inc. et al.*, No 4:19-cv-01767 (S.D. Tex., July 15, 2019); *Rockwall Cty, TX v. CVS Health Corp.*, No. 4:19-cv-2181 (S.D. Tex. July 4, 2019).

if the action requires construction of a federal statute, or at least a distinctive policy of a federal statute requires the application of federal legal principles.") *See also Bd. of Commissioners*, 850 F.3d at 722-23 (federal question necessarily raised where negligence and public nuisance claims relied on the court's interpretation of the scope of a duty of care contained in federal law); *Hughes*, 478 F. App'x at 170-71; *NASDAQ OMX Grp., Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1021-23 (2d Cir. 2014) (a duty derived from the Exchange Act to operate a fair and orderly market underpinned plaintiff's contract and tort claims and therefore necessarily raised a federal question); *Virgin Islands Hous. Auth. v. Coastal Gen. Constr. Servs. Corp.*, 27 F.3d 911, 916 (3d Cir. 1994) ("[A]n action under 28 U.S.C. § 1331(a) arises only if the complaint seeks a remedy expressly granted by federal law or if the action requires construction of a federal statute, or at least a distinctive policy of a federal statute requires the application of federal legal principles").

32.     Plaintiff's claims against Walgreens and the other Distributor Defendants require Plaintiff to establish that Defendants breached duties established exclusively under federal law by failing to monitor, investigate, and report shipments of otherwise lawful orders of controlled substances or by otherwise failing to maintain controls against diversion.

33.     Plaintiff fails to cite any state law source for Distributor Defendants' alleged duties to "monitor" prescription opioid orders and "halt" suspicious orders. *See* Am. Compl. ¶¶ 184, 191.  Indeed, Plaintiff's own Second Amended Complaint cites to federal law as the basis for these duties. *See, e.g.*, Am. Compl. ¶ 184 ("Distributors of prescription opioids must register both with the federal DEA and the Utah Division of Occupational and Professional Licensing. Pursuant to the Federal Controlled Substances Act (CSA), aspects of which are incorporated into Utah law, all DEA registrants must fulfill security, recordkeeping, monitoring and reporting

requirements that are designed to identify or prevent diversion"); *see also id.* ¶ 186 ("[A] central requirement of the CSA is that Manufacturer and Distributor Defendants design and operate a system that monitors and reports "suspicious orders" to the DEA").

34.     The Utah Administrative Codes Plaintiff cites, including Utah Admin. Code R156-17b-615(8)(f) and (10)(a)), focus only on preventing physical theft and diversion from the distributor's warehouses. *Id.* ¶ 185.  A distributor's duty to develop a monitoring system to "provide effective controls and procedures to guard against theft and diversion of controlled substances" arises only from federal law.  *See* 21 C.F.R. § 1301.71(a).

35.     While plaintiffs are masters of their complaints, and they "may avoid federal jurisdiction by *exclusive* reliance on state law," *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (emphasis added), Plaintiff here relies on violations of federal law as the basis for its state-law claims.[3]

36.     Plaintiff moreover "may not defeat removal by failing to plead federal questions that are essential elements of the plaintiff's claim." *Turgeau v. Administrative Review Bd.*, 446 F.3d 1052, 1060-61 (10th Cir. 2006) (quoting *Franchise Tax Bd.*, 463 U.S. at 22).

37.     In sum, despite Plaintiff's attempt to artfully omit any explicit federal question, the Second Amended Complaint necessarily raises a federal issue—namely, whether the

---

[3] Furthermore, it is not necessary for federal jurisdiction that Walgreens establish that *all* of Plaintiff's counts against it raise a federal question.  Even if Plaintiff could prove one or more of those counts without establishing a violation of federal law, this Court still has federal question jurisdiction:  "Nothing in the jurisdictional statutes suggests that the presence of related state law claims somehow alters the fact that [the] complaints, by virtue of their federal claims, were 'civil actions' within the federal courts' 'original jurisdiction.'" *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 166 (1997).

Because the Court has original jurisdiction over at least some counts against Walgreens, it has supplemental jurisdiction over Plaintiff's remaining counts against Walgreens and the other Distributor Defendants, which are so related that they "form part of the same case or controversy."  28 U.S.C. § 1367(a).

Distributor Defendants violated the CSA.

38.     ***Second***, this federal issue is "actually disputed" because the parties disagree as to the existence and scope of alleged duties arising under the CSA and whether the Distributor Defendants violated any duties arising under the CSA. Indeed, this federal issue is the "central point of dispute." *Gunn*, 568 U.S. at 259.

39.     ***Third***, the federal issue presented by Plaintiff's claims is "substantial."[4] "The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole." *Id.* at 260.  Among other things, the Court must assess whether the federal government has a "strong interest" in the federal issue at stake and whether allowing state courts to resolve the issue will "undermine 'the development of a uniform body of [federal] law.'" *Id.* at 260-61 (first quoting *Grable*, 545 U.S. at 315; then quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 162 (1989)).  As the Supreme Court explained in *Grable*, "[t]he doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. at 312.

40.     Plaintiff's theories of liability necessarily require that a court determine a question relating to the important federal issue of regulation of controlled substances.  Indeed, Congress designed the CSA with the intent of reducing illegal diversion of controlled substances, "while at the same time providing the legitimate drug industry with a unified approach to narcotic and

---

[4] The substantiality inquiry as it pertains to federal question jurisdiction is distinct from the underlying merits of Plaintiff's claims and has no bearing on the strength of those claims. *See Gunn*, 568 U.S. at 260 ("The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole.").

dangerous drug control." H.R. Rep. No. 1444, 91st Cong., 2nd Sess. (1970), as reprinted in 1970 U.S.C.C.A.N. 4566, 4571-72. Because Congress designed the legitimate drug industry with a unified approach to narcotic and dangerous drug control, it is important to uniformly interpret these duties under the CSA. The federal courts and the federal MDL court are best positioned to uniformly interpret these duties.

41. The text of the CSA itself notes that "illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people" and that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." 21 U.S.C. § 801. Thus, "[g]iven that . . . the plaintiffs' claims turn on the interpretation of the federal regulations governing" the distribution of controlled substances "and the importance of those regulations to the Congressional scheme, this case plainly falls within the narrow swath of cases described in Grable." *Anversa v. Partners Healthcare Sys., Inc.*, 835 F.3d 167, 174 n.5 (1st Cir. 2016).

42. Plaintiff's attempt to enforce the CSA raises a substantial federal question even though the CSA does not provide for a private right of action. In *Grable*, the Supreme Court held that lack of a federal cause of action does not foreclose federal-question jurisdiction. The Court stated that applying Merrell Dow too narrowly would both "overturn[] decades of precedent," and "convert[] a federal cause of action from a sufficient condition for federal question jurisdiction into a necessary one." *Grable*, 545 U.S. at 317; *see also, e.g., Ranck v. Mt. Hood Cable Reg. Comm'n*, No. 3:16-cv-02409-AA, 2017 WL 1752954, at *4-5 (D. Or. May 2, 2017) (state law claims based on violations of Cable Communications Policy Act raise substantial federal questions and satisfy *Grable* even though no private right of action exists

under Act).

43. Removal is especially appropriate here because Plaintiff's action is one of thousands of similar actions nationwide, most of which are pending in the MDL in the Northern District of Ohio. Indeed, Plaintiff claims that "the overprescription of opioids is a statewide (indeed, national) problem . . ." Am. Compl. ¶ 282. And Plaintiff relies on enforcement actions and settlements in jurisdictions outside of Utah to establish wrongful conduct. *Id.* ¶¶ 208, 227, 232. The MDL bellwether proceedings have substantially advanced and are set for trial in October 2019.

44. **Fourth**, and finally, the federal issue also is capable of resolution in federal court "without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. Federal courts exclusively hear challenges to DEA authority to enforce the CSA against distributors, and litigating this case in a state court runs the risk of the state court applying federal requirements inconsistently with the manner in which the federal agency tasked with enforcing the CSA—the DEA—applies them. Federal jurisdiction is therefore properly exercised under § 1331 to resolve "disputed issues of federal law" under the CSA.

45. In sum, removal of this action is appropriate because Plaintiff's "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314; *Gilmore v. Weatherford*, 694 F.3d 1160, 1176 (10th Cir. 2012) ("Although plaintiffs could lose their conversion claim without the court reaching the federal question, it seems that they cannot win unless the court answers that question. Thus, plaintiffs' 'right to relief necessarily depends on resolution of a substantial question of federal law.'" (quoting *Nicodemus v. Union Pac. Corp.*, 440 F.3d 1227, 1232 (10th

Cir. 2006))).

46.     To the extent that the Court determines that some, but not all, of Plaintiff's claims state a substantial federal question, the Court can evaluate whether to retain the non-federal claims against the Defendants under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367(a).

## B.     CLASS ACTION FAIRNESS ACT ("CAFA"), 28 U.S.C. §§ 1332(d); 1453(b)

47.     Plaintiff's lawsuit is removable under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d) and 1453(b), because: (1) litigation of this case in federal court raises factual and legal issues of national importance that would further CAFA's overall purpose; and (2) each of CAFA's statutory requirements is satisfied.  This Court must assess jurisdiction under CAFA at the time of removal.  28 U.S.C. § 1332(d); *see also Salzer v. SSM Health Care of Oklahoma Inc.*, 762 F.3d 1130, 1133 (10th Cir. 2014) ("[T]he propriety of removal is judged on the complaint as it stands at the time of the removal[.]") (citation omitted).

### 1.     This Is an Interstate Case of National Importance

48.     This lawsuit is precisely the type of case that Congress intended to be litigated in federal court.  Through CAFA, Congress expressed its intent "to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications."  S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34; s*ee also Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013) ("CAFA's primary objective" is to "ensur[e] Federal court consideration of interstate cases of national importance.") (internal citations and quotation marks omitted); *accord Dart Cherokee Basin Operating Co.*, LLC, 135 S. Ct. 547, 554 (2014).

49.     This case is one of hundreds of cases filed across the country in which government entities have sued prescription opioid manufacturers, distributors, and others for alleged harms arising from abuse of these medications.  The Opiate MDL alone has more than

2,100 cases and Plaintiff has scripted its Second Amended Complaint from complaints in cases already being litigated in the Opiate MDL.  For example, Plaintiff asserts that its claims touch upon issues of national importance: "Tens of millions of Americans suffer from and seek treatment for chronic pain.  To take advantage of the lucrative market for chronic pain patients, each Manufacturer Defendant developed a well-funded marketing scheme based on deception," Am. Compl. at ¶ 47; "The efficacy of Manufacturer and [Individual Physician] Defendants' marketing efforts can be seen by comparing opioid use in the United States against other countries, where restrictions on pharmaceutical advertising typically are more stringent," *id*. at ¶ 174; "[T]he overprescription of opioids is a statewide (indeed, national) problem," *id*. at ¶ 283.

50.    As Plaintiff avers, the issues in this case implicate factual and legal issues that span well beyond State lines and, as a result, should be litigated in federal court along with the other lawsuits in the Opiate MDL.  In denying remand in another opioid case in the diversity context, the U.S. District Court for the Southern District of West Virginia observed the following:

> Here, where the opioid epidemic is pervasive and egregious, there is at least a possibility of prejudice to the defendants at the hands of a jury drawn exclusively from the very county that is the plaintiff in this suit. A federal jury casts a wider net and is drawn from a division that comprises several counties. All may have an opioid problem, but not one that is specific to the plaintiff county.

*City of Huntington v. AmerisourceBergen Drug Corp.*, 2017 WL 3317300, at *2 (S.D.W. Va. Aug. 3, 2017).

51.    In short, jurisdiction in this matter is consistent with and promotes the purpose of CAFA.

### 2.    CAFA's Statutory Requirements Are Met

52.    To be removed under CAFA, this suit must qualify as a class action, there must be

at least 100 members of the proposed class, the amount in controversy must exceed $5 million, and there must be minimal diversity between the parties. 28 U.S.C. § 1332(d); 28 U.S.C. § 1453. All these requirements are met here.

### i. This Case Essentially Is a Class Action

53.     CAFA applies here because this case essentially is a class action. While Plaintiff has not alleged a putative class action on the face of its Second Amended Complaint, in reality, this lawsuit is "in substance a class action." *Addison Automatics, Inc. v. Hartford Cas. Ins. Co.*, 731 F.3d 740, 741-42 (7th Cir. 2013); *see also Badeaux v. Goodell*, 358 F. Supp. 3d 562, 569 (E.D. La., Jan. 31, 2019) ("Plaintiffs' state court petition unmistakably resembles a class action despite its omission of the words 'class action' . . . .").

54.     CAFA provides that "district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2); *see also Reece v. AES Corp.*, 638 F. App'x 755, 767 (10th Cir. 2016) (recognizing that CAFA jurisdiction exists when the proposed class contains at least one-hundred persons, the amount in controversy exceeds $5,000,000.00, and there is minimal diversity). CAFA "calls upon federal district court judges to look beyond the face of a complaint when determining whether federal jurisdiction exists over a matter that appears to be a class action in all but name." *W. Virginia ex rel. McGraw v. Comcast Corp.*, 705 F. Supp. 2d 441, 452 (E.D. Pa. 2010) (holding defendant properly removed action brought by the State of West Virginia against Comcast under CAFA because subscribers were the real parties in interest); *see also Bullard v. Burlington N. Santa Fe Ry. Co.*, 535 F.3d 759, 762 (7th Cir. 2008) ("[L]itigation counts as a class action if it is either filed as a representative suit or becomes a 'mass action' at any time.").

55. CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar state statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). Consistent with Congress's overall objective in favoring federal diversity jurisdiction over class actions with interstate ramifications, "the definition of 'class action' is to be interpreted liberally. Its application should not be confined solely to lawsuits that are labelled 'class actions' . . . . *Generally speaking, lawsuits that resemble a purported class action should be considered class actions for the purpose of applying these provisions.*" S. Rep. No. 109-14, at 35 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 34 (emphasis added).

56. Thus, where a lawsuit "resembl[es] a class action" by asserting claims both individually and on behalf of others, CAFA removal has been found proper. *Badeaux*, 358 F. Supp. 3d at 567. Courts have refused to "prioritize a complaint's use of magic words over its factual allegations," and have held that CAFA jurisdiction exists even where the complaint "does not seek class certification" or "omits reference to" a state statute "analogous to Rule 23." *Williams v. Emp'rs Mut. Cas. Co.*, 845 F.3d 891, 900–01 (8th Cir. 2017); *see also Dart Cherokee Basin Operating Co.*, LLC, 135 S. Ct. at 554 ("[N]o antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court"); *Speed v. JMA Energy Company, LLC*, 872 F.3d 1122, 1128 (10th Cir. 2017) ("Congress enacted [CAFA] to facilitate adjudication of certain class actions in federal court" (quoting Dart Cherokee, 135 S. Ct. at 554); *Black Iron, LLC v. Helm-Pacific*, 2017 WL 2623846 at *4 fn. 5 (D. Utah Jun. 16, 2017) ("no antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court" (quoting *Dart Cherokee*, 135 S. Ct. at 554).

57.     Here, Plaintiff is acting as a representative for a class of residents who were allegedly harmed, either directly or indirectly, by Defendants' purported misconduct. Plaintiff alleges that Defendants have inflicted both economic and noneconomic injuries on its individual residents. *E.g.*, Am. Compl. ¶ 17 (claiming that Manufacturer and Distributor Defendants "imperiled Salt Lake County and its residents with an oversupply of highly addictive narcotics"); *id*. ¶ 180 (alleging that "the use of opioids has taken an enormous toll on Salt Lake County and its residents); *id*. at ¶ 294 ("All told, nearly nine out of ten residents in Salt Lake County abusing opioids or other substances have nowhere to turn for treatment.."); *id*. ¶ 308 (describing support of treatment of county residents that have not been processed in the criminal justice system); *id*. ¶¶ 313, 321; ("Defendants, individually and in concert with each other, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of Salt Lake County residents and interferes with the comfortable enjoyment of life in violation of Utah law.").

58.     Plaintiff's alleged injuries derive from its residents' injuries and cannot be separated from those injuries. Plaintiff seeks to recover costs in providing law enforcement, medical, and social services for opioid addiction, emergencies, and overdose deaths, all of which stem from its residents' alleged opioid abuse. *E.g.*, Am. Compl. ¶ 303-310. Any damages would be a calculation of aggregate damages resulting from individual instances of opioid addiction and death and the extra public services allegedly needed would be paid, in whole or in part, from taxes collected by the County from its residents.

### ii.     CAFA's 100-Member Requirement Is Met

59.     The Second Amended Complaint satisfies CAFA's 100-member requirement because the putative class consists of thousands of residents and at least hundreds alleged to be injured. *See* 28 U.S.C. § 1332(d)(5)(B). In determining whether this requirement is met, United

States District Courts in Utah have considered the number of people who may have been potentially affected by the defendant's alleged misconduct, rather than the number of people who have been actually affected by such conduct. *See, e.g.*, *Ditty v. Check Rite, Ltd.*, 182 F.R.D. 639, 641 (D. Utah 1998) ("To satisfy this requirement, the plaintiffs need not show that joinder of all members is impossible, only that it is impracticable. Nor is it necessary that the plaintiffs identify the exact number of class members involved; courts have often used common sense assumptions to support a finding of numerosity.") (internal citations omitted); *Dilley v. Academy Credit, LLC*, 2008 WL 4527053 at *2-3 (D. Utah Sept. 29, 2008) (citing *Ditty* and finding that a Plaintiff allegation that proposed at least 600 potential class members met the numerosity requirement).

60.     According to Plaintiff, "[a]t least one Utahan fatally overdoses on opioids every day. . . [and] [n]early half of all fatal opioid overdoses in Utah annually occur in Salt Lake County; here, 531 opioid overdoses occurred in 2014-2015 alone—roughly one every 33 hours. More than one-third of all Utah emergency department encounters linked to opioids are reported by facilities operating in Salt Lake County."  Am. Compl. ¶¶ 1-2.  According to the United States Census Bureau, more than one million people live in Salt Lake County.[5]  Consequently, the potential number of people who have been or may be affected thus well exceeds the 100-member requirement under CAFA.

### iii.     CAFA's Minimal Diversity Requirements Are Met

61.     There is minimal diversity between the parties.  District courts have original jurisdiction of "any civil action in which the controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a

---

[5] *See* "QuickFacts Salt Lake County, Utah," United States Census Bureau, https://www.census.gov/quickfacts/fact/table/saltlakecountyutah,UT/PST045218.

class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2). CAFA eliminates the requirement of complete diversity. Instead, CAFA requires only minimal diversity—meaning that the parties are diverse if the plaintiff's citizenship differs from that of at least one defendant. 28 U.S.C. § 1332(d)(2)(A).

62. For purposes of diversity jurisdiction, a political subdivision is a citizen of the state. *See Moor v. Alameda Cty.*, 411 U.S. 693, 717 (1973) ("[A] political subdivision of a State . . . is a citizen of the State for diversity purposes."). A corporation is "a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1). For purposes of CAFA, the citizenship of any unincorporated association, such as limited partnerships and limited liability companies, is also determined by the entity's State of incorporation and principal place of business. 28 U.S.C. § 1332(d)(10).

63. Applying these principles, there is minimal diversity between the parties. Plaintiff Salt Lake County is a political subdivision of Utah. And many of the Defendants are citizens of States other than Utah. Am. Compl. ¶¶ 5-47. To name a few:

a. Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are both corporations organized under the laws of Delaware and both maintain their principal places of business in Malvern, Pennsylvania. They are, accordingly, citizens of Delaware and Pennsylvania.

b. Defendant Teva Pharmaceuticals USA, Inc. is a corporation organized under the laws of Delaware with its principal place of business in North Wales, Pennsylvania. It is, accordingly, a citizen of Delaware and Pennsylvania.

c. Defendant Cephalon, Inc. is a corporation organized under the laws of Delaware

with its principal place of business in Frazer, Pennsylvania.  It is, accordingly, a citizen of Delaware and Pennsylvania.

d.      Defendant Johnson & Johnson is a corporation organized under the laws of New Jersey with its principal place of business in New Brunswick, New Jersey.  It is, accordingly, a citizen of New Jersey.

e.      Defendant Actavis LLC is a limited liability company organized under the laws of Delaware and its principal place of business is in Parsippany, New Jersey.  Accordingly, it is a citizen of New Jersey and Delaware.

f.      Walgreens Boots Alliance, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Deerfield, Illinois.  Accordingly, it is a citizen of Delaware and Illinois.

64.      Because there is diversity of citizenship between at least one plaintiff and at least one defendant, this action meets the minimal diversity requirement under Section 1332(d)(2)(A).

### iv.      The Amount in Controversy Exceeds the Jurisdictional Limit

65.      The amount in controversy exceeds the jurisdictional threshold under CAFA. When a plaintiff alleges no specific amount of damages, "a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold."  *Dart Cherokee Basin Operating Co., LLC*, 135 S. Ct. at 554; *see also McCracken v. Progressive Direct Ins. Co.*, 896 F.3d 1166, 1170* fn. 5, (10th Cir. 2018) ("To remove a putative class action to federal court, "a defendant's notice of removal need include only a plausible allegation" that these requirements are satisfied." (quoting *Dart Cherokee*, 135 S. Ct. at 554). And, in making such determinations, "the claims of the individual class members shall be aggregated."  28 U.S.C. § 1332(d)(6).

66.      Here, Plaintiff alleges injuries resulting from opioid abuse and addiction that has

allegedly afflicted Plaintiff and its residents, with allegations extending as far back as the 1990s. *See, e.g.*, Am. Compl. ¶ 61 ("[I]n the 1990s . . . .").  Given the extent of the alleged injuries and time period, the alleged amount in controversy easily exceeds $5 million.[6]

## C.   DIVERSITY

### 1.   There is Complete Diversity of Citizenship Between Plaintiff and All Defendants Other than the Nominal Individual Physician Defendants

67.   There is complete diversity of citizenship here because Plaintiff is a Utah citizen and all of the Manufacturer and Distributor Defendants are citizens of states or foreign states other than Utah, *see infra* Part 1.i.; and the citizenship of the Individual Physician Defendants is irrelevant for purposes of diversity jurisdiction, *see infra* Part 1.ii.  This is because Plaintiff's claims against the Individual Physician Defendants are severable under Federal Rule of Civil Procedure 21 and the Individual Physician Defendants are fraudulently misjoined.

### i.   Plaintiff Is Diverse from All Defendants Other Than the non-Diverse Individual Physician Defendant

#### a.   Plaintiff Is a Citizen of Utah

68.   Plaintiff is a Utah citizen for purposes of diversity jurisdiction.  *See Moor v. Alameda Cty.*, 411 U.S. 693, 721 (1973) (holding that Alameda County is a California citizen for purposes of diversity jurisdiction).

#### b.   None of the Manufacturer and Distributor Defendants Is a Citizen of Utah

69.   For purposes of diversity jurisdiction, a corporation is "a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has

---

[6] The amount in controversy represents only what Plaintiff requests at this stage in the proceeding.  This is not an admission that Plaintiff is entitled to recover this amount.  *See Partin v. Marmic Fire & Safety Co., Inc.*, 2017 WL 2931401 at *5 (N.D. Okla. Jul. 10, 2017) ("There is no requirement that a defendant admit liability and assert that it owes damages in excess of $75,000 in order to remove an action to federal court.").

its principal place of business." 28 U.S.C. § 1332(c)(1). A partnership is a citizen of every state in which its partners are citizens. *See Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1015 (2016); *Depex Reina 9 P'ship v. Tex. Int'l Petroleum Corp.*, 897 F.2d 461, 463 (10th Cir. 1990). A limited liability company is a citizen of every state in which its members are citizens. *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1238 (10th Cir. 2015).

70. Applying these principles, no Defendant other than one Individual Physician Defendant is a citizen of Utah.

71. Defendant Purdue Pharma L.P. is a limited partnership organized under the laws of Delaware, none of whose partners is a citizen of Utah. *See* Am. Compl. ¶ 24.

72. Defendant Purdue Pharma Inc. is a New York corporation with its principal place of business in Stamford, Connecticut. *Id.*

73. Defendant The Purdue Frederick Company, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut. *Id.*

74. Defendant Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. *Id.* ¶ 26.

75. Defendant Johnson & Johnson is New Jersey corporation with its principal place of business in New Brunswick, New Jersey. *Id.*

76. Defendant Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. *Id.*

77. Defendant Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. *Id.*

78.     Defendant Noramco, Inc. is Delaware company headquartered in Wilmington, Delaware with offices in Athens, Georgia and Schaffhausen, Switzerland.  *Id.*

79.     Defendant Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  *Id.* ¶ 28.

80.     Defendant Endo Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.  *Id.*

81.     Defendant Allergan plc f/k/a Actavis plc is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.  *Id.* ¶ 30.

82.     Defendant Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.[7] is a Nevada limited liability company.  *Id.*  Its sole member is Allergan W.C. Holding Inc. f/k/a Actavis W.C. Holding Inc., a Delaware corporation with its principal place of business in Madison, New Jersey.

83.     Defendant Teva Pharmaceutical Industries Ltd. is an Israeli corporation with its principal place of business in Petah Tikva, Israel.  *Id.* ¶ 31.

84.     Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business in Pennsylvania.  *Id.*

85.     Cephalon, Inc. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania.  *Id.*

86.     Defendant Mallinckrodt plc is an Irish public limited company with its headquarters in Staines-Upon-Thames, Surrey, United Kingdom.  *Id.* ¶ 36.

---

[7] Plaintiff alleges that Defendant Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in March 2015, but does not allege the citizenship of Watson Pharmaceuticals, Inc.  Am. Compl. ¶ 30.  The Court should infer from Plaintiff's failure to allege that Watson Pharmaceuticals, Inc. is a citizen of Utah that Watson Pharmaceuticals, Inc. is not alleged to be a Utah citizen.

87.     Defendant Mallinckrodt LLC is a Delaware corporation with its headquarters in Hazelwood, Missouri, none of whose members is a citizen of Utah.  *Id.*

88.     Defendant SpecGx LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri, none of whose members is a citizen of Utah.  *Id.*

89.     Defendant AmerisourceBergen Drug Corporation's principal place of business is located in Chesterbrook, Pennsylvania, and it is incorporated in Delaware.  *Id.* ¶ 40.

90.     Defendant Cardinal Health, Inc. an Ohio corporation and is headquartered in Dublin, Ohio.  *Id.* ¶ 41.

91.     Defendant McKesson Corporation is incorporated in Delaware, with its principal place of business in Texas.

92.     Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its principal place of business in Illinois.  *Id.* ¶ 43.

93.     Defendant Walmart Inc. f/k/a Wal-Mart Stores, Inc. is a Delaware corporation with its principal place of business in Bentonville, Arkansas.  *Id.* ¶ 44.

94.     Accordingly, all of the Manufacturer and Distributor Defendants, and one of two Individual Physician Defendants, are citizens of a state or foreign state other than Utah.

### ii.     The Citizenship of the Individual Physician Defendants Should Be Ignored

95.     Plaintiffs also purport to bring claims against two individual physician defendants.  Only one of the Individual Physician Defendants, Dr. Lynn Webster, is alleged to be a citizen of Utah.  *Id.* ¶ 38.  The other Individual Physician Defendant, Russell K. Portenoy is a New York resident and physician licensed to practice medicine in the state of New York.  *Id.* ¶ 39.

96.     Even where the face of a Complaint shows a lack of complete diversity, removal

based on diversity jurisdiction is nonetheless proper if the claims against the non-diverse defendants are severable under Federal Rule of Civil Procedure 21 or if the non-diverse defendants are fraudulently misjoined.  Defendants are severable under Rule 21 if they are either unnecessary or dispensable under Rule 19, or if the claims against them are sufficiently distinct from claims against other defendants under Rule 20.

97.     Here, the Individual Physician Defendants, including the allegedly non-diverse Dr. Lynn Webster, should be severed because their presence as parties is unnecessary to adjudicate and provide full relief as to Plaintiff's claims against the other Defendants.

98.     "[I]t is well-settled that Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time [to preserve diversity jurisdiction.]" *Lenon v. St. Paul Mercury Ins. Co.*, 136 F.3d 1365, 1371 (10th Cir. 1998) (alterations in original) (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989)).  Courts in this Circuit thus have held that "[w]hen a non-diverse defendant threatens to destroy federal jurisdiction in a given case, the court can sever and dismiss that defendant without necessarily dismissing the entire case."  *Brin v. ACI Motor Freight, Inc.*, No. 13-cv-02035-RBJ, 2014 WL 1664889, at *2 (D. Colo. Apr. 23, 2014) (citing Fed. R. Civ. P. 21); *Jones v. Masterson*, No. 17-cv-00188-RBJ, 2017 WL 2532044, at *2-3 (D. Colo. June 12, 2017) (severing claims against nondiverse, dispensable defendant, and denying plaintiff's remand motion as to claims asserted against diverse defendant).

99.     *Joseph v. Baxter International, Inc.*, 614 F. Supp. 2d 868 (N.D. Ohio 2009), is particularly instructive. There, the plaintiffs, citizens of Louisiana, brought a products liability action against the out-of-state manufacturer of the drug Heparin.  *Id*. at 870.  Before the case was removed, the plaintiffs amended their complaint to add as defendants various non-diverse

healthcare provider companies, alleging that they engaged in "negligent acts and omissions in the administration of Heparin." *Id.* at 871. Despite the addition of these non-diverse healthcare provider defendants, the district court denied remand as to the diverse manufacturer defendant.

100. The court reasoned that the healthcare provider defendants were "not necessary parties as the resolution of a claim against them would not necessarily resolve the [plaintiffs'] claim against [the manufacturer]." *Id.* at 872. The medical malpractice claims against the healthcare providers "differ from the [plaintiffs'] products liability claim" against the manufacturer. *Id.* And, the court explained, the healthcare provider defendants were dispensable because the plaintiffs "retain an adequate remedy against the Healthcare Defendants as they can proceed with their claims in state court." *Id.* at 873. Given the separate factual basis for plaintiffs' medical malpractice claims against the healthcare providers, the court found that it could "sever them from the claims against [the manufacturer], and in doing so, perfect diversity jurisdiction over [the manufacturer]." *Id.* at 874.

101. A similar approach regarding unnecessary or "nominal" defendants has been followed within the 10th Circuit. *See, e.g.*, *Dodson Aviation, Inc. v. HLMP Aviation Corp.*, 2009 WL 1036123 at *2-3 (D. Kan. Feb. 12, 2009) (holding that "[defendant] is a nominal party, and its consent is not necessary for removal" and explaining that in the Tenth Circuit if a defendant "'was not necessary to the complete adjudication of the controversy between the parties [. . .] its citizenship was irrelevant when determining whether jurisdiction existed.'") (quoting *Hann v. City of Clinton, Oklahoma*, 131 F.2d 978, 981 (10th Cir. 1942)); *see Village Apartments Co., L.P. v. Asset Shelters Group, Inc.*, 2008 WL 11414603 at *4 (D.N.M. Apr. 29, 2008) (finding that defendant "is a nominal party . . . and who therefore was not required to join in the removal"). And numerous other courts have followed the same approach. *See, e.g., Sullivan v.*

*Calvert Mem'l Hosp.*, 117 F. Supp. 3d 702, 705-07 (D. Md. 2015); *Cooke-Bates v. Bayer Corp.*, No. 3:10-cv-261, 2010 WL 3984830, at *4 (E.D. Va. Oct. 8, 2010); *Mayfield v. London Women's Care, PLLC*, No. 15-19-DLB, 2015 WL 3440492, at *5 (E.D. Ky. May 28, 2015); *DeGidio v. Centocor, Inc.*, No. 3:09CV721, 2009 WL 1867676, at *3-4 (N.D. Ohio July 8, 2009); *McElroy v. Hamilton Cty. Bd. of Educ.*, No. 1:12-cv-297, 2012 WL 12871469, at *2-3 (E.D. Tenn. Dec. 20, 2012).

102.     Under a straightforward application of Rule 21, this Court should sever the Individual Physician Defendants as unnecessary and dispensable to perfect diversity jurisdiction. Alleged joint tortfeasors like the Individual Physician Defendants are unnecessary parties as a matter of settled law.  *See Temple v. Synthes Corp.*, 498 U.S. 5, 7-8 (1990) (holding that joint tortfeasors are not necessary parties under Rule 19); *Brin*, 2014 WL 1664889, at *4 ("Because Mr. Stiefvater, as a party with potential several liability arising out of this car accident, is not a required party under . . . Rule 19. . . [h]e is dismissed . . . in order to preserve diversity."); *Multimedia Games, Inc. v. WLGC Acquisition Corp.*, 214 F. Supp. 2d 1131, 1142 (N.D. Okla. 2001) ("It is a well-settled rule that a joint tortfeasor is not a necessary party under Rule 19(a) to an action against another party with similar liability.").

103.     Moreover, just like *Baxter* (and many other cases) in which the plaintiff's claims against the diverse defendants and non-diverse defendants were materially distinct, here Plaintiff's claims against the diverse Defendants do not depend on the resolution of any claims against the non-diverse Individual Physician Defendant, Dr. Lynn Webster.  And many of the claims are entirely unrelated. For example, Plaintiff alleges that the Distributor Defendants failed to report suspicious orders of opioid products.  By contrast, Plaintiff alleges that Dr. Webster made intentional misrepresentations about opioids and engaged in potentially criminal drug

dealing by overprescribing opioid medications to patients.  *Id.* ¶¶ 70-85.  Just like the nondiverse

healthcare providers in *Baxter*, Dr. Webster here is "not necessary . . . as the resolution of a

claim against [him] would not necessarily resolve the . . . claim[s] against" the diverse

Defendants. 614 F. Supp. 2d at 872.  If Plaintiff wants to pursue claims against Dr. Webster,

Plaintiff has an adequate remedy in state court.  *See Baxter*, 614 F. Supp. 2d at 872.

104.    Beyond Rule 19, the claims against Individual Physician Defendants, including

the non-diverse Dr. Webster, are also misjoined under Rule 20, which provides a distinct basis

for severance.  Rule 21 permits severance of claims against non-diverse defendants that do not

"aris[e] out of the same transaction, occurrence, or series of transactions or occurrences" as the

claims against diverse defendants. Fed. R. Civ. P. 20(a)(1)(A); *see Loeffelbein v. Milberg Weiss*

*Bershad Hynes & Lerach, LLP*, No. Civ.A. 02-2435-CM, 2003 WL 21313957, at *5 (D. Kan.

May 23, 2003) ("Rule 21 is a mechanism for correcting . . . the misjoinder . . . of parties or

claims" which "arises when the claims and parties fail to satisfy any of the conditions of

permissive joinder under Rule 20(a)." (citation omitted)).  Courts in this Circuit and other

circuits have repeatedly denied remand as to diverse defendants and severed claims against non-

diverse defendants where the claims against the non-diverse defendants arose from different

transactions or occurrences or were unnecessary to the resolution of the other claims before

them.[8]

105.    Severance is particularly appropriate here because it will enable the diverse

---

[8] *See, e.g., Loeffelbein*, 2003 WL 21313957, at *6; *Sutton v. Davol, Inc.*, 251 F.R.D. 500,
502–05 (E.D. Cal. 2008); *Greene v. Wyeth*, 344 F. Supp. 2d 674, 683–84 (D. Nev. 2004);
*Westley v. Progressive Specialty Ins. Co.*, No. 14-1410, 2014 WL 4489620, at *6–7 (E.D. La.
Sept. 10, 2014); *Anderson v. State Farm Mut. Auto. Ins. Co.*, No. 4:08CV345-RH/WCS, 2008
WL 11366408, at *3 (N.D. Fla. Nov. 10, 2008); *DirecTV, Inc. v. Beecher*, 296 F. Supp. 2d 937,
945 (S.D. Ind. 2003); *Randleel v. Pizza Hut of Am., Inc.*, 182 F.R.D. 542, 543 (N.D. Ill. 1998).

parties to benefit from the significant efficiencies stemming from participation in coordinated MDL proceedings in the Northern District of Ohio. Courts across the country have repeatedly recognized the importance of these efficiencies in severing non-diverse defendants to perfect diversity jurisdiction. *E.g., Sullivan*, 117 F. Supp. 3d at 707 ("Severance is particularly appropriate in this case because it would allow for the transfer of [plaintiff's] claims against the [diverse manufacturer] to Multi-District Litigation."); *Sutton*, 251 F.R.D. at 505 ("Plaintiffs' claims against the [non-diverse] Defendants are severed and remanded pursuant to Rule 21 . . . so as to preserve the removing Defendants' right to removal in the remaining multidistrict action and preserve the interests of judicial expediency and justice so that all pre-trial discovery on the products liability case can be coordinated in a single forum."); *Baxter*, 614 F. Supp. 2d at 873 ("[P]laintiffs will benefit from the MDL process: they will not bear the burden of having to engage on their own, and at their sole expense, in discovery vis-à-vis [the diverse manufacturer]."); *Mayfield*, 2015 WL 3440492, at *5 ("[I]f the surviving federal claims are transferred to the Ethicon MDL, the prospect of dual litigation has undeniable upside.").

106. As one court explained in materially identical circumstances, "[t]he Court's decision to sever . . . [the non-diverse healthcare provider] will not greatly prejudice [plaintiff], but failure to do so could subject [the diverse manufacturer] to considerable prejudice. [Plaintiff] will be forced to pursue two separate suits, but it will not alone bear the administrative and financial burdens of pursuing its claim against [the manufacturer] in the MDL proceedings. For its part, [the manufacturer] could be exposed to numerous related suits if courts considering suits similar to this one refused to sever claims against [the manufacturer] from those against the providers that prescribed [the drug]." *Cooke-Bates*, 2010 WL 3984830, at *4 (internal citations omitted).

107.    Finally, the citizenship of the Individual Physician Defendants, including the non-Diverse Dr. Webster, should be ignored for purposes of diversity jurisdiction under the fraudulent misjoinder doctrine.  Fraudulent misjoinder, sometimes called procedural misjoinder, "occurs when a plaintiff sues a diverse defendant in state court and joins a non-diverse or in-state defendant even though the plaintiff has no reasonable procedural basis to join such defendants in one action." *Lafalier v. State Farm Fire & Cas. Co.*, 391 F. App'x 732, 739 (10th Cir. Aug. 19, 2010) (internal quotation marks and citation omitted*); see also Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1360 (11th Cir. 1996), *abrogated on another ground in Cohen v. Office Depot, Inc.*, 204 F.3d 1069 (11th Cir. 2000).

108.    Severance of non-diverse defendants using the doctrine of fraudulent misjoinder is proper where, as here, "there are no questions of law or fact common to all Defendants that will arise in the action." *Bunnell v. Oklahoma MH Properties, LP*, No. CIV-12-372-R, 2012 WL 12863916, at *1 (W.D. Okla. May 11, 2012) (applying fraudulent misjoinder doctrine to sever non-diverse defendants).

109.    In opioid-related cases like this one, federal district courts have relied on the fraudulent misjoinder doctrine to ignore the citizenship of non-diverse physician defendants and deny remand based on diversity jurisdiction. *See Cty. Comm'n of McDowell Cty. v. McKesson Corp.*, 263 F. Supp. 3d 639, 647 (S.D. W. Va. 2017); *City of Huntington v. AmerisourceBergen Drug Corp.*, Civ. A. No. 3:17-01362, 2017 WL 3317300, at *4-5 (S.D. W. Va. Aug. 3, 2017); *but see Brooke Cty. Comm'n et al. v. Purdue Pharma L.P. et al.*, No. 5:18-cv-00009 (N.D. W. Va.), Doc. 23 (Feb. 23, 2018 Order).

110.    In sum, because Plaintiff is a Utah citizen, and because none of the properly joined defendants is a Utah citizen, there is complete diversity of citizenship.  *See* 28 U.S.C. §

1332(a).

### 2.     The Amount in Controversy Exceeds $75,000

111.    "[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 554 (2014).  "[W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court." *Id.* at 553.  In determining whether the amount in controversy is satisfied, the Court may consider compensatory and statutory damages, as well as punitive damages.  *See Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1217-18 (10th Cir. 2003).

112.    Here, Plaintiff alleges injuries resulting from opioid abuse and addiction that has allegedly afflicted Plaintiff and its residents, with allegations extending as far back as the 1990s. *See, e.g.*, Am. Compl. ¶ 61 ("[I]n the 1990s . . . .").  Given the extent of the alleged injuries and time period, the alleged amount in controversy easily exceeds $75,000.

113.    Plaintiff seeks compensatory damages for its actual damages as well as punitive damages.  *Id.* ¶ 146.

### OTHER REMOVAL ISSUES

### A.     FEDERAL QUESTION AND DIVERSITY

114.    For purposes of federal question jurisdiction under 28 U.S.C. § 1446(b)(2)(A), and for purposes of removal based on diversity jurisdiction under 28 U.S.C. § 1332(a) and pursuant to 28 U.S.C. § 1446(b), all Defendants that have been properly joined and served must join or consent to removal.

115.    The following Defendants have been served in this action and consent to removal, as indicated by their counsel's signatures below: Purdue Pharma L.P., Purdue Pharma, Inc., The

Purdue Frederick Company, Inc., Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-

McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen

Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Noramco, Inc., Endo Health Solutions

Inc., Endo Pharmaceuticals Inc., Allergan plc f/k/a Actavis plc,[9] Allergan Finance, LLC f/k/a

Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Cephalon, Inc., Teva Pharmaceutical Industries

Ltd.,[10] Teva Pharmaceuticals USA, Inc., Mallinckrodt plc,[11] Mallinckrodt LLC, SpecGx LLC,

AmerisourceBergen Drug Corporation, Cardinal Health, Inc., McKesson Corporation, and

Walmart Inc.

116.    The Individual Physician Defendants are not properly joined in this action, and

thus their consent to removal is not required.  Nevertheless, out of an abundance of action, Lynn

R. Webster and Russell K. Portenoy consent to removal.  The Defendants listed in this paragraph

expressly reserve, and do not waive, all defenses related to service of process and personal

jurisdiction.

117.    By filing this Notice of Removal, Walgreens and the consenting Defendants

expressly reserve, and do not waive, any and all defenses that may be available to them,

including those related to personal jurisdiction and service of process.  If any question arises as

---

[9] Allergan plc f/k/a Actavis plc is an Irish-based holding company that is not subject to personal jurisdiction in the United States.  It expressly reserves all rights and defenses including those related to personal jurisdiction and service of process.

[10] Teva Pharmaceutical Industries Ltd. ("Teva Ltd") is a foreign company and it is not subject to personal jurisdiction in the United States.  Teva Ltd. contests that it has been properly served and expressly reserves all defenses, including those related to personal jurisdiction and service of process.

[11] Mallinckrodt plc, an Irish public limited company, disputes that it is subject to personal jurisdiction in this Court, but it consents to this notice out of an abundance of caution and expressly reserves, and does not waive, all defenses, including those related to service of process and personal jurisdiction.

to propriety of removal to this Court, Walgreens requests the opportunity to present a brief and oral argument in support of its position that this case has been properly removed.

118. Pursuant to 28 U.S.C. § 1446(d), Walgreens will promptly file a copy of this Notice of Removal with the clerk of the state court where the lawsuit has been pending and serve notice of the filing of this Notice of Removal on Plaintiff.

119. Walgreens reserves the right to amend or supplement this Notice.

**B.** **CAFA**

120. Walgreens has satisfied all the procedural requirements for removal under 28 U.S.C. § 1446, and the District of Utah Local Rules.

121. Walgreens is filing this Notice of Removal pursuant to U.S.C. § 1441(a) in the United States District Court for the District of Utah, because the state court in which the action is pending, the Third Judicial District Court, in Summit County, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

122. Plaintiff served Walgreens with the Second Amended Complaint and Summons on or around August 5, 2019. Walgreens is removing the case within 30 days of that date; therefore, this removal is timely under 28 U.S.C. § 1446(b). *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 356 (1999).

123. Under CAFA, "[a] class action may be removed . . . by any defendant *without* the consent of all defendants." 28 U.S.C. § 1453(b) (emphasis added). Accordingly Walgreens has not sought consent of any other defendant.

**WHEREFORE**, Pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1446, and 1367, Walgreens hereby removes this action from the Third Judicial District Court of Summit County, Utah, No. 180500119, to the United States District Court for the District of Utah.

Dated:        September 4, 2019

By: /s/ Joseph J. Joyce

Joseph J. Joyce (Bar No. 4857)
Jeremy G. Knight (Bar No. 10722)
**J. Joyce Law Firm**
*Attorneys for Walgreens Boots Alliance, Inc.*
10813 South River Front Parkway, Suite 230
South Jordan, Utah  84095
Telephone:  (801) 302-2255
jjj@jjoycelawfirm.com
jgk@jjoycelawfirm.com

Lester C. Houtz*
Alex J. Harris*
BARTLIT BECK LLP
1801 Wewatta Street
Denver, CO 80202
Tel: (303) 592-3177
Fax: (303) 592-3140
les.houtz@bartlitbeck.com
alex.harris@bartlitbeck.com

*\* denotes national counsel who will seek pro hac vice admission*

*Attorneys for Walgreens Boots Alliance, Inc.*

CONSENT TO REMOVAL:

By: /s/ Elisabeth M. McOmber
*(with signature permission)*
Elisabeth M. McOmber (10615)
**SNELL & WILMER LLP**
15 West South Temple Street, Suite 1200
Salt Lake City, UT 84101
Telephone: (801) 257-1880
Facsimile: (801) 257-1800
emcomber@swlaw.com

Will W. Sachse*

**DECHERT LLP**
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104-2808
Telephone: (215) 994-2496
Facsimile: (215) 994-2222
Will.sachse@dechert.com

Sheila L. Birnbaum*
Mark S. Cheffo*
Hayden A. Coleman*
**DECHERT LLP**
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Sheila.birnbaum@dechert.com
Mark.cheffo@dechert.com
Hayden.coleman@dechert.com

*Counsel for Defendants Purdue Pharma L.P.,
Purdue Pharma Inc., and The Purdue Frederick
Company Inc.*
*\*denotes national counsel who will seek pro hac
vice admission*

CONSENT TO REMOVAL:

*/s/ Charles C. Lifland*
Charles C. Lifland*
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
(213) 430-6000
clifland@omm.com

*Attorney for Defendants Johnson & Johnson;
Janssen Pharmaceuticals, Inc.; Ortho-McNeil-
Janssen Pharmaceuticals, Inc. n/k/a Janssen
Pharmaceuticals, Inc.; and Janssen
Pharmaceutica, Inc. n/k/a Janssen
Pharmaceuticals, Inc.*

*\* denotes national counsel who will seek pro
hac vice admission*

CONSENT TO REMOVAL:

*/s/ Daniel G. Jarcho\**
D.C. Bar No. 391837
ALSTON & BIRD LLP
950 F Street NW
Washington, DC 20004
Telephone: (202) 239-3254
Facsimile: (202) 239-333
E-mail: daniel.jarcho@alston.com

Cari K. Dawson*
Georgia Bar No. 213490
Jenny A. Hergenrother*
Georgia Bar No. 447183
ALSTON & BIRD LLP
1201 West Peachtree Street NW
Atlanta, GA 30309
Tel.: (404) 881-7000
Fax: (404) 881-7777
E-mail: cari.dawson@alston.com
E-mail: jenny.hergenrother@alston.com

*Denotes national counsel who will seek pro
hac vice admission

*Attorneys for Noramco, Inc.*


CONSENT TO REMOVAL:

/s/ Perry S. Clegg
Perry S. Clegg (7831)
Matthew R. Lewis (7919)
Marcia Fuller Durkin (9973)
KUNZLER, PC
50 W. Broadway, Suite 1000
Salt Lake City, UT 84101
Tel.: (801) 994-4646
pclegg@kunzlerlaw.com
mlewis@kunzlerlaw.com
marcia@kunzlerlaw.com

John A. Freedman (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER

LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Tel.: (202) 942-5000
john.freedman@arnoldporter.com

Sean Morris (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Tel.: (213) 243-4000
sean.morris@arnoldporter.com

*Attorneys for Endo Health Solutions Inc. and
Endo Pharmaceuticals Inc.*

CONSENT TO REMOVAL:

*/s/ Donna Welch*
Donna Welch, P.C.*
Martin L. Roth*
Timothy Knapp*
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000
donna.welch@kirkland.com
martin.roth@kirkland.com
timothy.knapp@kirkland.com

Jennifer G. Levy, P.C.*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
jennifer.levy@kirkland.com

*denotes national counsel who will seek
pro hac vice admission*

*COUNSEL FOR ALLERGAN PLC F/K/A
ACTAVIS PLC AND ALLERGAN FINANCE,
LLC F/K/A ACTAVIS, INC. F/K/A WATSON
PHARMACEUTICALS, INC.*

CONSENT TO REMOVAL:

/s/ Brent O. Hatch
Brent O. Hatch (5715)
HATCH, JAMES & DODGE, PC
10 Herman Broadway, Suite 400
Salt Lake City, Utah 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666
bhatch@hjdlaw.com

Steven A. Reed*
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
steven.reed@morganlewis.com

Steven A. Luxton*
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
steven.luxton@morganlewis.com

Brian M. Ercole*
MORGAN, LEWIS & BOCKIUS LLP
200 South Biscayne Blvd., Suite 5300
Miami, FL 33131
Telephone: (305) 415-3000
Facsimile:  (305) 415-3001
brian.ercole@morganlewis.com

*denotes national counsel who will seek pro hac vice admission*

*Counsel for Teva Pharmaceuticals USA, Inc. and Cephalon, Inc.*

CONSENT TO REMOVAL:

/s/ Tyler V. Snow

Geoffrey C. Haslam (7217)
Tyler V. Snow (12668)
CHRISTENSEN & JENSEN, P.C.
257 East 200 South, Suite 1100
Salt Lake City, Utah 84111
Telephone: (801) 323.5000
Facsimile: (801) 355.3472
geoffrey.haslam@chrisjen.com
tyler.snow@chrisjen.com

-and-

Rocky C. Tsai, admitted pro hac vice
ROPES & GRAY, LLP
Three Embarcadero Center
San Francisco, CA 94111-4006
Telephone: (415) 315.6300
Rocky.Tsai@ropesgray.com

*Counsel for Mallinckrodt plc, Mallinckrodt
LLC, and SpecGx LLC*


CONSENT TO REMOVAL:

RAY QUINNEY & NEBEKER P.C.

/s/ Kamie F. Brown_____
Kristine M. Larsen
Whitney Hulet Krogue

*Attorneys for AmerisourceBergen Drug
Corporation*


CONSENT TO REMOVAL:

**MARSHALL OLSON & HULL, PC**
      BY:   /s/ Trevor C. Lang_____
          ERIK A. OLSON
          TREVOR C. LANG

      **COVINGTON & BURLING, LLP**
      NATHAN SHAFROTH [PRO HAC VICE]

      ATTORNEYS FOR DEFENDANT

CONSENT TO REMOVAL:

**Stoel Rives, LLP**

/s/ Michael R. Menssen
D. Matthew Moscon
*Attorneys for Defendant Cardinal Health, Inc.*
*With permission by e-mail, September 4, 2019.

CONSENT TO REMOVAL:

/s/ Nathaniel G. Ward
(motion for admission pending)
JONES DAY
51 Louisiana Ave., N.W.
Washington, Washington, D.C. 20001-2113
(202) 879-3784
nward@jonesday.com

Christopher Lovrien*
Sarah G. Conway*
JONES DAY
555 S. Flower St., 50th Floor
Los Angeles, CA 90071
(213) 243-2567
cjlovrien@jonesday.com
sgconway@jonesday.com

*denotes national counsel who will seek pro hac vice admission*

*Attorneys for Walmart Inc.*

CONSENT TO REMOVAL:

**Gordon & Rees LLP**
/s/ Mark A. Nickel
Mark A. Nickel
Sara E. Pendleton
*Attorneys for Defendant Lynn Webster*

CONSENT TO REMOVAL:

**Dodd & Kuendig**
/s/ Patricia C. Kuendig
Patricia C. Kuendig
*Attorneys for Defendant Russell K. Portenoy*

**CERTIFICATE OF SERVICE**

I, *Joseph J. Joyce*, hereby certify that the foregoing document will be served via the Court's ECF system to ECF registrants and/or via U.S. Mail on September 4, 2019.


*/s/ Joseph J. Joyce*



EXHIBIT A

# 180902421, SALT LAKE COUNTY vs. PURDUE PHARMA LP, et al.

UT District - Salt Lake City

SALT LAKE, STATE OF UTAH

This case was retrieved on 09/04/2019

## Header

**Case Number:** 180902421
**Date Filed:** 04/10/2018
**Date Full Case Retrieved:** 09/04/2019
**Status:** Unknown
**Misc:** (61) Product Liability; Civil

## Summary

**Judge**:  RICHARD MRAZIK
**CaseType**: Civil

## Participants

| Litigants | Attorneys |
|---|---|
| SALT LAKE COUNTY<br>**Plaintiff**<br>Address: 2001 SOUTH STATE STREET #N2-100 City: SALT LAKE CITY State: UT Zip Code: 84114 | THOMAS KARRENBERG<br>Plaintiff |
| | SIMARJIT S GILL<br>Plaintiff |
| | RALPH CHAMNESS<br>Plaintiff |
| | BRIDGET ROMANO<br>Plaintiff |
| | STEVE W BERMAN<br>Plaintiff |
| | RICHARD KAPLAN<br>Plaintiff |
| | ANDREW HALE<br>Plaintiff |
| | JENNIFER FOUNTAIN CONNOLLY<br>Plaintiff |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

**Litigants**                                    **Attorneys**

BEN HARRINGTON
Plaintiff

ACTAVIS LLC
**Defendant**
Address: CORPORATE CREATIONS NETWORK, INC.
Address 2: 3411 SILVERSIDE ROAD TATNALL BLDG,
SUITE City: WILMINGTON State: DE Zip Code: 19810

BRENT HATCH
Defendant

ANDREW DEISS
Defendant

ACTAVIS PHARMA INC FKA WATSON
**Defendant**
Address: 2825 EAST COTTONWOOD PARKWAY Address
2: #500 City: SALT LAKE CITY State: UT Zip Code: 84121

BRENT HATCH
Defendant

ANDREW DEISS
Defendant

ALLERGAN FINANCE LLC FKA ACTAV
**Defendant**
Address: MORRIS CORPORATE CENTER III Address 2:
400 INTERPACE PARKWAY City: PARSIPPANY State: NJ
Zip Code: 07054

BRENT MANNING
Defendant

ALAN C BRADSHAW
Defendant

ANDREW DEISS
Defendant

ELISABETH MCOMBER
Defendant

JESS M KRANNICH
Defendant

TREVOR LEE
Defendant

ALLERGAN PLC FKA ACTAVIS PLC
**Defendant**
Address: 4400 EASTON COMMONS WAY Address 2:
SUITE 125 City: COLUMBUS State: OH Zip Code: 43215

BRENT MANNING
Defendant

ALAN C BRADSHAW
Defendant

ANDREW DEISS
Defendant

ELISABETH MCOMBER
Defendant

JESS M KRANNICH
Defendant

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

**Litigants**                                          **Attorneys**

TREVOR LEE
Defendant

DOES 1-100
**Defendant**
Address: UNKNOWN

ENDO HEALTH SOLUTIONS INC                              ANDREW DEISS
**Defendant**                                          Defendant
Address: C/O THE CORPORATION TRUST CO Address 2:
1209 ORANGE STREET City: WILMINGTON State: DE Zip
Code: 19801                                            PERRY CLEGG
                                                       Defendant

                                                       MATTHEW LEWIS
                                                       Defendant

                                                       MARCIA FULLER DURKIN
                                                       Defendant
ENDO PHARMACEUTICALS INC                               ANDREW DEISS
**Defendant**                                          Defendant
Address: C/O THE CORPORATION TRUST CO Address 2:
1209 ORANGE STREET City: WILMINGTON State: DE Zip
Code: 19801                                            PERRY CLEGG
                                                       Defendant

                                                       MATTHEW LEWIS
                                                       Defendant

                                                       MARCIA FULLER DURKIN
                                                       Defendant
JANSSEN PHARMACEUTICA INC                              WESLEY FELIX
**Defendant**                                          Defendant
Address: 116 PINE STREET Address 2: SUITE 320 City:
HARRISBURG State: PA Zip Code: 17101                   ANDREW DEISS
                                                       Defendant

                                                       ELISABETH MCOMBER
                                                       Defendant

                                                       BRENDA WEINBERG
                                                       Defendant
JANSSEN PHARMACEUTICALS INC                            WESLEY FELIX
**Defendant**                                          Defendant
Address: 116 PINE STREET Address 2: SUITE 320 City:
HARRISBURG State: PA Zip Code: 17101
                                                       ANDREW DEISS
                                                       Defendant

180902421, SALT LAKE COUNTY vs. PURDUE PHARMA LP, et al.

| Litigants | Attorneys |
|---|---|
| | BRENDA WEINBERG<br>Defendant |
| JOHNSON & JOHNSON<br>**Defendant**<br>Address: ONE JOHNSON & JOHNSON PLAZA City: NEW BRUNSWICK State: NJ Zip Code: 08933 | WESLEY FELIX<br>Defendant |
| | ANDREW DEISS<br>Defendant |
| | ELISABETH MCOMBER<br>Defendant |
| | BRENDA WEINBERG<br>Defendant |
| LYNN R MD WEBSTER<br>**Defendant**<br>Address: 3838 SOUTH 700 EAST Address 2: #202 City: SALT LAKE CITY State: UT Zip Code: 84106 | SARA PAYNE<br>Defendant |
| | MARK NICKEL<br>Defendant |
| ORTHO-MCNEIL-JANSSEN PHARMACEU<br>**Defendant**<br>Address: 116 PINE STREET Address 2: SUITE 320 City: HARRISBURG State: PA Zip Code: 17101 | WESLEY FELIX<br>Defendant |
| | ANDREW DEISS<br>Defendant |
| | ELISABETH MCOMBER<br>Defendant |
| | BRENDA WEINBERG<br>Defendant |
| PURDUE PHARMA INC<br>**Defendant**<br>Address: 15 WEST SOUTH TEMPLE Address 2: SUITE 1701 City: SALT LAKE CITY State: UT Zip Code: 84101 | ANDREW DEISS<br>Defendant |
| | ELISABETH MCOMBER<br>Defendant |
| PURDUE PHARMA LP<br>**Defendant**<br>Address: 15 WEST SOUTH TEMPLE Address 2: STE 1701 City: SALT LAKE CITY State: UT Zip Code: 84101 | ANDREW DEISS<br>Defendant |
| | ELISABETH MCOMBER<br>Defendant |
| RUSSELL K MD PORTENOY<br>**Defendant**<br>Address: MJHS HOSPICE AND PALLIATIVE CARE Address 2: 39 BROADWAY, ROOM 200 City: NEW YORK State: NY Zip Code: 10006 | PATRICIA KUENDIG<br>Defendant |
| THE PURDUE FREDERICK COMPANY | ANDREW DEISS |

180902421, SALT LAKE COUNTY vs. PURDUE PHARMA LP, et al.

| Litigants | Attorneys |
|---|---|
| **Defendant** | Defendant |
| Address: C/O PRENTICE HALL CORPORATION Address 2: 2711 CENTERVILLE ROAD City: WILMINGTON State: DE Zip Code: 19808 | |
| | ELISABETH MCOMBER |
| | Defendant |
| WATSON LABORATORIES INC | BRENT HATCH |
| **Defendant** | Defendant |
| Address: CORPORATE CREATIONS NETWORK, INC. Address 2: 119 EAST COURT STREET City: CINCINNATI State: OH Zip Code: 45202 | |
| | ANDREW DEISS |
| | Defendant |
| WATSON PHARMACEUTICALS INC NKA | ANDREW DEISS |
| **Defendant** | Defendant |
| Address: 2825 EAST COTTONWOOD PARKWAY Address 2: #500 City: SALT LAKE CITY State: UT Zip Code: 84121 | |
| | ELISABETH MCOMBER |
| | Defendant |
| JANSSEN PHARMACEUTICALS INC | WESLEY FELIX |
| **Now Known As** | Now Known As |
| Address: 116 PINE STREET Address 2: SUITE 320 City: HARRISBURG State: PA Zip Code: 17101 | |
| | ANDREW DEISS |
| | Now Known As |
| | BRENDA WEINBERG |
| | Now Known As |
| JANSSEN PHARMACEUTICALS INC | WESLEY FELIX |
| **Now Known As** | Now Known As |
| Address: 116 PINE STREET Address 2: SUITE 320 City: HARRISBURG State: PA Zip Code: 17101 | |
| | ANDREW DEISS |
| | Now Known As |
| | BRENDA WEINBERG |
| | Now Known As |

# Fees

REVENUE DETAIL - TYPE: COMPLAINT - NO AMT S

Amount Due:$360.00

Amount Paid:$360.00

Amount Credit:$0.00

Balance: $ 0.00

REVENUE DETAIL - TYPE: JURY DEMAND - CIVIL

Amount Due:$250.00

Amount Paid:$250.00

Amount Credit:$0.00

Balance: $ 0.00

REVENUE DETAIL - TYPE: TELEPHONE CHARGES

Amount Due:$5.00

Amount Paid:$5.00

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE/FAX/EMAIL
Amount Due:$5.00
Amount Paid:$5.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TAX LIEN
Amount Due:$24.00
Amount Paid:$24.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE CHARGES
Amount Due:$6.00
Amount Paid:$6.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE/FAX/EMAIL
Amount Due:$6.00
Amount Paid:$6.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE CHARGES
Amount Due:$5.00
Amount Paid:$5.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE/FAX/EMAIL
Amount Due:$5.00
Amount Paid:$5.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE CHARGES
Amount Due:$6.50
Amount Paid:$6.50
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE/FAX/EMAIL
Amount Due:$6.50
Amount Paid:$6.50
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE CHARGES
Amount Due:$50.50
Amount Paid:$50.50
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: TELEPHONE/FAX/EMAIL
Amount Due:$50.50
Amount Paid:$50.50
Amount Credit:$0.00
Balance: $ 0.00

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

# Proceedings

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/10/2018 | | Case filed by efiler | |
| 04/10/2018 | | Fee Account created | |
| 04/10/2018 | | Fee Account created | |
| 04/10/2018 | | Fee Payment,CaseNumber:17145861 | |
| 04/10/2018 | | Filed: Complaint and Jury Demand | |
| 04/10/2018 | | Filed: Return of Electronic Notification | |
| 04/16/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Dr. Lynn R. Webster to Respond to Complaint | |
| 04/16/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Dr. Lynn Webster to Respond to Complaint | |
| 04/16/2018 | | Filed: Return of Electronic Notification | |
| 04/17/2018 | | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 04/17/2018 | | Filed: Order Granting Extension of Time for Dr. Lynn Webster to Respond to Complaint | |
| 04/17/2018 | | Filed: Return of Electronic Notification | |
| 04/17/2018 | | Filed: Return of Electronic Notification | |
| 04/20/2018 | | Filed: Acceptance of Service for Acquired Actavis Defendants upon WENDY WEST FEINSTEIN for | |
| 04/20/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Acquired Actavis Defendants to Respond to Complaint | |
| 04/20/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Acquired Actavis Defendants to Respond to Complaint | |
| 04/20/2018 | | Filed: Order Granting Extension of Time for Acquired Actavis Defendants to Respond to Complaint | |
| 04/20/2018 | | Filed: Request/Notice to Submit for Decision re Stipulated Motion for Extension of Time for Acquire Actavis Defendants to Respond to Complaint | |
| 04/20/2018 | | Filed: Return of Electronic Notification | |
| 04/20/2018 | | Filed: Return of Electronic Notification | |
| 05/03/2018 | | Filed: Acceptance of Service for Allergan Finance, LLC upon TIMOTHY W. KNAPP for | |
| 05/03/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Allergan Finance, LLC and Allergan PLC to Respond to Complaint | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| 05/03/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Allergan Finance, LLC and Allergan PLC to Respond to Complaint | |
| 05/03/2018 | | Filed: Request/Notice to Submit Request to Submit re Stipulated Motion for Extension of Time to Respond to Complaint for Allergan Finance, LLC and Allergan PLC | |
| 05/03/2018 | | Filed: Return of Electronic Notification | |
| 05/07/2018 | | Filed: Return of Electronic Notification | |
| 05/07/2018 | | Filed: Summons on Return Return of Service - Allergan PLC upon ROD, EMPLOYEE AT REGISTERED AGENT OFFICE for | |
| 05/10/2018 | | Filed: Order Granting Extension of Time for Allergan Finance, LLC and Allergan PLC to Respond to Complaint | |
| 05/10/2018 | | Filed: Return of Electronic Notification | |
| 05/11/2018 | | Filed: Acceptance of Service for Purdue Pharma, L.P., Purdue Pharma, Inc. and The Purdue Frederick Company, Inc. upon MARK S. CHEFFO for | |
| 05/11/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Purdue Defendants to Respond to Complaint | |
| 05/11/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Purdue Defendants to Respond to Complaint | |
| 05/11/2018 | | Filed: Request/Notice to Submit Request to Submit re Stipulated Motion for Extension of Time to Respond to Complaint for Purdue Defendants | |
| 05/11/2018 | | Filed: Return of Electronic Notification | |
| 05/16/2018 | | Filed: Acceptance of Service Janssen Defendants upon JENNIFER D. CARDELUS for | |
| 05/16/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Janssen Defendants to Respond to Complaint | |
| 05/16/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Janssen Defendants to Respond to Complaint | |
| 05/16/2018 | | Filed: Request/Notice to Submit Request to Submit re Stipulated Motion for Extension of Time to Respond to Complaint for Janssen Defendants | |
| 05/16/2018 | | Filed: Return of Electronic Notification | |
| 05/22/2018 | | Filed: Motion Pro Hac Vice for Admission of Ben Harrington | |

180902421, SALT LAKE COUNTY vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/22/2018 | | Filed: Motion Pro Hac Vice for Admission of Jennifer Fountain Connolly | |
| 05/22/2018 | | Filed: Motion Pro Hac Vice for Admission of Steve W, Berman | |
| 05/22/2018 | | Filed: Order (Proposed) Order Granting Motion for Pro Hac Vice Admission of Ben Harrington | |
| 05/22/2018 | | Filed: Order (Proposed) Order Granting Motion for Pro Hac Vice Admission of Jennifer Fountain Connolly | |
| 05/22/2018 | | Filed: Order (Proposed) Order Granting Motion for Pro Hac Vice Admission of Steve W. Berman | |
| 05/22/2018 | | Filed: Return of Electronic Notification | |
| 05/31/2018 | | Filed: Acceptance of Service for Endo Defendants upon SEAN MORRIS for | |
| 05/31/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Endo Defendants to Respond to Complaint | |
| 05/31/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Endo Defendants to Respond to Complaint | |
| 05/31/2018 | | Filed: Return of Electronic Notification | |
| 06/06/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to Complaint | |
| 06/06/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Manufacturer Defendants to Respond to Complaint | |
| 06/06/2018 | | Filed: Return of Electronic Notification | |
| 06/08/2018 | | Filed: Acceptance of Service for Russell K. Portenoy, MD upon S. AMY SPENCER for | |
| 06/08/2018 | | Filed: Return of Electronic Notification | |
| 06/14/2018 | | Fee Account created | |
| 06/14/2018 | | Fee Payment,CaseNumber:17214648 | |
| 06/19/2018 | | Filed: Order Granting Motion for Pro Hac Vice Admission of Ben Harrington | |
| 06/19/2018 | | Filed: Order Granting Motion for Pro Hac Vice Admission of Jennifer Fountain Connolly | |
| 06/19/2018 | | Filed: Order Granting Motion for Pro Hac Vice Admission of Steve W. Berman | |
| 06/19/2018 | | Filed: Return of Electronic Notification | |
| 06/19/2018 | | Filed: Return of Electronic Notification | |
| 06/19/2018 | | Filed: Return of Electronic Notification | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 06/20/2018 | | Filed: Order Granting Extension of Time for Janssen Defendants to Respond to Complaint | |
| 06/20/2018 | | Filed: Order Granting Extension of Time for Manufacturer Defendants to Respond to Complaint | |
| 06/20/2018 | | Filed: Order Granting Extension of Time for Purdue Defendants to Respond to Complaint | |
| 06/20/2018 | | Filed: Return of Electronic Notification | |
| 06/20/2018 | | Filed: Return of Electronic Notification | |
| 06/20/2018 | | Filed: Return of Electronic Notification | |
| 06/25/2018 | | Filed: Motion for Leave to File Excess Pages | |
| 06/25/2018 | | Filed: Motion to Dismiss | |
| 06/25/2018 | | Filed: Order (Proposed): Proposed Order Granting Defendant Lynn Websters Motion for Leave to File Excess Pages | |
| 06/25/2018 | | Filed: Return of Electronic Notification | |
| 06/25/2018 | | Filed: Return of Electronic Notification | |
| 06/26/2018 | | Filed: Order Granting Extension of Time for Endo Defendants to Respond to Complaint | |
| 06/26/2018 | | Filed: Other - Not Signed Order (Proposed): Proposed Order Granting Defendant Lynn Websters Motion for Leave to File Excess Pages | |
| 06/26/2018 | | Filed: Return of Electronic Notification | |
| 06/26/2018 | | Filed: Return of Electronic Notification | |
| 07/11/2018 | | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 07/11/2018 | | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 07/11/2018 | | Filed: Declaration of Brenda Weinberg in Support of Janssen Pharamaceuticals, Inc. and Johnson and Johnsons Motion to Dismiss | |
| 07/11/2018 | | Filed: Declaration of Brenda Weinberg in Support of Manufacturer Defendants Joint Request for Judicial Notice and Consideration of Certain Material in Support of Their Joint Motion to Dismiss | |
| 07/11/2018 | | Filed: Exhibit 1 - Affidavit of James DArreca | |
| 07/11/2018 | | Filed: Exhibit 1 to Declaration | |
| 07/11/2018 | | Filed: Exhibit 1 to Declaration | |
| 07/11/2018 | | Filed: Exhibit 2 to Declaration | |
| 07/11/2018 | | Filed: Exhibit 2 to Declaration | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 07/11/2018 | | Filed: Exhibit 3 to Declaration | |
| 07/11/2018 | | Filed: Exhibit 4 to Declaration | |
| 07/11/2018 | | Filed: Janssen Pharmaceuticals, Inc., and Johnson and Johnsons Motion to Dismiss | |
| 07/11/2018 | | Filed: Manufacturer Defendants Joint Motion to Dismiss | |
| 07/11/2018 | | Filed: Manufacturer Defendants Joint Request for Judicial Notice and Consideration of Certain Material in Support of Their Joint Motion to Dismiss | |
| 07/11/2018 | | Filed: Motion Allergan Finance, LLC;s and Allergan PLCs Motion to Dismiss and Memorandum in Support | |
| 07/11/2018 | | Filed: Motion for Leave to File Over-Length Joint Motion to Dismiss | |
| 07/11/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc. to Respond to Complaint | |
| 07/11/2018 | | Filed: Motion to Dismiss of Defendants Watson Laboratries, Inc., Actavis LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. | |
| 07/11/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Endo Defendants to Respond to Complaint | |
| 07/11/2018 | | Filed: Order (Proposed) re Motion for Leave to File Over-Length Joint Motion to Dismiss | |
| 07/11/2018 | | Filed: Request for Judicial Notice in Support of Janssen Pharmaceuticals, Inc., and Johnson and Johnsons Motion to Dismiss | |
| 07/11/2018 | | Filed: Request/Notice to Submit Motion for Leave to File Over-Length Joint Motion to Dismiss | |
| 07/11/2018 | | Filed: Return of Electronic Notification | |
| 07/11/2018 | | Filed: Return of Electronic Notification | |
| 07/11/2018 | | Filed: Return of Electronic Notification | |
| 07/11/2018 | | Filed: Return of Electronic Notification | |
| 07/11/2018 | | Filed: Return of Electronic Notification | |
| 07/11/2018 | | Filed: Return of Electronic Notification | |
| 07/11/2018 | | Filed: Return of Electronic Notification | |
| 07/11/2018 | | Filed: Return of Electronic Notification | |
| 07/12/2018 | | Filed: Order (Proposed) Granting Defendant Lynn Websters Motion for Leave To File Excess Pages | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 07/12/2018 | | Filed: Other - Not Signed Order (Proposed) Granting Defendant Lynn Websters Motion for Leave To File Excess Pages | |
| 07/12/2018 | | Filed: Return of Electronic Notification | |
| 07/12/2018 | | Filed: Return of Electronic Notification | |
| 07/13/2018 | | Filed: Motion Stipulated Motion for Extension of Time for Endo Health Solutions, Inc. and Endo Pharmaceuticals, Inc. to Respond to Complaint | |
| 07/13/2018 | | Filed: Order (Proposed) Order Granting Extension of Time for Endo Defendants to Respond to Complaint | |
| 07/13/2018 | | Filed: Order Granting Extension of Time for Endo Defendants to Respond to Complaint | |
| 07/13/2018 | | Filed: Order Granting Extension of Time for Endo Defendants to Respond to Complaint | |
| 07/13/2018 | | Filed: Return of Electronic Notification | |
| 07/13/2018 | | Filed: Return of Electronic Notification | |
| 07/13/2018 | | Filed: Return of Electronic Notification | |
| 07/19/2018 | | Filed: Appearance of Counsel/Notice of Limited Appearance of Marcia Fuller Durkin | |
| 07/19/2018 | | Filed: Appearance of Counsel/Notice of Limited Appearance of Perry S. Clegg | |
| 07/19/2018 | | Filed: Return of Electronic Notification | |
| 07/19/2018 | | Filed: Return of Electronic Notification | |
| 07/20/2018 | | Filed: Order re Motion for Leave to File Over-Length Joint Motion to Dismiss | |
| 07/20/2018 | | Filed: Return of Electronic Notification | |
| 07/23/2018 | | Filed: Motion to Dismiss and Strike of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. | |
| 07/23/2018 | | Filed: Opposition to Defendant Lynn R. Webster, MDs Motion to Dismiss | |
| 07/23/2018 | | Filed: Return of Electronic Notification | |
| 07/23/2018 | | Filed: Return of Electronic Notification | |
| 07/25/2018 | | Filed: Appearance of Counsel/Notice of Limited Appearance Notice of Appearance, Matthew R. Lewis | |
| 07/25/2018 | | Filed: Return of Electronic Notification | |
| 07/31/2018 | | Filed: Cross-Notice of Deposition of a Representative on Behalf of Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company | |
| 07/31/2018 | | Filed: Cross-Notice of Deposition of S. Seid | |

180902421, SALT LAKE COUNTY vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | as Fact Witness for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company Inc. | |
| 07/31/2018 | | Filed: Order (Proposed) on Salt Lake Countys Statement of Discovery Issues | |
| 07/31/2018 | | Filed: Return of Electronic Notification | |
| 07/31/2018 | | Filed: Return of Electronic Notification | |
| 07/31/2018 | | Filed: Salt Lake Countys Statement of Discovery Issues | |
| 08/02/2018 | | Filed: Notice of Withdrawal of Cross-Notice of Deposition of Stephen Seid as Fact Witness, and of Cross-Notice of Deposition of a Representative on Behalf of Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company | |
| 08/02/2018 | | Filed: Return of Electronic Notification | |
| 08/03/2018 | | Filed: Motion to Intervene/Join: Defendant Lynn Webster, MDs Joinder in Manufacturing Defendants Motion to Dismiss | |
| 08/03/2018 | | Filed: Notice of Withdrawal of Salt Lake Countys Statement of Discovery Issues Pursuant to Rule 37(a) Requesting a Protective Order and Expedited Treatment | |
| 08/03/2018 | | Filed: Return of Electronic Notification | |
| 08/03/2018 | | Filed: Return of Electronic Notification | |
| 08/08/2018 | | Fee Account created | |
| 08/08/2018 | | Fee Payment,CaseNumber:17272803 | |
| 08/08/2018 | | Filed: Other - Not Signed Order (Proposed) on Salt Lake Countys Statement of Discovery Issues | |
| 08/08/2018 | | Filed: Return of Electronic Notification | |
| 08/15/2018 | | Filed: Exhibits A to G of Salt Lake Countys Omnibus Opposition to Manufacturer Defendants Motions to Dismiss and Motions for Judicial Notice | |
| 08/15/2018 | | Filed: Motion for Leave to File Overlength Omnibus Opposition to Manufacturer Defendants Motions to Dismiss and Motions for Judicial Notice | |
| 08/15/2018 | | Filed: Notice of Dismissal Notice of Voluntary Dismissal Without Prejudice - Actavis Defendants | |
| 08/15/2018 | | Filed: Opposition to Salt Lake Countys Omnibus Opposition to Manufacturer Defendants Motions to Dismiss and Motions for Judicial Notice | |
| 08/15/2018 | | Filed: Order (Proposed) Order Granting | |

180902421, SALT LAKE COUNTY vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Motion for Leave to File Overlength Omnibus Opposition to Manufacturer Defendants Motions to Dismiss and Motions for Judicial Notice | |
| 08/15/2018 | | Filed: Return of Electronic Notification | |
| 08/22/2018 | | Fee Account created | |
| 08/22/2018 | | Fee Payment,CaseNumber:17289961 | |
| 08/22/2018 | | Filed: Order Granting Motion for Leave to File Overlength Omnibus Opposition to Manufacturer Defendants Motions to Dismiss and Motions for Judicial Notice | |
| 08/22/2018 | | Filed: Return of Electronic Notification | |
| 08/23/2018 | | Fee Account created | |
| 08/23/2018 | | Fee Payment,CaseNumber:17290664 | |
| 08/27/2018 | | Dismissed party - ACTAVIS LLC | |
| 08/27/2018 | | Dismissed party - ACTAVIS PHARMA INC FKA | |
| 08/27/2018 | | Dismissed party - WATSON LABORATORIES IN | |
| 08/29/2018 | | Filed: Return of Electronic Notification | |
| 08/29/2018 | | Filed: Salt Lake Countys Notice of Supplemental Authority Pursuant to Utah R. Civ. P. 7(i) | |
| 08/30/2018 | | Fee Account created | |
| 08/30/2018 | | Fee Payment,CaseNumber:17299786 | |
| 09/04/2018 | | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 09/04/2018 | | Filed: Return of Electronic Notification | |
| 09/07/2018 | | Filed: Order (Proposed) Re: Stipulation for Extension of Time to File Answer | |
| 09/07/2018 | | Filed: Request/Notice to Submit | |
| 09/07/2018 | | Filed: Return of Electronic Notification | |
| 09/07/2018 | | Filed: Stipulation for Extension of Time to File Answer | |
| 09/14/2018 | | Filed: Motion: Defendant Lynn Websters Motion for Leave to File Excess Pages | |
| 09/14/2018 | | Filed: Order (Proposed): Order Granting Defendant Lynn Websters Motion for Leave to File Excess Pages | |
| 09/14/2018 | | Filed: Reply: Defendant Lynn Webster, MDs Reply to Salt Lake Countys Opposition to Motion to Dismiss | |
| 09/14/2018 | | Filed: Return of Electronic Notification | |

180902421, SALT LAKE COUNTY vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 09/17/2018 | | Filed: Notice of Change of Firm Address | |
| 09/17/2018 | | Filed: Return of Electronic Notification | |
| 09/18/2018 | | Filed: Order Re: Stipulation for Extension of Time to File Answer | |
| 09/18/2018 | | Filed: Order: Order Granting Defendant Lynn Websters Motion for Leave to File Excess Pages | |
| 09/18/2018 | | Filed: Return of Electronic Notification | |
| 09/18/2018 | | Filed: Return of Electronic Notification | |
| 09/20/2018 | | Filed: Order (Proposed) Re: Stipulated Motion for Extension of Time to File Answer | |
| 09/20/2018 | | Filed: Request/Notice to Submit | |
| 09/20/2018 | | Filed: Return of Electronic Notification | |
| 09/20/2018 | | Filed: Stipulation for Extension of Time to File Answer | |
| 09/28/2018 | | Filed: Order (Proposed) granting Stipulated Motion to Extend Time for Manufacturer Defendants to File Replies in Support of their Motions to Dismiss | |
| 09/28/2018 | | Filed: Request/Notice to Submit for Decision Stipulated Motion to Extend Time for Manufacturer Defendants to File Replies in Support of their Motions to Dismiss | |
| 09/28/2018 | | Filed: Return of Electronic Notification | |
| 09/28/2018 | | Filed: Stipulated Motion to Extend Time for Manufacturer Defendants to File Replies in Support of their Motions to Dismiss | |
| 10/01/2018 | | Filed: Order Re: Stipulated Motion for Extension of Time to File Answer | |
| 10/01/2018 | | Filed: Return of Electronic Notification | |
| 10/03/2018 | | Filed: Return of Electronic Notification | |
| 10/03/2018 | | Filed: Salt Lake Countys Second Notice of Supplemental Authority Pursuant to Utah R. Civ. P. 7(i) | |
| 10/05/2018 | | Filed: Order granting Stipulated Motion to Extend Time for Manufacturer Defendants to File Replies in Support of their Motions to Dismiss | |
| 10/05/2018 | | Filed: Return of Electronic Notification | |
| 10/09/2018 | | Filed: Order (Proposed) Re: Stipulation for Extension of Time to File Answer | |
| 10/09/2018 | | Filed: Request/Notice to Submit | |
| 10/09/2018 | | Filed: Return of Electronic Notification | |
| 10/09/2018 | | Filed: Stipulation for Extension of Time to File | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Answer | |
| 10/10/2018 | | Filed: Order Re: Stipulation for Extension of Time to File Answer | |
| 10/10/2018 | | Filed: Return of Electronic Notification | |
| 10/19/2018 | | Filed: Motion Stipulation for Extension of Time to File Answer | |
| 10/19/2018 | | Filed: Order (Proposed) Re: Stipulation for Extension of Time to File Answer | |
| 10/19/2018 | | Filed: Request/Notice to Submit | |
| 10/19/2018 | | Filed: Request/Notice to Submit: Request to Submit for Decision | |
| 10/19/2018 | | Filed: Return of Electronic Notification | |
| 10/19/2018 | | Filed: Return of Electronic Notification | |
| 10/22/2018 | | Filed: Order (Proposed) Re: Stipulation for Extension of Time to File Answer | |
| 10/22/2018 | | Filed: Order Re: Stipulation for Extension of Time to File Answer | |
| 10/22/2018 | | Filed: Other - Not Signed Order (Proposed) Re: Stipulation for Extension of Time to File Answer | |
| 10/22/2018 | | Filed: Return of Electronic Notification | |
| 10/22/2018 | | Filed: Return of Electronic Notification | |
| 10/22/2018 | | Filed: Return of Electronic Notification | |
| 10/23/2018 | | Filed: Order (Proposed) granting Stipulated Motion to Extend Time for Manufacturer Defendants to File Replies in Support of Motion to Dismiss | |
| 10/23/2018 | | Filed: Request/Notice to Submit for Decision Stipulated Motion to Extend Time for Manufacturer Defendants to File Replies in Support of Motion to Dismiss | |
| 10/23/2018 | | Filed: Return of Electronic Notification | |
| 10/23/2018 | | Filed: Stipulated Motion to Extend Time for Manufacturer Defendants to File Replies in Support of Motion to Dismiss | |
| 10/25/2018 | | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 10/25/2018 | | Filed: Return of Electronic Notification | |
| 10/29/2018 | | Filed: Notice for Case 180902421 LP: Judge RICHARD MRAZIK | |
| 10/29/2018 | | MOTION TO DISMISS set on 01/10/2019 | |
| 10/29/2018 | | NOTICE for Case 180902421 ID 19537825 | |
| 11/02/2018 | | Filed: Motion to File Overlength Joint Reply | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | In Support of Manufacturer Defendants Motion to Dismiss | |
| 11/02/2018 | | Filed: Order (Proposed) Granting Motion to File Overlength Joint Reply In Support of Manufacturer Defendants Motion to Dismiss | |
| 11/02/2018 | | Filed: Reply Allergan Finance, LLC and Allergan PLCs Reply Memorandum in Support of the Individual Motion to Dismiss | |
| 11/02/2018 | | Filed: Reply Janssen Pharmaceuticals Inc and Johnson Johnsons Reply In Support of Motion to Dismiss | |
| 11/02/2018 | | Filed: Reply Manufacturer Defendants Joint Reply In Support of Their Motion to Dismiss | |
| 11/02/2018 | | Filed: Reply Memorandum in Suppport of Endo Health Solutions, Inc., and Endo Pharmaceuticals, Inc.s Motion to Dismiss and Motion to Strike | |
| 11/02/2018 | | Filed: Request/Notice to Submit Request to Submit Motion to File Overlength Joint Reply In Support of Manufacturer Defendants Motion to Dismiss | |
| 11/02/2018 | | Filed: Return of Electronic Notification | |
| 11/02/2018 | | Filed: Return of Electronic Notification | |
| 11/02/2018 | | Filed: Return of Electronic Notification | |
| 11/05/2018 | | Filed: Motion to Stay Hearing and Decision on Motions to Dismiss (Manufacturer Defendants) | |
| 11/05/2018 | | Filed: Order granting Stipulated Motion to Extend Time for Manufacturer Defendants to File Replies in Support of Motion to Dismiss | |
| 11/05/2018 | | Filed: Return of Electronic Notification | |
| 11/05/2018 | | Filed: Return of Electronic Notification | |
| 11/09/2018 | | Filed: Notice of Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/09/2018 | | Filed: Return of Electronic Notification | |
| 11/10/2018 | | Filed: Ex. 1 to Motion to Consolidate: Tooele Complaint | |
| 11/10/2018 | | Filed: Ex. 10 to Motion to Consolidate: Grand Complaint | |
| 11/10/2018 | | Filed: Ex. 11 to Motion to Consolidate: Table | |
| 11/10/2018 | | Filed: Ex. 12 to Motion to Consolidate: Order regarding Stay | |
| 11/10/2018 | | Filed: Ex. 13 to Motion to Consolidate: Consolidation Orders from Other States | |
| 11/10/2018 | | Filed: Ex. 2 to Motion to Consolidate: Salt | |

180902421, SALT LAKE COUNTY vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Lake Complaint | |
| 11/10/2018 | | Filed: Ex. 3 to Motion to Consolidate: Weber Complaint | |
| 11/10/2018 | | Filed: Ex. 4 to Motion to Consolidate: Carbon Complaint | |
| 11/10/2018 | | Filed: Ex. 5 to Motion to Consolidate: Uintah Complaint | |
| 11/10/2018 | | Filed: Ex. 6 to Motion to Consolidate: Wasatch Complaint | |
| 11/10/2018 | | Filed: Ex. 7-1 to Motion to Consolidate: Davis Complaint (Part 1) | |
| 11/10/2018 | | Filed: Ex. 7-2 to Motion to Consolidate: Davis Complaint (Part 2) | |
| 11/10/2018 | | Filed: Ex. 7-3 to Motion to Consolidate: Davis Complaint (Part 3) | |
| 11/10/2018 | | Filed: Ex. 7-4 to Motion to Consolidate: Davis Complaint (Part 4) | |
| 11/10/2018 | | Filed: Ex. 7-5 to Motion to Consolidate: Davis Complaint (Part 5) | |
| 11/10/2018 | | Filed: Ex. 7-6 to Motion to Consolidate: Davis Complaint (Part 6) | |
| 11/10/2018 | | Filed: Ex. 8 to Motion to Consolidate: Iron Complaint | |
| 11/10/2018 | | Filed: Ex. 9 to Motion to Consolidate: San Juan Complaint | |
| 11/10/2018 | | Filed: Exhibit A -- Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/10/2018 | | Filed: Return of Electronic Notification | |
| 11/10/2018 | | Filed: Return of Electronic Notification | |
| 11/10/2018 | | Filed: Return of Electronic Notification | |
| 11/10/2018 | | Filed: Return of Electronic Notification | |
| 11/10/2018 | | Filed: Return of Electronic Notification | |
| 11/10/2018 | | Filed: Second Notice of Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/10/2018 | | RE: PRIOR INTERACTIONS WITH LYNN WEBSTER | |
| 11/12/2018 | | Filed: Order Granting Motion to File Overlength Joint Reply In Support of Manufacturer Defendants Motion to Dismiss | |
| 11/12/2018 | | Filed: Return of Electronic Notification | |
| 11/13/2018 | | Filed: RE: MOTION TO STAY MOTIONS TO DISMISS | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 11/13/2018 | | Filed: RE: PRIOR INTERACTIONS WITH LYNN WEBSTER M.D. | |
| 11/13/2018 | | MOTION TO DISMISS Cancelled,CaseNumber:Cancelled | |
| 11/13/2018 | | RE: MOTION TO STAY MOTIONS TO DISMISS | |
| 11/14/2018 | | Filed: Motion to Vacate Oral Argument and Stay this Matter | |
| 11/14/2018 | | Filed: Return of Electronic Notification | |
| 11/20/2018 | | Filed: Return of Electronic Notification | |
| 11/20/2018 | | Filed: Salt Lake Countys Notice of Opposition to Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/28/2018 | | Filed: Order (Proposed) Order Re: Stipulation for Extension of Time to File Answer | |
| 11/28/2018 | | Filed: Request/Notice to Submit | |
| 11/28/2018 | | Filed: Return of Electronic Notification | |
| 11/28/2018 | | Filed: Stipulated Motion for Extension of Time to File Answer | |
| 11/30/2018 | | Filed: Order Re: Stipulation for Extension of Time to File Answer | |
| 11/30/2018 | | Filed: RE: MOTION TO VACATE ORAL ARGUMENT AND FOR STAY | |
| 11/30/2018 | | Filed: Return of Electronic Notification | |
| 11/30/2018 | | RE: MOTION TO VACATE ORAL ARGUMENT AND F | |
| 12/13/2018 | | Filed: Pre-Consolidation Case Management Order | |
| 12/21/2018 | | Filed: Exhibit 1- Tooele County Complaint | |
| 12/21/2018 | | Filed: Exhibit 10 - Grand County Complaint | |
| 12/21/2018 | | Filed: Exhibit 11 - Table of Related Cases | |
| 12/21/2018 | | Filed: Exhibit 12 - Order Granting Stipulated Motion to Stay | |
| 12/21/2018 | | Filed: Exhibit 13 - Order Granding Defendants Application to Coordinate Cases | |
| 12/21/2018 | | Filed: Exhibit 2 - Salt Lake County Complaint | |
| 12/21/2018 | | Filed: Exhibit 3 - Weber County Complaint | |
| 12/21/2018 | | Filed: Exhibit 4 - State of Utah Complaint | |
| 12/21/2018 | | Filed: Exhibit 5 - Uintah County Complaint | |
| 12/21/2018 | | Filed: Exhibit 6 - Wasatch County Complaint | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 12/21/2018 | | Filed: Exhibit 7-1- Davis County Complaint | |
| 12/21/2018 | | Filed: Exhibit 7-2- Davis County Complaint | |
| 12/21/2018 | | Filed: Exhibit 7-3- Davis County Complaint | |
| 12/21/2018 | | Filed: Exhibit 7-4 - Davis County Complaint | |
| 12/21/2018 | | Filed: Exhibit 7-5 - Davis County Complaint | |
| 12/21/2018 | | Filed: Exhibit 7-6 - Davis County Complaint | |
| 12/21/2018 | | Filed: Exhibit 8 - Iron County Complaint | |
| 12/21/2018 | | Filed: Exhibit 9 - San Juan County Complaint | |
| 12/21/2018 | | Filed: Exhibit A- Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 12/21/2018 | | Filed: Exhibit B - Distributor Defendants Joinder | |
| 12/21/2018 | | Filed: Exhibit C - Defendant Doctors Joinder | |
| 12/21/2018 | | Filed: Exhibit D - Salt Lake Countys Opposition | |
| 12/21/2018 | | Filed: Exhibit E - State of Utahs Opposition | |
| 12/21/2018 | | Filed: Exhibit F - Joint Opposition | |
| 12/21/2018 | | Filed: Exhibit G - Reply Memorandum | |
| 12/21/2018 | | Filed: Objection to Pre-Consolidation Case Management Order | |
| 12/21/2018 | | Filed: Return of Electronic Notification | |
| 12/21/2018 | | Filed: Return of Electronic Notification | |
| 12/21/2018 | | Filed: Return of Electronic Notification | |
| 12/21/2018 | | Filed: Return of Electronic Notification | |
| 12/21/2018 | | Filed: Return of Electronic Notification | |
| 12/21/2018 | | Filed: Return of Electronic Notification | |
| 12/21/2018 | | Filed: Return of Electronic Notification | |
| 01/02/2019 | | Filed: Minute Entry Regarding Prior Professional Associations | |
| 01/17/2019 | | Filed: Appearance of Counsel/Notice of Limited Appearance Notice of Entry of Appearance | |
| 01/17/2019 | | Filed: Return of Electronic Notification | |
| 01/18/2019 | | Filed: Exhibit A | |
| 01/18/2019 | | Filed: Manufacturer Defendants Joint Notice of Supplemental Authority | |
| 01/18/2019 | | Filed: Return of Electronic Notification | |
| 01/23/2019 | | Filed: Errata - Exhibit A to Manufacturer | |

180902421, SALT LAKE COUNTY  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
|  |  | Defendants Joint Notice of Supplemental Authority |  |
| 01/23/2019 |  | Filed: Exhibit A |  |
| 01/23/2019 |  | Filed: Return of Electronic Notification |  |
| 02/21/2019 |  | Filed: Motion Pro Hac Vice Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Donna Welch |  |
| 02/21/2019 |  | Filed: Order (Proposed) Granting Pro Hac Vice Admission of Donna Welch |  |
| 02/21/2019 |  | Filed: Return of Electronic Notification |  |
| 02/24/2019 |  | Filed: Order Granting Pro Hac Vice Admission of Donna Welch |  |
| 02/24/2019 |  | Filed: Return of Electronic Notification |  |
| 02/25/2019 |  | MOTION HEARING |  |
| 08/06/2019 |  | Fee Account created |  |
| 08/06/2019 |  | Fee Payment,CaseNumber:17680346 |  |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# 180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

UT District - Silver Summit (Coalville/Park City)

SUMMIT, STATE OF UTAH

<span style="color:red">**This case was retrieved on 09/04/2019**</span>

## Header

**Case Number:** 180500119
**Date Filed:** 03/20/2018
**Date Full Case Retrieved:** 09/04/2019
**Status:** Unknown
**Misc:** (61) Product Liability; Civil

## Summary

**Judge**: RICHARD MRAZIK
**CaseType**: Civil

## Participants

| Litigants | Attorneys |
| --- | --- |
| CACHE COUNTY<br>**Plaintiff** | MATTHEW MCCUNE<br>Plaintiff |
| DAVIS COUNTY<br>**Plaintiff** | DOUGLAS THAYER<br>Plaintiff |
| SALT LAKE COUNTY<br>**Plaintiff** | RICHARD KAPLAN<br>Plaintiff |
| | ANDREW HALE<br>Plaintiff |
| SUMMIT COUNTY<br>**Plaintiff**<br>Address: 60 NORTH MAIN STREET Address 2: PO BOX 128 City: COALVILLE State: UT Zip Code: 84017 | COLIN P KING<br>Plaintiff |
| | DONALD WINDER<br>Plaintiff |
| | MARGARET H OLSON<br>Plaintiff |
| | MICHAEL WOREL<br>Plaintiff |
| | MATTHEW MCCUNE<br>Plaintiff |
| TOOELE COUNTY<br>**Plaintiff** | MATTHEW MCCUNE<br>Plaintiff |
| UINTAH COUNTY | MATTHEW MCCUNE |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Litigants | Attorneys |
|---|---|
| **Plaintiff** | Plaintiff |
| VICTORIA SETHUNYA | |
| **Plaintiff** | Plaintiff |
| WASATCH COUNTY | MATTHEW MCCUNE |
| **Plaintiff** | Plaintiff |
| WASHINGTON COUNTY | MATTHEW MCCUNE |
| **Plaintiff** | Plaintiff |
| WEBER COUNTY | MATTHEW MCCUNE |
| **Plaintiff** | Plaintiff |
| Address: 2380 WASHINGTON BLVD Address 2: STE 230 City: OGDEN State: UT Zip Code: 84401 | |
| ABBVIE INC | |
| **Defendant** | |
| ACTAVIS INC FKA WATSON PHARMAC | MATTHEW LEWIS |
| **Defendant** | Defendant |
| Address: 2825 EAST COTTONWOOD PARKWAY Address 2: #500 City: SALT LAKE CITY State: UT Zip Code: 84121 | |
| ACTAVIS LABORATORIES UT INC | BRENT HATCH |
| **Defendant** | Defendant |
| ACTAVIS LLC | BRENT HATCH |
| **Defendant** | Defendant |
| Address: CORPORATION CREATIONS NETWORK INC Address 2: 119 EAST COURT STREET City: CINCINNATI State: OH Zip Code: 45202 | MATTHEW LEWIS Defendant |
| ACTAVIS PHARMA INC FKA WATSON | BRENT HATCH |
| **Defendant** | Defendant |
| Address: 2825 EAST COTTONWOOD PARKWAY Address 2: #500 City: SALT LAKE CITY State: UT Zip Code: 84121 | MATTHEW LEWIS Defendant |
| ALLERGAN PLC FKA ACTAVIS PLC | JESS M KRANNICH |
| **Defendant** | Defendant |
| Address: 4400 EASTON COMMONS WAY Address 2: SUITE 125 City: COLUMBUS State: OH Zip Code: 43215 | |
| ALLERGAN PLC FKA WATSON PHARMA | BRENT MANNING |
| **Defendant** | Defendant |
| Address: CT CORPORATION SYSTEM Address 2: 4400 EASTON COMMONS WAY STE 125 City: COLUMBUS State: OH Zip Code: 43215 | ALAN C BRADSHAW Defendant |
| | MATTHEW LEWIS Defendant |
| | JESS M KRANNICH Defendant |
| | TREVOR LEE Defendant |
| ALLERGAN SALES LLC | JESS M KRANNICH |
| **Defendant** | Defendant |
| ALLERGAN USA INC | JESS M KRANNICH |
| **Defendant** | Defendant |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Litigants | Attorneys |
|---|---|
| AMERISOURCEBERGEN CORPORATION<br>**Defendant**<br>Address: 1108 EAST SOUTH UNION AVE City: MIDVALE<br>State: UT Zip Code: 84047 | KAMIE BROWN<br>Defendant |
| | KRISTINE LARSEN<br>Defendant |
| | WHITNEY KROGUE<br>Defendant |
| AMERISOURCEBERGEN DRUG CORPORA<br>**Defendant**<br>Address: UNKNOWN | KAMIE BROWN<br>Defendant |
| ANESTA LLC<br>**Defendant** | BRENT HATCH<br>Defendant |
| CARDINAL HEALTH<br>**Defendant**<br>Address: 1108 EAST SOUTH UNION AVE City: MIDVALE<br>State: UT Zip Code: 84047 | D MATTHEW MOSCON<br>Defendant |
| | MICHAEL MENSSEN<br>Defendant |
| CARDINAL HEALTH 105 INC<br>**Defendant** | |
| CARDINAL HEALTH 107 LLC<br>**Defendant** | |
| CARDINAL HEALTH 108 LLC<br>**Defendant** | |
| CARDINAL HEALTH 110<br>**Defendant** | |
| CARDINAL HEALTH 112 LLC<br>**Defendant** | |
| CARDINAL HEALTH 200 LLC<br>**Defendant** | |
| CARDINAL HEALTH 414<br>**Defendant** | |
| CEPHALON INC<br>**Defendant**<br>Address: 2825 EAST COTTONWOOD PARKWAY Address<br>2: #500 City: SALT LAKE CITY State: UT Zip Code: 84121 | BRENT HATCH<br>Defendant |
| | MATTHEW LEWIS<br>Defendant |
| DEPOMED INC<br>**Defendant** | BRENT BAKER<br>Defendant |
| | JONATHAN BLETZACKER<br>Defendant |
| ENDO HEALTH SOLUTIONS<br>**Defendant**<br>Address: C/O THE CORPORATION TRUST CO Address 2:<br>1209 ORANGE STREET City: WILMINGTON State: DE Zip<br>Code: 19801 | BRENT HATCH<br>Defendant |
| | PERRY CLEGG<br>Defendant |
| | MATTHEW LEWIS |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

**Litigants**

**Attorneys**
Defendant

MARCIA FULLER DURKIN
Defendant

ENDO PHARMACEUTICALS INC
**Defendant**
Address: C/O THE CORPORATION TRUST CO Address 2:
1209 ORANGE STREET City: WILMINGTON State: DE Zip
Code: 19801

BRENT HATCH
Defendant

PERRY CLEGG
Defendant

MATTHEW LEWIS
Defendant

MARCIA FULLER DURKIN
Defendant

INSYS THERAPEUTICS INC
**Defendant**
Address: 1108 EAST SOUTH UNION AVE City: MIDVALE
State: UT Zip Code: 84047

BRENT HATCH
Defendant

MATTHEW LEWIS
Defendant

J RYAN MITCHELL
Defendant

JANSSEN PHARMACEUTICA INC NKA
**Defendant**
Address: 116 PINE STREET Address 2: SUITE 320 City:
HARRISBURG State: PA Zip Code: 17101

BRENT HATCH
Defendant

WESLEY FELIX
Defendant

ANDREW DEISS
Defendant

MATTHEW LEWIS
Defendant

BRENDA WEINBERG
Defendant

COREY RILEY
Defendant

JANSSEN PHARMACEUTICALS INC
**Defendant**
Address: 116 PINE STREET Address 2: SUITE 320 City:
HARRISBURG State: PA Zip Code: 17101

BRENT HATCH
Defendant

WESLEY FELIX

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Litigants | Attorneys |
|---|---|
| | Defendant |
| | ANDREW DEISS<br>Defendant |
| | MATTHEW LEWIS<br>Defendant |
| | BRENDA WEINBERG<br>Defendant |
| | COREY RILEY<br>Defendant |
| JOHNSON & JOHNSON<br>**Defendant**<br>Address: ONE JOHNSON & JOHNSON PLAZA City: NEW BRUNSWICK State: NJ Zip Code: 08933 | BRENT HATCH<br>Defendant |
| | WESLEY FELIX<br>Defendant |
| | ANDREW DEISS<br>Defendant |
| | MATTHEW LEWIS<br>Defendant |
| | BRENDA WEINBERG<br>Defendant |
| | COREY RILEY<br>Defendant |
| KNOLL PHARMACEUTICAL COMPANY<br>**Defendant**<br>LIPOCINE INC<br>**Defendant**<br>LIPOCINE OPERATING INC<br>**Defendant**<br>LYNN WEBSTER<br>**Defendant**<br>Address: 3838 SOUTH 700 EAST Address 2: #202 City: SALT LAKE CITY State: UT Zip Code: 84106 | MARK NICKEL<br>Defendant |
| MALLINCKRODT LLC<br>**Defendant**<br>Address: C/O THE CORPORATIONS TRUST CO Address 2: 1209 ORANGE STREET City: WILMINGTON State: DE Zip Code: 19801 | BRENT HATCH<br>Defendant |
| | GEOFFREY HASLAM<br>Defendant |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Litigants | Attorneys |
|---|---|
| | MATTHEW LEWIS<br>Defendant |
| | TYLER SNOW<br>Defendant |
| MALLINCKRODT PLC<br>**Defendant**<br>Address: UNKNOWN | |
| MCKESSON CORPORATION<br>**Defendant**<br>Address: 15 WEST SOUTH TEMPLE Address 2: STE 1701<br>City: SALT LAKE CITY State: UT Zip Code: 84101 | TREVOR LANG<br>Defendant |
| | NATHAN E SHAFROTH<br>Defendant |
| MCKESSON MEDICAL-SURGICAL INC<br>**Defendant** | |
| MYLAN BERTECK PHARMACEUTICALS<br>**Defendant** | MAX WHEELER<br>Defendant |
| | BRADLEY BLACKHAM<br>Defendant |
| MYLAN INC<br>**Defendant** | MAX WHEELER<br>Defendant |
| | BRADLEY BLACKHAM<br>Defendant |
| MYLAN INSTITUTIONAL INC<br>**Defendant** | MAX WHEELER<br>Defendant |
| | BRADLEY BLACKHAM<br>Defendant |
| MYLAN PHARMACEUTICALS INC<br>**Defendant** | MAX WHEELER<br>Defendant |
| | BRADLEY BLACKHAM<br>Defendant |
| MYLAN SPECIALTY LP<br>**Defendant** | MAX WHEELER<br>Defendant |
| | BRADLEY BLACKHAM<br>Defendant |
| NORAMCO INC<br>**Defendant** | |
| ORTHO-MCNEIL-JANSSEN PHARMACEU<br>**Defendant**<br>Address: 116 PINE STREET Address 2: SUITE 320 City:<br>HARRISBURG State: PA Zip Code: 17101 | BRENT HATCH<br>Defendant |
| | WESLEY FELIX |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

**Litigants**

**Attorneys**
Defendant

ANDREW DEISS
Defendant

MATTHEW LEWIS
Defendant

BRENDA WEINBERG
Defendant

COREY RILEY
Defendant

PERRY FINE
**Defendant**
Address: 3230 EAST MILLCREEK RD Address 2: SUITE 155
City: SALT LAKE CITY State: UT Zip Code: 84109

MARK NICKEL
Defendant

PRA HEALTH SCIENCES
**Defendant**

PURDUE PHARMA INC
**Defendant**
Address: 15 WEST SOUTH TEMPLE Address 2: STE 1701
City: SALT LAKE CITY State: UT Zip Code: 84101

BRENT HATCH
Defendant

MATTHEW LEWIS
Defendant

ELISABETH MCOMBER
Defendant

PURDUE PHARMA LP
**Defendant**
Address: 15 WEST SOUTH TEMPLE Address 2: STE 1701
City: SALT LAKE CITY State: UT Zip Code: 84101

BRENT HATCH
Defendant

MATTHEW LEWIS
Defendant

ELISABETH MCOMBER
Defendant

PURDUE PHARMA MANUFACTURING LP
**Defendant**

PURDUE PHARMACEUTICALS LP
**Defendant**

RUSSELL PORTENOY
**Defendant**

SCOTT FISHMAN
**Defendant**
Address: 2221 STOCKTON BLVD City: SACRAMENTO
State: CA Zip Code: 95817

SPECGX LLC
**Defendant**
Address: UNKNOWN

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Litigants | Attorneys |
|---|---|
| SPRIASO LLC **Defendant** | |
| TEVA PHAMACEUTICALS USA INC **Defendant** Address: 2825 EAST COTTONWOOD PARKWAY Address 2: #500 City: SALT LAKE CITY State: UT Zip Code: 84121 | BRENT HATCH Defendant |
| | MATTHEW LEWIS Defendant |
| TEVA PHARMACEUTICAL INDUSTRIES **Defendant** Address: UNKNOWN | BRENT HATCH Defendant |
| THE PURDUE FREDERICK COMPANY **Defendant** | |
| THE PURDUE FREDERICK COMPANY I **Defendant** Address: C/O PRENTICE HALL CORPORATION Address 2: 2711 CENTERVILLE ROAD City: WILMINGTON State: DE Zip Code: 19808 | BRENT HATCH Defendant |
| | MATTHEW LEWIS Defendant |
| | ELISABETH MCOMBER Defendant |
| WATSON LABORATORIES INC **Defendant** Address: CORPORATE CREATIONS NETWORK INC Address 2: 119 EAST COURT STREET City: CINCINNATI State: OH Zip Code: 45202 | |
| ANESTA CORP **Formerly Known As** | |
| ASSERTIO THERAPEUTICS INC **Formerly Known As** | |
| BERTEK PHARMACEUTICALS INC **Formerly Doing Bus** | |
| LIPOCINE INC **Formerly Known As** | |
| MARATHON BAR CORP **Formerly Known As** | |
| SALT LAKE COUNTY **Other Party** | RICHARD KAPLAN Other Party |
| | ANDREW HALE Other Party |
| SPECIALTY PHARMACEUTICAL SERVI **Doing Business As** | |
| THERATECH INC **Formerly Known As** | |
| WATSON LABORATORIES INC **Formerly Known As** | |
| WATSON LABORATORIES INC UTAH **Formerly Known As** | |

# Fees

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

REVENUE DETAIL - TYPE: COMPLAINT - NO AMT S
Amount Due:$360.00
Amount Paid:$360.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: JURY DEMAND - CIVIL
Amount Due:$250.00
Amount Paid:$250.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: JURY DEMAND - CIVIL
Amount Due:$0.00
Amount Paid:$0.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: AUDIO TAPE COPY
Amount Due:$10.00
Amount Paid:$10.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: AUDIO TAPE COPY
Amount Due:$10.00
Amount Paid:$10.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: AUDIO TAPE COPY
Amount Due:$10.00
Amount Paid:$10.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: AUDIO TAPE COPY
Amount Due:$10.00
Amount Paid:$10.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: JURY DEMAND - CIVIL
Amount Due:$250.00
Amount Paid:$250.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: AUDIO TAPE COPY
Amount Due:$10.00
Amount Paid:$10.00
Amount Credit:$0.00
Balance: $ 0.00
REVENUE DETAIL - TYPE: AUDIO TAPE COPY
Amount Due:$10.00
Amount Paid:$10.00
Amount Credit:$0.00
Balance: $ 0.00

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

# Proceedings

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 03/20/2018 | | Case filed by efiler | |
| 03/20/2018 | | Fee Account created | |
| 03/20/2018 | | Fee Account created | |
| 03/20/2018 | | Fee Payment,CaseNumber:17122940 | |
| 03/20/2018 | 1 | Filed: Complaint | |
| 03/20/2018 | 2 | Filed: Return of Electronic Notification | |
| 03/21/2018 | 3 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 03/21/2018 | 4 | Filed: Return of Electronic Notification | |
| 03/22/2018 | 5 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 03/22/2018 | 6 | Filed: Return of Electronic Notification | |
| 04/18/2018 | 8 | Filed: Motion: Proposed Order Granting Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to Complaint | |
| 04/18/2018 | 9 | Filed: Motion: Request to Submit Stipulated Motion for Decision | |
| 04/18/2018 | 7 | Filed: Motion: Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to Complaint | |
| 04/18/2018 | 10 | Filed: Return of Electronic Notification | |
| 04/30/2018 | 11 | Filed: Order Granting Extension of Time for Manufacturer Defendants to Respond to Complaint | |
| 05/24/2018 | | Case filed by efiler | |
| 05/24/2018 | | Fee Account created | |
| 05/24/2018 | | Fee Account created | |
| 05/24/2018 | | Fee Payment | |
| 05/24/2018 | 1 | Filed: Complaint for Damages and Jury Damand | |
| 05/24/2018 | 2 | Filed: Return of Electronic Notification | |
| 05/25/2018 | 3 | Filed: Notice of Appearance of Counsel | |
| 05/25/2018 | 4 | Filed: Return of Electronic Notification | |
| 06/18/2018 | 12 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 06/18/2018 | 15 | Filed: Order (Proposed) Granting Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to Complaint | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|----------------|---------|
| 06/18/2018 | 16 | Filed: Request/Notice to Submit | |
| 06/18/2018 | 13 | Filed: Return of Electronic Notification | |
| 06/18/2018 | 17 | Filed: Return of Electronic Notification | |
| 06/18/2018 | 18 | Filed: Return of Electronic Notification | |
| 06/18/2018 | 14 | Filed: Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to Complaint | |
| 06/21/2018 | 19 | Filed: Order Granting Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to Complaint | |
| 06/21/2018 | 20 | Filed: Return of Electronic Notification | |
| 07/13/2018 | 5 | Filed: Motion Stipulated Motion to Extend Defendants Cardinal Health and McKesson Corps Time to Respond to Complaint | |
| 07/13/2018 | 7 | Filed: Order (Proposed) Granting Stipulated Motion to Extend Defendants Cardinal Health and McKesson Corps Time to Respond to Complaint | |
| 07/13/2018 | 6 | Filed: Request/Notice to Submit Stipulated Motion to Extend Defendants Cardinal Health and McKesson Corps Time to Respond to Complaint | |
| 07/13/2018 | 8 | Filed: Return of Electronic Notification | |
| 07/16/2018 | 9 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 07/16/2018 | 12 | Filed: Order (Proposed) granting Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to the Complaint | |
| 07/16/2018 | 13 | Filed: Request/Notice to Submit Stipulated Motion for Extension of Time for the Manufacturer Defendants to Respond to the Complaint | |
| 07/16/2018 | 10 | Filed: Return of Electronic Notification | |
| 07/16/2018 | 14 | Filed: Return of Electronic Notification | |
| 07/16/2018 | 15 | Filed: Return of Electronic Notification | |
| 07/16/2018 | 11 | Filed: Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to the Complaint | |
| 07/17/2018 | 21 | Filed: Appearance of Counsel/Notice of Limited Appearance for Defendant McKesson Corporation | |
| 07/17/2018 | 16 | Filed: Appearance of Counsel/Notice of Limited Appearance for Defendant McKesson Corporation | |
| 07/17/2018 | 22 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| 07/17/2018 | 17 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 31 | Filed: Affidavit/Declaration of Brenda Weinberg in Support of Janssen Pharmaceuticals, Inc. and Johnson and Johnsons Motion to Dismiss | |
| 07/18/2018 | 62 | Filed: Affidavit/Declaration of Brenda Weinberg in Support of Manufacturer Defendants Joint Request for Judicial Notice and Consideration of Certain Materials in Support of Their Joint Motion to Dismiss | |
| 07/18/2018 | 23 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 07/18/2018 | 45 | Filed: Appearance of Counsel/Notice of Limited Appearance Notice of Appearance of J. Ryan Mitchell on Behalf of Defendant Insys Therapeutics, Inc. | |
| 07/18/2018 | 48 | Filed: Appearance of Counsel/Notice of Limited Appearance of Brent O. Hatch | |
| 07/18/2018 | 39 | Filed: Appearance of Counsel/Notice of Limited Appearance of Perry S. Clegg | |
| 07/18/2018 | 46 | Filed: Certificate of Service of Insys Therapeutics, Inc.s Motion to Dismiss | |
| 07/18/2018 | 32 | Filed: Exhibit 1 to Weinberg Declaration | |
| 07/18/2018 | 63 | Filed: Exhibit 1 to Weinberg Declaration | |
| 07/18/2018 | 33 | Filed: Exhibit 2 to Weinberg Declaration | |
| 07/18/2018 | 64 | Filed: Exhibit 2 to Weinberg Declaration | |
| 07/18/2018 | 34 | Filed: Exhibit 3 to Weinberg Declaration | |
| 07/18/2018 | 35 | Filed: Exhibit 4 to Weinberg Declaration | |
| 07/18/2018 | 36 | Filed: Exhibit 5 to Weinberg Declaration | |
| 07/18/2018 | 37 | Filed: Exhibit 6 to Weinberg Declaration | |
| 07/18/2018 | 43 | Filed: Insys Therapeutics, Inc.s Motion to Dismiss | |
| 07/18/2018 | 29 | Filed: Janssen Pharmaceuticals, Inc. and Johnson and Johnsons Motion to Dismiss | |
| 07/18/2018 | 30 | Filed: Janssen Pharmaceuticals, Inc. and Johnson and Johnsons Request for Judicial Notice and Consideration of Certain Material in Support of Their Motion to Dismiss | |
| 07/18/2018 | 60 | Filed: Manufacturer Defendants Joint Motion to Dismiss | |
| 07/18/2018 | 61 | Filed: Manufacturer Defendants Joint Request for Judicial Notice and Consideration of Certain Materials in Support of Their Joint Motion to Dismiss | |
| 07/18/2018 | 54 | Filed: Memorandum of Law in Support of | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.s Motion to Dismiss | |
| 07/18/2018 | 41 | Filed: Motion (Hearing Requested) - Mallinckrodt, LLCs Motion to Dismiss (Oral Argument Requested) | |
| 07/18/2018 | 56 | Filed: Motion for Leave to File Over-Length Manufacturer Defendants Joint Motion to Dismiss | |
| 07/18/2018 | 25 | Filed: Motion for Leave to File Over-Length Motion to Dismiss | |
| 07/18/2018 | 51 | Filed: Motion to Dismiss of Defendants Cephalon, Inc. and Teva Pharmaceuticals USA, Inc. | |
| 07/18/2018 | 50 | Filed: Motion to Dismiss of Defendants Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. | |
| 07/18/2018 | 27 | Filed: Order (Proposed) granting Motion for Leave to File Over-Length Motion to Dismiss | |
| 07/18/2018 | 58 | Filed: Order (Proposed) re Motion for Leave to File Over-Length Manufacturer Defendants Joint Motion to Dismiss | |
| 07/18/2018 | 57 | Filed: Request/Notice to Submit Motion for Leave to File Over-Length Manufacturer Defendants Joint Motion to Dismiss | |
| 07/18/2018 | 26 | Filed: Request/Notice to Submit Motion for Leave to File Over-Length Motion to Dismiss | |
| 07/18/2018 | 24 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 28 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 38 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 40 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 42 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 44 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 47 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 49 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 53 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 52 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 55 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 59 | Filed: Return of Electronic Notification | |
| 07/18/2018 | 65 | Filed: Return of Electronic Notification | |
| 07/19/2018 | 66 | Filed: Appearance of Counsel/Notice of Limited Appearance of Marcia Fuller Durkin | |
| 07/19/2018 | 67 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 07/20/2018 | 68 | Filed: Order granting Motion for Leave to File Over-Length Motion to Dismiss | |
| 07/20/2018 | 69 | Filed: Return of Electronic Notification | |
| 07/23/2018 | | Case Disposition is Remanded | |
| 07/23/2018 | | Case Disposition is Removed Fed Court | |
| 07/23/2018 | 22 | Filed: Notice of Removal to Federal Court | |
| 07/23/2018 | 19 | Filed: Order granting Stipulated Motion for Extension of Time for Manufacturer Defendants to Respond to the Complaint | |
| 07/23/2018 | 18 | Filed: Order Granting Stipulated Motion to Extend Defendants Cardinal Health and McKesson Corps Time to Respond to Complaint | |
| 07/23/2018 | 70 | Filed: Order re Motion for Leave to File Over-Length Manufacturer Defendants Joint Motion to Dismiss | |
| 07/23/2018 | 20 | Filed: Return of Electronic Notification | |
| 07/23/2018 | 21 | Filed: Return of Electronic Notification | |
| 07/23/2018 | 73 | Filed: Return of Electronic Notification | |
| 07/23/2018 | 23 | Filed: Return of Electronic Notification | |
| 07/23/2018 | 72 | Filed: Return of Service of Complaint upon Cardinal Health upon MATTHEW MOSCON for | |
| 07/25/2018 | 74 | Filed: Appearance of Counsel/Notice of Limited Appearance Notice of Appearance, Matthew R. Lewis | |
| 07/25/2018 | 75 | Filed: Return of Electronic Notification | |
| 07/26/2018 | 76 | Filed: Motion to Extend Cardinal Healths Time to Respond to Complaint | |
| 07/26/2018 | 78 | Filed: Order (Proposed) Granting Motion to Extend Cardinal Healths Time to Respond to Complaint | |
| 07/26/2018 | 80 | Filed: Request/Notice to Submit | |
| 07/26/2018 | 77 | Filed: Return of Electronic Notification | |
| 07/26/2018 | 79 | Filed: Return of Electronic Notification | |
| 07/26/2018 | 81 | Filed: Return of Electronic Notification | |
| 07/30/2018 | 82 | Filed: Appearance of Counsel/Notice of Limited Appearance for Defendant McKesson Corporation | |
| 07/30/2018 | 24 | Filed: Appearance of Counsel/Notice of Limited Appearance for Defendant McKesson Corporation | |
| 07/30/2018 | 83 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 07/30/2018 | 25 | Filed: Return of Electronic Notification | |
| 07/31/2018 | 84 | Filed: Cross-Notice of Deposition of a Representative on Behalf of Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company Inc. | |
| 07/31/2018 | 85 | Filed: Cross-Notice of Deposition of S. Seid as Fact Witness for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company Inc. | |
| 07/31/2018 | 87 | Filed: Order Granting Motion to Extend Cardinal Healths Time to Respond to Complaint | |
| 07/31/2018 | 86 | Filed: Return of Electronic Notification | |
| 07/31/2018 | 88 | Filed: Return of Electronic Notification | |
| 08/01/2018 | 91 | Filed: Order (Proposed) Granting Motion to Extend Briefing Schedule | |
| 08/01/2018 | 90 | Filed: Request/Notice to Submit Stipulated Motion to Extend Briefing Schedule | |
| 08/01/2018 | 92 | Filed: Return of Electronic Notification | |
| 08/01/2018 | 89 | Filed: Stipulated Motion to Extend Briefing Schedule | |
| 08/02/2018 | 108 | Filed: Return of Electronic Notification | |
| 08/02/2018 | 94 | Filed: Return of Service of Summons and Complaint to Actavis Pharma, Inc. upon MALIA CAMPOS for | |
| 08/02/2018 | 99 | Filed: Return of Service of Summons and Complaint to Teva Pharmaceuticals, USA Inc. upon KARLA LUING for | |
| 08/02/2018 | 101 | Filed: Return of Service Summons and Complaint to Allergan PLC upon SHELBI SULLENBERGER for | |
| 08/02/2018 | 95 | Filed: Return of Service Summons and Complaint to Cephalon, Inc upon KYLIE GRAHAM for | |
| 08/02/2018 | 102 | Filed: Return of Service Summons and Complaint to ENDO Health Solutions, Inc. upon AMY MCLAREN for | |
| 08/02/2018 | 103 | Filed: Return of Service Summons and Complaint to ENDO Pharmaceuticals, Inc. upon AMY MCLAREN for | |
| 08/02/2018 | 96 | Filed: Return of Service Summons and Complaint to Insys Therapeutics, Inc upon MICHELLE FOWLER for | |
| 08/02/2018 | 107 | Filed: Return of Service Summons and Complaint to Janssen Pharmaceutica, Inc. upon STEPFONI MURPHY for | |
| 08/02/2018 | 106 | Filed: Return of Service Summons and | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Complaint to Johnson Johnson upon MICHELLE BACORN for | |
| 08/02/2018 | 93 | Filed: Return of Service Summons and Complaint to Lynn Webster upon HOLLY WEBSTER for | |
| 08/02/2018 | 104 | Filed: Return of Service Summons and Complaint to Mallinckrodt, LLC upon AMY MCLAREN for | |
| 08/02/2018 | 100 | Filed: Return of Service Summons and Complaint to Ortho-McNeill-Jenssen Pharmaceuticals, Inc. upon STEPFONI MURPHY for | |
| 08/02/2018 | 98 | Filed: Return of Service Summons and Complaint to Purdue Pharma, Inc. upon KARLA LUING for | |
| 08/02/2018 | 97 | Filed: Return of Service Summons and Complaint to Purdue Pharma, L.P. upon KARLA LUING for | |
| 08/02/2018 | 105 | Filed: Return of Service Summons and Complaint to The Purdue Frederick Company, Inc. upon LYNANNE GARES for | |
| 08/03/2018 | 110 | Filed: Objection to Cross-Notice of Deposition of Representative on Behalf of Defendants Purdue Pharma L.P., Purdue Pharma, Inc., and the Purdue Frederick Company | |
| 08/03/2018 | 109 | Filed: Objection to Cross-Notice of Deposition of Stephen Seid as Fact Witness for Defendants Purdue Pharma L.P., Purdue Pharma, Inc., and the Purdue Frederick Company | |
| 08/03/2018 | 111 | Filed: Return of Electronic Notification | |
| 08/06/2018 | 112 | Filed: Notice of Withdrawal of Cross-Notice of Deposition of Stephen Seid as Fact Witness, and of Cross-Notice of Deposition of a Representative on Behalf of Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company | |
| 08/06/2018 | 113 | Filed: Return of Electronic Notification | |
| 08/07/2018 | 115 | Filed: Return of Electronic Notification | |
| 08/07/2018 | 114 | Filed: Return of Service of Complaint and Summons upon Dr. Perry Fine upon PERRY FINE, M.D. for | |
| 08/08/2018 | 116 | Filed: **EFile Error - duplicate filing.**Amended Complaint and Jury Demand | |
| 08/08/2018 | 120 | Filed: Amended Complaint for Damages | |
| 08/08/2018 | 121 | Filed: Notice of Amendments to Original Complaint | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 08/08/2018 | 117 | Filed: Return of Electronic Notification | |
| 08/09/2018 | | Dismissed party - PORTENOY, RUSSELL | |
| 08/09/2018 | | Fee Account created | |
| 08/09/2018 | 118 | Filed: **EFile Error - duplicate filing.**Notice of Amendments to Original Complaint | |
| 08/09/2018 | 123 | Filed: Motion Stipulated Motion to Extend Answer for McKesson and ABC | |
| 08/09/2018 | 124 | Filed: Order (Proposed) Granting Stipulated Motion to Extend Answer for McKesson and ABC | |
| 08/09/2018 | 119 | Filed: Return of Electronic Notification | |
| 08/09/2018 | 122 | Filed: Return of Electronic Notification | |
| 08/09/2018 | 125 | Filed: Return of Electronic Notification | |
| 08/09/2018 | | JURY DEMAND - CIVIL Account Adjustment | |
| 08/10/2018 | 126 | Filed: Appearance of Counsel/Notice of Limited Appearance of Kamie F. Brown, Kristine M. Larsen, and Whitney Hulet Krogue on Behalf of AmerisourceBergen Corporation | |
| 08/10/2018 | 26 | Filed: Appearance of Counsel/Notice of Limited Appearance of Kamie F. Brown, Kristine M. Larsen, and Whitney Hulet Krogue on Behalf of AmerisourceBergen Corporation | |
| 08/10/2018 | 127 | Filed: Return of Electronic Notification | |
| 08/10/2018 | 27 | Filed: Return of Electronic Notification | |
| 08/10/2018 | 56 | Filed: Utah Federal Court Civil Docket for Case 1;18-cv-00089-RJS | |
| 08/10/2018 | 55 | Filed: Utah Federal Court Judgment in a Civil Case | |
| 08/10/2018 | 54 | Filed: Utah Federal Court Memorandum Decision and Order Granting Motion to Remand | |
| 08/13/2018 | 45 | Filed: Return of Electronic Notification | |
| 08/13/2018 | 50 | Filed: Return of Electronic Notification | |
| 08/13/2018 | 132 | Filed: Return of Electronic Notification | |
| 08/13/2018 | 53 | Filed: Return of Electronic Notification | |
| 08/13/2018 | 134 | Filed: Return of Electronic Notification | |
| 08/13/2018 | 28 | Filed: Return of Service of Complaint and Summons upon Actavis Pharma, Inc upon NICOLE GOOD for | |
| 08/13/2018 | 29 | Filed: Return of Service of Complaint and Summons upon Actavis, Inc upon SUZY KALUTI for | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 08/13/2018 | 30 | Filed: Return of Service of Complaint and Summons upon Actavis, LLC upon SUZY KALUTI for | |
| 08/13/2018 | 31 | Filed: Return of Service of Complaint and Summons upon Allergan, PLC upon SHELBI SULLENBERGER for | |
| 08/13/2018 | 32 | Filed: Return of Service of Complaint and Summons upon Amerisourcebergen Corporation upon HOLLY THORP for | |
| 08/13/2018 | 33 | Filed: Return of Service of Complaint and Summons upon Cardinal Health, Inc. upon HOLLY THORP for | |
| 08/13/2018 | 34 | Filed: Return of Service of Complaint and Summons upon Cephalon, Inc. upon NICOLE GOOD for | |
| 08/13/2018 | 35 | Filed: Return of Service of Complaint and Summons upon Dr. Lynn Webster upon HOLLY WEBSTER (WIFE) for | |
| 08/13/2018 | 36 | Filed: Return of Service of Complaint and Summons upon Endo Health Solutions, Inc. upon AMY MCLAREN for | |
| 08/13/2018 | 37 | Filed: Return of Service of Complaint and Summons upon Endo Pharmaceuticals, Inc. upon AMY MCLAREN for | |
| 08/13/2018 | 39 | Filed: Return of Service of Complaint and Summons upon Janssen Pharmaceuticals, Inc. upon STEPFONI MURPHY for | |
| 08/13/2018 | 38 | Filed: Return of Service of Complaint and Summons upon Johnson Johnson upon MARIA FLORES for | |
| 08/13/2018 | 40 | Filed: Return of Service of Complaint and Summons upon Mallinckrodt, LLC upon AMY MCLAREN for | |
| 08/13/2018 | 48 | Filed: Return of Service of Complaint and Summons upon McKesson Corporation upon KARLA LUING for | |
| 08/13/2018 | 41 | Filed: Return of Service of Complaint and Summons upon Ortho-McNeil-Janssen Pharmaceuticals, Inc upon STEPFONI MURPHY for | |
| 08/13/2018 | 43 | Filed: Return of Service of Complaint and Summons upon Purdue Pharma, Inc. upon KARLA LUING for | |
| 08/13/2018 | 46 | Filed: Return of Service of Complaint and Summons upon Teva Pharmaceuticals USA, Inc | |
| 08/13/2018 | 42 | Filed: Return of Service of Complaint and Summons upon The Purdue Frederick Company upon LYNANNE GARES for | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 08/13/2018 | 47 | Filed: Return of Service of Complaint and Summons upon Watson Laboratories, Inc. upon SUZY KALUTI for | |
| 08/13/2018 | 131 | Filed: Return of Service of Summon and Complaint upon Scott Fishman | |
| 08/13/2018 | 129 | Filed: Return of Service of Summon and Complaint upon Watson Laboratories, Inc. upon SUZY KALUTI for | |
| 08/13/2018 | 128 | Filed: Return of Service of Summons and Complaint upon Actavis . LLC upon SUZY KALUTI for | |
| 08/13/2018 | 130 | Filed: Return of Service of Summons and Complaint upon Actavis, Inc. FKA Watson Laboratories upon SUZY KALUTI for | |
| 08/13/2018 | 133 | Filed: Return of Service of Summons and Complaint upon Amerisourcebergen Corp. upon SAMANTHA ROCCHINO for | |
| 08/13/2018 | 51 | Filed: Return of Service of Summons and Complaint upon Amerisourcebergen Corp. upon SARAH B. JOHANSEN for | |
| 08/13/2018 | 52 | Filed: Return of Service of Summons and Complaint upon INSYS Therapeutics, Inc. upon HOLLY THORP for | |
| 08/13/2018 | 49 | Filed: Return of Service of Summons and Complaint upon Janssen Pharmaceutica, Inc. NKA upon STEPFONI MURPHY for | |
| 08/13/2018 | 44 | Filed: Return of Service Purdue Pharma, L.P. upon KARLA LUING for | |
| 08/14/2018 | 135 | Filed: Order Granting Motion to Extend Briefing Schedule | |
| 08/14/2018 | 136 | Filed: Order Granting Stipulated Motion to Extend Answer for McKesson and ABC | |
| 08/14/2018 | 138 | Filed: Return of Electronic Notification | |
| 08/21/2018 | 57 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 08/21/2018 | 58 | Filed: Return of Electronic Notification | |
| 08/22/2018 | 139 | Filed: Motion Stipulated Motion to Apply Currently Pending Motions to Dismiss to Amended Complaint and to Maintain Briefing Schedule | |
| 08/22/2018 | 140 | Filed: Order (Proposed) Granting Stipulated Motion to Apply Currently Pending Motions to Dismiss to Amended Complaint and to Maintain Briefing Schedule | |
| 08/22/2018 | 142 | Filed: Request/Notice to Submit for Decision the Parties Stipulated Motion to Apply Currently Pending Motions to Dismiss to Amended Complaint and to Maintain Briefing | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Schedule | |
| 08/22/2018 | 141 | Filed: Return of Electronic Notification | |
| 08/22/2018 | 143 | Filed: Return of Electronic Notification | |
| 08/28/2018 | | Case filed by efiler,CaseNumber:190500261 | |
| 08/28/2018 | | Fee Account created,CaseNumber:190500261 | |
| 08/28/2018 | | Fee Account created,CaseNumber:190500261 | |
| 08/28/2018 | | Fee Payment,CaseNumber:190500261 | |
| 08/28/2018 | 1 | Filed: Complaint,CaseNumber:190500261 | |
| 08/28/2018 | 2 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 08/31/2018 | 59 | Filed: Appearance of Counsel/Notice of Limited Appearance for Marcia Fuller Durkin | |
| 08/31/2018 | 145 | Filed: Motion: Defendant Doctors Motion for Leave to File Excess Pages | |
| 08/31/2018 | 144 | Filed: Motion: Defendants Perry Fine and Lynn Websters Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim Upon Which Relief Can Be Granted | |
| 08/31/2018 | 146 | Filed: Order (Proposed): Order Granting Defendant Doctors Motion for Leave to File Excess Pages | |
| 08/31/2018 | 60 | Filed: Return of Electronic Notification | |
| 08/31/2018 | 147 | Filed: Return of Electronic Notification | |
| 09/06/2018 | 61 | Filed: Appearance of Counsel/Notice of Limited Appearance of Brent O. Hatch | |
| 09/06/2018 | 63 | Filed: Appearance of Counsel/Notice of Limited Appearance of Dillon P. Olson | |
| 09/06/2018 | 62 | Filed: Appearance of Counsel/Notice of Limited Appearance of Lara A. Swensen | |
| 09/06/2018 | 70 | Filed: Motion (Joint) to Dismiss on Behalf of Distributor Defendants | |
| 09/06/2018 | 67 | Filed: Motion (Unopposed) for Leave to File an Over-Length Joint Motion to Dismiss | |
| 09/06/2018 | 68 | Filed: Order (Proposed) Granting Unopposed Motion for Leave to File an Over-Length Joint Motion to Dismiss | |
| 09/06/2018 | 64 | Filed: Return of Electronic Notification | |
| 09/06/2018 | 65 | Filed: Return of Electronic Notification | |
| 09/06/2018 | 66 | Filed: Return of Electronic Notification | |
| 09/06/2018 | 69 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 09/06/2018 | 71 | Filed: Return of Electronic Notification | |
| 09/07/2018 | 148 | Filed: Order Granting Stipulated Motion to Apply Currently Pending Motions to Dismiss to Amended Complaint and to Maintain Briefing Schedule | |
| 09/07/2018 | 150 | Filed: Order: Order Granting Defendant Doctors Motion for Leave to File Excess Pages | |
| 09/07/2018 | 149 | Filed: Return of Electronic Notification | |
| 09/07/2018 | 151 | Filed: Return of Electronic Notification | |
| 09/10/2018 | 80 | Filed: Appearance of Counsel/Notice of Limited Appearance of Michael R. Menssen | |
| 09/10/2018 | 78 | Filed: Motion (Joint) to Dismiss on Behalf of Distributor Defendants (REVISED AS TO JUDGE AND CASE NUMBER ONLY) | |
| 09/10/2018 | 76 | Filed: Motion (Unopposed) for Leave to File an Over-Length Joint Motion to Dismiss (REVISED AS TO JUDGE AND CASE NUMBER ONLY) | |
| 09/10/2018 | 74 | Filed: Order (Proposed) Granting Unopposed Motion for Leave to File an Over-Length Joint Motion to Dismiss | |
| 09/10/2018 | 72 | Filed: Other - Not Signed Order (Proposed) Granting Unopposed Motion for Leave to File an Over-Length Joint Motion to Dismiss | |
| 09/10/2018 | 73 | Filed: Return of Electronic Notification | |
| 09/10/2018 | 75 | Filed: Return of Electronic Notification | |
| 09/10/2018 | 77 | Filed: Return of Electronic Notification | |
| 09/10/2018 | 79 | Filed: Return of Electronic Notification | |
| 09/10/2018 | 81 | Filed: Return of Electronic Notification | |
| 09/11/2018 | 86 | Filed: Motion (Stipulated) for Extension of Time for the Manufacturer Defendants to Respond to Complaint | |
| 09/11/2018 | 82 | Filed: Motion Stipulated Motion for Extension of Time for Briefing Related to the Distributor Defendants Motion to Dismiss | |
| 09/11/2018 | 88 | Filed: Order (Proposed) (Stipulated) Granting Stipulated Motion for Extension of Time for the Manufacturer Defendants to Respond to Complaint | |
| 09/11/2018 | 84 | Filed: Order (Proposed) Granting Stipulated Motion for Extension of Time for Briefing Related to the Distributor Defendants Motion to Dismiss | |
| 09/11/2018 | 87 | Filed: Request/Notice to Submit (Stipulated) for Decision | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 09/11/2018 | 83 | Filed: Request/Notice to Submit Stipulated Motion for Extension of Time for Briefing Related to the Distributor Defendants Motion to Dismiss | |
| 09/11/2018 | 85 | Filed: Return of Electronic Notification | |
| 09/11/2018 | 89 | Filed: Return of Electronic Notification | |
| 09/12/2018 | 152 | Filed: Motion Pro Hac Vice | |
| 09/12/2018 | 90 | Filed: Motion Pro Hac Vice | |
| 09/12/2018 | 153 | Filed: Order (Proposed) Pro Hac Vice | |
| 09/12/2018 | 91 | Filed: Order (Proposed) Pro Hac Vice | |
| 09/12/2018 | 154 | Filed: Return of Electronic Notification | |
| 09/12/2018 | 92 | Filed: Return of Electronic Notification | |
| 09/13/2018 | 155 | Filed: Other - Not Signed Order (Proposed) Pro Hac Vice | |
| 09/13/2018 | 156 | Filed: Return of Electronic Notification | |
| 09/14/2018 | 157 | Filed: Motion Stipulated Motion for Extension of Time for Briefing Related to Doctor Defendants Motion to Dismiss | |
| 09/14/2018 | 159 | Filed: Order (Proposed) Granting Stipulated Motion for Extension of Time for Briefing Related to Doctor Defendants Motion to Dismiss | |
| 09/14/2018 | 158 | Filed: Request/Notice to Submit Stipulated Motion for Extension of Time for Briefing Related to Doctor Defendants Motion to Dismiss | |
| 09/14/2018 | 160 | Filed: Return of Electronic Notification | |
| 09/17/2018 | 93 | Filed: Order (Stipulated) Granting Stipulated Motion for Extension of Time for the Manufacturer Defendants to Respond to Complaint | |
| 09/17/2018 | 95 | Filed: Order Granting Stipulated Motion for Extension of Time for Briefing Related to the Distributor Defendants Motion to Dismiss | |
| 09/17/2018 | 94 | Filed: Return of Electronic Notification | |
| 09/17/2018 | 96 | Filed: Return of Electronic Notification | |
| 09/18/2018 | 100 | Filed: Motion: Defendant Doctors Motion for Leave to File Excess Pages | |
| 09/18/2018 | 99 | Filed: Motion: Defendants Perry Fine and Lynn Websters Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim Upon Which Relief Can Be Granted | |
| 09/18/2018 | 101 | Filed: Order (Proposed): Order Granting Defendant Doctors Motion for Leave to File | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Excess Pages | |
| 09/18/2018 | 161 | Filed: Order Granting Stipulated Motion for Extension of Time for Briefing Related to Doctor Defendants Motion to Dismiss | |
| 09/18/2018 | 97 | Filed: Order Granting Unopposed Motion for Leave to File an Over-Length Joint Motion to Dismiss | |
| 09/18/2018 | 98 | Filed: Return of Electronic Notification | |
| 09/18/2018 | 162 | Filed: Return of Electronic Notification | |
| 09/18/2018 | 102 | Filed: Return of Electronic Notification | |
| 09/24/2018 | 103 | Filed: Order Pro Hac Vice | |
| 09/24/2018 | 104 | Filed: Return of Electronic Notification | |
| 10/01/2018 | 165 | Filed: Motion Stipulated Motion to Stay Briefing on Manufacturer Defendants Motion to Dismiss | |
| 10/01/2018 | 163 | Filed: Notice of Dismissal of Scott Fishman | |
| 10/01/2018 | 105 | Filed: Notice of Dismissal of Scott Fishman | |
| 10/01/2018 | 167 | Filed: Order (Proposed) Granting Stipulated Motion to Stay Briefing on Manufacturer Defendants Motion to Dismiss | |
| 10/01/2018 | 166 | Filed: Request/Notice to Submit Stipulated Motion to Stay Briefing on Manufacturer Defendants Motion to Dismiss | |
| 10/01/2018 | 164 | Filed: Return of Electronic Notification | |
| 10/01/2018 | 106 | Filed: Return of Electronic Notification | |
| 10/01/2018 | 168 | Filed: Return of Electronic Notification | |
| 10/02/2018 | | Dismissed party - FISHMAN, SCOTT | |
| 10/02/2018 | 171 | Filed: Order (Proposed) Granting Stipulated Motion to Stay Briefing on Manufacturer Defendants Motion to Dismiss | |
| 10/02/2018 | 169 | Filed: Other - Not Signed Order (Proposed) Granting Stipulated Motion to Stay Briefing on Manufacturer Defendants Motion to Dismiss | |
| 10/02/2018 | 170 | Filed: Return of Electronic Notification | |
| 10/02/2018 | 172 | Filed: Return of Electronic Notification | |
| 10/03/2018 | 173 | Filed: Motion for Leave to Withdraw as Counsel for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and the Purdue Frederick Company Inc. | |
| 10/03/2018 | 175 | Filed: Order (Proposed) on Motion for Leave to Withdraw as Counsel for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and the Purdue Frederick Company Inc. | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| 10/03/2018 | 174 | Filed: Request/Notice to Submit Motion for Leave to Withdraw as Counsel for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and the Purdue Frederick Company Inc. | |
| 10/03/2018 | 176 | Filed: Return of Electronic Notification | |
| 10/04/2018 | 107 | Filed: Order: Order Granting Defendant Doctors Motion for Leave to File Excess Pages | |
| 10/04/2018 | 108 | Filed: Return of Electronic Notification | |
| 10/05/2018 | 177 | Filed: Order Granting Stipulated Motion to Stay Briefing on Manufacturer Defendants Motion to Dismiss | |
| 10/05/2018 | 179 | Filed: Order on Motion for Leave to Withdraw as Counsel for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and the Purdue Frederick Company Inc. | |
| 10/05/2018 | 178 | Filed: Return of Electronic Notification | |
| 10/05/2018 | 180 | Filed: Return of Electronic Notification | |
| 10/08/2018 | 184 | Filed: Motion (Joint) Motion to Dismiss on Behalf of Distributor Defendants | |
| 10/08/2018 | 181 | Filed: Motion for Leave of Court for Distributor Defendants to File an Overlength Joint Motion to Dismiss | |
| 10/08/2018 | 183 | Filed: Order (Proposed) Granting Distributor Defendants Motion for Leave of Court to File an Overlength Joint Motion to Dismiss | |
| 10/08/2018 | 182 | Filed: Request/Notice to Submit Distributor Defendants Motion for Leave of Court to File an Overlength Joint Motion to Dismiss | |
| 10/08/2018 | 185 | Filed: Return of Electronic Notification | |
| 10/08/2018 | 186 | Filed: Return of Electronic Notification | |
| 10/09/2018 | | Dismissed party - FISHMAN, SCOTT | |
| 10/10/2018 | 189 | Filed: Motion Stipulated Motion to Stay Briefing on Distributor Defendants Joint Motion to Dismiss | |
| 10/10/2018 | 109 | Filed: Motion Stipulated Motion to Stay Briefing on Distributor Defendants Motion to Dismiss | |
| 10/10/2018 | 191 | Filed: Order (Proposed) Granting Stip Motion to Stay Briefing | |
| 10/10/2018 | 111 | Filed: Order (Proposed) Granting Stip Motion to Stay Briefing | |
| 10/10/2018 | 187 | Filed: Order Granting Distributor Defendants Motion for Leave of Court to File an Overlength Joint Motion to Dismiss | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|----------------|---------|
| 10/10/2018 | 190 | Filed: Request/Notice to Submit | |
| 10/10/2018 | 110 | Filed: Request/Notice to Submit | |
| 10/10/2018 | 188 | Filed: Return of Electronic Notification | |
| 10/10/2018 | 192 | Filed: Return of Electronic Notification | |
| 10/10/2018 | 112 | Filed: Return of Electronic Notification | |
| 10/11/2018 | 113 | Filed: Motion Stipulated Motion to Stay Manufacturer Defendants Deadline to File A Response to the Complaint | |
| 10/11/2018 | 115 | Filed: Order (Proposed) Granting Stip Motion to Stay Deadline | |
| 10/11/2018 | 114 | Filed: Request/Notice to Submit | |
| 10/11/2018 | 116 | Filed: Return of Electronic Notification | |
| 10/12/2018 | 193 | Filed: Order Granting Stip Motion to Stay Briefing | |
| 10/12/2018 | 194 | Filed: Return of Electronic Notification | |
| 10/16/2018 | 117 | Filed: Other - Not Signed Order (Proposed) Granting Stip Motion to Stay Deadline | |
| 10/16/2018 | 118 | Filed: Return of Electronic Notification | |
| 10/18/2018 | 119 | Filed: Order Granting Stip Motion to Stay Briefing | |
| 10/18/2018 | 120 | Filed: Return of Electronic Notification | |
| 10/22/2018 | 122 | Filed: Order (Proposed) Granting Stipulated Motion to Stay Briefing on Manufacturer Defendants Motion to Dismiss | |
| 10/22/2018 | 121 | Filed: Request/Notice to Submit | |
| 10/22/2018 | 123 | Filed: Return of Electronic Notification | |
| 10/23/2018 | 124 | Filed: Appearance of Counsel/Notice of Limited Appearance of Perry S. Clegg | |
| 10/23/2018 | 125 | Filed: Return of Electronic Notification | |
| 10/24/2018 | 126 | Filed: Order Granting Stipulated Motion to Stay Briefing on Manufacturer Defendants Motion to Dismiss | |
| 10/24/2018 | 127 | Filed: Return of Electronic Notification | |
| 10/26/2018 | | Case Stay begins on 4/26/2018 | |
| 10/29/2018 | | Case Stay updated to 10/26/2018 | |
| 11/09/2018 | 196 | Filed: Exhibit 1 Tooele Complaint | |
| 11/09/2018 | 215 | Filed: Exhibit 10 - Grand Complaint | |
| 11/09/2018 | 216 | Filed: Exhibit 11 - Table | |
| 11/09/2018 | 217 | Filed: Exhibit 12 - Order regarding Stay | |
| 11/09/2018 | 218 | Filed: Exhibit 13 - Consolidation Orders | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| 11/09/2018 | 197 | Filed: Exhibit 2 Salt Lake Complaint | |
| 11/09/2018 | 198 | Filed: Exhibit 3 Weber Complaint | |
| 11/09/2018 | 199 | Filed: Exhibit 4 Carbon Complaint | |
| 11/09/2018 | 200 | Filed: Exhibit 5 Uintah Complaint | |
| 11/09/2018 | 202 | Filed: Exhibit 6 Wasatch Complaint | |
| 11/09/2018 | 203 | Filed: Exhibit 7-1 Davis Complaint | |
| 11/09/2018 | 204 | Filed: Exhibit 7-2 Davis Complaint | |
| 11/09/2018 | 206 | Filed: Exhibit 7-3 Davis Complaint | |
| 11/09/2018 | 207 | Filed: Exhibit 7-4 Davis Complaint | |
| 11/09/2018 | 208 | Filed: Exhibit 7-5 Davis Complaint | |
| 11/09/2018 | 209 | Filed: Exhibit 7-6 Davis Complaint | |
| 11/09/2018 | 210 | Filed: Exhibit 8 - Iron Complaint | |
| 11/09/2018 | 211 | Filed: Exhibit 9 - San Juan Complaint | |
| 11/09/2018 | 195 | Filed: Motion Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/09/2018 | 201 | Filed: Order (Proposed) Order Granting Manufacturer Defendants Request for Expedited Briefing and Consideraton of Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/09/2018 | 205 | Filed: Return of Electronic Notification | |
| 11/09/2018 | 212 | Filed: Return of Electronic Notification | |
| 11/09/2018 | 213 | Filed: Return of Electronic Notification | |
| 11/09/2018 | 214 | Filed: Return of Electronic Notification | |
| 11/09/2018 | 219 | Filed: Return of Electronic Notification | |
| 11/12/2018 | 220 | Filed: Opposition to Joint Opposition to Expedited Consideration Requested on Manufacturer Defendants Joint Motion to Consolidate | |
| 11/12/2018 | 221 | Filed: Return of Electronic Notification | |
| 11/13/2018 | 226 | Filed: Distributor Defendants Joinder in Manufacturer Defendants Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/13/2018 | 222 | Filed: MINUTE ENTRY | |
| 11/13/2018 | 229 | Filed: Motion Stipulated Motion to Stay Briefing on Doctor Defendants Motion to Dismiss | |
| 11/13/2018 | 128 | Filed: Motion Stipulated Motion to Stay Briefing on Doctor Defendants Motion to Dismiss | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 11/13/2018 | 225 | Filed: Opposition to Expedited Consideration of Motion to Consolidate | |
| 11/13/2018 | 231 | Filed: Order (Proposed) Granting Stipulated Motion to Stay Briefing on Doctor Defendants Motion to Dismiss | |
| 11/13/2018 | 130 | Filed: Order (Proposed) Granting Stipulated Motion to Stay Briefing on Doctor Defendants Motion to Dismiss | |
| 11/13/2018 | 223 | Filed: Other - Not Signed Order (Proposed) Order Granting Manufacturer Defendants Request for Expedited Briefing and Consideraton of Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/13/2018 | 230 | Filed: Request/Notice to Submit Stipulated Motion to Stay Briefing on Doctor Defendants Motion to Dismiss | |
| 11/13/2018 | 129 | Filed: Request/Notice to Submit Stipulated Motion to Stay Briefing on Doctor Defendants Motion to Dismiss | |
| 11/13/2018 | 224 | Filed: Return of Electronic Notification | |
| 11/13/2018 | 227 | Filed: Return of Electronic Notification | |
| 11/13/2018 | 228 | Filed: Return of Electronic Notification | |
| 11/13/2018 | 232 | Filed: Return of Electronic Notification | |
| 11/13/2018 | 131 | Filed: Return of Electronic Notification | |
| 11/13/2018 | | MINUTE ENTRY | |
| 11/14/2018 | 233 | Filed: Motion: Defendant Doctors Joinder in the Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/14/2018 | 235 | Filed: Order Granting Stipulated Motion to Stay Briefing on Doctor Defendants Motion to Dismiss | |
| 11/14/2018 | 234 | Filed: Return of Electronic Notification | |
| 11/14/2018 | 236 | Filed: Return of Electronic Notification | |
| 11/15/2018 | 4 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 11/15/2018 | 3 | Filed: to Mallinckrodt PLC,CaseNumber:190500261 | |
| 11/19/2018 | 237 | Filed: Filing by Non-Party Notice of Special Appearance - Andrew R. Hale | |
| 11/19/2018 | 238 | Filed: Filing by Non-Party Notice of Special Appearance - Richard A. Kalpan | |
| 11/19/2018 | 239 | Filed: Return of Electronic Notification | |
| 11/20/2018 | 241 | Filed: Filing by Non-Party Exhibits A to E of Salt Lake Countys Opposition to | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Manufacturer Defendants Joint Motion to Consolidate | |
| 11/20/2018 | 240 | Filed: Filing by Non-Party Salt Lake Countys Opposition to Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/20/2018 | 132 | Filed: Order Granting Stipulated Motion to Stay Briefing on Doctor Defendants Motion to Dismiss | |
| 11/20/2018 | 242 | Filed: Return of Electronic Notification | |
| 11/20/2018 | 133 | Filed: Return of Electronic Notification | |
| 11/23/2018 | 247 | Filed: Magleby/DKOW Plaintiffs Notice of Non-Opposition to the Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 11/23/2018 | 243 | Filed: Opposition to Manufacturer Defendants Joint Motion to Consolidate | |
| 11/23/2018 | 245 | Filed: Opposition to Manufacturer Defendants Joint Motion to Consolidate | |
| 11/23/2018 | 244 | Filed: Return of Electronic Notification | |
| 11/23/2018 | 246 | Filed: Return of Electronic Notification | |
| 11/23/2018 | 248 | Filed: Return of Electronic Notification | |
| 11/28/2018 | 249 | Filed: Notice of Withdrawal of David J. Williams | |
| 11/28/2018 | 250 | Filed: Return of Electronic Notification | |
| 11/30/2018 | 5 | Filed: Appearance of Counsel/Notice of Limited Appearance for Defendants McKesson Corporation and McKesson Medical-Surgical, Inc.,CaseNumber:190500261 | |
| 11/30/2018 | 6 | Filed: Appearance of Counsel/Notice of Limited Appearance for Defendants McKesson Corporation and McKesson Medical-Surgical, Inc.,CaseNumber:190500261 | |
| 11/30/2018 | 251 | Filed: Motion FOR 1-DAY EXTENSION OF TIME FOR MANUFACTURER DEFENDANTS TO FILE THEIR REPLY MEMORANDUM SUPPORTING THEIR JOINT MOTION TO CONSOLIDATE RELATED CASES FOR PRETRIAL PROCEEDINGS | |
| 11/30/2018 | 256 | Filed: Opposition to to Manufactturer Defendants Joint Motion for 1-Day Extension of Time | |
| 11/30/2018 | 252 | Filed: Order (Proposed) GRANTING MOTION FOR 1-DAY EXTENSION OF TIME FOR MANUFACTURER DEFENDANTS TO FILE THEIR REPLY MEMORANDUM | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | SUPPORTING THEIR JOINT MOTION TO CONSOLIDATE RELATED CASES FOR PRETRIAL PROCEEDINGS | |
| 11/30/2018 | 254 | Filed: Order GRANTING MOTION FOR 1-DAY EXTENSION OF TIME FOR MANUFACTURER DEFENDANTS TO FILE THEIR REPLY MEMORANDUM SUPPORTING THEIR JOINT MOTION TO CONSOLIDATE RELATED CASES FOR PRETRIAL PROCEEDINGS | |
| 11/30/2018 | 253 | Filed: Return of Electronic Notification | |
| 11/30/2018 | 255 | Filed: Return of Electronic Notification | |
| 11/30/2018 | 257 | Filed: Return of Electronic Notification | |
| 11/30/2018 | 7 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 11/30/2018 | 8 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/03/2018 | 263 | Filed: Exhibit 1 | |
| 12/03/2018 | 264 | Filed: Exhibit 2 | |
| 12/03/2018 | 265 | Filed: Exhibit 3 | |
| 12/03/2018 | 266 | Filed: Exhibit 4 | |
| 12/03/2018 | 258 | Filed: Memorandum - Overlength (Proposed) Motion for Leave to File Over-Length Reply Memorandum Supporting Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 12/03/2018 | 260 | Filed: Order (Proposed) Granting Motion for Leave to File Over-Length Reply Memorandum Supporting Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 12/03/2018 | 262 | Filed: Reply Memorandum Supporting Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 12/03/2018 | 268 | Filed: Request/Notice to Submit Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 12/03/2018 | 259 | Filed: Request/Notice to Submit Motion for Over-Length Reply Memorandum Supporting Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 12/03/2018 | 261 | Filed: Return of Electronic Notification | |
| 12/03/2018 | 267 | Filed: Return of Electronic Notification | |
| 12/03/2018 | 269 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 12/04/2018 | 270 | Filed: Order Granting Motion for Leave to File Over-Length Reply Memorandum Supporting Manufacturer Defendants Joint Motion to Consolidate Related Cases for Pretrial Proceedings | |
| 12/04/2018 | 271 | Filed: Return of Electronic Notification | |
| 12/05/2018 | 11 | Filed: Ex Parte Order (Proposed),CaseNumber:190500261 | |
| 12/05/2018 | 9 | Filed: Motion Ex Parte Motion for Extension to Serve Foreign Defendants,CaseNumber:190500261 | |
| 12/05/2018 | 10 | Filed: Request/Notice to Submit,CaseNumber:190500261 | |
| 12/05/2018 | 12 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/11/2018 | 13 | Filed: Ex Parte Order,CaseNumber:190500261 | |
| 12/11/2018 | 272 | Filed: Notice for Case 180500119 LP: Judge RICHARD MRAZIK | |
| 12/11/2018 | | MOTION TO CONSOLIDATE on 02/22/2019 | |
| 12/11/2018 | | NOTICE for Case 180500119 ID 19644371 | |
| 12/13/2018 | 273 | Filed: Pre-Consolidation Case Management Order | |
| 12/14/2018 | 134 | Filed: Copy of Pre-Consolidation Case Management Order issued by Judge RIchard E. Mrazik, 3rd District Court | |
| 12/14/2018 | 24 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/14/2018 | 34 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/14/2018 | 14 | Filed: Summons on Return Abbvie, Inc. upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 15 | Filed: Summons on Return Actavis Laboratories UT, Inc. upon NICOLE GOOD for,CaseNumber:190500261 | |
| 12/14/2018 | 16 | Filed: Summons on Return Actavis LLC upon JOELLE AGENA for,CaseNumber:190500261 | |
| 12/14/2018 | 17 | Filed: Summons on Return Actavis Pharma, Inc. upon NICOLE GOOD for,CaseNumber:190500261 | |
| 12/14/2018 | 18 | Filed: Summons on Return Allergan Finance, LLC upon ASHLEI KLEIN FLYNN for,CaseNumber:190500261 | |
| 12/14/2018 | 19 | Filed: Summons on Return Allergan Sales, LLC upon DANI SNOW for,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 12/14/2018 | 20 | Filed: Summons on Return Allergan USA, Inc. upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 21 | Filed: Summons on Return Amerisourcebergen Corporation upon AMY MCLAREN for,CaseNumber:190500261 | |
| 12/14/2018 | 22 | Filed: Summons on Return Amerisourcebergen Drug Corporation upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 23 | Filed: Summons on Return Anesta LLC upon NICOLE GOOD for,CaseNumber:190500261 | |
| 12/14/2018 | 25 | Filed: Summons on Return Cardinal Health 105 upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 26 | Filed: Summons on Return Cardinal Health 107 upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 27 | Filed: Summons on Return Cardinal Health 108 upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 28 | Filed: Summons on Return Cardinal Health 110 upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 29 | Filed: Summons on Return Cardinal Health 112 upon AMY MCLAREN for,CaseNumber:190500261 | |
| 12/14/2018 | 30 | Filed: Summons on Return Cardinal Health 200 upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 31 | Filed: Summons on Return Cardinal Health 414, LLC upon DANI SNOW for,CaseNumber:190500261 | |
| 12/14/2018 | 32 | Filed: Summons on Return Cardinal Health, Inc upon JOHN SCHMIDT for,CaseNumber:190500261 | |
| 12/14/2018 | 33 | Filed: Summons on Return Depomed, Inc. upon KARLA LUING for,CaseNumber:190500261 | |
| 12/17/2018 | 44 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/17/2018 | 35 | Filed: Return of Service Affidavit of Service - Endo Health Solutions Inc upon AMY MCLAREN for,CaseNumber:190500261 | |
| 12/17/2018 | 43 | Filed: Return of Service Affidavit of Service - Endo Pharmaceuticals Inc upon AMY MCLAREN for,CaseNumber:190500261 | |
| 12/17/2018 | 42 | Filed: Return of Service Affidavit of Service - Janssen Pharmaceuticals Inc upon STEFONI MURPHY for,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 12/17/2018 | 41 | Filed: Return of Service Affidavit of Service - Knoll Pharmaceuticals upon DEREK HACKETT for,CaseNumber:190500261 | |
| 12/17/2018 | 36 | Filed: Return of Service Affidavit of Service - Lipocine Inc upon KIM GALLEGOS for,CaseNumber:190500261 | |
| 12/17/2018 | 40 | Filed: Return of Service Affidavit of Service - Mallinckrodt LLC upon AMY MCLAREN for,CaseNumber:190500261 | |
| 12/17/2018 | 39 | Filed: Return of Service Affidavit of Service - McKesson Corporation upon KARLA LUING for,CaseNumber:190500261 | |
| 12/17/2018 | 37 | Filed: Return of Service Affidavit of Service - McKesson Medical Surgical Inc upon KARLA LUING for,CaseNumber:190500261 | |
| 12/17/2018 | 38 | Filed: Return of Service Affidavit of Service - Noramco Inc upon AMY MCLAREN for,CaseNumber:190500261 | |
| 12/18/2018 | 45 | Filed: Order--- Pre-Consolidation Case Management Order ( Signed by Judge Mrazik in Third District Court),CaseNumber:190500261 | |
| 12/18/2018 | | Stay begins 12/18/2018 ends 12/18/2019,CaseNumber:190500261 | |
| 12/19/2018 | 56 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/19/2018 | 46 | Filed: Return of Service Perry Fine_Affidavit of Service,CaseNumber:190500261 | |
| 12/19/2018 | 54 | Filed: Return of Service Purdue Pharma Inc_Affidavit of Service upon PRENTICE HALL CORPORATION SYSTEM, INC., for,CaseNumber:190500261 | |
| 12/19/2018 | 47 | Filed: Return of Service Purdue Pharma LP_Affidavit of Service upon KARLA LUING for,CaseNumber:190500261 | |
| 12/19/2018 | 53 | Filed: Return of Service Purdue Pharma Manufacturing LP_Affidavit of Service upon KARLA LUING for,CaseNumber:190500261 | |
| 12/19/2018 | 52 | Filed: Return of Service Purdue Pharmaceuticals LP_Affidavit of Service upon KARLA LUING for,CaseNumber:190500261 | |
| 12/19/2018 | 51 | Filed: Return of Service Spriaso LLC_Affidavit of Service upon KIM GALLEGOS for,CaseNumber:190500261 | |
| 12/19/2018 | 48 | Filed: Return of Service Teva Pharmaceuticals USA Inc_Affidavit of Service upon NICOLE GOOD for,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 12/19/2018 | 55 | Filed: Return of Service The Purdue Frederick Company Inc_Affidavit of Service upon CORPORATION SERVICE COMPANY, AS REGISTER for,CaseNumber:190500261 | |
| 12/19/2018 | 50 | Filed: Return of Service The Purdue Frederick Company_Affidavit of Service upon LYNANNE GARES for,CaseNumber:190500261 | |
| 12/19/2018 | 49 | Filed: Return of Service Watson Laboratories_Affidavit of Service upon HOLLY ALBER for,CaseNumber:190500261 | |
| 12/21/2018 | 275 | Filed: Exhibit A - Joint Motion to Consolidate | |
| 12/21/2018 | 58 | Filed: Exhibit A - Joint Motion to Consolidate,CaseNumber:190500261 | |
| 12/21/2018 | 59 | Filed: Exhibit B - Distributor Defendants Joinder,CaseNumber:190500261 | |
| 12/21/2018 | 276 | Filed: Exhibit B - Joint Opposition | |
| 12/21/2018 | 277 | Filed: Exhibit C - Defendant Doctors Joinder | |
| 12/21/2018 | 60 | Filed: Exhibit C - Defendant Doctors Joinder,CaseNumber:190500261 | |
| 12/21/2018 | 278 | Filed: Exhibit D - Salt Lake Countys Opposition | |
| 12/21/2018 | 61 | Filed: Exhibit D - Salt Lake Countys Opposition,CaseNumber:190500261 | |
| 12/21/2018 | 279 | Filed: Exhibit E - State of Utahs Opposition | |
| 12/21/2018 | 62 | Filed: Exhibit E - State of Utahs Opposition,CaseNumber:190500261 | |
| 12/21/2018 | 280 | Filed: Exhibit F - Joint Opposition | |
| 12/21/2018 | 63 | Filed: Exhibit F - Joint Opposition,CaseNumber:190500261 | |
| 12/21/2018 | 281 | Filed: Exhibit G - Reply Memorandum | |
| 12/21/2018 | 64 | Filed: Exhibit G - Reply Memorandum,CaseNumber:190500261 | |
| 12/21/2018 | 274 | Filed: Objection to Pre-Consolidation Case Management Order | |
| 12/21/2018 | 57 | Filed: Objection to Pre-Consolidation Case Management Order,CaseNumber:190500261 | |
| 12/21/2018 | 282 | Filed: Return of Electronic Notification | |
| 12/21/2018 | 65 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/26/2018 | 67 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/26/2018 | 66 | Filed: Return of Service Affidavit of | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Service_Russell Portenoy_Davis upon RUSSELL PORTENOY, M.D. for,CaseNumber:190500261 | |
| 12/28/2018 | 71 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 12/28/2018 | 68 | Filed: Return of Service Affidavit of Service _ Scott Fishman upon BLANCA (WIFE TO SCOTT FISHMAN) for,CaseNumber:190500261 | |
| 12/28/2018 | 70 | Filed: Return of Service Affidavit of Service Johnson Johnson upon MARIA FLORES for,CaseNumber:190500261 | |
| 12/28/2018 | 69 | Filed: Return of Service Affidavit of Service_Cephalon upon NICOLE GOOD for,CaseNumber:190500261 | |
| 01/02/2019 | 135 | Filed: Minute Entry Regarding Prior Professional Associations | |
| 01/02/2019 | 283 | Filed: Minute Entry Regarding Prior Professional Associations | |
| 01/02/2019 | 72 | Filed: Minute Entry Regarding Prior Professional Associations,CaseNumber:190500261 | |
| 01/17/2019 | 284 | Filed: Appearance of Counsel/Notice of Limited Appearance Notice of Entry of Appearance | |
| 01/17/2019 | 285 | Filed: Return of Electronic Notification | |
| 01/18/2019 | 287 | Filed: Exhibit A | |
| 01/18/2019 | 286 | Filed: Manufacturer Defendants Joint Notice of Supplemental Authority | |
| 01/18/2019 | 288 | Filed: Return of Electronic Notification | |
| 01/23/2019 | 289 | Filed: Errata - Exhibit A to Manufacturer Defendants Joint Notice of Supplemental Authority | |
| 01/23/2019 | 290 | Filed: Exhibit A | |
| 01/23/2019 | 291 | Filed: Return of Electronic Notification | |
| 01/30/2019 | 73 | Filed: Return of Service Teva Pharmaceutical Industries LTD,CaseNumber:190500261 | |
| 02/06/2019 | 76 | Filed: Motion Pro Hac Vice of Joseph B. Deacon,CaseNumber:190500261 | |
| 02/06/2019 | 74 | Filed: Motion Pro Hac Vice of Martin J. Phipps,CaseNumber:190500261 | |
| 02/06/2019 | 79 | Filed: Order (Proposed) Granting Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admision of Joseph B. Deacon,CaseNumber:190500261 | |
| 02/06/2019 | 78 | Filed: Order (Proposed) Granting Motion and | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Consent of Sponsoring Local Counsel for Pro Hac Vice Admision of Martin J. Phipps,CaseNumber:190500261 | |
| 02/06/2019 | 75 | Filed: Request/Notice to Submit,CaseNumber:190500261 | |
| 02/06/2019 | 77 | Filed: Request/Notice to Submit,CaseNumber:190500261 | |
| 02/06/2019 | 80 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 02/19/2019 | 83 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 02/19/2019 | 82 | Filed: Return of Service Allergen PLC upon RODNEY LAFFERTY, OFFICE MANAGER for,CaseNumber:190500261 | |
| 02/19/2019 | 81 | Filed: Return of Service Mallinckrodt PLC upon DR. DAVID KEENAN, MANAGING DIRECTOR for,CaseNumber:190500261 | |
| 02/20/2019 | 84 | Filed: Order Granting Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admision of Joseph B. Deacon,CaseNumber:190500261 | |
| 02/20/2019 | 85 | Filed: Order Granting Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admision of Martin J. Phipps,CaseNumber:190500261 | |
| 02/20/2019 | 87 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 02/20/2019 | 86 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 02/22/2019 | | Fee Account created | |
| 02/22/2019 | | Fee Account created | |
| 02/22/2019 | | Fee Payment,CaseNumber:17490581 | |
| 02/22/2019 | | Fee Payment,CaseNumber:17490720 | |
| 02/22/2019 | 292 | Filed: Request for Audio Recording | |
| 02/22/2019 | 294 | Filed: Request for Audio Recording | |
| 02/22/2019 | 293 | Filed: Return of Electronic Notification | |
| 02/22/2019 | 295 | Filed: Return of Electronic Notification | |
| 02/22/2019 | | MOTION HEARING | |
| 02/25/2019 | | Fee Account created | |
| 02/25/2019 | | Fee Payment,CaseNumber:17491501 | |
| 02/25/2019 | 296 | Filed: Appearance of Counsel/Notice of Limited Appearance Notice of Appearance of Counsel | |
| 02/25/2019 | 136 | Filed: Appearance of Counsel/Notice of | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Limited Appearance Notice of Appearance of Counsel | |
| 02/25/2019 | 137 | Filed: Return of Electronic Notification | |
| 02/25/2019 | 297 | Filed: Return of Electronic Notification | |
| 02/26/2019 | 298 | Filed: MOTION HEARING | |
| 02/26/2019 | 299 | Filed: Recording Request Completed and Emailed to Counsel | |
| 02/26/2019 | | Filed: TRANSCRIPT for Hearing of 02-22-2019 | |
| 02/27/2019 | 90 | Filed: Motion Distributor Defendants Joint Motion for Extension of Time to Respond to the Complaint,CaseNumber:190500261 | |
| 02/27/2019 | 92 | Filed: Order (Proposed) Granting Distributor Defendants Joint Motion for Extension of Time to Respond to the Complaint,CaseNumber:190500261 | |
| 02/27/2019 | 91 | Filed: Request/Notice to Submit Request to Submit Distributor Defendants Joint Motion for Extension of Time to Respond to the Complaint for Decision,CaseNumber:190500261 | |
| 02/27/2019 | 89 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 02/27/2019 | 93 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 02/27/2019 | 88 | Filed: Return of Service Lipocine Operating Inc. upon KIM GALLEGOS, AUTHORIZED TO ACCEPT for,CaseNumber:190500261 | |
| 02/28/2019 | 100 | Filed: Appearance of Counsel/Notice of Limited Appearance of Kamie F. Brown, Kristine M. Larsen, and Whitney Hulet Krogue on Behalf of AmerisourceBergen Corporation and AmerisourceBergen Drug Corporation,CaseNumber:190500261 | |
| 02/28/2019 | 96 | Filed: Opposition to Distributor Defendants Motion for Extension of Time,CaseNumber:190500261 | |
| 02/28/2019 | 94 | Filed: Order Granting Distributor Defendants Joint Motion for Extension of Time to Respond to the Complaint,CaseNumber:190500261 | |
| 02/28/2019 | 98 | Filed: Request/Notice to Submit,CaseNumber:190500261 | |
| 02/28/2019 | 95 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 02/28/2019 | 97 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 02/28/2019 | 99 | Filed: Return of Electronic | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Notification,CaseNumber:190500261 | |
| 02/28/2019 | 101 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/04/2019 | 102 | Filed: Motion for Rule 16 Conference,CaseNumber:190500261 | |
| 03/04/2019 | 103 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/05/2019 | 104 | Filed: Appearance of Counsel/Notice of Limited Appearance of D. Matthew Moscon and Michael R. Menssen on Behalf of Cardinal Defendants,CaseNumber:190500261 | |
| 03/05/2019 | 301 | Filed: Motion Requesting a Joinder of Pro Se Plaintiff Victoria Sethunya to Complaint and Jury Demand | |
| 03/05/2019 | 105 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/06/2019 | 108 | Filed: Appearance of Counsel/Notice of Limited Appearance Joseph R. Brubaker and Rod N. Andreason,CaseNumber:190500261 | |
| 03/06/2019 | 107 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/06/2019 | 109 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/06/2019 | 106 | Filed: Return of Service Russell Portenoy upon DR. PORTENOY for,CaseNumber:190500261 | |
| 03/12/2019 | 302 | Filed: Certificate of Service of Proposed Order Granting in Part and Denying in Part the Manufacturer Defendants Motion to Consolidate | |
| 03/12/2019 | 304 | Filed: Order (Proposed) Granting in Part and Denying in Part the Manufacturer Defendants Motion to Consolidate | |
| 03/12/2019 | 303 | Filed: Request/Notice to Submit Proposed Order Granting in Part and Denying in Part the Manufacturer Defendants Motion to Consolidate | |
| 03/12/2019 | 305 | Filed: Return of Electronic Notification | |
| 03/13/2019 | 110 | Filed: Appearance of Counsel/Notice of Limited Appearance Notice of Appearance of Counsel,CaseNumber:190500261 | |
| 03/13/2019 | 112 | Filed: Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/13/2019 | 116 | Filed: Opposition to Manufacturer Defendants Motion for Additional Extension of Time,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 03/13/2019 | 308 | Filed: Order (Proposed) Granting in Part and Denying in Part the Manufacturer Defendants Motion to Consolidate | |
| 03/13/2019 | 114 | Filed: Order (Proposed) Granting Manufacturer Defendants Joint Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/13/2019 | 306 | Filed: Other - Not Signed Order (Proposed) Granting in Part and Denying in Part the Manufacturer Defendants Motion to Consolidate | |
| 03/13/2019 | 113 | Filed: Request/Notice to Submit for Decision Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/13/2019 | 118 | Filed: Request/Notice to Submit,CaseNumber:190500261 | |
| 03/13/2019 | 307 | Filed: Return of Electronic Notification | |
| 03/13/2019 | 309 | Filed: Return of Electronic Notification | |
| 03/13/2019 | 111 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/13/2019 | 115 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/13/2019 | 117 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/13/2019 | 119 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/14/2019 | 124 | Filed: Motion for Leave to File Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/14/2019 | 127 | Filed: Notice of Non-Opposition to Distributor Defendants Motion for Leave to File Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/14/2019 | 310 | Filed: Opposition to Salt Lake Countys Opposition to Victoria Sethunyas Motion Requesting Joinder | |
| 03/14/2019 | 125 | Filed: Order (Proposed) Granting Distributor Defendants Motion for Leave to File Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/14/2019 | 120 | Filed: Reply in Support of Motion for Extension of Time to Respond to Complaint - Expedited Consideration Requested,CaseNumber:190500261 | |
| 03/14/2019 | 122 | Filed: Request/Notice to Submit Renewed Request to Submit for Decision Motion for Extension of Time to Respond to Complaint - Expedited Consideration Requested,CaseNumber:190500261 | |
| 03/14/2019 | 311 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 03/14/2019 | 121 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/14/2019 | 123 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/14/2019 | 126 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/14/2019 | 128 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/15/2019 | 142 | Filed: Affidavit/Declaration: Declaration of Dr. Scott Fishman,CaseNumber:190500261 | |
| 03/15/2019 | 129 | Filed: Appearance of Counsel/Notice of Limited Appearance,CaseNumber:190500261 | |
| 03/15/2019 | 315 | Filed: Memorandum in Response to Rule 60 Motion to Correct Order | |
| 03/15/2019 | 139 | Filed: Motion (Hearing Requested): Motion to Dismiss Dr. Fine,CaseNumber:190500261 | |
| 03/15/2019 | 141 | Filed: Motion (Hearing Requested): Motion to Dismiss Fishman,CaseNumber:190500261 | |
| 03/15/2019 | 137 | Filed: Motion - Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/15/2019 | 130 | Filed: Motion for Clarification and/or for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/15/2019 | 144 | Filed: Motion for leave to file excess pages,CaseNumber:190500261 | |
| 03/15/2019 | 145 | Filed: Order (Proposed) for leave to file excess pages,CaseNumber:190500261 | |
| 03/15/2019 | 131 | Filed: Order (Proposed) Granting Lipocine Defendants Motion to Join Manufacturing Defendants Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/15/2019 | 312 | Filed: Order Granting in Part and Denying in Part the Manufacturer Defendants Motion to Consolidate | |
| 03/15/2019 | 133 | Filed: Order Granting Manufacturer Defendants Joint Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/15/2019 | 135 | Filed: Request/Notice to Submit for Decision Distributor Defendants Motion for Leave to File Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/15/2019 | 317 | Filed: Request/Notice to Submit for Decision: Rule 60 Motion to Correct Order | |
| 03/15/2019 | 313 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 03/15/2019 | 316 | Filed: Return of Electronic Notification | |
| 03/15/2019 | 318 | Filed: Return of Electronic Notification | |
| 03/15/2019 | 132 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/15/2019 | 134 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/15/2019 | 136 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/15/2019 | 138 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/15/2019 | 140 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/15/2019 | 143 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/15/2019 | 146 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/15/2019 | 314 | Filed: Rule 60 Motion to Correct Order | |
| 03/18/2019 | | Case Stay ends on 3/18/2019,CaseNumber:190500261 | |
| 03/20/2019 | 147 | Filed: Notice for Case 180700870 MI: Judge DAVID CONNORS,CaseNumber:190500261 | |
| 03/20/2019 | | NOTICE for Case 180700870 ID 19885426,CaseNumber:190500261 | |
| 03/20/2019 | | RULE 16 CONFERENCE set on 04/17/2019,CaseNumber:190500261 | |
| 03/21/2019 | 319 | Filed: Notice for Case 180500119 LP: Judge RICHARD MRAZIK | |
| 03/21/2019 | 148 | Filed: Order Granting Distributor Defendants Motion for Leave to File Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/21/2019 | 321 | Filed: Return of Electronic Notification | |
| 03/21/2019 | 149 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/21/2019 | 320 | Filed: Summit and Tooele Countys Joinder in Salt Lake Countys Opposition to Victoria Sethunyas Motion Requesting Joinder | |
| 03/21/2019 | | NOTICE for Case 180500119 ID 19888114 | |
| 03/21/2019 | | RE: MOTION TO CORRECT ORDER | |
| 03/21/2019 | | STATUS HEARING set on 04/29/2019 | |
| 03/25/2019 | 150 | Filed: Motion for Extension of Time to Respond to Motions to Dismss,CaseNumber:190500261 | |
| 03/25/2019 | 152 | Filed: Order (Proposed) Granting Plaintiffs Motion for Extension of Time to Respond to | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Motions to Dismiss,CaseNumber:190500261 | |
| 03/25/2019 | 151 | Filed: Request/Notice to Submit,CaseNumber:190500261 | |
| 03/25/2019 | 153 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/27/2019 | 155 | Filed: Order for leave to file excess pages,CaseNumber:190500261 | |
| 03/27/2019 | 154 | Filed: Order Granting Lipocine Defendants Motion to Join Manufacturing Defendants Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/27/2019 | 156 | Filed: Order Granting Plaintiffs Motion for Extension of Time to Respond to Motions to Dismiss,CaseNumber:190500261 | |
| 03/27/2019 | 322 | Filed: Response Motion to the Denial of Joinder of Pro se Plaintiff pro se Plaintiff Victoria Sethunya to Complaint and Jury Demand | |
| 03/27/2019 | 157 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/27/2019 | 158 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/27/2019 | 159 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/28/2019 | 160 | Filed: Motion for Extension of Time to Respond to Complaint (Expedited Consideration Requested),CaseNumber:190500261 | |
| 03/28/2019 | 162 | Filed: Order (Proposed) Granting Manufacturer Defendants Joint Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/28/2019 | 161 | Filed: Request/Notice to Submit for Decision Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/28/2019 | 163 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 169 | Filed: Appearance of Counsel/Notice of Limited Appearance,CaseNumber:190500261 | |
| 03/29/2019 | 213 | Filed: Declaration of Andrew G. Deiss in Support of Manufacturer Defendants Joint Request for Judicial Notice,CaseNumber:190500261 | |
| 03/29/2019 | 172 | Filed: Ex. 1 - UT-Davis - DArecca Affidavit Signed,CaseNumber:190500261 | |
| 03/29/2019 | 189 | Filed: Exhibit 1,CaseNumber:190500261 | |
| 03/29/2019 | 201 | Filed: Exhibit 10 to Motion to Transfer | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
|  |  | Venue,CaseNumber:190500261 |  |
| 03/29/2019 | 202 | Filed: Exhibit 11 to Motion to Transfer Venue,CaseNumber:190500261 |  |
| 03/29/2019 | 203 | Filed: Exhibit 12 to Motion to Transfer Venue,CaseNumber:190500261 |  |
| 03/29/2019 | 204 | Filed: Exhibit 13 to Motion to Transfer Venue,CaseNumber:190500261 |  |
| 03/29/2019 | 190 | Filed: Exhibit 2,CaseNumber:190500261 |  |
| 03/29/2019 | 191 | Filed: Exhibit 3,CaseNumber:190500261 |  |
| 03/29/2019 | 192 | Filed: Exhibit 4,CaseNumber:190500261 |  |
| 03/29/2019 | 193 | Filed: Exhibit 5,CaseNumber:190500261 |  |
| 03/29/2019 | 194 | Filed: Exhibit 6,CaseNumber:190500261 |  |
| 03/29/2019 | 195 | Filed: Exhibit 7,CaseNumber:190500261 |  |
| 03/29/2019 | 199 | Filed: Exhibit 8 to Motion to Transfer Venue,CaseNumber:190500261 |  |
| 03/29/2019 | 200 | Filed: Exhibit 9 to Motion to Transfer Venue,CaseNumber:190500261 |  |
| 03/29/2019 | 175 | Filed: Exhibit A,CaseNumber:190500261 |  |
| 03/29/2019 | 178 | Filed: Exhibit A,CaseNumber:190500261 |  |
| 03/29/2019 | 179 | Filed: Exhibit B,CaseNumber:190500261 |  |
| 03/29/2019 | 180 | Filed: Exhibit C,CaseNumber:190500261 |  |
| 03/29/2019 | 212 | Filed: Manufacturer Defendants Joint Request for Judicial Notice,CaseNumber:190500261 |  |
| 03/29/2019 | 197 | Filed: Motion (Hearing Requested) Motion to Dismiss Complaint,CaseNumber:190500261 |  |
| 03/29/2019 | 184 | Filed: Motion - Defendant Mallinckrodt LLCs Motion to Dismiss for Failure to State a Claim for Relief and Supporting Memorandum,CaseNumber:190500261 |  |
| 03/29/2019 | 209 | Filed: Motion for Leave to File Over-Length Joint Motion to Dismiss,CaseNumber:190500261 |  |
| 03/29/2019 | 188 | Filed: Motion Johnson Johnson and Janssen Pharmaceuticals, Inc.s Motion to Transfer Venue,CaseNumber:190500261 |  |
| 03/29/2019 | 211 | Filed: Motion Manufacturer Defendants Joint Motion to Dismiss,CaseNumber:190500261 |  |
| 03/29/2019 | 185 | Filed: Motion of Specially Appearing Defendant Mallinckrodt plc to Dismiss for Lack of Personal Jurisdiction and Improper Service,CaseNumber:190500261 |  |
| 03/29/2019 | 174 | Filed: Motion of Specially-Appearing Defendant Teva Pharmaceutical Industries |  |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Ltd. to Dismiss the Complaint for Lack of Personal Jurisdiction and Insufficient Service of Process,CaseNumber:190500261 | |
| 03/29/2019 | 171 | Filed: Motion to Dismiss and Memorandum in Support on Behalf of Allergan Finance, LLC fka Actavis, Inc. fka Watson Pharmaceuticals, Inc.; Allergan Sales, LLC; Allergan USA Inc.; and Specially Appearing Defendant Allergan PLC fka Actavis PLC,CaseNumber:190500261 | |
| 03/29/2019 | 177 | Filed: Motion to Dismiss of Defendants Cephalon, Inc., Teva Pharmaceuticals USA Inc., and Anesta LLC, f/k/a Anesta Corp.,CaseNumber:190500261 | |
| 03/29/2019 | 182 | Filed: Motion to Dismiss of Defendants Watson Laboratories, Inc, Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. and Actavis Laboratories UT, Inc.,CaseNumber:190500261 | |
| 03/29/2019 | 206 | Filed: Motion to Join Manufacturer Defendants Joint Motion to Dismiss and Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/29/2019 | 164 | Filed: Motion to Join Request for Extension of Time Filed By Manufacturing Defendants,CaseNumber:190500261 | |
| 03/29/2019 | 167 | Filed: Opposition to Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 03/29/2019 | 207 | Filed: Order (Proposed) Granting Lipocine Defendants Motion to Join Manufacturer Defendants Joint Motion to Dismiss and Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/29/2019 | 214 | Filed: Order (Proposed) granting Motion for Leave to File Over-Length Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/29/2019 | 165 | Filed: Order (Proposed) Granting Motion to Join Request for Extension of Time Filed by Manufacturing Defendants,CaseNumber:190500261 | |
| 03/29/2019 | 210 | Filed: Request/Notice to Submit Motion for Leave to File Over-Length Joint Motion to Dismiss,CaseNumber:190500261 | |
| 03/29/2019 | 166 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 168 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 170 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 173 | Filed: Return of Electronic | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Notification,CaseNumber:190500261 | |
| 03/29/2019 | 176 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 181 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 183 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 186 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 187 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 196 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 198 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 205 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 208 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/29/2019 | 215 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/30/2019 | 217 | Filed: Affidavit/Declaration Declaration of Andrew G. Deiss in Support of Janssen Pharmaceuticals Inc and Johnson Johnsons Motion to Dismiss,CaseNumber:190500261 | |
| 03/30/2019 | 223 | Filed: Exhibit 1 to Declaration of Andrew G. Deiss in Support of Janssen Pharmaceuticals Inc and Johnson Johnsons Motion to Dismiss,CaseNumber:190500261 | |
| 03/30/2019 | 220 | Filed: Exhibit 1 to Declaration of Andrew G. Deiss in Support of Manufacturer Defendants Joint Request for Judicial Notice,CaseNumber:190500261 | |
| 03/30/2019 | 224 | Filed: Exhibit 2 to Declaration of Andrew G. Deiss in Support of Janssen Pharmaceuticals Inc and Johnson Johnsons Motion to Dismiss,CaseNumber:190500261 | |
| 03/30/2019 | 221 | Filed: Exhibit 2 to Declaration of Andrew G. Deiss in Support of Manufacturer Defendants Joint Request for Judicial Notice,CaseNumber:190500261 | |
| 03/30/2019 | 225 | Filed: Exhibit 3 to Declaration of Andrew G. Deiss in Support of Janssen Pharmaceuticals Inc and Johnson Johnsons Motion to Dismiss,CaseNumber:190500261 | |
| 03/30/2019 | 222 | Filed: Exhibit 3 to Declaration of Andrew G. Deiss in Support of Manufacturer Defendants Joint Request for Judicial Notice,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 03/30/2019 | 226 | Filed: Exhibit 4 to Declaration of Andrew G. Deiss in Support of Janssen Pharmaceuticals Inc and Johnson Johnsons Motion to Dismiss,CaseNumber:190500261 | |
| 03/30/2019 | 216 | Filed: Motion Janssen Pharmaceuticals Inc and Johnson Johnsons Motion to Dismiss,CaseNumber:190500261 | |
| 03/30/2019 | 218 | Filed: Request/Notice to Submit Janssen Pharmaceuticals Inc and Johnson Johnsons Request for Judicial Notice and Consideration of Certain Materials in Support of Their Motion to Dismiss,CaseNumber:190500261 | |
| 03/30/2019 | 219 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/30/2019 | 227 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 03/30/2019 | 228 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/01/2019 | 237 | Filed: Motion Pro Hac Vice Motion and Consent of Local Counsel for Pro Hac Vice Admission of Scott D. Powers,CaseNumber:190500261 | |
| 04/01/2019 | 229 | Filed: Motion Pro Hac Vice Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Kevin M. Sadler,CaseNumber:190500261 | |
| 04/01/2019 | 232 | Filed: Motion Pro Hac Vice Motion and Consent of Sponsoring Local Counseling for Pro Hac Vice Admission of David Arlington,CaseNumber:190500261 | |
| 04/01/2019 | 234 | Filed: Order (Proposed) Granting Pro Hac Vice Admission of David Arlington,CaseNumber:190500261 | |
| 04/01/2019 | 231 | Filed: Order (Proposed) Granting Pro Hac Vice Admission of Kevin M. Salder,CaseNumber:190500261 | |
| 04/01/2019 | 239 | Filed: Order (Proposed) Granting Pro Hac Vice Admission of Scott D. Powers,CaseNumber:190500261 | |
| 04/01/2019 | 323 | Filed: RE: MOTION TO CORRECT ORDER | |
| 04/01/2019 | 233 | Filed: Request/Notice to Submit Request to Submit for Decision Regarding Pro Hac Vice Admission of David Arlington,CaseNumber:190500261 | |
| 04/01/2019 | 230 | Filed: Request/Notice to Submit Request to Submit for Decision Regarding Pro Hac Vice Admission of Kevin M. Sadler,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/01/2019 | 238 | Filed: Request/Notice to Submit Request to Submit for Decision Regarding Pro Hac Vice Admission of Scott D. Powers,CaseNumber:190500261 | |
| 04/01/2019 | 236 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/01/2019 | 235 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/01/2019 | 240 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/03/2019 | | Case filed by efiler,CaseNumber:190500299 | |
| 04/03/2019 | | Fee Account created,CaseNumber:190500299 | |
| 04/03/2019 | | Fee Account created,CaseNumber:190500299 | |
| 04/03/2019 | | Fee Payment,CaseNumber:190500299 | |
| 04/03/2019 | 1 | Filed: Complaint For Damages And Jury Demand,CaseNumber:190500299 | |
| 04/03/2019 | 324 | Filed: Corrected Certificate of Service | |
| 04/03/2019 | 4 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 04/03/2019 | 3 | Filed: Return of Service,CaseNumber:190500299 | |
| 04/03/2019 | 2 | Filed: Summons on Return,CaseNumber:190500299 | |
| 04/05/2019 | 325 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 04/05/2019 | 327 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 04/05/2019 | 138 | Filed: Appearance of Counsel/Notice of Limited Appearance | |
| 04/05/2019 | 241 | Filed: Appearance of Counsel/Notice of Limited Appearance,CaseNumber:190500261 | |
| 04/05/2019 | 5 | Filed: Appearance of Counsel/Notice of Limited Appearance,CaseNumber:190500299 | |
| 04/05/2019 | 246 | Filed: Exhibit A - B. Hatch Email to D. Thayer (Mar. 7, 2019),CaseNumber:190500261 | |
| 04/05/2019 | 247 | Filed: Exhibit B - J. Milne Email to Defendants (Mar. 22, 2019),CaseNumber:190500261 | |
| 04/05/2019 | 248 | Filed: Exhibit C - B. Hatch Emails with D. Thayer (Mar. 26, 2019),CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/05/2019 | 249 | Filed: Exhibit D - B. Hatch Emails with D. Thayer (Mar. 27, 2019),CaseNumber:190500261 | |
| 04/05/2019 | 250 | Filed: Exhibit E - M. Phipps Email to B. Hatch (Mar. 28, 2019),CaseNumber:190500261 | |
| 04/05/2019 | 243 | Filed: Notice of Non-Opposition to Motion for Leave to File Over-Length Motion to Dismiss,CaseNumber:190500261 | |
| 04/05/2019 | 330 | Filed: Order (Proposed) Ruling and Order Granting in Part and Denying in Part the Manufacturer Defendants Motion to Consolidate | |
| 04/05/2019 | 245 | Filed: Reply Memorandum in Support of Motion for Extension of Time to Respond to the Complaint,CaseNumber:190500261 | |
| 04/05/2019 | 329 | Filed: Request for More Time | |
| 04/05/2019 | 326 | Filed: Return of Electronic Notification | |
| 04/05/2019 | 328 | Filed: Return of Electronic Notification | |
| 04/05/2019 | 139 | Filed: Return of Electronic Notification | |
| 04/05/2019 | 331 | Filed: Return of Electronic Notification | |
| 04/05/2019 | 242 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/05/2019 | 244 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/05/2019 | 251 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/05/2019 | 6 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 04/08/2019 | 252 | Filed: Order granting Motion for Leave to File Over-Length Joint Motion to Dismiss,CaseNumber:190500261 | |
| 04/09/2019 | 332 | Filed: Order Ruling and Order Granting in Part and Denying in Part the Manufacturer Defendants Motion to Consolidate | |
| 04/09/2019 | 333 | Filed: Return of Electronic Notification | |
| 04/11/2019 | 7 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Cardinal Health, Inc upon D. MATTHEW MOSCON for,CaseNumber:190500299 | |
| 04/11/2019 | 254 | Filed: Opposition to to Johnson Johnson and Janssen Pharmaceuticals, Inc.s Motion to Transfer Venue,CaseNumber:190500261 | |
| 04/11/2019 | 255 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/11/2019 | 8 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/12/2019 | | Fee Account created,CaseNumber:190500299 | |
| 04/12/2019 | | Fee Account created,CaseNumber:190500299 | |
| 04/12/2019 | | Fee Payment,CaseNumber:190500299 | |
| 04/12/2019 | 263 | Filed: Ex Parte Order (Proposed) Order Granting Ex Parte Motion for Additional Time,CaseNumber:190500261 | |
| 04/12/2019 | 261 | Filed: Motion Ex Parte Motion for Additional Time to File Consolidated Reply in Support of Motion to Transfer Venue,CaseNumber:190500261 | |
| 04/12/2019 | 334 | Filed: Motion Pro Hac Vice for Nathan Shafroth | |
| 04/12/2019 | 256 | Filed: Motion Pro Hac Vice for Nathan Shafroth,CaseNumber:190500261 | |
| 04/12/2019 | 259 | Filed: Notice of Non-Opposition to Lipocine Defendants Motion to Join Manufacturer Defendants Joint Motion to Dismiss and Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 04/12/2019 | 265 | Filed: Opposition to Motion for Additional Time to File Consoldiated Reply in Support of Motion to Transfer Venue,CaseNumber:190500261 | |
| 04/12/2019 | 335 | Filed: Order (Proposed) Granting Pro Hac Vice for Nathan Shafroth | |
| 04/12/2019 | 257 | Filed: Order (Proposed) Granting Pro Hac Vice for Nathan Shafroth,CaseNumber:190500261 | |
| 04/12/2019 | 267 | Filed: Order (Proposed) on Opposition to Motion for Additional Time to File Consolidated Reply in Support of Motion to Transfer Venue,CaseNumber:190500261 | |
| 04/12/2019 | 262 | Filed: Request/Notice to Submit Request to Submit Ex Parte Motion for Additional Time to File Consolidated Reply in Support of Motion to Transfer Venue,CaseNumber:190500261 | |
| 04/12/2019 | 266 | Filed: Request/Notice to Submit,CaseNumber:190500261 | |
| 04/12/2019 | 336 | Filed: Return of Electronic Notification | |
| 04/12/2019 | 258 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/12/2019 | 260 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/12/2019 | 264 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/12/2019 | 268 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/15/2019 | 271 | Filed: Appearance of Counsel/Notice of Limited Appearance - Matthew R. Lewis,CaseNumber:190500261 | |
| 04/15/2019 | 269 | Filed: Appearance of Counsel/Notice of Limited Appearance of Marcia Fuller Durkin,CaseNumber:190500261 | |
| 04/15/2019 | 273 | Filed: Appearance of Counsel/Notice of Limited Appearance Perry S. Clegg,CaseNumber:190500261 | |
| 04/15/2019 | 270 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/15/2019 | 272 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/15/2019 | 274 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/16/2019 | 9 | Filed: Acceptance of Service upon E-MAIL KAMIE F. BROWN for,CaseNumber:190500299 | |
| 04/16/2019 | 279 | Filed: Exhibit A - Proposed Case Management Order,CaseNumber:190500261 | |
| 04/16/2019 | 280 | Filed: Exhibit B - D. Thayer Email to J. Krannich (Apr. 15, 2019),CaseNumber:190500261 | |
| 04/16/2019 | 281 | Filed: Exhibit C - Plaintiffs April 8 Draft CMO,CaseNumber:190500261 | |
| 04/16/2019 | 276 | Filed: Order (Proposed) Initial Case Management Order,CaseNumber:190500261 | |
| 04/16/2019 | 275 | Filed: Plaintiffs Notice of Lodgment of Initial Case Management Order,CaseNumber:190500261 | |
| 04/16/2019 | 277 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/16/2019 | 10 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 04/16/2019 | 278 | Filed: Rule 16 Statement and Proposed Case Management Order,CaseNumber:190500261 | |
| 04/17/2019 | | Fee Account created,CaseNumber:190500261 | |
| 04/17/2019 | | Fee Payment,CaseNumber:190500261 | |
| 04/17/2019 | 283 | Filed: Distributor Defendants Rule 16 Statement and Proposed Case Management Order,CaseNumber:190500261 | |
| 04/17/2019 | 337 | Filed: Order Granting Pro Hac Vice for Nathan Shafroth | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/17/2019 | 285 | Filed: Request for Audio Recording,CaseNumber:190500261 | |
| 04/17/2019 | 338 | Filed: Return of Electronic Notification | |
| 04/17/2019 | 284 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/17/2019 | 286 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/17/2019 | | ORAL ARGUMENT set on 05/15/2019,CaseNumber:190500261 | |
| 04/17/2019 | | ORAL ARGUMENT set on 06/07/2019,CaseNumber:190500261 | |
| 04/17/2019 | | RULE 16 CONFERENCE,CaseNumber:190500261 | |
| 04/18/2019 | | Fee Account created,CaseNumber:190500261 | |
| 04/18/2019 | | Fee Account created,CaseNumber:190500261 | |
| 04/18/2019 | | Fee Payment,CaseNumber:190500261 | |
| 04/18/2019 | | Fee Payment,CaseNumber:190500261 | |
| 04/18/2019 | 289 | Filed: Request for Audio Recording of Court Proceeding,CaseNumber:190500261 | |
| 04/18/2019 | 287 | Filed: Request for Copy of Recording of Court Proceeding,CaseNumber:190500261 | |
| 04/18/2019 | 288 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/18/2019 | 290 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/19/2019 | 11 | Filed: Appearance of Counsel/Notice of Limited Appearance for Defendant McKesson Corporation,CaseNumber:190500299 | |
| 04/19/2019 | 339 | Filed: Response to Plaintiff Salt Lake County&#39;s Second Motion to Deny Requester Victoria Sethunya&#39;s Joinder Motion and a Deman for $1,000,000.00 in Damages | |
| 04/19/2019 | 340 | Filed: Response to Plaintiff Salt Lake County&#39;s Second Motion to Deny Requester Victoria Sethunya&#39;s Joinder Motion and a Deman for $1,000,000.00 in Damages Corrected | |
| 04/19/2019 | 12 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 04/22/2019 | 13 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for McKesson Corporation upon TREVOR C. LANG for,CaseNumber:190500299 | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/22/2019 | 291 | Filed: Order Granting Lipocine Defendants Motion to Join Manufacturer Defendants Joint Motion to Dismiss and Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 04/22/2019 | 293 | Filed: Order Granting Pro Hac Vice Admission of David Arlington,CaseNumber:190500261 | |
| 04/22/2019 | 292 | Filed: Order Granting Pro Hac Vice Admission of Kevin M. Salder,CaseNumber:190500261 | |
| 04/22/2019 | 294 | Filed: Order Granting Pro Hac Vice Admission of Scott D. Powers,CaseNumber:190500261 | |
| 04/22/2019 | 299 | Filed: Order Granting Pro Hac Vice for Nathan Shafroth,CaseNumber:190500261 | |
| 04/22/2019 | 295 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/22/2019 | 298 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/22/2019 | 297 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/22/2019 | 296 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/22/2019 | 300 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/22/2019 | 14 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 04/23/2019 | 17 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Mallinkrodt LLC upon TYLER V. SNOW for,CaseNumber:190500299 | |
| 04/23/2019 | 15 | Filed: Appearance of Counsel/Notice of Limited Appearance of Kamie F. Brown, Kristine M. Larsen and Whitney Hulet Krogue on Behalf of AmerisourceBergen Corporation,CaseNumber:190500299 | |
| 04/23/2019 | 16 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 04/23/2019 | 18 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 04/24/2019 | | Fee Account created,CaseNumber:190500261 | |
| 04/24/2019 | | Fee Account created,CaseNumber:190500261 | |
| 04/24/2019 | | Fee Payment,CaseNumber:190500261 | |
| 04/24/2019 | | Fee Payment,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/26/2019 | | Fee Account created,CaseNumber:190500261 | |
| 04/26/2019 | 311 | Filed: Appearance of Counsel/Notice of Limited Appearance Elisabeth M. McOmber, Katherine R. Nichols and Annika L. Jones for Purdue Defendants,CaseNumber:190500261 | |
| 04/26/2019 | 318 | Filed: Ex. 1 - Iron County Complaint,CaseNumber:190500261 | |
| 04/26/2019 | 319 | Filed: Ex. 2 - San Juan County Complaint,CaseNumber:190500261 | |
| 04/26/2019 | 320 | Filed: Ex. 3 - Grand County Complaint,CaseNumber:190500261 | |
| 04/26/2019 | 321 | Filed: Ex. 4 - Millard County Complaint,CaseNumber:190500261 | |
| 04/26/2019 | 322 | Filed: Ex. 5 - Sanpete County Complaint,CaseNumber:190500261 | |
| 04/26/2019 | 323 | Filed: Ex. 6 - Table of 6 Cases,CaseNumber:190500261 | |
| 04/26/2019 | 324 | Filed: Ex. 7 - Orders,CaseNumber:190500261 | |
| 04/26/2019 | 325 | Filed: Ex. 8 - Declaration of Tyler Snow,CaseNumber:190500261 | |
| 04/26/2019 | 328 | Filed: Ex. A - Hatch to Phipps 04.18.19 Email,CaseNumber:190500261 | |
| 04/26/2019 | 343 | Filed: Joinder in Salt Lake Countys Opposition to Victoria Sethunyas Motion Requesting Joinder | |
| 04/26/2019 | 317 | Filed: Motion to Consolidate Related Cases and Memorandum in Support - EXPEDITED TREATMENT REQUESTED,CaseNumber:190500261 | |
| 04/26/2019 | 341 | Filed: Notice for Case 180500119 LP: Judge RICHARD MRAZIK | |
| 04/26/2019 | 330 | Filed: Notice of Non-Opposition of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. to Motion to Transfer Venue,CaseNumber:190500261 | |
| 04/26/2019 | 313 | Filed: Notice of Non-Opposition of Mallinckrodt LLC to Motion to Transfer Venue Filed By Johnson Johnson and Janssen Pharmaceuticals, Inc.,CaseNumber:190500261 | |
| 04/26/2019 | 315 | Filed: Notice of Non-Opposition of Purdue Defendants to the Motion to Transfer Venue Filed by Johnson Johnson and Janssen Pharmaceuticals, Inc.,CaseNumber:190500261 | |
| 04/26/2019 | 327 | Filed: Opposition to Johnson Johnson and | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Janssen Pharmaceuticals, Inc.s Motion to Transfer Venue,CaseNumber:190500261 | |
| 04/26/2019 | 307 | Filed: Other - Not Signed Ex Parte Order Order Granting Ex Parte Motion for Additional Time,CaseNumber:190500261 | |
| 04/26/2019 | 301 | Filed: Other - Not Signed Order Granting Manufacturer Defendants Joint Motion for Extension of Time to Respond to Complaint,CaseNumber:190500261 | |
| 04/26/2019 | 302 | Filed: Other - Not Signed Order Granting Motion to Join Request for Extension of Time Filed by Manufacturing Defendants,CaseNumber:190500261 | |
| 04/26/2019 | 303 | Filed: Other - Not Signed Order Initial Case Management Order,CaseNumber:190500261 | |
| 04/26/2019 | 308 | Filed: Other - Not Signed Order on Opposition to Motion for Additional Time to File Consolidated Reply in Support of Motion to Transfer Venue,CaseNumber:190500261 | |
| 04/26/2019 | 342 | Filed: RE: JOINDER OF VICTORIA SETHUNYA&#39;S CLAIM | |
| 04/26/2019 | 344 | Filed: Return of Electronic Notification | |
| 04/26/2019 | 304 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 305 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 306 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 310 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 309 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 312 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 314 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 316 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 326 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 329 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | 331 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/26/2019 | | NOTICE for Case 180500119 ID 19981556 | |
| 04/26/2019 | | RE: JOINDER OF VICTORIA | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | SETHUNYA&#39;S CLAIM | |
| 04/26/2019 | | STATUS HEARING Modified,CaseNumber:Modified | |
| 04/26/2019 | | STATUS HEARING set on 04/29/2019 | |
| 04/29/2019 | 345 | Filed: Notice for Case 180500119 LP: Judge RICHARD MRAZIK | |
| 04/29/2019 | | MOTION TO DISMISS set on 09/10/2019 | |
| 04/29/2019 | | NOTICE for Case 180500119 ID 19982417 | |
| 04/29/2019 | | STATUS HEARING | |
| 04/30/2019 | 336 | Filed: EX A - DEA Letters to Distributors,CaseNumber:190500261 | |
| 04/30/2019 | 364 | Filed: EX AA - West Virginia (Brooke) (Cardinal) MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 337 | Filed: EX B - McKesson 2008 Settlement MOA,CaseNumber:190500261 | |
| 04/30/2019 | 365 | Filed: EX BB - West Virginia (Brooke) (Distributors) MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 338 | Filed: EX C - McKesson 2018 Utah Stipulation Order,CaseNumber:190500261 | |
| 04/30/2019 | 366 | Filed: EX CC - West Virginia (Brooke) (Purdue) MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 339 | Filed: EX D - Cardinal 2008 Settlement MOA,CaseNumber:190500261 | |
| 04/30/2019 | 367 | Filed: EX DD - West Virginia MTD Order (Cardinal) (2-19-16),CaseNumber:190500261 | |
| 04/30/2019 | 340 | Filed: EX E - Cardinal 2012 MOA,CaseNumber:190500261 | |
| 04/30/2019 | 368 | Filed: EX EE - West Virginia MTD Order (Cardinal) (4-17-15),CaseNumber:190500261 | |
| 04/30/2019 | 341 | Filed: EX F - Alaska MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 369 | Filed: EX FF - West Virginia MTD Order (Distributors) (9-8-15),CaseNumber:190500261 | |
| 04/30/2019 | 342 | Filed: EX G - Arkansas MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 370 | Filed: EX GG - West Virginia (Amerisource) MTD Order (12-12-14),CaseNumber:190500261 | |
| 04/30/2019 | 343 | Filed: EX H - Delaware MTD Order,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 04/30/2019 | 371 | Filed: EX HH - MDL RR,CaseNumber:190500261 | |
| 04/30/2019 | 344 | Filed: EX I - Kentucky MTD Order (JJ),CaseNumber:190500261 | |
| 04/30/2019 | 372 | Filed: EX II - MDL MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 345 | Filed: EX J - Kentucky MTD Order (Endo),CaseNumber:190500261 | |
| 04/30/2019 | 346 | Filed: EX K - Mississippi MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 347 | Filed: EX L - Missouri MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 348 | Filed: EX M - MDL (Blackfeet Tribe) (Montana law) MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 349 | Filed: EX N - New Hampshire MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 350 | Filed: EX O - New Jersey (Grewal) MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 351 | Filed: EX P - New York MTD Order (Distributors),CaseNumber:190500261 | |
| 04/30/2019 | 352 | Filed: EX Q - New York MTD Order (Manufacturers),CaseNumber:190500261 | |
| 04/30/2019 | 353 | Filed: EX R - Ohio MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 354 | Filed: EX S - MDL (Muscogee Creek) (Oklahoma law) MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 355 | Filed: EX T - Oklahoma MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 356 | Filed: EX U - South Carolina MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 357 | Filed: EX V - Tennessee MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 358 | Filed: EX W - Tennessee (Staubus) MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 359 | Filed: EX X - Vermont MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 362 | Filed: EX Y - Washington (Everett) MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 363 | Filed: EX Z - Washington MTD Order,CaseNumber:190500261 | |
| 04/30/2019 | 332 | Filed: Motion for Leave to File Overlength Brief in Opposition to Distibutor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|---|---|---|---|
| 04/30/2019 | 335 | Filed: Opposition to to Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 04/30/2019 | 333 | Filed: Order (Proposed) Granting Plaintiffs Motion for Leave to File Overlength Brief in Opposition to Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 04/30/2019 | 334 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/30/2019 | 361 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/30/2019 | 373 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/30/2019 | 375 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 04/30/2019 | 374 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/03/2019 | 19 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Allergan Finance, LLC f/k/a Actavis PLC f/k/a Actavis PLC upon JESSE M. KRANNICH for,CaseNumber:190500299 | |
| 05/03/2019 | 20 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 05/06/2019 | 349 | Filed: Acknowledgement from Utah Bar Association for Amy Laurendeau | |
| 05/06/2019 | 384 | Filed: Exhibit 1 to Reply Memorandum Supporting Johnson Johnson and Janssen Pharmaceutical, Inc.s Motion to Transfer Venue,CaseNumber:190500261 | |
| 05/06/2019 | 348 | Filed: Motion Pro Hac Vice for Admission of Amy Laurendeau | |
| 05/06/2019 | 376 | Filed: Motion Pro Hac Vice for Admission of Amy Laurendeau,CaseNumber:190500261 | |
| 05/06/2019 | 351 | Filed: Order (Proposed) granting Motion for Admission of Amy Laurendeau | |
| 05/06/2019 | 379 | Filed: Order (Proposed) granting Pro Hac Admission of Amy Laurendeau,CaseNumber:190500261 | |
| 05/06/2019 | 350 | Filed: Pro Hac Application Materials for Amy Laurendeau | |
| 05/06/2019 | 378 | Filed: Pro Hac Application Materials for Amy Laurendeau,CaseNumber:190500261 | |
| 05/06/2019 | 383 | Filed: Reply Memorandum Supporting Johnson Johnson and Janssen Pharmaceutical, Inc.s Motion to Transfer Venue,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/06/2019 | 381 | Filed: Response to Allergan Defendants Response to Johnson Johnson and janssen pharmaceuticals, Inc.s Motion to Transfer Venue,CaseNumber:190500261 | |
| 05/06/2019 | 347 | Filed: Return of Electronic Notification | |
| 05/06/2019 | 352 | Filed: Return of Electronic Notification | |
| 05/06/2019 | 380 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/06/2019 | 382 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/06/2019 | 385 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/06/2019 | 346 | Filed: Stipulated Briefing Schedule for Defendants Motions to Dismiss | |
| 05/06/2019 | 377 | Filed: Utah Bar Association Acknowledgement for Admission of Amy Laurendeau,CaseNumber:190500261 | |
| 05/07/2019 | | TELEPHONE/FAX/EMAIL Account Adjustment,CaseNumber:190500261 | |
| 05/10/2019 | 23 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Endo Health Solutions Inc. upon MARCIA FULLER DURKIN for,CaseNumber:190500299 | |
| 05/10/2019 | 24 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Endo Pharmaceuticals, Inc. upon MARCIA FULLER DURKIN for,CaseNumber:190500299 | |
| 05/10/2019 | 21 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for INSYS Therapeutics, Inc upon J. RYAN MITCHELL for,CaseNumber:190500299 | |
| 05/10/2019 | 26 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Perry Fine upon SARA E. PENDLETON for,CaseNumber:190500299 | |
| 05/10/2019 | 392 | Filed: Notice of Non-Opposition of Endo Health Solutions and Endo Pharmaceuticals,CaseNumber:190500261 | |
| 05/10/2019 | 386 | Filed: Notice of Non-Opposition of Mallinckrodt LLC to Motion to Consolidate Related Cases Filed By Allergan Defendants and Teva Defendants,CaseNumber:190500261 | |
| 05/10/2019 | 388 | Filed: Opposition to Motion to Consolidate Related Cases and Memorandum in Support,CaseNumber:190500261 | |
| 05/10/2019 | 390 | Filed: Order (Proposed) on April 17, 2019 Rule 16 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Conference,CaseNumber:190500261 | |
| 05/10/2019 | 387 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/10/2019 | 389 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/10/2019 | 391 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/10/2019 | 393 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/10/2019 | 22 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 05/10/2019 | 25 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 05/10/2019 | 27 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 05/13/2019 | 28 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Actavis LLC upon BRENT O. HATCH for,CaseNumber:190500299 | |
| 05/13/2019 | 29 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Actavis Parma, Inc. f/k/a Watson Pharma, Inc. upon BRENT O. HATCH for,CaseNumber:190500299 | |
| 05/13/2019 | 31 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Cephalon, Inc. upon BRENT O. HATCH for,CaseNumber:190500299 | |
| 05/13/2019 | 30 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Teva Pharmaceuticals USA, Inc. upon BRENT O. HATCH for,CaseNumber:190500299 | |
| 05/13/2019 | 32 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Watson Laboratories, Inc upon BRENT O. HATCH for,CaseNumber:190500299 | |
| 05/13/2019 | 407 | Filed: Ex. A - Transcript of Hearing, Pgs. 51-52, 89,CaseNumber:190500261 | |
| 05/13/2019 | 400 | Filed: Motion for Leave to File Overlength Omnibus Opposition to Manufacturer Defendants Motion to Dismiss,CaseNumber:190500261 | |
| 05/13/2019 | 396 | Filed: Notice of Dismissal,CaseNumber:190500261 | |
| 05/13/2019 | 404 | Filed: Opposition to Omnibus Opposition to Manufacturer Defendants Motions to Dismiss,CaseNumber:190500261 | |
| 05/13/2019 | 402 | Filed: Order (Proposed) Granting Plaintiffs Motion for Leave to File Overlength Omnibus | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Opposition to Manufacturer Defendants Motions to Dismiss,CaseNumber:190500261 | |
| 05/13/2019 | 355 | Filed: Order granting Motion for Admission of Amy Laurendeau | |
| 05/13/2019 | 410 | Filed: Order Granting Plaintiffs Motion for Leave to File Overlength Brief in Opposition to Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 05/13/2019 | 406 | Filed: Reply Memorandum in Support of Motion to Consolidate Related Cases (EXPEDITED TREATMENT REQUESTED - Hearing May 15, 2019, 1:30 pm),CaseNumber:190500261 | |
| 05/13/2019 | 408 | Filed: Request/Notice to Submit and Notice of Hearing Re: Motion to Consolidate Related Cases (EXPEDITED TREATMENT REQUESTED - Hearing May 15, 2019, 1:30 pm),CaseNumber:190500261 | |
| 05/13/2019 | 353 | Filed: Request/Notice to Submit Motion for Pro Hac Admission of Amy Laurendeau | |
| 05/13/2019 | 394 | Filed: Request/Notice to Submit Motion for Pro Hac Admission of Amy Laurendeau,CaseNumber:190500261 | |
| 05/13/2019 | 401 | Filed: Request/Notice to Submit Plainitffs Motion for Leave to File Overlength Omnibus Opposition to Manufacturer Defendants Motion to Dismiss,CaseNumber:190500261 | |
| 05/13/2019 | 398 | Filed: Request/Notice to Submit Plaintiffs motion for Leave to File Overlenght Brief in Opposition to Distributor Defendants Joint Motion to Dismiss,CaseNumber:190500261 | |
| 05/13/2019 | 354 | Filed: Return of Electronic Notification | |
| 05/13/2019 | 356 | Filed: Return of Electronic Notification | |
| 05/13/2019 | 395 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/13/2019 | 397 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/13/2019 | 399 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/13/2019 | 403 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/13/2019 | 405 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/13/2019 | 409 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/13/2019 | 411 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/13/2019 | 33 | Filed: Return of Electronic | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Notification,CaseNumber:190500299 | |
| 05/14/2019 | | Dismissed party - ALLERGAN PLC FKA ACTAV,CaseNumber:190500261 | |
| 05/14/2019 | | Dismissed party - MALLINCKRODT LLC,CaseNumber:190500261 | |
| 05/14/2019 | | Dismissed party - TEVA PHARMACEUTICAL IN,CaseNumber:190500261 | |
| 05/14/2019 | 412 | Filed: Appearance of Counsel/Notice of Limited Appearance: Appearance of Counsel,CaseNumber:190500261 | |
| 05/14/2019 | 414 | Filed: Notice of Supplemental Authority,CaseNumber:190500261 | |
| 05/14/2019 | 413 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/14/2019 | 415 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/15/2019 | 418 | Filed: Order Granting Plaintiffs Motion for Leave to File Overlength Omnibus Opposition to Manufacturer Defendants Motions to Dismiss,CaseNumber:190500261 | |
| 05/15/2019 | 416 | Filed: Order granting Pro Hac Admission of Amy Laurendeau,CaseNumber:190500261 | |
| 05/15/2019 | 417 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/15/2019 | 419 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/15/2019 | | ORAL ARGUMENT,CaseNumber:190500261 | |
| 05/17/2019 | | Fee Account created,CaseNumber:190500261 | |
| 05/17/2019 | | Fee Account created,CaseNumber:190500261 | |
| 05/17/2019 | | Fee Payment,CaseNumber:190500261 | |
| 05/17/2019 | 420 | Filed: Request for Audio Recording of Court Proceeding,CaseNumber:190500261 | |
| 05/17/2019 | 421 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/20/2019 | 422 | Filed: Notice of Stipulation,CaseNumber:190500261 | |
| 05/20/2019 | 423 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/22/2019 | 37 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Janssen Pharmaceutica, Inc n/k/a Janssen Pharmaceuticals, Inc. upon ANDREW G. DEISS for,CaseNumber:190500299 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/22/2019 | 35 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Janssen Pharmaceuticals, Inc. upon ANDREW G. DEISS for,CaseNumber:190500299 | |
| 05/22/2019 | 34 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Johnson Johnson upon ANDREW G. DEISS for,CaseNumber:190500299 | |
| 05/22/2019 | 36 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc. upon ANDREW G. DEISS for,CaseNumber:190500299 | |
| 05/22/2019 | 428 | Filed: Motion Pro Hac Vice Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Daniel R. Griffin,CaseNumber:190500261 | |
| 05/22/2019 | 424 | Filed: Motion Pro Hac Vice Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Meagan M. Talafuse,CaseNumber:190500261 | |
| 05/22/2019 | 430 | Filed: Order (Proposed) Granting Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Daniel R. Griffin,CaseNumber:190500261 | |
| 05/22/2019 | 426 | Filed: Order (Proposed) Granting Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Meagan M. Talafuse,CaseNumber:190500261 | |
| 05/22/2019 | 429 | Filed: Request/Notice to Submit Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Daniel R. Griffin,CaseNumber:190500261 | |
| 05/22/2019 | 425 | Filed: Request/Notice to Submit Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Meagan M. Talafuse,CaseNumber:190500261 | |
| 05/22/2019 | 427 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/22/2019 | 431 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/22/2019 | 38 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 05/24/2019 | | Fee Account created | |
| 05/24/2019 | | Fee Payment,CaseNumber:17600421 | |
| 05/24/2019 | 40 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Purdue Pharma, Inc. upon ELISABETH M. MCOMBER for,CaseNumber:190500299 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/24/2019 | 39 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Purdue Pharma, L.P. upon ELISABETH M. MCOMBER for,CaseNumber:190500299 | |
| 05/24/2019 | 41 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for The Purdue Frederick Company, Inc. upon ELISABETH M. MCOMBER for,CaseNumber:190500299 | |
| 05/24/2019 | 357 | Filed: Request for Audio Recording | |
| 05/24/2019 | 358 | Filed: Return of Electronic Notification | |
| 05/24/2019 | 42 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 05/28/2019 | 359 | Filed: Recording Request Completed and Emailed to Counsel | |
| 05/29/2019 | 43 | Filed: Acceptance of Service and Stipulation to Extend Answer Deadline for Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals. Inc. upon JESSE M. KRANNICH for,CaseNumber:190500299 | |
| 05/29/2019 | 140 | Filed: Motion Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes | |
| 05/29/2019 | 45 | Filed: Motion Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes,CaseNumber:190500299 | |
| 05/29/2019 | 141 | Filed: Order (Proposed) Granting Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes | |
| 05/29/2019 | 46 | Filed: Order (Proposed) Granting Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes,CaseNumber:190500299 | |
| 05/29/2019 | 142 | Filed: Return of Electronic Notification | |
| 05/29/2019 | 44 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 05/29/2019 | 47 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 05/30/2019 | 143 | Filed: Order Granting Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes | |
| 05/30/2019 | 361 | Filed: Return of Electronic Notification | |
| 05/30/2019 | 144 | Filed: Return of Electronic Notification | |
| 05/30/2019 | 364 | Filed: Return of Electronic Notification | |
| 05/30/2019 | 360 | Filed: Signed Order (Uintah) Granting Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes | |
| 05/30/2019 | 362 | Filed: Signed Order (Wasatch) Granting Stipulated Motion to Transfer Venue for | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | Pretrial and Discovery Purposes | |
| 05/30/2019 | 363 | Filed: Signed Order (Weber) Granting Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes | |
| 05/31/2019 | 448 | Filed: Exhibit A,CaseNumber:190500261 | |
| 05/31/2019 | 434 | Filed: Motion for Leave to File an Overlength Joint Reply Memorandum,CaseNumber:190500261 | |
| 05/31/2019 | 436 | Filed: Order (Proposed) Granting Cardinal Healths Motion for Leave to File Overlength Joint Reply Memorandum,CaseNumber:190500261 | |
| 05/31/2019 | 442 | Filed: Order Granting Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Daniel R. Griffin,CaseNumber:190500261 | |
| 05/31/2019 | 443 | Filed: Order Granting Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Meagan M. Talafuse,CaseNumber:190500261 | |
| 05/31/2019 | 450 | Filed: Reply Brief in Support of Motion to Dismiss of Defendants Cephalon, Inc., Teva Pharmaceuticals USA, Inc., and Anesta LLC, f/k/a Anesta Corp,CaseNumber:190500261 | |
| 05/31/2019 | 432 | Filed: Reply Depomed, Inc. and Assertio Therapeutics Reply in Support of Motion to Dismiss,CaseNumber:190500261 | |
| 05/31/2019 | 438 | Filed: Reply Distributor Defendants Joint Reply Memorandum in Support of Motion to Dismiss,CaseNumber:190500261 | |
| 05/31/2019 | 440 | Filed: Reply Memorandum in Support of Motion to Dismiss on Behalf of Allergan Finance, LLC F/K/A Actavis, Inc. F/K/A Watson Pharmaceuticals, Inc.; Allergan Sales, LLC; and Allergan USA Inc.,CaseNumber:190500261 | |
| 05/31/2019 | 447 | Filed: Reply of Defendants Watson Laboratories, Inc, Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc., and Actavis Laboratories UT, Inc. in Support of their Motion to Dismiss,CaseNumber:190500261 | |
| 05/31/2019 | 435 | Filed: Request/Notice to Submit for Decision Distributor Defendants Motion for Leave to File an Overlength Joint Reply Memorandum,CaseNumber:190500261 | |
| 05/31/2019 | 433 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/31/2019 | 437 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 05/31/2019 | 439 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/31/2019 | 441 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/31/2019 | 444 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/31/2019 | 446 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/31/2019 | 449 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/31/2019 | 451 | Filed: Return of Electronic Notification,CaseNumber:190500261 | |
| 05/31/2019 | 445 | Filed: Ruling and Order on Defendants Johnson & Johnson and Janssen Pharmaceuticals, INC&#39;s Motion to Transfer Venue and Defendants Allergen&#39;s Motion to Consolidate Related Cases,CaseNumber:190500261 | |
| 06/03/2019 | 368 | Filed: Motion Pro Hac Vice - Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Erin R. Macgowan | |
| 06/03/2019 | 367 | Filed: Motion Pro Hac Vice - Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Rocky C. Tsai | |
| 06/03/2019 | 370 | Filed: Order (Proposed) Granting Motion for Pro Hac Vice Admission of Erin R. Macgowan | |
| 06/03/2019 | 369 | Filed: Order (Proposed) Granting Motion for Pro Hac Vice Admission of Rocky C. Tsai | |
| 06/03/2019 | 366 | Filed: Return of Electronic Notification | |
| 06/03/2019 | 371 | Filed: Return of Electronic Notification | |
| 06/03/2019 | 365 | Filed: Signed Order (Cache) Granting Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes | |
| 06/04/2019 | 373 | Filed: Order Granting Motion for Pro Hac Vice Admission of Erin R. Macgowan | |
| 06/04/2019 | 372 | Filed: Order Granting Motion for Pro Hac Vice Admission of Rocky C. Tsai | |
| 06/04/2019 | 374 | Filed: Return of Electronic Notification | |
| 06/04/2019 | 375 | Filed: Return of Electronic Notification | |
| 06/04/2019 | | ORAL ARGUMENT Cancelled,CaseNumber:190500261 | |
| 06/06/2019 | | AUDIO TAPE COPY Account Adjustment,CaseNumber:190500261 | |
| 06/06/2019 | | Case filed by casetran,CaseNumber:190500261 | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 06/06/2019 | 376 | Filed: Notice of Withdrawal of Counsel - Thomas R. Karrenberg | |
| 06/06/2019 | 377 | Filed: Return of Electronic Notification | |
| 06/12/2019 | | Fee Account created | |
| 06/12/2019 | | Fee Payment,CaseNumber:17620331 | |
| 06/12/2019 | 381 | Filed: Amended Complaint Salt Lake Countys First Amended Complaint and Jury Demand | |
| 06/12/2019 | 379 | Filed: Defendant Insys Therapeutics, Inc.s Notice of Bankruptcy Filing and Imposition of Automatic Stay | |
| 06/12/2019 | 48 | Filed: Defendant Insys Therapeutics, Inc.s Notice of Bankruptcy Filing and Imposition of Automatic Stay,CaseNumber:190500299 | |
| 06/12/2019 | 380 | Filed: Return of Electronic Notification | |
| 06/12/2019 | 382 | Filed: Return of Electronic Notification | |
| 06/12/2019 | 49 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 06/13/2019 | 387 | Filed: Ex Parte Order (Proposed) Order to Delete First Amended Complaint | |
| 06/13/2019 | 385 | Filed: Motion Ex Parte Motion to Delete First Amended Complaint | |
| 06/13/2019 | 50 | Filed: Order Granting Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes,CaseNumber:190500299 | |
| 06/13/2019 | 386 | Filed: Request/Notice to Submit re Ex Parte Motion to Delete First Amended Complaint | |
| 06/13/2019 | 384 | Filed: Return of Electronic Notification | |
| 06/13/2019 | 388 | Filed: Return of Electronic Notification | |
| 06/13/2019 | 51 | Filed: Return of Electronic Notification,CaseNumber:190500299 | |
| 06/13/2019 | 383 | Filed: Signed Order (Washington) Granting Stipulated Motion to Transfer Venue for Pretrial and Discovery Purposes | |
| 06/18/2019 | 392 | Filed: Appearance of Counsel/Notice of Limited Appearance of Mylan Defendants | |
| 06/18/2019 | 391 | Filed: Ex Parte Order Order to Delete First Amended Complaint | |
| 06/18/2019 | 396 | Filed: Motion Mylan Defendants Unopposed Motion to Extend Time to Answer or Otherwise Respond | |
| 06/18/2019 | 394 | Filed: Order (Proposed) Granting Mylan Defendants Unopposed Motion to Extend Time to Answer or Otherwise Respond | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 06/18/2019 | 397 | Filed: Request/Notice to Submit Mylan Defendants Unopposed Motion to Extend Time To Answer or Otherwise Respond | |
| 06/18/2019 | 393 | Filed: Return of Electronic Notification | |
| 06/18/2019 | 395 | Filed: Return of Electronic Notification | |
| 06/18/2019 | 398 | Filed: Return of Electronic Notification | |
| 06/19/2019 | | **** PRIVATE **** Filed: (Private Unredacted) Salt Lake County First Amended Complaint | |
| 06/19/2019 | | **** PRIVATE **** Filed: Amended Complaint First Amended Complaint of Salt Lake County- Redacted | |
| 06/19/2019 | | **** PRIVATE **** Filed: Motion to Classify First Amended Complaint as Private | |
| 06/19/2019 | | **** PRIVATE **** Filed: Order (Proposed) Order Granting Motion to Classify First Amended Complaint as Private | |
| 06/19/2019 | 400 | Filed: Order (Proposed) Order Granting Stipulated Briefing Schedule for Defendants Motions to Dismiss | |
| 06/19/2019 | 404 | Filed: Order Granting Mylan Defendants Unopposed Motion to Extend Time to Answer or Otherwise Respond | |
| 06/19/2019 | 402 | Filed: Order Granting Stipulated Briefing Schedule for Defendants Motions to Dismiss | |
| 06/19/2019 | 399 | Filed: Request/Notice to Submit re Stipulated Briefing Schedule for Defendants Motions to Dismiss | |
| 06/19/2019 | 401 | Filed: Return of Electronic Notification | |
| 06/19/2019 | 403 | Filed: Return of Electronic Notification | |
| 06/19/2019 | 405 | Filed: Return of Electronic Notification | |
| 06/19/2019 | 407 | Filed: Return of Electronic Notification | |
| 06/19/2019 | 411 | Filed: Return of Electronic Notification | |
| 06/20/2019 | | Case filed by casetran,CaseNumber:190500299 | |
| 06/20/2019 | 412 | Filed: Order Granting Motion to Classify First Amended Complaint as Private | |
| 06/20/2019 | 413 | Filed: Return of Electronic Notification | |
| 06/27/2019 | 417 | Filed: Motion For Status Conference | |
| 06/27/2019 | 415 | Filed: Notice of Withdrawal of Counsel Rebecca Van Tassell | |
| 06/27/2019 | 416 | Filed: Return of Electronic Notification | |
| 06/27/2019 | 418 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 07/01/2019 | | Case Disposition is Case consolidation,CaseNumber:190500299 | |
| 07/01/2019 | | Case filed by casetran,CaseNumber:190500299 | |
| 07/01/2019 | 423 | Filed: AMENDED ORDER REGARDING CONSOLIDATION OF OPIOID MATTERS | |
| 07/01/2019 | 420 | Filed: Notice for Case 180500119 LP: Judge RICHARD MRAZIK | |
| 07/01/2019 | 419 | Filed: Notice of Status Conference - Emailed to Counsel | |
| 07/01/2019 | 422 | Filed: Order Regarding Consolidation of Opioid Matters | |
| 07/01/2019 | 424 | Filed: Response to Motion for Status Conference | |
| 07/01/2019 | 425 | Filed: Return of Electronic Notification | |
| 07/01/2019 | 421 | Filed: UPDATED Notice of Status Conference | |
| 07/01/2019 | | NOTICE for Case 180500119 ID 20142361 | |
| 07/01/2019 | | STATUS CONFERENCE set on 07/02/2019 | |
| 07/02/2019 | | STATUS HEARING | |
| 07/05/2019 | 431 | Filed: Notice of Withdrawal of Counsel of Dillon P. Olson | |
| 07/05/2019 | 432 | Filed: Return of Electronic Notification | |
| 07/08/2019 | 433 | Filed: Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Rachel B. Weil | |
| 07/08/2019 | 434 | Filed: Order (Proposed) Granting Pro Hac Vice Admission of Rachel B. Weil | |
| 07/08/2019 | 435 | Filed: Return of Electronic Notification | |
| 07/10/2019 | 436 | Filed: Order Granting Pro Hac Vice Admission of Rachel B. Weil | |
| 07/10/2019 | 437 | Filed: Return of Electronic Notification | |
| 07/15/2019 | 439 | Filed: Defendant Insys Therapeutics, Inc.s Notice of Stay Order | |
| 07/15/2019 | 440 | Filed: Return of Electronic Notification | |
| 07/25/2019 | 468 | Filed: Notice of Change of Address and Firm Affiliation for Salt Lake County Pro Hac Vice Attorney Jennifer Fountain Connolly | |
| 07/25/2019 | 466 | Filed: Order (Proposed) Partially-Stipulated Order Regarding Second Briefing Schedule for Motion to Dismiss | |
| 07/25/2019 | 465 | Filed: Request/Notice to Submit For Decision Partially-Stipulated Order Regarding Second Briefing Schedule for Motion to Dismiss | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 07/25/2019 | 464 | Filed: Return of Electronic Notification | |
| 07/25/2019 | 467 | Filed: Return of Electronic Notification | |
| 07/25/2019 | 469 | Filed: Return of Electronic Notification | |
| 07/25/2019 | 463 | Filed: Return of Service for Amerisource Bergen Drug Corporation for Salt Lake Countys First Amended Complaint upon CT CORPORATION SYSTEM for | |
| 07/25/2019 | 460 | Filed: Return of Service for Cardinal Health, Inc. for Salt Lake Countys First Amended Complaint upon CT CORPORATION SYSTEM for | |
| 07/25/2019 | 458 | Filed: Return of Service for Cephalon, Inc. for Salt Lake Countys First Amended Complaint upon CORPORATION CREATIONS NETWORK, INC. for | |
| 07/25/2019 | 462 | Filed: Return of Service for Mallinckrodt, LLC for Salt Lake Countys First Amended Complaint upon THE CORPORATION TRUST COMPANY for | |
| 07/25/2019 | 461 | Filed: Return of Service for McKesson Corporation for Salt Lake Countys First Amended Complaint upon CORPORATION SERVICE COMPANY for | |
| 07/25/2019 | 459 | Filed: Return of Service for SpecGx, LLC for Salt Lake Countys First Amended Complaint upon CT CORPORATION SYSTEM for | |
| 07/25/2019 | 457 | Filed: Return of Service for Teva Pharmaceuticals for Salt Lake Countys First Amended Complaint upon CORPORATE CREATIONS NETWORK, INC. for | |
| 07/26/2019 | 486 | Filed: Acceptance of Service CACHE ET AL. V. R SACKLER -- ACCEPTANCE OF SERVICE DOCTORS | |
| 07/26/2019 | 495 | Filed: Acceptance of Service SEVIER ET AL. V. R. SACKLER ET AL -- ACCEPTANCE OF SERVICE DOCTORS | |
| 07/26/2019 | 474 | Filed: Acceptance of Service SUMMIT V. R. SACKLER ET AL. -- ACCEPTANCE OF SERVICE DOCTORS | |
| 07/26/2019 | 477 | Filed: Acceptance of Service TOOELE V. R SACKLER -- ACCEPTANCE OF SERVICE DOCTORS | |
| 07/26/2019 | 488 | Filed: Acceptance of Service UINTA ET AL. V. R. SACKLER ET AL -- ACCEPTANCE OF SERVICE DOCTORS | |
| 07/26/2019 | 480 | Filed: Acceptance of Service WASATCH V. R SACKLER -- ACCEPTANCE OF SERVICE DOCTORS | |
| 07/26/2019 | 491 | Filed: Acceptance of Service WASHINGTON | |

**180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.**

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| | | ET AL. V. R. SACKLER ET AL -- ACCEPTANCE OF SERVICE DOCTORS | |
| 07/26/2019 | 483 | Filed: Acceptance of Service WEBER V. R SACKLER -- ACCEPTANCE OF SERVICE DOCTORS | |
| 07/26/2019 | 485 | Filed: CACHE ET AL. V. R. SACKLER ET AL -- COMPLAINT AND JURY DEMAND | |
| 07/26/2019 | 471 | Filed: Order (Proposed) Amended Partially-Stipulated Order Regarding Second Briefing Schedule for Motions to Dismiss | |
| 07/26/2019 | 501 | Filed: Order Amended Partially-Stipulated Order Regarding Second Briefing Schedule for Motions to Dismiss | |
| 07/26/2019 | 499 | Filed: Other - Not Signed Order (Proposed) Partially-Stipulated Order Regarding Second Briefing Schedule for Motion to Dismiss | |
| 07/26/2019 | 470 | Filed: Request/Notice to Submit for Decision Amended Partially-Stipulated Order Regarding Second Briefing Schedule for Motions to Dismiss | |
| 07/26/2019 | 472 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 475 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 478 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 481 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 484 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 489 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 492 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 493 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 496 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 498 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 500 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 502 | Filed: Return of Electronic Notification | |
| 07/26/2019 | 497 | Filed: Salt Lake County Second Amended Complaint and Jury Demand | |
| 07/26/2019 | 494 | Filed: SEVIER ET AL. V. R. SACKLER ET AL -- COMPLAINT AND JURY DEMAND | |
| 07/26/2019 | 473 | Filed: SUMMIT V. R. SACKLER ET AL. -- COMPLAINT FOR DAMAGES AND JURY DEMAND | |
| 07/26/2019 | 476 | Filed: TOOELE V. R. SACKLER ET AL -- COMPLAINT AND JURY DEMAND | |
| 07/26/2019 | 487 | Filed: UINTAH ET AL. V. R. SACKLER ET AL -- COMPLAINT AND JURY DEMAND | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 07/26/2019 | 479 | Filed: WASATCH V. R. SACKLER ET AL -- COMPLAINT AND JURY DEMAND | |
| 07/26/2019 | 490 | Filed: WASHINGTON ET AL. V. R. SACKLER ET AL -- COMPLAINT AND JURY DEMAND | |
| 07/26/2019 | 482 | Filed: WEBER V.R. SACKLER ET AL -- COMPLAINT AND JURY DEMAND | |
| 08/02/2019 | | Fee Account created | |
| 08/02/2019 | | Fee Payment,CaseNumber:17677725 | |
| 08/02/2019 | 504 | Filed: Request for Audio Recording Request for Copy of Audio Record | |
| 08/02/2019 | 505 | Filed: Return of Electronic Notification | |
| 08/05/2019 | 506 | Filed: Motion Summit Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 514 | Filed: Motion Uintah County, et al. Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 518 | Filed: Motion Wasatch Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 510 | Filed: Motion Weber Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 508 | Filed: Order (Proposed) Granting Summit Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 516 | Filed: Order (Proposed) Granting Uintah County, et al. Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 520 | Filed: Order (Proposed) Granting Wasatch Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 512 | Filed: Order (Proposed) Granting Weber Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 507 | Filed: Request/Notice to Submit Summit Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 515 | Filed: Request/Notice to Submit Uintah County, et al. Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 519 | Filed: Request/Notice to Submit Wasatch Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 511 | Filed: Request/Notice to Submit Weber Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/05/2019 | 509 | Filed: Return of Electronic Notification | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 08/05/2019 | 513 | Filed: Return of Electronic Notification | |
| 08/05/2019 | 517 | Filed: Return of Electronic Notification | |
| 08/05/2019 | 521 | Filed: Return of Electronic Notification | |
| 08/06/2019 | 522 | Filed: Motion Cache Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 526 | Filed: Motion Tooele Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 530 | Filed: Motion Washington Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 524 | Filed: Order (Proposed) Granting Cache Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 528 | Filed: Order (Proposed) Granting Tooele Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 532 | Filed: Order (Proposed) Granting Washington Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 523 | Filed: Request/Notice to Submit Cache Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 527 | Filed: Request/Notice to Submit Tooele Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 531 | Filed: Request/Notice to Submit Washington Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/06/2019 | 525 | Filed: Return of Electronic Notification | |
| 08/06/2019 | 529 | Filed: Return of Electronic Notification | |
| 08/06/2019 | 533 | Filed: Return of Electronic Notification | |
| 08/08/2019 | 534 | Filed: Notice for Case 180500119 LP: Judge RICHARD MRAZIK | |
| 08/08/2019 | | STATUS HEARING (W43) set on 08/12/2019 | |
| 08/12/2019 | 537 | Filed: Motion Pro Hac Vice Admission of Sarah B. Johansen on Behalf of AmerisourceBergen Corporation and AmerisourceBergen Drug Corporation | |
| 08/12/2019 | 535 | Filed: Motion Pro Hac Vice Admission of Steven J. Boranian on Behalf of AmerisourceBergen Corporation and AmerisourceBergen Drug Corporation | |
| 08/12/2019 | 538 | Filed: Order (Proposed) Granting Pro Hac Vice Admission of Sarah B. Johansen | |
| 08/12/2019 | 536 | Filed: Order (Proposed) Granting Pro Hac Vice Admission of Steven J. Boranian | |

180500119, SUMMIT COUNTY, et al.  vs.  PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 08/12/2019 | 539 | Filed: Return of Electronic Notification | |
| 08/12/2019 | 540 | Filed: Return of Electronic Notification | |
| 08/12/2019 | | STATUS HEARING | |
| 08/13/2019 | 542 | Filed: Order Granting Cache Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/13/2019 | 541 | Filed: Order Granting Pro Hac Vice Admission of Sarah B. Johansen | |
| 08/13/2019 | 545 | Filed: Order Granting Pro Hac Vice Admission of Steven J. Boranian | |
| 08/13/2019 | 548 | Filed: Order Granting Summit Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/13/2019 | 543 | Filed: Order Granting Tooele Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/13/2019 | 546 | Filed: Order Granting Uintah County, et al. Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/13/2019 | 547 | Filed: Order Granting Wasatch Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/13/2019 | 544 | Filed: Order Granting Washington Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/13/2019 | 549 | Filed: Order Granting Weber Countys Unopposed Motion to Sever Insys Therapeutics, Inc. | |
| 08/13/2019 | 550 | Filed: Return of Electronic Notification | |
| 08/13/2019 | 552 | Filed: Return of Electronic Notification | |
| 08/13/2019 | 551 | Filed: Return of Electronic Notification | |
| 08/13/2019 | 554 | Filed: Return of Electronic Notification | |
| 08/13/2019 | 553 | Filed: Return of Electronic Notification | |
| 08/13/2019 | 556 | Filed: Return of Electronic Notification | |
| 08/13/2019 | 557 | Filed: Return of Electronic Notification | |
| 08/13/2019 | 555 | Filed: Return of Electronic Notification | |
| 08/13/2019 | 558 | Filed: Return of Electronic Notification | |
| 08/14/2019 | 562 | Filed: Return of Electronic Notification | |
| 08/14/2019 | 560 | Filed: Return of Service of Salt Lake Countys Second Amended Complaint on Noramco, Inc. | |
| 08/14/2019 | 559 | Filed: Return of Service of Salt Lake Countys Second Amended Complaint on Walgreen Co | |

180500119, SUMMIT COUNTY, et al. vs. PURDUE PHARMA LP, et al.

| Date | # | Proceeding Text | Details |
|------|---|-----------------|---------|
| 08/14/2019 | 561 | Filed: Return of Service of Salt Lake Countys Second Amended Complaint on Walmart | |
| 08/21/2019 | | Fee Account created | |
| 08/22/2019 | | Fee Payment,CaseNumber:17698237 | |
| 09/03/2019 | 565 | Filed: Motion Pro Hac Vice Motion and Consent of Sponsoring Local Counsel for Pro Hac Vice Admission of Maria Pellegrino Rivera | |
| 09/03/2019 | 566 | Filed: Order (Proposed) Granting Pro Hac Vice Admission of Maria Pellegrino Rivera | |
| 09/03/2019 | 567 | Filed: Return of Electronic Notification | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

# EXHIBIT B



# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Walgreens Distribution<br>Corporation Service Company- Wilmington, DELAWARE<br>251 Little Falls Dr<br>Wilmington, DE 19808-1674 |

| | |
|---|---|
| **Entity:** | Walgreens Boots Alliance, Inc.<br>Entity ID Number  3377172 |
| **Entity Served:** | Walgreens Boots Alliance, Inc. a/k/a Walgreen Co. |
| **Title of Action:** | Salt Lake County vs. Purdue Pharma L.P. |
| **Document(s) Type:** | Summons and Amended Complaint |
| **Nature of Action:** | Violation of State/Federal Act |
| **Court/Agency:** | Salt Lake County District Court, UT |
| **Case/Reference No:** | 180500119 |
| **Jurisdiction Served:** | Delaware |
| **Date Served on CSC:** | 08/05/2019 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Andrew R. Hale<br>801-639-0954 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Sim Gill (Utah Bar No. 6389)
OFFICE OF SALT LAKE COUNTY
DISTRICT ATTORNEY
Bridget K. Romano (Utah Bar No. 6979)
Deputy District Attorney
35 East 500 South
Salt Lake City, Utah 84111
Telephone: (385) 468-7700
bromano@slco.org

Thomas R. Karrenberg (Utah Bar No. 3720)
Richard A. Kaplan (Utah Bar No. 13480)
Andrew R. Hale (Utah Bar No. 13725)
ANDERSON & KARRENBERG
50 West Broadway, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 639-0954
tkarrenberg@aklawfirm.com
rkaplan@aklawfirm.com
ahale@aklawfirm.com

Steve W. Berman
Anne F. Johnson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
annej@hbsslaw.com

Ben M. Harrington
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
benh@hbsslaw.com

*Attorneys for Plaintiff Salt Lake County*

## IN THE THIRD DISTRICT COURT

## FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SALT LAKE COUNTY,<br><br>                 Plaintiff,<br><br>        v.<br><br>PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ALLERGAN FINANCE, LLC (f/k/a ACTAVIS, INC.); WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; SPECGX LLC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; LYNN R. WEBSTER, MD; RUSSELL K. PORTENOY, MD; AND DOES 1 THROUGH 100, INCLUSIVE,<br><br>                 Defendants. | **SUMMONS**<br><br><br>Civil No. 180500119<br><br>The Honorable<br>Richard Mrazik |

**THE STATE OF UTAH TO THE NAMED DEFENDANT:**

Walgreens Boots Alliance, Inc. a/k/a Walgreen Co.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court, 450 South State Street, Salt Lake City, UT, and to serve upon Plaintiff's attorneys, Sim Gill, Office of Salt Lake County District Attorneys, 35 East 500 South Salt Lake City, Utah 84111 and Thomas R. Karrenberg, Richard A. Kaplan, and Andrew R. Hale, Anderson & Karrenberg, 50 West Broadway, Suite 700, Salt Lake City, Utah 84101-2035, an Answer to the Second Amended Complaint which is herewith served upon you, within thirty (30) days after service of this Summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the First Amended Complaint, the original of which has been filed with the Clerk of the Court and a copy of which is hereto annexed and herewith served upon you.

**DATED:** July 26, 2019

ANDERSON & KARRENBERG

/s/ Andrew R. Hale
Thomas R. Karrenberg
Richard A. Kaplan
Andrew R. Hale
***Attorneys for Plaintiffs***

Sim Gill (Utah Bar No. 6389)
OFFICE OF SALT LAKE COUNTY
DISTRICT ATTORNEY
Bridget K. Romano (Utah Bar No. 6979)
Deputy District Attorney
35 East 500 South
Salt Lake City, Utah 84111
Telephone: (385) 468-7700
bromano@slco.org

Richard A. Kaplan (Utah Bar No. 13480)
Andrew R. Hale (Utah Bar No. 13725)
ANDERSON & KARRENBERG
50 West Broadway, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 639-0954
tkarrenberg@aklawfirm.com
rkaplan@aklawfirm.com
ahale@aklawfirm.com

Steve W. Berman
Anne F. Johnson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
annej@hbsslaw.com

Ben M. Harrington
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
benh@hbsslaw.com

*Attorneys for Plaintiff Salt Lake County*

## IN THE THIRD DISTRICT COURT

## FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| SALT LAKE COUNTY,<br><br>  Plaintiff,<br><br>v.<br><br>PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; NORAMCO, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ALLERGAN FINANCE, LLC (f/k/a ACTAVIS, INC.); WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; MALLINCKRODT PLC; MALLINCKRODT LLC; SPECGX LLC; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; MCKESSON CORPORATION; WALMART INC. f/k/a WAL-MART STORES, INC.; WALGREENS BOOTS ALLIANCE, INC. a/k/a WALGREEN CO., LYNN R. WEBSTER, MD; RUSSELL K. PORTENOY, MD; AND DOES 1 THROUGH 100, INCLUSIVE,<br><br>  Defendants. | **SECOND AMENDED COMPLAINT AND JURY DEMAND**<br><br>Civil No. 180500119<br><br>The Honorable<br>Richard Mrazik |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................1

II.  JURISDICTION AND VENUE ...............................................7

III. PARTIES ...........................................................................8

    A.   Plaintiff ......................................................................8

    B.   Manufacturer Defendants.............................................8

    C.   KOL Defendants .......................................................13

    D.   Distributor Defendants................................................13

IV.  FACTUAL ALLEGATIONS ...............................................15

    A.   Manufacturer Defendants Used Every Available Avenue to Disseminate Their False and Deceptive Statements About Opioids. .........................15

        1.   Manufacturer Defendants spread and continue to spread their false and deceptive statements through direct marketing of their branded opioids..........................................16

        2.   Manufacturer Defendants used a diverse group of seemingly independent third parties to spread false and deceptive statements about the risks and benefits of opioids.......................19

    B.   Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits Of Opioids........................................42

        1.   Manufacturer Defendants falsely trivialized or failed to disclose the known risks of long-term opioid use.....................42

        2.   Manufacturer Defendants grossly overstated the benefits of chronic opioid therapy. ........................................58

        3.   Manufacturer Defendants also engaged in other unlawful, unfair, and fraudulent misconduct. ...............................63

    C.   Manufacturer Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations........................................65

    D.   Manufacturer Defendants' Scheme Was Successful in Deceiving Doctors and Generating Enormous Profits........................66

    E.   Manufacturer and Distributor Defendants Failed to Maintain Effective Controls to Prevent Diversion of Opioids and Halt Suspicious Orders.................69

        1.   Manufacturer and Distributor Defendants have an acknowledged duty to erect controls against the diversion of prescription opioids and report suspicious shipments. ...........................69

2.  Manufacturer and Distributor Defendants have failed to implement effective controls against the diversion of opioids. ...................................73

3.  Manufacturer and Distributor Defendants maintain granular prescribing data and knew suspicious shipments were directed into Salt Lake County...................................................................................101

4.  Manufacturer and Distributor Defendants failed to investigate and report suspicious opioid shipments into Salt Lake County......................103

F.  Defendants Fraudulently Concealed Their Misconduct. .....................105

G.  Defendants Have Created a Public Nuisance.......................................107

1.  Defendants' conduct foreseeably led to opioid abuse that has wrought havoc on Salt Lake County communities....................................107

2.  Defendants knew and should have known that their conduct would lead to overprescribing, diversion, and catastrophic human and economic costs. ...................................................................................115

3.  Defendants' conduct is not excused by the actions of any third parties....................................................................................................116

H.  Defendants' Conduct Has Caused Salt Lake County Substantial Economic Injury......................................................................................................117

V.  CAUSES OF ACTION ........................................................................................120

FIRST CAUSE OF ACTION:  PUBLIC NUISANCE UTAH CODE ANN. § 76-10-801, *ET SEQ.* (AGAINST ALL DEFENDANTS) .....................................................120

SECOND CAUSE OF ACTION:  PUBLIC NUISANCE UTAH COMMON LAW (AGAINST ALL DEFENDANTS) ........................................................................121

THIRD CAUSE OF ACTION:  UTAH CONSUMER SALES PRACTICES ACT ("UCSPA") UTAH CODE ANN. § 13-11-1, *ET SEQ.* (AGAINST MANUFACTURER DEFENDANTS).....................................................................122

FOURTH CAUSE OF ACTION:  COMMON LAW FRAUD (AGAINST MANUFACTURER AND KOL DEFENDANTS)...........................................................131

FIFTH CAUSE OF ACTION:  COMMON LAW NEGLIGENCE ..............................141

(AGAINST MANUFACTURER AND DISTRIBUTOR DEFENDANTS)................................141

SIXTH CAUSE OF ACTION:  CIVIL CONSPIRACY (AGAINST DEFENDANTS PURDUE, JANSSEN, ENDO, CEPHALON, MALLINCKRODT, AND KOL DEFENDANTS).........................................................................................142

SEVENTH CAUSE OF ACTION:  CIVIL CONSPIRACY (AGAINST MANUFACTURER AND DISTRIBUTOR DEFENDANTS)........................................144

EIGHTH CAUSE OF ACTION:  UNJUST ENRICHMENT (AGAINST MANUFACTURER DEFENDANTS).........................................................................145

PRAYER FOR RELIEF ...................................................................................146

JURY DEMAND ...........................................................................................146

Plaintiff Salt Lake County, by Salt Lake County District Attorney Sim Gill and as authorized by Salt Lake County Mayor Jenny Wilson, files this Second Amended Complaint and alleges as follows:

## I.    INTRODUCTION

1.    The opioid epidemic gripping Utah has grown into a public health crisis of historic proportions. At least one Utahn fatally overdoses on opioids every day, and widespread opioid abuse is devastating families and tearing at the fabric of Utah communities.

2.    Although no region of the State has been untouched by this crisis, Salt Lake County has been disproportionately affected. The numbers are striking. Nearly half of all fatal opioid overdoses in Utah annually occur in Salt Lake County; here, 531 opioid overdoses occurred in 2014-2015 alone—roughly one every 33 hours. More than one-third of all Utah emergency department encounters linked to opioids are reported by facilities operating in Salt Lake County. And while opioid-related crime is on the rise across the State, much of it has occurred in Salt Lake County urban encampments, like the Rio Grande area of downtown Salt Lake City, where opioid abusers congregate to become both the victimizers of others and the victims of drug dealers who prey on their addictions.

3.    As this crisis has evolved, Salt Lake County has pursued a range of remedial initiatives, including innovative drug diversion programs (like Operation Diversion in 2016) and law enforcement crackdowns (like Operation Rio Grande in 2017 to today), in which opioid abusers are offered treatment, supervision and case management at public expense. Salt Lake County also has implemented intensive treatment programs in its jail facilities, both to care for detainees in the thralls of opioid withdrawal and to provide ongoing medically assisted treatments to support their recovery. Outside the jail, Salt Lake County has funded a range of public health programs addressing opioid abuse, including community treatment facilities and

needle disposal sites, while also expending substantial sums outfitting local law enforcement officers with Naloxone, a drug specifically designed to arrest and reverse opioid overdoses.

4.    These efforts, and others, have saved countless Salt Lake County lives and given a second chance to numerous individuals swept into the criminal justice system as a result of their opioid addiction. But there is more work to be done.

5.    The Utah Department of Human Services in 2017 developed an index that draws on opioid mortality and morbidity data to rank Utah counties based on the severity of the opioid-related issues they confront.[1] The purpose of this study was to identify those Utah counties most in need of resources to combat opioid abuse. On this index, Salt Lake County ranks second among all Utah counties, topped only by Carbon County.

| Utah Counties Ranked Highest to Lowest Based on Opioid Mortality and Morbidity Index | |
| --- | --- |
| County | Index Score |
| Carbon | 1.9971875 |
| Salt Lake | 1.1817145 |
| Weber | 0.69898 |
| Tooele | 0.6622465 |
| Emery | 0.6403785 |
| Duchesne | 0.438872 |
| Utah | 0.2257305 |
| Washington | 0.0223215 |
| Morgan | -0.016289 |
| Box Elder | -0.056396 |
| Kane | -0.073293 |
| Juab | -0.1185665 |
| Davis | -0.1471655 |
| Iron | -0.27035 |
| Uintah | -0.309091 |
| Sanpete | -0.438246 |
| Cache | -0.6334995 |
| Summit | -0.6958145 |
| Sevier | -0.8067115 |
| Wasatch | -0.8141125 |
| Piute | -1.487913 |

---

[1] Utah Department of Human Services, Division of Substance Abuse and Mental Health, *Utah's Opioid Crisis Consequence and Resource Assessment* (July 2017) at 7.

6.     Salt Lake County thus has not only already devoted a substantial segment of its taxpayer-funded financial resources toward combatting opioid abuse, but additional resources and even more comprehensive efforts plainly are needed to stem the tide.

7.     While this burden has fallen on Salt Lake County, it was born from the misconduct of others who must be held accountable. As more fully detailed below, and as Salt Lake County's investigation amply demonstrates, Utah's opioid crisis stems directly from two principal causes:  (a) a callously deceptive marketing scheme that was spearheaded by certain opioid manufacturers ("Manufacturer Defendants"[2]) and prominent doctors they bankrolled, including Defendants Lynn Webster, MD and Russell Portenoy, MD; and (b) the failure of Manufacturing Defendants and certain opioid distributors ("Distributor Defendants"[3]) to maintain controls against the diversion of prescription opioids into illicit distribution channels.

8.     While all Defendants bear responsibility for Salt Lake County's opioid crisis, the Manufacturer Defendants laid the foundation by grossly inflating the demand for opioids.  Prior to the Manufacturer Defendants' marketing scheme, the prevailing view in the medical community was that opioids, while appropriate for treating short-term acute pain and providing palliative (end-of-life) care, were too addictive and debilitating to be prescribed for chronic pain (like back pain, migraines and arthritis).[4]  This reasoned consensus effectively locked Manufacturer Defendants out of a particularly lucrative segment of patients who, by virtue of their chronic ailments, required prolonged treatment.  To tap into this market, Manufacturer Defendants had to convince doctors nationwide, including in Utah, that the prevailing

---

[2] Namely Defendants Purdue Pharma L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals Inc., Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc., Noramco, Inc., Endo Health Solutions, Inc., Endo Pharmaceuticals, Inc., Allergan PLC f/k/a Actavis PLC, Allergan Finance, LLC f/k/a Actavis Inc., Watson Pharmaceuticals, Inc. n/k/a Actavis, Inc., Teva Pharmaceutical Industries, LTD., Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Mallinckrodt PLC, and Mallinckrodt LLC, and SpecGx LLC.

[3] Namely Defendants AmerisourceBergen Drug Corporation, Cardinal Health, Inc., McKesson Corporation, Walmart, Inc., and Walgreens Boots Alliance, Inc.

[4] In this Complaint, "chronic pain" means non-cancer pain lasting three months or longer.

understanding of opioids was unfounded and that chronic pain patients not only could, but should, be prescribed opioids long-term.

9.      To accomplish this, each Manufacturer Defendant spent, and some continue to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids while overstating the benefits of using them for chronic pain.  As to the risks, Manufacturer Defendants falsely and misleadingly, and sometimes contrary to the language of their drugs' labels:  (a) downplayed the serious risk of addiction; (b) promoted the concept of "pseudoaddiction" and thus advocated that the signs of addiction should be treated with more opioids; (c) exaggerated the effectiveness of screening tools in preventing addiction; (d) claimed that opioid dependence and withdrawal are easily managed; (e) denied the risks of higher opioid dosages; and (f) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction.  Simultaneously, Defendants also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no evidence to support these claims.

10.      Manufacturer Defendants disseminated these messages in Utah directly, both through their sales representatives and in speaker groups led by physicians recruited by Manufacturer Defendants.  Borrowing a page from Big Tobacco's playbook, Manufacturer Defendants also worked through third parties they controlled, including (a) "key opinion leaders" ("KOLs") in the medical community like Defendants Dr. Webster and Dr. Portenoy, and (b) seemingly neutral and credible professional societies and patient advocacy groups ("Front Groups").  Manufacturer Defendants then worked together with those KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, Continuing Medical Education ("CME") programs, medical conferences and seminars, and scientific articles.  Thus, working individually and collectively, and through these Front Groups and KOLs, Manufacturer Defendants persuaded doctors and patients that

what they had long known—*i.e.*, that opioids are addictive and unsafe in most circumstances for long-term use—was untrue and, quite the opposite, that the compassionate treatment of pain required opioids.

11.     Salt Lake County was particularly influenced by this marketing scheme through the efforts of Defendant Dr. Webster, a KOL based out of Salt Lake County. After founding the Salt Lake County-based Lifetree Pain Clinic in 1990, Dr. Webster received millions of dollars in consulting fees and other funds from opioid manufacturers. Taking cues from Defendant Dr. Portenoy—a KOL of unparalleled national prominence—Dr. Webster has pursued a career in Salt Lake County, continuing to this day, of overstating the benefits and minimizing the risk of chronic opioid therapy.

12.     Working as a paid consultant for the opioid industry, Dr. Webster has perpetuated a host of misconceptions, including the debunked concept of "pseudoaddiction." Dr. Webster also created what he styled the "Opioid Risk Tool," a one-minute screening that purportedly enables doctors to expediently identify patients likely to become addicted to opioids. In reality, the Opioid Risk Tool has promoted more liberal prescribing practices by giving doctors the false impression that, with just a few questions asked, opioids can be freely prescribed without endangering patients. This is precisely why the Opioid Risk Tool has been found on websites operated by Manufacturer Defendants.

13.     In 2010, the DEA raided Dr. Webster's Salt Lake County clinic and, although the U.S. Attorney ultimately elected not to bring charges, the investigation revealed that more than 20 of Dr. Webster's patients died of opioid overdoses under his "care." Undeterred, Dr. Webster continues to receive substantial funding from opioid manufacturers and, as a paid consultant, mislead the medical community as to the efficacy of opioids. Dr. Webster has also emerged as a vocal critic of efforts to curtail opioid prescribing in Salt Lake County and nationwide.

14.     Tragically, Manufacturer and KOL Defendants' collective efforts to promote chronic opioid treatment have been wildly successful, particularly in Utah. The data are astounding. In recent years, Utah's opioid prescribing rate—that is, the number of opioid prescriptions dispensed per capita—has hovered around 90%. This means that, in recent years, there were enough opioids prescribed in the State to supply nine out of every ten Utahns with one prescription each. Here again, Salt Lake County has been disproportionately affected, with Salt Lake County opioid prescribing rates exceeding the State average in nine out of the last ten years.

15.     Alarming as they are, these statistics do not illustrate fully the harm prescription opioid abuse has caused Salt Lake County communities. The dramatic increase in opioid prescriptions to treat chronic pain has resulted in a population of addicts who seek opioids wherever they can be obtained. Some addicts have turned to heroin. Studies show that 80% of heroin addicts started with prescription drugs, and heroin overdoses in Utah have increased dramatically over the last decade. Other addicts have sought prescription opioids diverted into the black market or from Salt Lake County doctors, such as Lynn Webster, who have been willing to overprescribe opioids with little regard for the medical need or dire consequences.

16.     The diversion of prescription opioids into illicit channels in no way lessens Defendants' responsibility for Salt Lake County's opioid crisis. Quite the opposite, Manufacturer and Distributor Defendants have a legal obligation to prevent diversion by monitoring the supply chain to identify, report and suspend suspicious opioid shipments. But as revealed in DEA data recently obtained by Salt Lake County, Manufacturer and Distributor Defendants failed to discharge this critical obligation in Salt Lake County.

17.     The DEA data show large numbers of shipments of unusual size or frequency that should have raised red flags. But rather than investigate and, where warranted, report these shipments to the DEA as is required, Manufacturer and Distributor Defendants often did nothing.

This preserved a valuable revenue stream for Manufacturer and Distributor Defendants—who ultimately profit from diversion—but imperiled Salt Lake County and its residents with an oversupply of highly addictive narcotics.

18.     Defendants' collective conduct has exacted a foreseeable financial burden on Salt Lake County, which itself has spent substantial sums on opioid prescriptions for its insured employees and their dependents, along with millions of additional dollars on addiction treatment and other programs aimed at curbing the crisis for the Salt Lake County citizenry. And this is only the beginning. Eradicating opioid abuse and its devastating consequences will require an enormous further outlay of public health and law enforcement resources at the county level. These abatement costs are directly attributable to Defendants' conduct and the flood of opioids it has unleashed on the region.

19.     With this action Salt Lake County seeks to hold Defendants accountable, individually and collectively, for creating a public nuisance in violation of Utah Code Ann. § 76-10-806 and the common law, engaging in deceptive acts and practices in violation of the Utah Consumer Sales Practices Act, committing common law fraud, negligently failing to maintain controls against diversion, participating in a civil conspiracy, and unjustly enriching themselves at Salt Lake County's expense. Salt Lake County seeks all remedies available, including injunctive relief, damages, restitution, and abatement.

## II.     JURISDICTION AND VENUE

20.     This Court has jurisdiction over this case under Utah Code Ann. § 78A-5-102(1).

21.     This Court has personal jurisdiction over Defendants under Utah Code Ann. § 78B-3-205 because they transact business, supply services and goods, and have caused injury within the State of Utah.

22.     Venue is proper in Salt Lake County pursuant to Utah Code Ann. § 78B-3-307.

# III.    PARTIES

## A.    Plaintiff

23.    Plaintiff Salt Lake County is a political subdivision of the State of Utah.

## B.    Manufacturer Defendants

24.    PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware. PURDUE PHARMA, INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY, INC. is a Delaware corporation with its principal place of business in Stamford, Connecticut. Purdue Pharma L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc. are referred to herein as "Purdue."

25.    Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER, and Targiniq ER in the United States and Salt Lake County. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

26.    JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of JOHNSON & JOHNSON (J&J), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. J&J is the only company that owns more

than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. In the daily course of its operations, Janssen Pharmaceuticals abides by an "Ethical Code for the Conduct of Research and Development" that is established and enforced by J&J across all of its subsidiaries. Until 2016, one of those subsidiaries was NORAMCO, INC. ("Noramco"), a Delaware company headquartered in Wilmington, Delaware with offices in Athens, Georgia and Schaffhausen, Switzerland. Noramco manufacturers the active pharmaceutical ingredients in the opioids produced by Janssen and other opioid manufacturers. Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., Noramco and J&J are referred to herein as "Janssen."

27.     Janssen manufactures, promotes, sells, and distributes drugs in the United States and Salt Lake County, including the opioid Duragesic. Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

28.     ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly-owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to herein as "Endo."

29.     Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States and Salt Lake County. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana

ER yielded $1.15 billion in revenue from 2010 to 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States and Salt Lake County, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

30. ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ACTAVIS PLC acquired Allergan plc in March 2015, and the combined company changed its name to Allergan plc in January 2013. Before that, WATSON PHARMACEUTICALS, INC. acquired ACTAVIS, INC. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then Actavis plc in October 2013. ALLERGAN FINANCE, LLC (f/k/a Actavis, Inc.), a wholly-owned subsidiary of Allergan plc, is a Nevada limited liability company. Each of these defendants is owned by Allergan plc, which uses them to market and sell its drugs in the United States. Upon information and belief, Allergan plc exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. Collectively, these defendants and entities are referred to as "Actavis."

31. Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States and Salt Lake County. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc. on December 30, 2008, and began marketing Kadian in 2009.

32. CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a wholly-owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania. Teva USA acquired Cephalon in October 2011.

33.    Cephalon, Inc. manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the U.S. and Salt Lake County. Actiq and Fentora have been approved by the FDA only for the "management of breakthrough cancer pain in patients 16 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."[5] In 2008, Cephalon pled guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

34.    Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon-branded products through its "specialty medicines" division. The FDA-approved prescribing information and medication guide for Cephalon opioids discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon, Inc. to disclose that it is a wholly-owned subsidiary of Teva Ltd. on prescription savings cards, indicating Teva Ltd. would be responsible for covering certain co-pay costs. All of Cephalon's promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012—the year immediately following the Cephalon acquisition—attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales." Through interrelated operations like these, Teva Ltd. operates through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc.,

---

[5] Breakthrough pain is a short-term flare of moderate-to-severe pain in patients with otherwise stable persistent pain.

Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder.

35. Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to herein as "Cephalon."

36. MALLINCKRODT PLC is an Irish public limited company with its headquarters in Staines-Upon-Thames, Surrey, United Kingdom. Mallinckrodt plc was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien plc, which was fully transferred to Mallinckrodt plc in June of that year. Mallinckrodt plc also operates under the registered business name Mallinckrodt Pharmaceuticals, with its U.S. headquarters in Hazelwood, Missouri. MALLINCKRODT LLC is a Delaware corporation with its headquarters in Hazelwood, Missouri. SPECGX LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri and is a wholly-owned subsidiary of Mallinckrodt plc. Together, Mallinckrodt plc, Mallinckrodt LLC, and SPECGX LLC are referred to herein as "Mallinckrodt."

37. Mallinckrodt manufactures and markets two branded opioids: Exalgo, which is extended-release hydromorphone, and Roxicodone, which is oxycodone. In 2009, Mallinckrodt Inc., a subsidiary of Covidien plc, acquired the U.S. rights to Exalgo. The FDA approved Exalgo in 2012. Mallinckrodt further expanded its branded opioid portfolio in 2012 by purchasing Roxicodone from Xanodyne Pharmaceuticals. In addition, Mallinckrodt developed Xartemis XR, an extended-release combination of oxycodone and acetaminophen, which the FDA approved in March 2014, and which Mallinckrodt has since discontinued. Mallinckrodt promoted its branded opioid products with its own direct sales force. Mallinckrodt has also long been a leading manufacturer of generic opioids.

## C.     KOL Defendants

38.     LYNN R. WEBSTER is a Utah resident and physician licensed to practice medicine in the state of Utah. Dr. Webster has received substantial funding from opioid manufacturers and has actively promoted the use of opioids to treat chronic pain in Salt Lake County and across the country. Dr. Webster currently serves as the vice president of scientific affairs at PRA Health Sciences, a research center located in Salt Lake County that conducts clinical trials for pharmaceutical products.

39.     RUSSELL K. PORTENOY is a New York resident and physician licensed to practice medicine in the state of New York. Dr. Portenoy has received substantial funding from opioid manufacturers and has actively promoted the use of opioids to treat chronic pain in Salt Lake County and across the country. Dr. Portenoy currently serves as the executive director of the MJHS Institute for Innovation in Palliative Care and as chief medical officer at MJHS Hospice and Palliative Care.

## D.     Distributor Defendants

40.     AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country, including in Salt Lake County. AmerisourceBergen is the tenth largest company by revenue in the United States, with annual revenue of $167 billion in 2018. AmerisourceBergen's principal place of business is located in Chesterbrook, Pennsylvania, and it is incorporated in Delaware.

41.     CARDINAL HEALTH, INC. ("Cardinal") describes itself as a "global, integrated health care services and products company," and is the sixteenth largest company by revenue in the U.S., with annual revenue of $136 billion in 2016. Cardinal distributes pharmaceutical drugs, including opioids, throughout the country, including in Salt Lake County. Cardinal is an Ohio corporation and is headquartered in Dublin, Ohio. Based on

Cardinal's own estimates, one of every six pharmaceutical products dispensed to United States patients travels through the Cardinal Health network.

42.     MCKESSON CORPORATION ("McKesson") is seventh on the list of Fortune 500 companies, ranking ahead of Ford and General Motors, with annual revenue of $208 billion in 2018.  McKesson is a wholesaler of pharmaceutical drugs that distributes opioids throughout the country, including in Salt Lake County.  McKesson is incorporated in Delaware, with its principal place of business in San Francisco, California.

43.     WALGREENS BOOTS ALLIANCE, INC. A/K/A WALGREENS CO. ("Walgreens") is a Delaware corporation with its principal place of business in Illinois. Walgreens, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.  At all times relevant to this Complaint, Walgreens distributed prescription opioids throughout the United States, including in Salt Lake County. Walgreens also operates retail pharmacies to which it distributes and dispenses prescription opioids.

44.     WALMART INC. F/K/A WAL-MART STORES, INC. ("Walmart") is a Delaware corporation with its principal place of business in Bentonville, Arkansas.  Walmart, through its various EA registrant subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor.  At all times relevant to this Complaint, Walmart distributed prescription opioids throughout the United States, including in Salt Lake County.  Walmart also operates retail pharmacies to which it distributes and dispenses prescription opioids.

45.     Salt Lake County lacks information sufficient to specifically identify the true names or capacities, whether individual, corporate or otherwise, of the Defendants sued herein under the fictitious names DOES 1 through 100 inclusive, and they are therefore sued herein pursuant to Rule 9(a)(2) of the Utah Rules of Civil Procedure.  Salt Lake County will amend this

Complaint to show their true names and capacities if and when they are ascertained. Salt Lake County is informed and believes, and on such information and belief alleges, that each of the Defendants named as a DOE is responsible in some manner for the events and occurrences alleged in this Complaint and is liable for the relief sought herein.

## IV.    FACTUAL ALLEGATIONS

46.    Before the 1990s, generally accepted standards of medical practice dictated that opioids should be used only for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

47.    Tens of millions of Americans suffer from and seek treatment for chronic pain. To take advantage of the lucrative market for chronic pain patients, each Manufacturer Defendant developed a well-funded marketing scheme based on deception. Manufacturer Defendants used both direct marketing and unbranded advertising disseminated by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use. These statements were unsupported by or contrary to the scientific evidence, and they are also contrary to pronouncements by and guidance from the United States Food and Drug Administration ("FDA") and Centers for Disease Control and Prevention ("CDC") based on that evidence. They also targeted susceptible prescribers and vulnerable patient populations.

## A.    Manufacturer Defendants Used Every Available Avenue to Disseminate Their False and Deceptive Statements About Opioids.

48.    Manufacturer Defendants spread their false and deceptive statements by marketing their branded opioids directly to doctors and patients in Salt Lake County.

Manufacturer Defendants also bankrolled and controlled professional societies and other ostensibly neutral third parties in order to lend these deceptive statements an artificial veneer of independence and scientific legitimacy.

**1.    Manufacturer Defendants spread and continue to spread their false and deceptive statements through direct marketing of their branded opioids.**

49.    Manufacturer Defendants' direct marketing of opioids generally proceeded on two tracks. First, each Manufacturer Defendant conducted and many continue to conduct advertising campaigns touting the purported benefits of their branded drugs. For example, Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001. This amount included $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

50.    A number of Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, Endo has distributed and made available on its website (www.opana.com) a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker and chef, misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured patients with chronic pain and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. Janssen used branded advertising and published reprints of journal articles promoting the use of opioids to treat osteoarthritis, even though the FDA found, in reviewing the New Drug Application for Janssen's drug Nucynta ER, that Nucynta ER was no more effective in reducing osteoarthritis pain than a placebo. Actavis distributed a product advertisement that falsely claimed that use of Kadian to treat chronic non-cancer pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives. The FDA later warned Actavis such claims were misleading.

51.     Second, each Manufacturer Defendant promoted the use of opioids for chronic pain through "detailers"—sales representatives who visited individual doctors and medical staff in their offices—and small-group speaker programs.  Manufacturer Defendants have not corrected this misinformation.  In 2014 alone, Manufacturer Defendants spent $154 million on detailing branded opioids to doctors.  This amount is twice as much as Manufacturer Defendants spent on detailing in 2000.  The amount includes $108 million spent by Purdue, $34 million by Janssen, $13 million by Cephalon, $10 million by Endo, and $2 million by Actavis.

52.     Manufacturer Defendants' detailers have been reprimanded for their deceptive detailing.  A July 2010 "Dear Doctor" letter mandated by the FDA required Actavis to acknowledge to the doctors to whom it marketed its drugs that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

53.     Manufacturer Defendants also identified doctors to serve, for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by Manufacturer Defendants.  These speaker programs provided: (a) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (b) recognition and compensation for the doctors selected as speakers; and (c) an opportunity to promote the drug through the speaker to his or her peers.  They were also one of the key ways Manufacturer Defendants' messages were disseminated as medical knowledge:  these speakers give the false impression that they are providing unbiased and medically accurate presentations when they

were, in fact, presenting a script prepared by Manufacturer Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct Manufacturer Defendants' prior misrepresentations about the risks and benefits of opioids.

54. Even without such studies, Manufacturer Defendants purchase, manipulate and analyze some of the most sophisticated data available in *any* industry. Manufacturer Defendants use this data to track, precisely, the rates of initial prescribing and renewal by individual doctor, which in turn allows them to target, tailor, and monitor the impact of their core messages. Thus, Manufacturer Defendants *know* their detailing to doctors is effective.

55. Manufacturer Defendants employed the same marketing plans and strategies and deployed the same messages in Salt Lake County as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This top-down approach ensures that Manufacturer Defendants' messages are accurately and consistently delivered across marketing channels— including detailing visits, speaker events, and advertising—and in each sales territory. Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their drugs.

56. Manufacturer Defendants ensured and continue to ensure marketing consistency nationwide through: (a) national and regional sales representative training; (b) national training of local medical liaisons, the company employees who respond to physician inquiries; (c) centralized speaker training; (d) single sets of visual aids, speaker slide decks, and sales training materials; and (e) nationally coordinated advertising. Manufacturer Defendants' sales

representatives and physician speakers were required to stick to prescribed talking points, sales messages, and slide decks, and supervisors rode along with them periodically to both check on their performance and compliance.

57.    In February 2018, with legal challenges mounting, Purdue announced that it would cease detailing physicians in respect to Purdue's branded opioids.  Purdue did not, however, make any commitment to correct the misrepresentations its multi-decade detailing campaign has engendered in the medical community.  Nor did Purdue commit to cease other deceptive marketing tactics, including the practice addressed below of laundering promotional messages through front groups and other ostensibly unbiased third parties.  Far from reversing course, Purdue has indicated it will aggressively promote its drugs that treat opioid-induced constipation—drugs that can be profitable only if opioids are widely prescribed.

**2.    Manufacturer Defendants used a diverse group of seemingly independent third parties to spread false and deceptive statements about the risks and benefits of opioids.**

58.    Manufacturer Defendants also deceptively marketed opioids in Salt Lake County through unbranded advertising—*i.e.*, advertising promoting opioid use generally but not naming a specific opioid.  This advertising was ostensibly created and disseminated by independent third parties.  But by funding, directing, reviewing, editing, and distributing this unbranded advertising, Manufacturer Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain.  Much as Manufacturer Defendants controlled the distribution of their "core messages" via their own detailers and speaker programs, Manufacturer Defendants similarly controlled the distribution of these messages in scientific publications, treatment

guidelines, and CMEs, and at medical conferences and seminars. To this end, Manufacturer Defendants used third-party public relations firms to help control those messages when they originated from third-parties.

59. Manufacturer Defendants also used third parties to conduct unbranded advertising because that advertising is not submitted to and typically is not reviewed by the FDA. Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like the tobacco companies, Manufacturer Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

60. Manufacturer Defendants' deceptive unbranded marketing often contradicted what they said in their branded materials reviewed by the FDA. For example, Endo's unbranded advertising contradicted the fine print in its concurrent branded advertising for Opana ER:

| Pain: Opioid Therapy (Unbranded) | Opana ER Advertisement (Branded) |
|---|---|
| "People who take opioids **as prescribed usually do not become addicted.**" | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use.**" |

61. By promoting opioids generally, unbranded marketing benefits all Manufacturer Defendants. It also provided supplemental benefits to Manufacturer Defendants who were involved in, and profited from, other aspects of the opioid supply chain. Most notably, in the 1990s Janssen developed a vertically integrated operation in which it not only marketed branded

opioids, but also manufactured and distributed the raw narcotics used in those and other prescription opioids. This operation was directed by J&J, the corporate parent of the Janssen family of companies.

62.     Specifically, through its subsidiary Tasmanian Alkaloids, J&J developed in the mid-1990s a potent poppy strain—known as the "Norman" poppy—that could be used to manufacture oxycodone, the active ingredient in a number of prescription opioids, including Purdue's blockbuster drug OxyContin. Through another subsidiary, Defendant Noramco, J&J then manufactured oxycodone and other opioid formulations for distribution to opioid manufacturers. By the time J&J sold Noramco in 2016, it had become "the #1 supplier of Narcotic APIs in the United States," supplying more 50 percent of *all* oxycodone, hydrocodone, codeine and morphine distributed in the United States. Its customers included each of the Manufacturer Defendants here.

63.     J&J's vast enterprise was instrumental in providing Manufacturer Defendants with the raw materials they needed to satisfy the runaway demand their marketing efforts created. J&J also recognized that the profitability of its supply enterprise was contingent on the widespread prescription of all opioids. If demand for OxyContin or any other opioid diminished, so too would demand for the raw opioids J&J cultivated and produced. This is precisely why J&J provided substantial support to unbranded marketing of opioids. Along with other Manufacturer Defendants, it did so through two primary vehicles—key opinion leaders and front groups. These are addressed in turn below.

### a.     Key Opinion Leaders ("KOLs")

64.     Manufacturer Defendants also spoke through a small circle of doctors who, upon information and belief, were selected, funded, and elevated by Manufacturer Defendants because they had expressed support for using opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs."

65. Manufacturer Defendants paid KOLs to serve as consultants or on their advisory boards and to give talks or present CMEs, and their support helped these KOLs become respected industry "experts." As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying Manufacturer Defendants by advancing their marketing goals. KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by Manufacturer Defendants.

66. KOLs have written, consulted on, edited, and lent their names to books and articles, and given speeches and CMEs supportive of chronic opioid therapy. Manufacturer Defendants created opportunities for KOLs to participate in research studies that Manufacturer Defendants suggested or chose and then cited and promoted favorable studies or articles by their KOLs. By contrast, Manufacturer Defendants did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

67. Manufacturer Defendants' KOLs also served on committees that developed treatment guidelines strongly encouraging the use of opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that developed, selected, and presented CMEs. These guidelines and CMEs were not supported by the scientific evidence at the time they were created, and they are not supported by the scientific evidence today. Manufacturer Defendants were able to direct and exert control over each of these activities through their KOLs. The 2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

68. Doctors are one of the most important avenues that Manufacturer Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. Manufacturer Defendants know that doctors generally rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the State of New York found in its settlement with

Purdue that through March 2015, the Purdue website *In the Face of Pain* (www.inthefaceofpain.com (discontinued Oct. 1, 2015)) failed to disclose that doctors who provided testimonials on the site were paid by Purdue. The settlement further concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials.

69. Thus, even though some of Manufacturer Defendants' KOLs have recently moderated or conceded the lack of evidence for many of the claims they made, those admissions did not reverse the effect of the false and deceptive statements that continue to appear nationwide and in Salt Lake County in Manufacturer Defendants' own marketing as well as in treatment guidelines, CMEs and other seminars, scientific articles and research, and other publications available in paper or online.

### (1) Defendant Lynn Webster

70. Of the KOLs Manufacturer Defendants utilized, Defendant Lynn Webster has been one of the most influential, particularly in Salt Lake County where he is based. Dr. Webster founded the Lifetree Pain Clinic in Salt Lake City in 1990, serving as its CEO and medical director. In 2003, Dr. Webster expanded his operation by co-founding Lifetree Clinical Research, which provided drug development services to pharmaceutical clients. In 2013, Dr. Webster became the president of the American Academy of Pain Management (AAPM), a front group for the opioid industry (discussed further below), and he remained on AAPM's board of directors for a period thereafter. Dr. Webster also has served, and continues to serve, as a senior editor for *Pain Medicine*, a journal that sells advertising space to Manufacturer Defendants and has published an assortment of pieces overstating the therapeutic benefits of treating chronic pain with opioids.

71. In these various capacities, Dr. Webster authored numerous studies and CMEs supporting chronic opioid treatment, and many of these were directly funded by opioid

manufacturers. As Dr. Webster's stature grew, Salt Lake County became a sort of "mecca" for opioid advocates and their backers in the pharmaceutical industry.[6] Dr. Webster was handsomely rewarded for his efforts. Between 2009 and 2013, he received nearly $2 million from Manufacturer Defendant Cephalon.[7] In 2013, the Salt Lake Tribune reported that Dr. Webster was ranked "among the top 50 for single largest payments received" from pharmaceutical companies, "behind marquee hospitals, such as the Mayo Clinic, Cleveland Clinic and Duke and Harvard Universities."[8] LifeTree Research, co-founded by Dr. Webster, received an additional $3.4 million in drug company payments between 2009 and 2013.[9]

72.     Dr. Webster was a forceful proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indicators of undertreated pain. The only way to differentiate the two, Dr. Webster claimed, was to *increase* a patient's dose of opioids. As he wrote in his book *Avoiding Opioid Abuse While Managing Pain* (2007), which is still available, when facing signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response." Endo distributed this book to doctors and all Manufacturer Defendants latched onto the pseudoaddiction concept it articulated. Although Dr. Webster has since moderated his support for pseudoaddiction, the concept lingers in the pain management community and continues to be used to justify aggressive opioid treatment for the most vulnerable patients.

73.     Another devastating contribution of Dr. Webster's is the so-called "Opioid Risk Tool," a five question, one-minute screening tool relying on patient self-reports that purportedly

---

[6] Sam Quinones, Dreamland: The True Tale of America's Opiate Epidemic (Bloomsbury Press 2015), at 94.

[7] ProPublica Data, available at: https://projects.propublica.org/d4d-archive/search?company%5Bid%5D=&period%5B%5D=&services%5B%5D=&state%5Bid%5D=45&term=Lynn+Webster&utf8=%E2%9C%93.

[8] Kristen Steward and Jennifer Dobner, *Utah doctors paid $ 25.8 million by drug companies*, Salt Lake Tribune (March 12, 2013), available at: http://archive.sltrib.com/article.php?id=55962410&itype=CMSID.

[9] *Id.*

allows doctors to assess and manage the risk that their patients will become addicted to opioids. In developing the Opioid Risk Tool, Dr. Webster claimed it "exhibited a high degree of sensitivity and specificity for determining which individuals are at risk for opioid-related, aberrant behaviors."[10] This asserted ability to pre-sort at-risk patients gave doctors—particularly busy primary care doctors who are most often consulted for pain—confidence to prescribe opioids long-term. It is thus little surprise that the tool has been aggressively promoted by Manufacturer Defendants, with versions of it appearing on websites run by Endo, Janssen, and Purdue. Advising the Utah Department of Health, Dr. Webster also was successful in incorporating the Opioid Risk Tool into Utah's Clinical Guidelines on Prescribing Opioids for Treatment of Pain, first published in 2009.[11] Tellingly, opioid prescribing rates in Utah have increased since those guidelines were published.[12]

74.     Although widely popular, the Opioid Risk Tool has been proven ineffective. The CDC has advised, in particular, that all known opioid addiction screening tools—including Dr. Webster's Opioid Risk Tool—show "insufficient accuracy for classification for patients as at low or high risk for abuse or misuse."[13] And among risk-assessment tools, the CDC singled out Dr. Webster's as being "extremely inconsistent."[14] By giving doctors the false impression that opioids can be safely prescribed to a "screened" population, the Opioid Risk Tool gave opioid manufacturers their Trojan horse—a catalyst for risky prescribing that could be billed as a risk-management tool for conscientious practitioners.

---

[10] Lynn Webster, *Predicting aberrant behaviors in opioid-treated patients: Preliminary validation of the Opioid Risk Tool, Pain Medicine* (2005), abstract available at: https://www.ncbi.nlm.nih.gov/pubmed/16336480.

[11] *Utah Clinical Guidelines on Prescribing Opioids for Treatment of Pain*, Utah Department of Health (2009), available at: http://health.utah.gov/prescription/pdf/guidelines/final.04.09opioidGuidlines.pdf.

[12] Utah Department of Health, Violence & Injury Prevention Program, *Opioid Prescribing Practices in Utah, 2002-2015* (April 2016), at 11.

[13] CDC Guideline for Prescribing Opioids for Chronic Pain (March 18, 2016), available at https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[14] *Id.*

75. While Dr. Webster was deceptively promoting chronic opioid treatment, he also maintained an active pain practice at his Lifetree Pain Clinic in Salt Lake City. At least 20 patients under Dr. Webster's care died of opioid overdoses, and subsequent lawsuits have revealed the staggering quantity of opioids these patients received.[15]

76. As but one example, one of Lifetree's patients, Tina Webb, was prescribed 32 pain pills a day, and as many as 296 over an eight-day stretch.[16] Within months of beginning this "treatment" regime at Lifetree, Ms. Webb began behaving erratically, falling asleep in the middle of meals and gasping for air in the night. After Ms. Webb crashed her car into her family's home, her husband confronted Lifetree to complain about the prescriptions she was receiving, but little changed. Ms. Webb then took the initiative and attempted to wean herself off opioids, but agonizing withdrawal symptoms led her back to Lifetree where she received a new prescription and fatally overdosed shortly thereafter.

77. Ms. Webb's story is not unique. Another deceased patient of Dr. Webster's, Carol Ann Bosley, was prescribed a six-fold increase in medication in the year before she overdosed, at which point she was receiving approximately 600 pain and anti-anxiety pills per month.[17] Ms. Bosley's husband complained to Lifetree that she was exhibiting signs of addiction and abuse, including passing out mid-meal and having difficulty conducting ordinary conversations.[18] Nothing changed. When Ms. Bosley was unable to produce pills that should

---

[15] Although Dr. Webster's management of the Lifetree clinic illustrates the effect of his messaging on actual prescribing practices, Salt Lake County asserts no claim against Dr. Webster arising from his medical practice. The claims against Dr. Webster relate solely to his participation, as a KOL and otherwise, in Manufacturer Defendants' deceptive marketing campaign.

[16] Jesse Hyde and Daphne Chen, *The untold story of how Utah doctors and Big Pharma helped drive the national opioid epidemic*, Deseret News (Oct. 26, 2017), available at: https://www.deseretnews.com/article/900002328/theuntold-story-of-how-utah-doctors-and-big-pharma-helped-drive-the-national-opioid-epidemic.html.

[17] Stephanie Smith, *Prominent pain doctor investigated by DEA after patient deaths*, CNN (Dec. 20, 2013), available at: http://www.cnn.com/2013/12/20/health/pain-pillar/index.html.

[18] Jesse Hyde and Daphne Chen, *The untold story of how Utah doctors and Big Pharma helped drive the national opioid epidemic*, Deseret News (Oct. 26, 2017), available at:

have been left over from a prior prescription, a nurse operating under Dr. Webster's pseudoaddiction theory concluded Ms. Bosley was not addicted but was instead overusing her medication because of untreated pain.[19] Ms. Bosley overdosed on opioids and died in November 2009.

78.     Lifetree shut down in 2010 after it was raided by DEA agents who discovered an entire file cabinet labeled "deceased patients."[20] Within an hour, Dr. Webster had received calls from doctors in other parts of the country who were aware of the raid. How did they know? They knew because there were pharmaceutical representatives present in Dr. Webster's clinic when the DEA entered, and these representatives called their colleagues across the country who, likewise, were visiting pain clinics and other facilities to push their drugs.[21]

79.     Although Dr. Webster ultimately was not charged with any crime, the Deseret News has reported that DEA agents believed there was sufficient evidence to prosecute Dr. Webster, and one agent described the case's termination as the most frustrating event of his career.[22] Dr. Webster has taken no responsibility, claiming that the overdose deaths at his clinic were "not as a result of treatment, but in spite of it."[23]

80.     Today, Dr. Webster no longer treats patients. He does, however, still function as a mouthpiece for opioid manufacturers' agenda, who continue to pay him significant sums in

---

https://www.deseretnews.com/article/900002328/theuntold-story-of-how-utah-doctors-and-big-pharma-helped-drive-the-national-opioid-epidemic.html.

[19] *Id.*

[20] *Id.*

[21] Lynn Webster, *The Painful Truth: What Chronic Pain is Really Like and Why it Matters to Each of Us* (2015), at 145.

[22] Jesse Hyde and Daphne Chen, *The untold story of how Utah doctors and Big Pharma helped drive the national opioid epidemic*, Deseret News (Oct. 26, 2017), available at: https://www.deseretnews.com/article/900002328/theuntold-story-of-how-utah-doctors-and-big-pharma-helped-drive-the-national-opioid-epidemic.html.

[23] Lynn Webster, *Intimidating doctors won't solve the chronic pain epidemic* (Aug. 11, 2014), available at: https://www.kevinmd.com/blog/2014/08/intimidating-doctors-wont-solve-chronic-pain-epidemic.html.

consulting and other fees. Between 2013 and 2015, Dr. Webster received more than $150,000 from drug companies, much of it from manufacturers of opioids.[24]

81.     Among the misconceptions Dr. Webster continues to promote is the notion that at-risk patients can be expediently prescreened before commencing opioids treatment. In his 2015 book *The Painful Truth: What Chronic Pain is Really Like and Why it Matters to Each of Us* ("Painful Truth"), Dr. Webster claimed there are just "four simple guidelines to follow if you want to avoid the risk of becoming addicted to opioids," one of them being the Opioid Risk Tool he developed.[25] The book invites readers to calculate their own "addiction risk level" by visiting Dr. Webster's website and clicking on the Opioid Risk Tool link. In addition, although Dr. Webster has attempted to walk back his support of "pseudoaddiction," he continues to invoke its faulty logic, claiming, for example, that many opioid overdose deaths are not the result of overprescribing but in fact suicides caused by "inadequately treated emotional and physical pain."[26]

82.     Dr. Webster also has emerged as a vocal critic of recent efforts to limit opioid prescribing. In September 2017, for example, Dr. Webster criticized as "wrong" CVS Caremark's decision to reduce opioid prescribing by aligning reimbursement policies with CDC guidelines.[27] In December 2017, Dr. Webster published an article on his website claiming that the term "opioid crisis" is a misnomer arising from an "anti-opioid movement" and that the CDC has inappropriately linked heroin deaths to prescription opioids, notwithstanding overwhelming

---

[24] *See* ProPublica Data, available at: https://projects.propublica.org/docdollars/doctors/pid/1136720.

[25] *Painful Truth*, at 77-78; *see also* Lynn Webster, *Emotional Trauma Affects Boys and Girls Differently: What You Need to Know*, available at: http://thepainfultruthbook.com/2016/11/emotional-trauma-affects-boys-and-girls-differently-what-you-need-to-know/.

[26] @DrLynnWebster, Facebook (Jan. 24, 2018 at 9:55am), available at: https://www.facebook.com/DrLynnWebster.

[27] @LynnRWebsterMD, Twitter (Dec. 7, 2017, 1:45pm), available at: https://twitter.com/LynnRWebsterMD/status/938887130545360898.

evidence showing that most heroin users start with prescription drugs.[28] More recently, when the Centers for Medicare & Medicaid Services (CMS) announced plans to monitor doctors who may be inappropriately or fraudulently overprescribing opioids, Dr. Webster blasted the proposal as "deeply flawed."[29]

83.     Similarly, Dr. Webster has criticized DEA efforts to curb the flow of opioids and monitor suspicious prescribing patterns. He claims that doctors who have been arrested or prosecuted for overprescribing opioids were simply "trying to help patients the best way they know how" and that the authorities are engaging in "intimidation tactics" as a means of altering doctors' practices.[30]

84.     Dr. Webster also continues to serve as an apologist for his pharmaceutical sponsors. As recently as March 2018, Dr. Webster criticized an article that attributed the opioid crisis in part to advertising by pharmaceutical companies. The article was "misleading," Dr. Webster claimed, because pharmaceutical companies "do[] not target the public" and do not "spend a lot of money" promoting opioids.[31] Both assertions are false. In fact, pharmaceutical companies routinely promote their drugs in brochures and other materials intended for public consumption, and they have spent enormous sums on these and other promotional efforts.

85.     In an effort to counteract legislative initiatives to curb opioid prescribing, Dr. Webster's website even invites people to write congress using a provided form letter. The letter contains a prompt to describe "your story and how opioid treatments benefit you or your loved

---

[28] Lynn Webster, Gaslighting the Public (Dec. 30, 2017), available at: http://thepainfultruthbook.com/2017/12/gaslighting-the-public/.

[29] @LynnRWebsterMD, Twitter (Jan. 28, 2018 at 9:01 am), available at: http://thepainfultruthbook.com/2017/12/gaslighting-the-public/.

[30] *Painful Truth*, at 146, 154.

[31] DrLynnWebster, Facebook (March 27, 2018 at 12:20 pm), available at: https://www.facebook.com/DrLynnWebster.

one," but does not invite any description of the harms opioids have caused patients, their loved ones, or the community at large.[32]

### (2)     Defendant Russell Portenoy

86.     Dr. Webster did not operate in a vacuum. He built upon the work of other KOLs supported by Manufacturer Defendants, most notably Dr. Russell Portenoy, the former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York. A preferred KOL of the opioid industry, Dr. Portenoy received research support, consulting fees, and honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.

87.     Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS")/American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain. He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by Manufacturer Defendants.

88.     Before Dr. Portenoy began advocating for chronic opioid treatment, the conventional wisdom in the medical community was that opioids should almost never be prescribed for the treatment of chronic pain. As one leading pain specialist at the University of Washington put it, "[i]t did not enter our minds that there could be significant numbers of chronic pain patients who were successfully managed with opioids, because if there were any, we almost never saw them."[33]

89.     Dr. Portenoy gained national prominence, and sponsorship from opioid manufacturers, by attempting to poke holes in this conventional view. In an influential 1986 paper on chronic opioid treatment, Portenoy surmised that "opioid maintenance therapy can be a

---

[32] Letter to Congress, available at: http://www.lynnwebstermd.com/send-a-letter-to-congress/.

[33] John D. Loeser, *Five Crises in Pain Management*, 20 Pain Clinical Updates 1 (2012).

safe, salutary and more humane alternative" to other treatments.[34] This sweeping conclusion was not, however, predicated on any long-term study of non-malignant pain patients. It was generalized from observations of just 38 cancer patients who had received an opioid prescription.

90. Dr. Portenoy has published other articles claiming, falsely, that: (a) "the risk of addiction during opioid administration for chronic nonmalignant pain is probably very low"; (b) "opioid therapy can be discontinued without difficulty in virtually all patients"; and (c) "opioid-induced euphoria experienced by addicts occurs rarely among patients who receive an opioid for pain."[35] Dr. Portenoy arrived at these erroneous conclusions by again extrapolating largely from a limited number of studies involving a small number of cancer patients. Although no long-term studies supported the safety and efficacy of chronic opioid treatment, Dr. Portenoy opined that this should not discourage doctors from this treatment course because "documentation" of the efficacy of this approach "must be ongoing"—in other words, doctors should experiment on their patients.[36]

91. Predictably, if not by design, opioid manufacturers seized on this message. In the words of Dr. Kolodny, cofounder of Physicians for Responsible Opioid Prescribing, Portenoy ascended the lecture circuit with Purdue "fl[yng] in people to resorts to hear him speak."[37] The message was simple and false: "Docs have been letting patients suffer; nobody really gets addicted; it's been studied."[38] In these lectures, given mostly to primary care doctors, Dr.

---

[34] Russel K. Portenoy and Kathleen M. Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 Cases*, 25 Pain 171-86 (1986).

[35] Russell K. Portenoy, *Opioid therapy for chronic nonmalignant pain*, Pain Res Manage Vol. 1, No. 1 Spring (1996), at 23-25.

[36] *Id.*

[37] Sam Quinones, Dreamland: The True Tale of America's Opiate Epidemic (Bloomsbury Press 2015), at 314.

[38] *Id.*

Portenoy routinely asserted that opioid addiction occurs in less than 1% of patients who receive opioids for chronic pain.[39] There was no sound, scientific support for this claim.

92.     Dr. Portenoy also conveyed similar messages in promotional materials distributed directly by Manufacturer Defendants. By way of example, he edited Endo's promotional brochure *Understanding Your Pain*, a publication that is still available. *Understanding Your Pain* is directed toward patients, and seeks to alleviate their concerns with chronic opioid treatment by claiming (a) that a patient is not addicted to opioids so long as he can assure *himself* that he would not want the drugs if his pain subsided, and (b) that opioid tolerance is "not a problem" because the dose can always be increased.

93.     Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentations. He appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program, broadcast in Salt Lake County and across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[40] In a 1993 interview with the New York Times, Dr. Portenoy similarly claimed that opioids "can be used for a long time, with few side effects and that addiction and abuse are not a problem."[41]

94.     Dr. Portenoy has since admitted that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." According to Dr. Portenoy, because the primary goal was to "destigmatize" opioids, he and other doctors promoting them overstated

---

[39] Sonia Moghe, CNN, *Opioid history: From 'wonder drug' to abuse epidemic*, available at: https://www.cnn.com/2016/05/12/health/opioid-addiction-history/index.html.

[40] Good Morning America television broadcast, ABC News (Aug. 30, 2010).

[41] Elisabeth Rosenthal, *Patients in Pain Find Relief, Not Addiction, in Narcotics,* N.Y. Times (Mar. 28, 1993), available at: https://www.nytimes.com/1993/03/28/us/patients-in-pain-find-relief-not-addiction-in-narcotics.html.

their benefits and glossed over their risks. He has stated, specifically: "because the primary goal was to destigmatize, we often left evidence behind."[42] Dr. Portenoy also has conceded that "[d]ata about the effectiveness of opioids does not exist."[43] Portenoy candidly stated: "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[44] The damage, however, had been done.

### b. Front Groups

95.     Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of Manufacturer Defendants, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also assisted Manufacturer Defendants by responding to negative articles, advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and conducting outreach to vulnerable patient populations targeted by Manufacturer Defendants.

96.     These Front Groups depended on Manufacturer Defendants for funding and, in some cases, for survival. Manufacturer Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. For example, Purdue's consulting agreement with APF (discussed further below) gave it direct, contractual control over APF's work. These efforts assured that Front Groups would generate only the messages Defendants wanted to distribute. Despite this, the Front Groups concealed the extent to which they were bankrolled by Defendants, holding themselves out as independent professional societies faithfully serving the

---

[42] Sonia Moghe, CNN, *Opioid history: From 'wonder drug' to abuse epidemic*, available at: https://www.cnn.com/2016/05/12/health/opioid-addiction-history/index.html.

[43] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, WALL ST. J. (Dec. 17, 2012), available at: https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[44] *Id.*

needs of their constituencies—whether patients suffering from pain or doctors treating those patients.

97. The U.S. Senate Homeland Security & Government Affairs Committee recently completed an investigation into the financial connections between opioid manufacturers and 14 different Front Groups advocating opioid-related policies and practices. The investigation revealed that Manufacturer Defendants Purdue and Janssen, along with opioid manufacturers Mylan, Depomed and Insys, contributed more than $10 million to opioid Front Groups and their affiliates between 2012 and 2017.[45] Of these manufacturers, Purdue contributed the most, with payments exceeding $4 million between 2012 and 2017. Janssen was the second largest contributor until 2015, when it sold the licensing rights to its opioid Nucynta.[46]

98. These disturbing contributions are only the tip of the iceberg. The Senate did not request payment information from all opioid manufacturers (including Endo, Cephalon, and Mallinckrodt), and thus, admittedly, did not "capture the full extent of the financial ties between opioid manufacturers and patient advocacy groups and professional societies."[47]

99. The results of the Senate's investigation are set forth in a February 2018 report authored by Missouri Senator McCaskill's office. The report identifies a "direct link between corporate donations" made by opioid manufactures and the Front Groups' "advancement of opioids-friendly messaging."[48] Elaborating, the report observes:

---

[45] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member McCaskill's Office, *Fueling the Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Feb. 2018), at 1, available at:
https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20Third%20Party%20Advocacy%20Groups.pdf.

[46] *Id.* at 5-6.

[47] *Id.* at 15.

[48] *Id.* at 1.

Initiatives from the groups in this report often echoed and amplified messages favorable to increased opioid use—and ultimately, the financial interests of opioid manufacturers. These groups have issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain, lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for overprescription and misbranding. Notably, a majority of these groups also strongly criticized 2016 guidelines from the Centers for Disease Control and Prevention (CDC) that recommended limits on opioid prescriptions for chronic pain—the first national standards for prescription opioids and a key federal response to the ongoing epidemic.[49]

100.    Senator McCaskill's report concluded that "[t]hrough criticism of government prescribing guidelines, minimization of opioid addiction risk, and other efforts, ostensibly neutral advocacy organizations have often supported industry interests at the expense of their own constituencies."[50]

101.    To reach a wide audience, and give the impression of professional consensus, opioid manufacturers have bankrolled a diverse array of Front Groups. All told, Manufacturer Defendants Purdue, Janssen, Cephalon, Endo, and Mallinckrodt contributed to more than a dozen Front Groups, including many of the same ones. Two of the most prominent are described below, but there are many others, including the American Pain Society ("APS"), the Federation of State Medical Boards ("FSMB"), the U.S. Pain Foundation ("USPF"), the American Geriatrics Society ("AGS"), American Chronic Pain Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain Foundation ("NPF"), Pain & Policy Studies Group ("PPSG"), and Alliance for Patient Access ("APA").

---

[49] *Id.*

[50] *Id.* at 3.

### (1)   American Pain Foundation ("APF")

102.   The most prominent of Manufacturer Defendants' Front Groups was APF, which received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012.[51] Endo alone provided more than half that funding; Purdue was next, at $1.7 million.

103.   APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet—to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Salt Lake County.

104.   In addition to Perry Fine (a KOL from the University of Utah who received funding from Janssen, Cephalon, Endo, and Purdue), Russell Portenoy, and Scott Fishman (a KOL from the University of California, Davis who authored *Responsible Opioid Prescribing*, a publication sponsored and/or promoted by Cephalon, Purdue and Mallinckrodt), all of whom served on APF's Board and reviewed its publications, another board member, Lisa Weiss, was an employee of a public relations firm that worked for both Purdue and APF.

105.   In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources. Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009; its budget for 2010 projected receipts of roughly $2.9 million from drug companies, out of total income of about $3.5 million. By 2011, APF was entirely dependent on incoming grants from

---

[51] Senator McCaskill's February 2018 report studied contributions between 2012 and 2017 and thus did not look into industry contributions to APF.

Manufacturer Defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit. As one of its board members, Russell Portenoy, explained, the lack of funding diversity was one of the biggest problems at APF.

106. APF held itself out as an independent patient advocacy organization. It often engaged in grassroots lobbying against various legislative initiatives that might limit opioid prescribing, and thus the profitability of its sponsors. It was often called upon to provide "patient representatives" for Manufacturer Defendants' promotional activities, including for Purdue's *Partners Against Pain* and Janssen's *Let's Talk Pain*. APF functioned largely as an advocate for the interests of Manufacturer Defendants, not patients. Indeed, as early as 2001, Purdue told APF that the basis of a grant was Purdue's desire to "strategically align its investments in nonprofit organizations that share [its] business interests."

107. In practice, APF operated in close collaboration with opioid makers. On several occasions, representatives of the drug companies, often at informal meetings at Front Group conferences, suggested activities and publications for APF to pursue. APF then submitted grant proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.

108. APF assisted in other marketing projects for drug companies. One project funded by another drug company—*APF Reporter's Guide: Covering Pain and Its Management* (2009) – recycled text that was originally created as part of the company's training document.

109. The same drug company made general grants, but even then it directed how APF used them. In response to an APF request for funding to address a potentially damaging state Medicaid decision related to pain medications generally, the company representative responded, "I provided an advocacy grant to APF this year—this would be a very good issue on which to use some of that. How does that work?"

110.    The close relationship between APF and the drug company was not unique, but mirrors relationships between APF and Manufacturer Defendants. APF's clear lack of independence—in its finances, management, and mission—and its willingness to allow Manufacturer Defendants to control its activities and messages support an inference that each Manufacturer Defendant that worked with it was able to exercise editorial control over its publications.

111.    Indeed, the U.S. Senate Finance Committee began looking into APF in May 2012 to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and Manufacturer Defendants stopped funding it. Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."

### (2)    American Academy of Pain Medicine

112.    The American Academy of Pain Medicine ("AAPM"),[52] with the assistance, prompting, involvement, and funding of Manufacturer Defendants, issued treatment guidelines and sponsored and hosted medical education programs essential to Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

113.    AAPM has received millions of dollars from opioid manufacturers since 2009, including nearly $1.2 million from Manufacturer Defendants Purdue and Janssen in the 2012-2017 period alone. AAPM also maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event—its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education

---

[52] The American Academy of Pain Management is now known as The Academy of Integrative Pain Management.

programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Manufacturer Defendants Endo, Purdue, Cephalon, and Actavis were members of the council and presented deceptive programs to doctors who attended this annual event.

114.    AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members. Endo attended AAPM conferences, funded its CMEs, and distributed its publications. The conferences sponsored by AAPM heavily emphasized sessions on opioids—37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs including Defendants Dr. Webster and Dr. Portenoy. Dr. Webster was even elected president of AAPM while under a DEA investigation. Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[53]

115.    AAPM's staff understood they and their industry funders were engaged in a common task. Manufacturer Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization.

116.    In 1997, AAPM and the American Pain Society jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low. The co-author of the statement, Dr. Haddox, was at the time a paid speaker for Purdue. Dr. Portenoy was the sole consultant. The consensus statement remained on AAPM's website until 2011, and was taken down from AAPM's website only after a doctor complained, though it lingers on the internet elsewhere.

---

[53] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis, Medscape Neurology, Expert Interview (2005).

117. Recognizing the importance of opioid treatment guidelines in securing the acceptance of chronic opioid therapy, AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend the use of opioids to treat chronic pain. Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Cephalon, Endo, and Purdue.

118. The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 Guidelines were influenced by contributions that drug companies, including Manufacturer Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids; the Guidelines have been cited hundreds of times in academic literature, were disseminated in Salt Lake County during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

119. Manufacturer Defendants widely referenced and promoted the 2009 Guidelines without disclosing the acknowledged lack of evidence to support them.

120. When the CDC issued guidelines in 2016 recommending the use of non-opioid therapies in the treatment of chronic pain, AAPM's immediate past president Daniel Carr was highly critical, stating "that the CDC guideline makes disproportionally strong recommendations based upon a narrowly selected portion of the available clinical evidence.[54]

---

[54] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member McCaskill's Office, *Fueling the Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Feb. 2017), at 1.

121.    In an effort to retain credibility, AAPM has obscured its financial ties to opioid manufacturers. Nowhere on AAPM's website is it disclosed that AAPM has received millions of dollars in funding from the industry it has supported. Far from it, AAPM has a page on its website purporting to list the "patrons" who have donated to the organization between January 1, 2017 and October 31, 2017—not a single opioid manufacturer (or other pharmaceutical company) is identified.[55]

122.    AAPM recently became known as the Academy of Integrative Pain Management ("AIPM"). Despite the change in name, the academy has remained a vehicle funded by and operated on behalf of pharmaceutical companies generally and opioid manufacturers specifically. AIPM's executive director, Bob Twillman, recently reported that AIPM receives fifteen (15) percent of its funding from pharmaceutical companies, not including revenue from advertisements in its publications. Its state advocacy project, the academy's lobbying arm, is 100 percent funded by drugmakers and their allies.

> **(3)    Manufacturer Defendants coordinated and worked together through Front Groups.**

123.    Manufacturer Defendants worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, Manufacturer Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Cephalon, Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from Manufacturer Defendants. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which

---

[55] *See* AAPM Foundation Donors, available at: aapmfoundation.org/donors.

Manufacturer Defendants determined would reduce prescribing. PCF also worked to address a perceived "lack of coordination" among its members and developed "key" messages that were disseminated in programs and industry-run websites.

**B.    Manufacturer Defendants' Marketing Scheme Misrepresented the Risks and Benefits Of Opioids.**

124.    To convince doctors and patients in Salt Lake County and across the nation that opioids can and should be used to treat chronic pain, Manufacturer Defendants had to convince them that long-term opioid use is both safe and helpful. Knowing that they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, Manufacturer Defendants made claims that were not supported by or were contrary to the scientific evidence. These claims were made in promotional materials distributed directly to doctors and patients; they also were advanced covertly through third parties Manufacturer Defendants controlled, including KOL Defendants Dr. Webster and Dr. Portenoy. Even though pronouncements by and guidance from the FDA and the CDC based on that evidence confirm that their claims were false and deceptive, Manufacturer Defendants have not corrected them, or instructed their KOLs or Front Groups to correct them, and continue to spread them today.

**1.    Manufacturer Defendants falsely trivialized or failed to disclose the known risks of long-term opioid use.**

125.    To convince doctors and patients that opioids are safe, Manufacturer and KOL Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations—which are described below—reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could

easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, they continue to make them today.

126. *First*, Manufacturer and KOL Defendants falsely claimed that the risk of addiction is low and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Some illustrative examples of these false and deceptive claims are described below:

    a.    Actavis's predecessor caused a patient education brochure to be distributed in all states in 2007 that claimed opioid addiction is possible, but "less likely if you have never had an addiction problem." Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use this brochure in 2009 and beyond.

    b.    Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which instructed that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft. This publication is still available online.

    c.    Endo sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

    d.    Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website www.opana.com.

    e.    Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive, and asserted as

fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

f.  Janssen operated a website, Prescriberesponsibly.com (last updated July 2, 2015), which claimed that concerns about opioid addiction are "overestimated."

g.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*—which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]." This publication is still available online.

h.  Detailers for Purdue, Endo, Cephalon, Janssen, and Mallinckrodt minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

i.  At least until June 2007, Mallinckrodt sponsored pain-topics.org, a website that characterized as "misinformation" the fact that long-term opioid treatment can lead to addiction, suggesting that opioid overdoses are limited to a "minimal" number of "celebrities and street users." The website contained a handout advising doctors that "[p]atients' fears of opioid addiction should be dispelled."

j.  As of 2012, Mallinckrodt was promoting[56] a book titled *Defeat Chronic Pain Now!*, which claimed that "[o]nly rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction," and further that "[w]hen chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving."

k.  Dr. Portenoy gave numerous lectures to primary care physicians claiming, falsely, that less than 1% of patients prescribed opioids for chronic pain become addicted. Dr.

---

[56] Mallinckrodt promoted *Defeat Chronic Pain Now!* through C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance, an advocacy arm Mallinckrodt established in 2010. Although "C.A.R.E.S Alliance" is a service mark of Mallinckrodt, materials distributed by C.A.R.E.S Alliance included unbranded publications that did not disclose and sought to minimize Mallinckrodt's involvement.

> Webster similarly has asserted, again falsely, that addiction
> occurs in as few as 2% of these patients.

127.    These claims are contrary to longstanding scientific evidence, as the FDA and

CDC have conclusively declared.  As noted in the 2016 CDC Guideline endorsed by the FDA,

there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an

alternative term for opioid addiction])."  The Guideline points out that "[o]pioid pain medication

use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy

for 3 months substantially increases risk for opioid use disorder."

128.    The FDA further exposed the falsity of Manufacturer and KOL Defendants'

claims about the low risk of addiction when it announced changes to the labels for ER/LA

(Extended Release/Long Acting) opioids in 2013 and for IR (immediate release) opioids in 2016.

In its announcements, the FDA found that "most opioid drugs have 'high potential for abuse'"

and that opioids "are associated with a substantial risk of misuse, abuse, NOWS [neonatal opioid

withdrawal syndrome], addiction, overdose, and death."  According to the FDA, because of the

"known serious risks" associated with long-term opioid use, including "risks of addiction, abuse,

and misuse, even at recommended doses, and because of the greater risks of overdose and

death," opioids should be used only "in patients for whom alternative treatment options" like

non-opioid drugs have failed.  The FDA further acknowledged that the risk is not limited to

patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed

[opioids]."

129.    Manufacturer and KOL Defendants' marketing claims are further proven false by

the warnings on their FDA-approved drug labels, which caution that opioids "expose[] users to

risks of addiction, abuse and misuse, which can lead to overdose and death," that the drugs

contain "a substance with a high potential for abuse," and that addiction "can occur in patients

appropriately prescribed" opioids.

130.    The State of New York, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the State found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. Endo remains free, however, to make those statements in Salt Lake County, nor has Endo engaged in a campaign to reverse the impact of previous statements that were to the contrary.

131.    *Second*, Manufacturer and KOL Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Manufacturer and KOL Defendants called this phenomenon "pseudoaddiction" —a term coined by the now infamous Dr. David Haddox, who went to work for Purdue, and popularized by KOLs Lynn Webster and Dr. Russell Portenoy—and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Some illustrative examples of these deceptive claims are described below:

   a.    Purdue, Cephalon, Mallinckrodt, and Endo sponsored or promoted Responsible Opioid Prescribing (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. Responsible Opioid Prescribing remains for sale online. The 2012 edition, which also remains available online, continues to teach that pseudoaddiction is real.

   b.    Janssen sponsored, funded, and edited the Let's Talk Pain website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudoaddiction is different from true

addiction because such behaviors can be resolved with effective pain management."

c.       Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 titled Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

d.       Purdue published a pamphlet in 2011 entitled Providing Relief, Preventing Abuse, which described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

e.       Purdue sponsored a CME program entitled Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

f.       Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which states: "Pseudo-addiction describes patient behaviors that may occur when pain is undertreated . . . Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated." This publication is still available online.

g.       Mallinckrodt sponsored a website—pain-topics.org— which described pseudoaddiction as a phenomenon associated with "undertreated" pain, with patients becoming "very focused on obtaining opioid medications," conduct that "may be erroneously perceived as 'drug seeking.'"

h.       Dr. Webster and Dr. Portenoy have both supported the "pseudoaddiction" construct. In his book *Avoiding Opioid Abuse While Managing Pain* (2007), Webster claimed that when facing signs of aberrant behavior, increasing the dose

"in most cases . . . should be the clinician's first response."

132.    The 2016 CDC Guideline rejects the concept of pseudoaddiction. The Guideline nowhere recommends that opioid dosages be increased if a patient is not experiencing pain relief. To the contrary, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer-term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

133.    Even one of the Defendants has effectively repudiated the concept of pseudoaddiction. In finding that "[t]he pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents," the State of New York, in its 2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'" Consistent with this, Endo agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York. Endo, however, remains free to do so in Salt Lake County.

134.    *Third*, Manufacturer and KOL Defendants falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. Manufacturer and KOL Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable

starting on opioid therapy for chronic pain.  Some illustrative examples of these deceptive claims are described below:

a.  Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled Pain Management Dilemmas in Primary Care: Use of Opioids, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

b.  Endo, Janssen and Purdue all linked websites they ran or administered to Dr. Lynn Webster's Opioid Risk Tool, a brief questionnaire that gave doctors false confidence in prescribing opioids for chronic pain.

c.  Purdue sponsored a 2011 webinar, Managing Patient's Opioid Use: Balancing the Need and Risk, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

d.  As recently as 2015, Purdue has represented in scientific conferences that "bad apple" patients—and not opioids— are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

e.  Through its C.A.R.E.S. Alliance, Mallinckrodt offered a "Fact Sheet" that promoted opioid "risk assessment tools," including Dr. Webster's Opioid Risk Tool.

f.  Not only did Dr. Webster create the Opioid Risk Tool, he has continued to promote it, including in his 2015 book The Painful Truth, which asserts that the tool is one of "four simple guidelines to follow if you want to avoid the risk of becoming addicted to opioids."

g.  Dr. Portenoy has repeatedly claimed that addiction risk can be managed by prescreening patients, claiming on Good Morning America in 2010 that "[i]f a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."

135.    Once again, the 2016 CDC Guideline confirms that these statements were false, misleading, and unsupported at the time they were made by Manufacturer and KOL Defendants. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse—"for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the Guideline recognizes that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy."

136.    *Fourth*, to underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Manufacturer and KOL Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

137.    For example, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days. And Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur. Dr. Portenoy likewise claimed in a 1996 article that "opioid therapy can be discontinued without difficulty in virtually all patients."[57] A publication promoted by Mallinckrodt claimed that physical dependence to opioids "is easily remedied."

138.    Manufacturer and KOL Defendants deceptively minimized the significant symptoms of opioid withdrawal—which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia

---

[57] Russell K. Portenoy, *Opioid therapy for chronic nonmalignant pain*, Pain Res Manage Vol. 1, No. 1 Spring (1996), at 25.

(rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction—and grossly understated the difficulty of tapering, particularly after long-term opioid use. Yet the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

139.    *Fifth*, Manufacturer and KOL Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. Some illustrative examples are described below:

    a.    Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use these materials in 2009 and beyond.

    b.    Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids

have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available for sale online.

c.   Endo sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d.   Endo distributed a pamphlet edited by Dr. Portenoy entitled Understanding Your Pain: Taking Oral Opioid Analgesics, which, in Q&A format, asked: "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."

e.   Janssen sponsored a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f.   Purdue's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g.   Purdue sponsored APF's A Policymaker's Guide to Understanding Pain & Its Management, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages. This publication is still available online.

h.   Purdue sponsored a CME entitled Overview of Management Options that is still available for CME credit. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

i.   Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, the "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders,"[58] challenging the correlation between opioid dosage and overdose.

k.   A publication promoted by Mallinckrodt claimed that "the issue of tolerance is overblown" and that "[o]nly a minority

---

[58] See https://cpdd.org/.

of chronic pain patients who are taking long-term opioids
develop tolerance."

140.    These claims conflict with the scientific evidence, as recently confirmed by the
FDA and CDC.  As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids
for chronic pain are not established" while the "risks for serious harms related to opioid therapy
increase at higher opioid dosage."  More specifically, the CDC explains that "there is now an
established body of scientific evidence showing that overdose risk is increased at higher opioid
dosages."  The CDC also states that "there is an increased risk for opioid use disorder,
respiratory depression, and death at higher dosages."  That is why the CDC advises doctors to
"avoid increasing dosages" above 90 morphine milligram equivalents per day.

141.    The 2016 CDC Guideline reinforces earlier findings announced by the FDA.  In
2013, the FDA acknowledged in response to a citizen petition by a physician group "that the
available data do suggest a relationship between increasing opioid dose and risk of certain
adverse events."  For example, the FDA noted that studies "appear to credibly suggest a positive
association between high-dose opioid use and the risk of overdose and/or overdose mortality."
In fact, a recent study found that 92% of persons who died from an opioid-related overdose were
initially prescribed opioids for chronic pain.

142.    *Finally*, Manufacturer and KOL Defendants' deceptive marketing of the so-called
abuse-deterrent properties of some of their opioids, described below, has created false
impressions that these opioids can curb addiction and abuse.  Indeed, in a 2014 survey of 1,000
primary care physicians, nearly half reported that they believed abuse-deterrent formulations are
inherently less addictive.[59]

143.    These abuse deterrent formulations (AD opioids) are harder to crush, chew, or
grind; become gelatinous when combined with a liquid, making them harder to inject; or contain

---

[59] Catherine S. Hwang, *et al.*, *Prescription Drug Abuse: A National Survey of Primary
Care Physicians*, 175(2) JAMA INTERN. MED. 302-4 (Dec. 8, 2014), available at:
https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/1984247.

a counteragent such as naloxone that is activated if the tablets are tampered. Despite this, AD opioids are not impossible to abuse. They can be defeated—often quickly and easily—by those determined to do so. Moreover, they do not stop oral intake, the most common avenue for opioid misuse and abuse, and do not reduce the rate of misuse and abuse by patients who become addicted after using opioids long-term as prescribed or who escalate their use by taking more pills or higher doses.

144.    Because of these significant limitations on AD opioids and because of the heightened risk for misconceptions and for the false belief that AD opioids can be prescribed safely, the FDA has cautioned that "[a]ny communications from the sponsor companies regarding AD properties must be truthful and not misleading (based on a product's labeling), and supported by sound science taking into consideration the totality of the data for the particular drug. Claims for AD opioid products that are false, misleading, and/or insufficiently proven do not serve the public health."[60]

145.    Despite this admonition, Manufacturer and KOL Defendants have made and continue to make misleading claims about the ability of so-called abuse-deterrent opioid formulations to prevent or reduce abuse and addiction and the safety of these formulations. For example, until July 2017 when Endo withdrew from the market in response to pressure from the FDA to do so, Endo marketed Opana ER as tamper, or crush, resistant and less prone to misuse and abuse even though: (a) the FDA rejected Endo's petition to approve Opana ER as abuse-deterrent in 2012; (b) the FDA warned in a 2013 letter that there was no evidence that Opana ER "would provide a reduction in oral, intranasal or intravenous abuse"; and (c) Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed. Endo's advertisements for the 2012 reformulation of Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse.

---

[60] *Id.*

146.    In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was "designed to be, or is crush resistant." The State found those statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER. The NY AG also found that Endo failed to disclose its own knowledge of the crushability of redesigned Opana ER in its marketing to formulary committees and pharmacy benefit managers.

147.    Because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and a serious blood disease, in May 2017, an FDA advisory committee recommended that Opana ER be withdrawn from the market. The FDA adopted this recommendation on June 8, 2017 and requested that Endo withdraw Opana ER from the market.[61] Approximately one month later, Endo did so.[62]

148.    Likewise, Purdue has engaged and continues to engage in deceptive marketing of its AD opioids – i.e., reformulated OxyContin and Hysingla. Before April 2013, Purdue did not market its opioids based on their abuse deterrent properties. However, beginning in 2013 and continuing until at least February 2018, detailers from Purdue regularly used the so-called abuse deterrent properties of Purdue's opioid products as a primary selling point to differentiate those products from their competitors. Specifically, these detailers: (a) claimed that Purdue's AD opioids prevent tampering and cannot be crushed or snorted; (b) claimed that Purdue's AD opioids prevent or reduce opioid misuse, abuse, and diversion, are less likely to yield a euphoric high, and are disfavored by opioid abusers; (c) claimed that Purdue's AD opioids are "safer" than other opioids; and (d) failed to disclose that Purdue's AD opioids do not impact oral abuse or misuse and that its abuse deterrent properties can be defeated.

---

[61] Press Release, "FDA requests removal of Opana ER for risks related to abuse," June 8, 2017, available at: https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm.

[62] Press Release, "Endo Provides Update On Opana ER," July 6, 2017, available at: http://www.endo.com/news-events/press-releases.

149.    These statements and omissions by Purdue are false and misleading and conflict with or are inconsistent with the FDA-approved label for Purdue's AD opioids—which indicates that abusers do seek them because of their high likability when snorted, that their abuse deterrent properties can be defeated, and that they can be abused orally notwithstanding their abuse deterrent properties and which does not indicate that AD opioids prevent or reduce abuse, misuse, or diversion.

150.    To the contrary, testimony in litigation against Purdue and other evidence indicates that Purdue knew and should have known that "reformulated OxyContin is not better at tamper resistance than the original OxyContin" and is still regularly tampered with and abused. Websites and message boards used by drug abusers, such as bluelight.org and Reddit, also report a variety of ways to tamper with OxyContin and Hysingla, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which the tablet has been dissolved. Even Purdue's own website describes a study it conducted that found continued abuse of OxyContin with so-called abuse deterrent properties. Finally, there are no studies indicating that Purdue's AD opioids are safer than any other opioid products.

151.    A 2015 study also shows that many opioid addicts are abusing Purdue's AD opioids through oral intake or by defeating the abuse deterrent mechanism. Indeed, *one-third* of the patients in the study defeated the abuse deterrent mechanism and were able to continue inhaling or injecting the drug. And to the extent that the abuse of Purdue's AD opioids was reduced, those addicts simply shifted to other drugs such as heroin.[63] Despite this, J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's AD opioids are being abused in large numbers.

---

[63] Cicero, Theodore J., and Matthew S. Ellis, *Abuse-deterrent formulations and the prescription opioid abuse epidemic in the United States: lessons learned from Oxycontin* (2015) 72.5 JAMA Psychiatry 424-430.

152. Mallinckrodt misleadingly promoted its opioid Exalgo as having properties that "make it difficult to extract the active ingredient using common forms of physical tampering, including chewing, crushing and dissolving."[64] Yet one member of the FDA's Controlled Substance Staff has acknowledged that hydromorphone—the active opioid in Exalgo—has a "high abuse potential comparable to oxycodone" and further predicted that "Exalgo will have high levels of abuse and diversion."[65] Mallinckrodt similarly promoted Xartemis XR as having abuse-deterrent properties. Neither Exalgo or Xartemis XR were ever approved by the FDA as abuse-deterrent.

153. The 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by nonoral routes." Tom Frieden, the Director of the CDC, has further reported that his staff could not find "any evidence showing the updated opioids [ADFs] actually reduce rates of addiction, overdoses, or death."[66]

154. These false and misleading claims about the abuse deterrent properties of their opioids are especially troubling. First, these claims are falsely assuaging doctors' concerns about the toll caused by the explosion in opioid prescriptions and use and encouraging doctors to prescribe AD opioids under the mistaken belief that these opioids are safer, even though they are not. These claims are therefore causing doctors to prescribe more AD opioids—which are far more expensive than other opioid products—even though they provide little or no additional benefit.

---

[64] Mallinckrodt Press Release, *FDA Approves Mallinckrodt's EXALGO® (hydromorphone HCl) Extended-Release Tablets 32 mg (CII) for Opioid-Tolerant Patients with Moderate-to-Severe Chronic Pain* (Aug. 27, 2012), available at http://newsroom.medtronic.com/phoenix.zhtml?c=251324&p=irol-newsArticle&ID=2004159.

[65] *See* https://www.markey.senate.gov/imo/media/doc/2016-02-19-Markey-ADF-Opioid-timeline.pdf.

[66] Perrone, *et al.*, *Drugmakers push profitable, but unproven, opioid solution*, AP News (Dec. 15, 2016), available at: https://apnews.com/2179dcb0023847879d291804d7c9270b.

155.    Second, Manufacturer and KOL Defendants are using these claims in a spurious attempt to rehabilitate their image as responsible opioid manufacturers. In response to the flood of litigation filed against the company, Defendant Purdue has been taking out full-page advertisements in the *Wall Street Journal* touting its efforts to stem the opioid epidemic. Chief among Purdue's claims is its development of opioids with "abuse-deterrent properties." Notably, the advertisement contains a footnote that Purdue's marketing materials never included, which states: "Opioids with abuse-deterrent properties are not abuse-proof and don't prevent addiction, but they are part of a multifaceted approach to addressing the prescription opioid abuse crisis."

156.    These numerous, longstanding misrepresentations of the risks of long-term opioid use spread by Manufacturer and KOL Defendants successfully convinced doctors and patients to discount those risks.

### 2.    Manufacturer Defendants grossly overstated the benefits of chronic opioid therapy.

157.    To convince doctors and patients that opioids should be used to treat chronic pain, Manufacturer and KOL Defendants also had to persuade them that there was a significant upside to long-term opioid use. But as the 2016 CDC Guidelines now make clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain." In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use. The FDA, too, has recognized the lack of evidence to support long-term opioid use. In 2013, the FDA stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, Manufacturer and KOL Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by

scientific evidence. Not only have Manufacturer and KOL Defendants failed to correct these false and deceptive claims, they continue to make them today.

158. For example, Manufacturer and KOL Defendants falsely claimed that long-term opioid use improved patients' function and quality of life. Some illustrative examples are described below:

a.    Actavis distributed an advertisement that claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

b.    Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c.    Janssen sponsored and edited a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009) —which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stair and states that "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'"

d.    Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function.

e.    Responsible Opioid Prescribing (2007), sponsored and/or distributed by Cephalon, Endo, Mallinckrodt, and Purdue, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

f.    Cephalon and Purdue sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve." The guide was available online until APF shut its doors in 2012.

g.    Endo's NIPC website painknowledge.com claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of

daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

h.      Endo was the sole sponsor, through NIPC, of a series of CMEs titled Persistent Pain in the Older Patient, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

i.      Janssen sponsored, funded, and edited a website, Let's Talk Pain, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function." This video is still available today on YouTube.

j.      Purdue sponsored the development and distribution of APF's A Policymaker's Guide to Understanding Pain & Its Management, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The Policymaker's Guide was originally published in 2011 and is still available online today.

k.      In a 2015 video on Forbes.com discussing the introduction of Hysingla ER, Purdue's Vice President of Health Policy, J. David Haddox, talked about the importance of opioids, including Purdue's opioids, to chronic pain patients' quality of life, and complained that CDC statistics do not take into account that patients could be driven to suicide without pain relief.

l.      Mallinckrodt's website misleadingly states that chronic opioid treatment "helps enable patients to stay in the workplace, enjoy interactions with family and friends, and remain an active member of society."[67]

m.      Purdue's, Cephalon's, Endo's, Janssen's, and Mallinckrodt's sales representatives have conveyed the message that opioids will improve patient function.

---

[67] *See* http://www.mallinckrodt.com/corporate-responsibility/responsible-use.

159.   These claims find no support in the scientific literature. Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is <u>no good evidence</u> that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely." (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline:

- "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."

- "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

- "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

160.   The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

161.   The 2016 CDC Guideline was not the first time a federal agency repudiated Manufacturer and KOL Defendants' claim that opioids improved function and quality of life. In 2010, the FDA warned Actavis, in response to its advertising, that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience . . . results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[68] And in 2008, the FDA

---

[68] Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), available at: http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf.

sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

162.    Manufacturer and KOL Defendants also have promoted opioids as providing far more effective pain relief than non-opioid alternatives even through there is no scientific evidence supporting that conclusion. Researchers recently analyzed the comparative effectiveness of opioids in the treatment of 240 chronic pain patients. Half of the patients received a regimen of opioids, the other half was prescribed non-opioid alternatives, such as NSAIDs (like ibuprofen) and acetaminophen (*e.g.*, Tylenol). The study found that "[t]here was no significant difference in pain-related function between the 2 groups over 12 months" and that "[p]ain intensity was significantly better in the nonopioid group" over the same period.[69] In other words, ibuprofen and Tylenol can be more effective than opioids in treating chronic pain.

163.    Manufacturer and KOL Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. For example, Manufacturer and KOL Defendants have overstated the number of deaths from NSAIDS and have prominently featured the risks of NSAIDS, while minimizing or failing to mention the serious risks of opioids. Dr. Webster has even claimed that "[i]t's not hard to overdose on NSAIDs or acetaminophen."[70] Once again, these misrepresentations contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate."

---

[69] Erin E. Krebs, MD, *et al.*, *Effect of Opioid vs Nonopioid Medications on Pain-Related Function in Patients With Chronic Back Pain or Hip or Knee Osteoarthritis Pain*, JAMA (March 6, 2018), at 876.

[70] *APF releases opioid medication safety module*, Drug Topics (May 10, 2011), available at: https://www.drugtopics.com/clinical-news/apf-releases-opioid-medication-safety-module.

And the 2016 CDC Guideline states that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

### 3. Manufacturer Defendants also engaged in other unlawful, unfair, and fraudulent misconduct.

164.    Purdue misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours—a fact that Purdue has known at all times relevant to this action. According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial number" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

165.    Purdue's competitors were aware of this problem. For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing. Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours. Indeed, Purdue's sales representatives have advised doctors that OxyContin lasts a full 12 hours. And if a doctor suggested that OxyContin does not last 12 hours, these sales representatives, at Purdue's instruction, recommend increasing the dose, rather than the frequency of use. Purdue gave its sales representatives these instructions to prevent doctors from switching to a different drug and to address the unwillingness of insurers to pay for more frequent use of OxyContin.

166.    Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid-tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for or has been shown to be safe or effective for chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm, including the high risk of "serious and life-threatening adverse events" and abuse—which are greatest in non-cancer patients. The FDA also issued a Public Health Advisory in 2007 emphasizing that Fentora should only be used for cancer patients who are opioid-tolerant and should not be used for any other conditions, such as migraines, post-operative pain, or pain due to injury.

167.    Despite this, Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe. As part of this campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer pain. For example:

- Cephalon paid to have a CME it sponsored, *Opioid-Based Management of Persistent and Breakthrough Pain*, published in a supplement of *Pain Medicine News* in 2009. The CME instructed doctors that "clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain. The CME is still available online.

- Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

- In December 2011, Cephalon widely disseminated a journal supplement entitled *"Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)"* to *Anesthesiology News*, *Clinical Oncology News*, and *Pain Medicine News*—three

publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain"—and not just cancer pain.

168.    Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses.

## C.    Manufacturer Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.

169.    As a part of their deceptive marketing scheme, Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the United States, including in Salt Lake County. Using sophisticated prescribing data, Manufacturing Defendants were able to identify suspicious providers who were overprescribing opioids. Rather than report these doctors, as is required, Manufacturing Defendants made them a focus of their marketing efforts.[71] In addition, Manufacturer Defendants focused their deceptive marketing on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but were less likely to be educated about treating pain and the risks and benefits of opioids and therefore more likely to accept Manufacturer Defendants' misrepresentations. Those primary care doctors then became sources of information for other doctors, including doctors in Salt Lake County.

170.    Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain. Manufacturer Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guideline therefore concludes that there are "special risks of long-term opioid use for elderly

---

[71] *See infra* at 76-77.

patients" and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

**D.    Manufacturer Defendants' Scheme Was Successful in Deceiving Doctors and Generating Enormous Profits.**

171.    Manufacturer Defendants' misrepresentations, made both directly and through funded third-parties like Drs. Webster and Portenoy, deceived doctors and patients about the risks and benefits of long-term opioid use in Salt Lake County and across the nation. Studies reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not even warned they might become addicted to opioids prescribed to them.

172.    Both Manufacturer Defendants and their KOL surrogates knew and should have known that their misrepresentations about the risk and benefits of long-term opioid use were false and misleading when they made them.

173.    This deceptive marketing conduct caused and continues to cause doctors to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent Manufacturer and KOL Defendants' misrepresentations, these doctors would have prescribed fewer opioids, their patients would have sought fewer opioids, and there would be fewer opioids available for misuse and abuse.

174.    The efficacy of Manufacturer and KOL Defendants' marketing efforts can be seen by comparing opioid use in the United States against other countries, where restrictions on pharmaceutical advertising typically are more stringent. Although the United States contains only 4.6% of the world's population, Americans consume nearly 100% of the global supply of hydrocodone (*e.g.*, Actavis's Norco) and approximately 80% of all oxycodone (*e.g.*, Purdue's

OxyContin).[72] Moreover, escalating opioid prescribing rates in the United States neatly track the elevated sums Manufacturer Defendants have expended on marketing their drugs, sums that rose from $91 million in 2000 to $288 million in 2011.

175. The role of Defendants' marketing scheme in contributing to the opioid epidemic has now been acknowledged by members of the medical community. Representing the NIH's National Institute of Drug Abuse in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."[73]

176. In August 2016, then-U.S. Surgeon General Vivek Murthy published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . [m]any of [whom] were even taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain."

177. The incumbent U.S. Surgeon General Jerome Adams issued a rare Surgeon General's Advisory on April 5, 2018, encouraging widespread distribution of Naloxone, an opioid antagonist that can reverse the effects of an opioid overdose. The advisory observes that opioid overdoses are on the rise nationwide and that a contributing factor is "an increasing number of individuals receiving higher doses of prescription opioids for long-term management of chronic pain."[74]

---

[72] United States Cong., Senate Caucus on Int'l Drug Control, May 14, 2014, 113th Cong. 2nd sess. (Statement of Dr. Nora Volkow).

[73] United States Cong., Senate Caucus on Int'l Drug Control, May 14, 2014, 113th Cong. 2nd sess. (Statement of Dr. Nora Volkow).

[74] Surgeon General Advisory on Naloxone and Opioid Overdose, April 5, 2018, available at: https://www.surgeongeneral.gov/priorities/opioid-overdose-prevention/naloxone-advisory.html.

178.     Scientific evidence also demonstrates a strong correlation between opioid prescriptions and opioid abuse.  In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

179.     Contrary to Manufacturer and KOL Defendants' misrepresentations, most opioid addiction begins with legitimately *prescribed* opioids, and therefore could have been prevented had Defendants' representations to prescribers been truthful.  In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from pill mills, drug dealers or the internet.[75]  Numerous doctors and substance abuse counselors note that many of their patients who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic.

180.     While the use of opioids has taken an enormous toll on Salt Lake County and its residents, Manufacturer Defendants have realized blockbuster profits.  In 2014 alone, opioids generated $11 billion in revenue for drug companies like Manufacturer Defendants.  Indeed, financial information indicates that each Manufacturer Defendant experienced a material increase in sales, revenue, and profits from the false and deceptive advertising and other unlawful and unfair conduct described above.  Dr. Webster and Dr. Portenoy likewise profited from their participation in the scheme, receiving millions of dollars in consulting and other fees from the Manufacturer Defendants.

---

[75] *See* U.S. Dep't of Health & Human Servs., *2011 National Survey on Drug Use and Health* (Sept. 2012), available at:
https://www.samhsa.gov/data/sites/default/files/2011MHFDT/2k11MHFR/Web/NSDUHmhfr2011.htm.

E.    **Manufacturer and Distributor Defendants Failed to Maintain Effective Controls to Prevent Diversion of Opioids and Halt Suspicious Orders.**

181.    By deceptively marketing prescription opioids for chronic pain, Manufacturer Defendants and KOL Defendants generated a population of addicts in Salt Lake County who would look to any source—including rogue dispensaries and the black market—to obtain opioids. But Defendants' responsibilities for the opioid epidemic in Salt Lake County do not end there. Entities that manufacture and distribute opioids—including Manufacturer and Distributor Defendants here—have a common-law and statutory duty to prevent the diversion of opioids into illicit distribution channels. In pursuit of profits, Manufacturer and Distributor Defendants failed to discharge these basic responsibilities and instead turned a blind eye to many suspicious opioid shipments directed into Salt Lake County communities. This failure flooded Salt Lake County with prescription opioids, compounding the impact of the Manufacturer Defendants' marketing scheme and fueling the opioid crisis engulfing the region.

1.    **Manufacturer and Distributor Defendants have an acknowledged duty to erect controls against the diversion of prescription opioids and report suspicious shipments.**

182.    Most prescription opioids are classified as Schedule II controlled substances, meaning they have a "high potential for abuse" that "may lead to severe psychological or physical dependence."[76] As manufacturers and distributors of these dangerous narcotics, Defendants play a critical role in preventing their diversion outside the lawful supply chain, which generally is comprised of four sequential links: (1) manufacturers, such as Manufacturer Defendants, who provide drugs to (2) wholesale distributors, such as Distributor Defendants, who ship drugs to (3) dispensaries, including pharmacies and hospitals, who supply (4) end users.

---

[76] 21 U.S.C. § 812(b)(2).

183. Manufacturer and Distributor Defendants' duties to prevent diversion through this supply chain arise under Utah common law, which imposes an obligation of reasonable care to prevent the foreseeable harms that can result from the diversion of highly addictive drugs.

184. Manufacturer and Distributor Defendants are likewise subject to federal and state anti-diversion regulatory schemes. Specifically, manufacturers and distributors of prescription opioids must register both with the federal DEA and the Utah Division of Occupational and Professional Licensing.[77] Pursuant to the Federal Controlled Substances Act (CSA), aspects of which are incorporated into Utah law, all DEA registrants must fulfill security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion. An entity that is sanctioned by the DEA for failing to abide by these requirements is subject to identical sanctions under Utah law.[78]

185. Entities engaged in the distribution or manufacture of opioids also have independent obligations under Utah law to "be equipped with security measures, systems and procedures necessary to provide reasonable security against theft and diversion of prescription drugs."[79] For prescription opioids and other drugs that "leave, or have left, the normal distribution channel," distributors must prepare special "pedigrees" that identify "each sale in the chain of distribution of the product from the manufacturer, through acquisition and sale by any pharmaceutical wholesaler."[80]

186. A principal cause of diversion is the fulfillment of suspicious opioid shipments that, in whole or part, are likely to make their way into illegal markets. For this reason, a central requirement of the CSA is that Manufacturer and Distributor Defendants design and operate a

---

[77] See 21 C.F.R. § 1301.11; UT ADC R156-37-301(1)(n).

[78] See Utah Code Ann. §§ 58-1-501(2)(d), 58-1-401(2)(a).

[79] See Utah Admin. Code R156-17b-615(8)(f).

[80] See Utah Admin. Code R156-17b-615(10)(a).

system that monitors and reports "suspicious orders" to the DEA.[81] "Suspicious orders" include orders of "unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[82]

187.    Manufacturer and Distributor Defendants are required to report all suspicious orders to the DEA, and they are not permitted to fulfill such orders unless they determine, though an exercise of due diligence, that the orders are not likely to be diverted into illegal channels.[83]

188.    In settlements with the DEA and DOJ, Manufacturer and Distributor Defendants have repeatedly acknowledged these obligations. The DEA also has gone to great lengths to remind Manufacturer and Distributor Defendants of their duties to report and suspend suspicious shipments. These efforts have included online guidance and in-person conferences, which Defendants have attended.[84]

189.    The DEA has also provided Manufacturer and Distributor Defendants with written guidance. In 1984, the DEA advised pharmaceutical distributors, through their trade organization, that "the submission of a monthly printout of after-the-fact-sales will not relieve a registrant from the responsibility of reporting excessive or suspicious orders" and that "DEA has interpreted 'orders' to mean prior to shipment."[85] In 2006, the DEA sent a letter to every DEA registrant to "reiterate the responsibilities of controlled substance distributors in view of the prescription drug abuse problem our nation currently faces."[86] The DEA stated that this includes

---

[81] *See* 21 C.F.R. § 1301.74(b).

[82] *Id.*

[83] *Id.*

[84] Distributor Conferences (2013-2016), available at:
https://www.deadiversion.usdoj.gov/mtgs/distributor/index.html; Manufacturer Conferences (2013-2015) available at: https://www.deadiversion.usdoj.gov/mtgs/man_imp_exp/index.html; National Conference on Pharmaceutical and Chemical Diversion (2008-2017) available at
https://www.deadiversion.usdoj.gov/mtgs/drug_chemical/index.html; Diversion Awareness Conferences (2011-2017) available at: https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/index.html.

[85] *In Re: National Prescription Opiate Litigation,* 17-md-2804 (N.D. Oh.), Dkt. No. 1957-5.

[86] *Id.* at Dkt. No. 1957-6.

reporting and stopping "suspicious orders that might be diverted."[87]  Again in 2007, the DEA

sent a letter to "every entity in the United States registered with the Drug Enforcement

Administration (DEA) to manufacture or distribute controlled substances."[88]  This letter

"reiterate[d]" that manufacturers and distributors have an obligation to report suspicious orders

and provided a framework for identifying such orders.[89]  In particular, the DEA advised that

Manufacturer and Distributor Defendants "must conduct an independent analysis of suspicious

orders prior to completing a sale to determine whether controlled substances are likely to be

diverted from legitimate channels."[90]  The DEA further advised that "suspicious orders include

orders of an unusual size, orders deviating substantially from a normal pattern, and orders of an

unusual frequency"—criteria that "are disjunctive and are not all inclusive."[91]  Moreover,

"registrant need not wait for a 'normal pattern' to develop over time before determining whether

a particular order is suspicious.  The size of an order alone, whether or not it deviates from a

normal pattern, is enough to trigger the registrant's responsibility to report the order as

suspicious."[92]

190.    As reflected in the DEA's written guidance, the obligation to report suspicious

orders is borne not only by the Distributor Defendants, but also by the manufacturers of opioids,

including the Manufacturer Defendants here.  In this respect, Manufacturer Defendant

Mallinckrodt acknowledged in a 2017 settlement with the DEA that it has "a responsibility to

maintain effective controls against diversion, including a requirement that it review and monitor

---

[87] *Id.*

[88] Letter from Joseph T. Rannazzisi, Deputy Assistant Administrator, Office of Diversion Control, DEA, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health Inc. v. Holder*, No. 1:12-cv-00185-RBW, 846 F. Supp. 2d 203 (D.D.C. Feb. 10, 2012), Dkt. No. 14-8.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.*

these sales and report suspicious orders to DEA."[93]  Mallinckrodt further acknowledged "the

importance of the prevention of diversion of the controlled substances [it] manufacture[s]" and

agreed that it would "design an operate a system that meets the requirements of 21 CFR

1301.74(b) . . . [such that it would] utilize all available transaction information to identify

suspicious orders of any Mallinckrodt product" and then "notify DEA of any diversion and/or

suspicious circumstances involving any Mallinckrodt controlled substances."[94]

### 2. Manufacturer and Distributor Defendants have failed to implement effective controls against the diversion of opioids.

191.    As detailed further below, Manufacturer and Distributor Defendants have failed to

report and halt suspicious shipments into Salt Lake County.  Although this particular failure

could not have been known to Salt Lake County any earlier, it comports with these Defendants'

prolonged refusal to implement meaningful anti-diversion controls.  Each Manufacturer and

Distributor Defendant is aware that its anti-diversion systems are deficient—often because the

DEA has said so—but none have cured the deficiencies.  This failure has materially contributed

to the opioid crisis by flooding Salt Lake County and other communities with large quantities of

diverted opioids.

192.    As detailed in what follows, Defendants' monitoring programs are not only

flawed, they share many of the same deficiencies.  This is no accident.  Defendants developed

their deficient monitoring programs in coordination, including through their trade organization

known as the "Healthcare Distribution Alliance" or "HDA."  Both Distributor and Manufacturer

Defendants belong to the HDA, including Cardinal, McKesson, AmerisourceBergen, Purdue,

Endo, Mallinckrodt, Janssen, Actavis, and Cephalon.[95]

---

[93] Administrative Memorandum of Agreement, dated July 10, 2017, at 1, available at: https://www.justice.gov/usao-edmi/press-release/file/986026/download.

[94] *Id.* at 4.

[95] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Oh.), Dkt. No. 1979-7, at 37-38 (HDA 30(b)(6) deposition).

193.    By its own account, HDA provides Defendants with a forum for "networking" and building "alliances."[96]  HDA openly encourages members to participate in working groups to provide "guidance" and "leadership" across the membership on a variety of issues affecting the industry, including "DEA regulation of distribution" and "supply chain issues."[97]

194.    In 2007, in response to heightened DEA scrutiny, HDA's membership began "developing a comprehensive DEA strategy," including in respect to the identification of "suspicious orders."[98]  HDA's internal documents show that members were specifically concerned about the "surge in DEA enforcement around suspicious shipments" and felt the industry needed "to quickly develop a plan to deal with and work with the DEA as necessary."[99]  HDA members considered plans to "challenge the DEA" and "develop business practices" in response to the DEA's heightened scrutiny of suspicious shipments.[100]  As part of this effort, HDA collected copies of its "member companies' suspicious order policies and procedures."[101]  HDA members then convened privately to discuss "best practices" in response to DEA enforcement and brainstorm "next steps."[102]  In January 2008, as part of a monthly meeting with the Pain Care Forum, an opioid-advocacy Front Group, the HDA apprised Pain Care Forum members—including opioid manufacturers and pharmacies—of the DEA's enforcement actions and the steps HDA was taking in response.[103]

195.    Defendants also shared common consultants and personnel.  For example, Cephalon retained two AmerisourceBergen employees to develop its suspicious shipment monitoring program, even though AmerisourceBergen was under DEA investigation at the time.

---

[96] *See* https://www.hda.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx?la=en.

[97] *See* https://www.hda.org/about/councils-and-committees#Committees.

[98] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Oh.), Dkt. No. 1979-7, at 61-62 (HDA 30(b)(6) deposition).

[99] *Id.* at 68.

[100] *Id.* at 75-76.

[101] *Id.* at 121.

[102] *Id.* at 137.

[103] *Id.* at 139-140

Given this extraordinary level of industry coordination, it is no surprise that Defendants' inadequate monitoring programs shared uncanny similarities.

### a.    McKesson

196.    McKesson distributed more than 50 million opioid pills into Salt Lake County between 2006 and 2012 without implementing meaningful systems to prevent the diversion of those opioids.[104]    Indeed, on at least two separate occasions, McKesson has been subjected to civil penalties by the DEA for failing to implement anti-diversion controls in Utah and other states.    In May 2008, McKesson entered into a settlement agreement with the DEA, pursuant to which it agreed to pay $13.25 million—including $544,000 to Utah—to settle claims that McKesson had "failed to report to the DEA suspicious sales" of opioids it had received from pharmacies and clinics.[105]    The DEA alleged that "[b]y failing to report suspicious orders for controlled substances that it received from rogue pharmacies, the McKesson Corporation fueled the explosive prescription drug abuse problem we have in this country."[106]

197.    As part of the 2008 settlement, McKesson recognized its ongoing obligation to monitor and report suspicious orders to the DEA, and agreed to develop a Controlled Substance Monitoring Program ("CSMP") to that end.[107]    But despite this existing—and now contractual— obligation, McKesson continued to fill suspicious orders of opioids without implementing effective controls against diversion.    The DEA found, for example, that between June 2008 and May 2013, one McKesson distribution facility in Colorado "processed more than 1.6 million

---

[104] *Drilling into the DEA's pain pill database,* The Washington Post, (originally published July 16, 2019, updated July 21, 2019) https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/?utm_term=.f0cebd69c859.

[105] DOJ May 2, 2008 Press Release, *McKesson Corporation Agrees to Pay More than $13 Million to Settle Claims that it Failed to Report Suspicious Sales of Prescription Medications,* available at https://www.justice.gov/archive/opa/pr/2008/May/08-opa-374.html.

[106] *Id.*

[107] *See* January 2017 DOJ Settlement Agreement and Release, at ¶ III.B, available at: https://dopl.utah.gov/orders/2018-149_SO_2018-04-09.pdf.

orders for controlled substances from June 2008 through May 13, 2013, but reported just 16 orders as suspicious, all connected to one instance related to a recently terminated customer."[108]

198.    On the basis of this and other evidence, McKesson acknowledged as part of its 2017 settlement agreement with DOJ that between 2009 and 2017 "it did not identify or report to DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious" under the regulatory framework and McKesson's 2008 settlement with the DEA.[109] Admitting wrongdoing, McKesson agreed to pay a $150 million civil penalty.

199.    As a result of the same misconduct, the Utah Division of Occupational & Professional Licensing initiated administrative proceedings against McKesson. By Stipulation and Order dated April 5, 2018, McKesson acknowledged that it had engaged in "unprofessional conduct as defined in Utah Code Ann. § 58-1-501(2)(d); and that said conduct justifies disciplinary action against Respondent's license."[110] McKesson agreed that its "Utah license to distribute substances shall be immediately suspended and remain suspended until January 17, 2020."[111]

200.    McKesson has systematically failed to report suspicious shipments because it has never implemented meaningful anti-diversion controls. Between 1997 and 2007—as the opioid crisis emerged—McKesson's system consisted of producing periodic reports documenting *retrospective* sales of controlled substances that exceeded a customer's 12-month purchase average. Under this facially inadequate system, McKesson did not even block shipments it flagged as suspicious. McKesson's own regulatory affairs director has acknowledged that

---

[108] DOJ January 17, 2017 Press Release, *McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs*, available at: https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

[109] *See* January 2017 DOJ Settlement Agreement and Release, at ¶¶ IV.A to IV.B, available at: https://dopl.utah.gov/orders/2018-149_SO_2018-04-09.pdf.

[110] *In the Matter of the License of McKesson Corporation*, Stipulation and Order dated April 5, 2018, at ¶ 8, available at: https://dopl.utah.gov/orders/2018-149_SO_2018-04-09.pdf.

[111] *Id.*

"simply reporting larger than usual orders" did not satisfy McKesson's obligations under the CSA.[112] McKesson's system also failed to track generic drugs. Thus, when the DEA notified McKesson in 2006 that it had identified millions of generic hydrocodone shipments by McKesson to rogue internet pharmacies over a three-week period, McKesson had to concede that—because those shipments involved generic formulations—McKesson's systems had not even flagged them as suspicious.[113]

201.    In addition to being deficiently constructed, McKesson's pre-2007 monitoring system was not seriously implemented. McKesson employees have acknowledged that, beyond confirming certain erroneous "fat fingered" orders, McKesson undertook no investigation of the legitimacy of the excessive orders the system identified.[114] This was an abject failure to abide by the requirements of the CSA.

202.    After its 2008 settlement with the DEA, McKesson modified its anti-diversion system, but embedded loopholes to keep the system ineffectual. Indeed, when introducing the changes, McKesson ensured its pharmacy customers that they could continue "business as usual."[115] Having just settled claims for failing to report suspicious orders, business as usual was the last thing McKesson should have promised its customer base.

203.    McKesson's new system set monthly opioid thresholds for customers, above which orders would be flagged as suspicious. But these thresholds were set far too high. Even McKesson's director of regulatory affairs acknowledged the "large gaps between the amount of Oxy or Hydro [customers] are allowed to buy (their threshold) and the amount they really need. .

---

[112] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1964-28 (MCKMDL00510747).

[113] *Id.* at Dkt. No. 1964-30 (MCKMDL00496877-MCKMDL00496878).

[114] *Id.* at Dkt. No. 1964-29 (Snider Depo., 77:3-78:4).

[115] *Id.* at Dkt. No. 1910-1 at 84 (citing Dkt. No. 1964-41 (MCKMDL00543613)).

. . This increases the opportunity for diversion by exposing more product for introduction into the pipeline than may be being used for legitimate purposes."[116]

204. McKesson also routinely increased customers' thresholds without adequate justification. According to internal McKesson documents, requests for threshold increases were "almost automatic."[117] This was particularly true for national retail pharmacies, for whom McKesson granted threshold increases without conducting any due diligence. Many national retail pharmacies have been investigated and fined by the DEA for diversion-related misconduct.

205. Perhaps most troublingly, McKesson assisted its customers in circumventing the system by warning them when they were approaching their threshold. This was a sales strategy. It allowed customers at the cusp of their threshold to request a threshold increase—which invariably would be granted—before sales were lost. As one McKesson employee put it: "We are in the business to sell product. If we could produce a report . . . that warned customers approach to a threshold, say at 85% of their 10,000 dosages, work could begin on justifying an increase in threshold prior to any lost sales."[118]

206. In sum, at no point in time has McKesson employed effective controls against diversion. This is not an oversight. It was a corporate strategy to keep opioid profits flowing. Tellingly in this regard, when McKesson revamped its diversion "controls" in 2008, it specifically instructed its employees to "[r]efrain from using the word 'suspicious'" because "[o]nce McKesson deems an order and/or customers suspicious, McKesson is required to act."[119] McKesson's policies assured this happened rarely.

---

[116] *Id.* at Dkt. No. 1910-1 at 84 (citing Dkt. No. 1964-43 (MCKMDL00507799)).
[117] *Id.* at Dkt. No.1910-1 at 84 (citing Dkt. No. 1964-47 (MCKMDL00507223)).
[118] *Id.* at Dkt. No. 1910-1 at 86-87 (citing Dkt. No. 1964-65 (MCKMDL00543972)).
[119] *Id.* at Dkt. No. 1910-1 at 88 (citing Dkt. No. 1964-72 (MCKMDL005118078)).

### b.      Cardinal

207.      Between 2006 and 2012, Cardinal directed more than 30 million opioid pills into Salt Lake County without adopting an effective system to monitor shipments likely to be diverted into illicit distribution channels.[120] Cardinal has in fact been repeatedly sanctioned for failing to report suspicious opioid shipments. In 2008, Cardinal agreed to pay $34 million in civil penalties related to the diversion of opioids from its warehouses across the United States. The penalties arose from the DEA's allegations that Cardinal had filled and failed to report suspicious orders of hydrocodone to rogue pharmacies, conduct that "allowed the 'diversion' of millions of dosage units of hydrocodone from legitimate to non-legitimate channels."[121] The DEA alleged that despite its "repeated attempts to educate Cardinal Health on diversion awareness and prevention, Cardinal engaged in a pattern of failing to report blatantly suspicious orders for controlled substances."[122]

208.      Cardinal did not reform its conduct. Pursuant to a settlement agreement executed in May 2012, the DEA suspended for two years Cardinal's license to distribute controlled substances from its Florida distribution center.[123] In just three years, the distribution center had shipped more than 12 million dosage units of oxycodone to just four local pharmacies.[124] Through the settlement, Cardinal admitted "that it neglected its vital responsibility to prevent the diversion of controlled substances medications."[125] The failure was particularly acute given that,

---

[120] *Drilling into the DEA's pain pill database*, The Washington Post, (originally published July 16, 2019, updated July 21, 2019) https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/?utm_term=.f0cebd69c859.

[121] U.S. Attorney's Office for the District of Colorado, Oct. 2, 2008 Press Release, *Cardinal Health Inc., Agrees To Pay $34 Million To Settle Claims That It Failed To Report Suspicious Sales Of Widely-Abused Controlled Substances* (Oct. 2, 2008) *available at:* https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.

[122] *Id.*

[123] DEA May 15, 2012 Press Release, *DEA Suspends for Two Years Pharmaceutical Wholesale Distributor's Ability to Sell Controlled Substances from Lakeland, Florida Facility, available at:* https://web.archive.org/web/20151009061847/http:/www.dea.gov/divisions/hq/2012/pr051512p.html.

[124] *Id.*

[125] *Id.*

as part of the prior 2008 settlement, Cardinal had agreed to implement compliance programs to "prevent diversion."[126] According to the DEA, the 2012 sanction "was based, in part, on Cardinal's failure to live up to the terms of the 2008 [agreement]."[127]

209. Although Cardinal agreed as part of the 2012 settlement to improve its anti-diversion procedures, Cardinal continued to neglect its obligation to report suspicious shipments. In 2016, Cardinal agreed to pay an additional $44 million in civil penalties based on its failure to report suspicious orders in Maryland, Florida and New York.[128] As part of the settlement, "Cardinal admitted that from January 1, 2009 to May 14, 2012, it failed to report suspicious orders to the DEA as required by the CSA."[129] In January 2017, Cardinal paid the State of West Virginia $20 million to settle allegations that it failed to report suspicious orders into that state.

210. Cardinal's repeated failure to report suspicious shipments arose from what its own CEO described as a "result-orientated culture" that could spawn "ill-advised or short-sighted decisions."[130] Indeed, before 2008, Cardinal had virtually no system for monitoring suspicious shipments. All it did was supply the DEA with certain monthly summaries showing purchase volumes, but Cardinal's own consultant found these reports to be "not sufficient to monitor deviations in ordering patterns on a real time basis."[131] And even when Cardinal identified a suspicious shipment, it fulfilled the shipment anyway.

211. It was not until its 2008 settlement with the DEA that Cardinal began blocking shipments it identified as suspicious. But its systems for identifying those shipments remained inadequate. Similar to McKesson, Cardinal adopted in 2008 customer-specific thresholds, above

---

[126] *Id.*

[127] *Id.*

[128] US Attorney's Office District of Maryland, Dec. 23, 2016 Press Release, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, available at: https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act.

[129] *Id.*

[130] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1910-1 at 88 (citing Dkt. No. 1964-72 (MCKMDL005118078)).

[131] *Id.* at Dkt. No. 1964-7 (CAH_MDL2804_03309962; CAH_MDL2804_03309964).

which shipments would be identified as suspicious. But these thresholds were too high because they were set in accordance with current, and thus already inflated, ordering volumes. Cardinal also performed virtually no due diligence of its chain pharmacy customers, wary that these retailers can "take their billions upon billions of dollars in business to any wholesaler in the country."[132]

212.    The result was a wholesale failure to identify suspicious shipments. Cardinal's internal documents show in this regard that between 2008 and 2013—the height of the opioid crisis—Cardinal reported only a *few dozen* suspicious shipments to the DEA.[133] Cardinal also failed to report shipments it flagged. In fact, Cardinal has now acknowledged that between 2012 and 2015, it failed to report 14,000 suspicious orders from "across the country," and that the "vast majority" of those orders included opioids.[134]

### c.    AmerisourceBergen

213.    AmerisourceBergen distributed more than 80 million opioid pills into Salt Lake County between 2006 and 2012.[135] It did so without implementing effective controls against diversion. This is part of a larger pattern. In 2007, the DEA suspended the registration of the Orlando branch of AmerisourceBergen for allegedly selling "large quantities" of hydrocodone to rogue pharmacies.[136] The DEA took these dramatic steps having determined that "the continued registration of this company constitutes an imminent danger to public health and safety."[137] The

---

[132] *Id.* at Dkt. No. 1964-16 (89(5) FOIL Appeal G000804 000006).

[133] *Id.* at Dkt. No. 1964-13 (CAH_MDL2804_03262438).

[134] *Id.* at Dkt. No. 1910-1 at 77 (citing Dkt. No. 1964-17 (Cameron Depo., 269:12-270:13)).

[135] *Drilling into the DEA's pain pill database,* The Washington Post, (originally published July 16, 2019, updated July 21, 2019) https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/?utm_term=.f0cebd69c859.

[136] DEA April 24, 2007 Press Release, *DEA Suspends Orlando Branch of Drug Company from Distributing Controlled Substances,* available at: https://www.dea.gov/sites/default/files/divisions/mia/2007/mia042407p.html.

[137] *Id.*

DEA investigated AmerisourceBergen again in 2012 for failing to protect against diversion.[138] Then in 2017, AmerisourceBergen agreed to pay West Virginia $16 million to settle claims that the company failed to monitor and report suspicious opioid shipments.

214. While these regulatory actions prompted certain changes in AmerisourceBergen's anti-diversion system, at no point has that system been effective. Prior to 2007, AmerisourceBergen maintained a "ship and report" policy—that is, its corporate *policy* was to ship suspicious orders before they were reported to the DEA.[139] This ensured no interruption in AmerisourceBergen's sales. To identify suspicious shipments, AmerisourceBergen placed signs within its distribution centers identifying customer ordering thresholds, and relied on distribution center employees' discretion to identify suspicious shipments.[140] AmerisourceBergen had no division or group charged with implementing diversion controls. Nor did it have any policies in place to (a) compare a customers' orders with orders placed by similarly situated customers; (b) compare a customers' orders of certain controlled substances relative to other controlled substances; or (c) evaluate the frequency of customer orders.[141]

215. It was not until 2007, after its Orlando center was shut down by the DEA, that AmerisourceBergen began blocking shipments it identified as suspicious. But even then, such orders were promptly fulfilled with little or no documentation of any due diligence on AmerisourceBergen's part.[142] Other anti-diversion protocols AmerisourceBergen implemented in 2007 were facially ineffectual and designed to fail. For example, AmerisourceBergen "diligence" included a customer questionnaire that, in theory, could be used to identify rogue pharmacies. But the questionnaire was completed by AmerisourceBergen sales representatives

---

[138] Jeff Overley, *AmerisourceBergen Subpoenaed by DEA Over Drug Diversion* (Aug. 9, 2012), LAW360, available at: https://www.law360.com/articles/368498/amerisourcebergen-subpoenaed-by-deaover- drug-diversion.

[139] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1964-79 (Zimmerman Depo. I, 108:11-110:22).

[140] *Id.* at Dkt. No. 1964-82 (Mavs Depo. I, 173:19-174:9).

[141] *Id.* at Dkt. No. 1964-83 (Mavs Depo. II, 68:1-71; 72:1-5; 72:22-73:3).

[142] *Id.* at Dkt. No. 1910-1 at 94.

who were incentivized to increase sales with their customers, not compile information that would limit or cease their distributions. Moreover, the questionnaires were only used for new customers, not existing customers, and no retail chain pharmacy was required to complete one.[143]

### d. Walmart

216. Walmart sold an extraordinary amount of prescription opioids into Salt Lake Communities. From 2006 to 2012 Walmart distributed 20,728,000 opioids into Salt Lake County.[144] Walmart's noncompliant sales were made possible by, and are evidence of, Walmart's failures to comply with its duties under state and federal controlled substance laws.

217. Walmart utilized employees at its distribution centers to review orders for controlled substances, speak to pharmacies about the orders, and escalate any order needing further review.[145] However, Walmart had no written criteria[146] regarding how to identify orders that needed further review and simply relied on the "experience" of hourly associates reviewing hundreds of orders each day to recall what an unusual order would be for one of Walmart's more than 4,000 pharmacies.[147] Under this ad hoc system, few, if any, orders were ever identified by distribution center employees as needing further review or followed up on.

218. Walmart's policies failed to identify suspicious orders before shipment or anytime, and, as a consequence, Walmart routinely shipped suspicious orders. Walmart failed to

---

[143] *Id.* at Dkt. No. 1910-1 at 95 (citing Dkt. No. 1964-79 (Zimmerman Depo. I, 201:11-24; 213:16-214:9)).

[144] *Drilling into the DEA's pain pill database*, The Washington Post, (originally published July 16, 2019, updated July 21, 2019) https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/?utm_term=.f0cebd69c859.

[145] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1964-98 (Abernathy Depo., 24:15-25:6); Dkt. No. 1964-103 (Walmart Fed. R. Civ. P. 30(b)(6) Depo., 170:17-171:3).

[146] *Id.* at Dkt. No. 1910-1 at 100 (citing Dkt. 1964-98 (Abernathy Depo., 42:23-43:5).

[147] *Id.* at Dkt. No. 1964-103 (Walmart Fed. R. Civ. P. 30(b)(6) Depo. 52:1-13; 170:17-171:6; 215:18-216:23).

use available reports and information to monitor for suspicious orders. Walmart further did not have a process to monitor or keep track of any order that was flagged.

219. While Walmart faxed "exception reports" to the DEA, these reports were not suspicious order reports and were not used by Walmart to assess suspicious orders.[148]

220. Walmart delegated to the managers of distribution centers responsibility to report suspicious orders to the DEA, however, this was never done.[149]

221. Walmart implemented so-called "hard limits" on opioid orders. Under this approach, weekly orders of Oxycodone 30mg ("Oxy 30") were automatically reduced to 20 bottles (for example, a 40 bottle order was cut to 20 bottles).[150] Upon information and belief, orders that were reduced pursuant to these hard limits were neither reported to the DEA, nor held until determined to be appropriate (*i.e.*, the orders shipped).

222. During 2012, Walmart also monitored weekly orders of other controlled substances in quantities of more than 20 bottles.[151] These orders were reported on a daily basis to Walmart's home office for review before shipping by distribution center managers.[152] These daily reports were reported to Walmart's home office, but no further action was taken in response to the reports. A Walmart distribution center manager, who often prepared these "Over 20 Reports," testified that he did not recall the home office reviewing or holding any order and

---

[148] Walmart's monthly Controlled Drug Stock Exception Reports were not used to monitor daily orders for controlled substances. *See In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1964-103 (Walmart Fed. R. Civ. P. 30(b)(6) Depo., 221:21-222:5; 295:7-18 (referring to Controlled Drug Stock Exception Reports)).

[149] *Id.* at Dkt. No. 1964-103 (Walmart Fed. R. Civ. P. 30(b)(6) Depo.. 293:7-23); Dkt. No. 1964-98 (Abernathy Depo., 152:14-15).

[150] *Id.* at Dkt. No. 1964-98 (Abernathy Depo., 64:24-65:22).

[151] *Id.* at Dkt. No. 1964-98(Abernathy Depo., 59:6-61:21; 64:24-65:22; 122:24-123:23).

[152] *Id.*

that the orders that were sent for review would routinely be shipped the same day if he did not

hear from the home office. More specifically, the "Over 20 Report" was provided to the home

office in the morning, and if nothing was done by mid-afternoon, the orders were filled and

shipped.[153] He could not recall a single instance when an order was reviewed or even held.[154]

Further, if an order was reduced, the ordering pharmacy could place an order through McKesson

or ABDC.[155] These orders were simply not monitored by Walmart. In short, Walmart's system

permitted orders flagged by the "Over 20 Report" to ship prior to completing the investigation

and permitted Walmart stores to evade the restriction by ordering from a different distributor.

Thus, even Walmart's "hard-limit" policy failed to satisfy either the reporting or the shipping

obligations under the Controlled Substances Act.

223. Upon information and belief, Walmart conducted very little due diligence during

the relevant time period. Even once Walmart put a policy in place requiring flagged orders to be

reviewed, Walmart failed to follow its own policy and the review of these orders failed to occur.

224. Though Walmart had access to significant information about red flags due to its

vertical integration with its stores, Walmart failed to use available information in order to more

effectively prevent diversion.

### e. Walgreens

225. Walgreens failed to meet its suspicious order monitoring requirements, failed to

stop shipment of suspicious orders, and failed to effectively prevent diversion in breach of its

duties under state and federal law.

---

[153] *Id.* at Dkt. No. 1964-98 (Abernathy Depo.. 59:6-61:21).

[154] *Id.* at Dkt. No. 1964-98 (Abernathy Depo.. 61:14-21; 122:24-123:23; 138:1-7).

[155] *Id.* at Dkt. No. 1964-98 (Abernathy Depo.. 254:2-10).

226.    Walgreens is the second-largest pharmacy store chain in the United States behind

CVS, with annual revenue of more than $118 billion.    According to its website, Walgreens

operates more than 8,100 retail locations and filled 990 million prescriptions on a 30-day

adjusted basis in 2017.    From 2006 to 2012, Walgreens distributed 44,057,430 opioids into Salt

Lake County.[156]

227.    Walgreens self-distributed, meaning that its distribution "customers" were its own

individual Walgreens pharmacies.[157]    Walgreens could have used its pharmacies data to

determine the maximum amount of opioids a pharmacy should be allowed to receive but it failed

to take these factors into account in its monitoring program during the vast majority of the time it

was distributing prescription opioids, relying instead on an overly lenient volume "three times"

formula.    As part of a settlement with DEA in June 2013, Walgreens admitted that its "suspicious

order reporting for distribution to certain pharmacies did not meet the standards identified by

DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control,

sent to every registered manufacturer and distributor, including Walgreens, on September 27,

2006, February 7, 2007 and December 27, 2007."[158]

228.    Walgreens knew for some time that its monitoring system did not comply with its

CSA obligations.    In 2006 the DEA sent Walgreens a Letter of Admonition citing Walgreens for

recordkeeping inadequacies and security deficiencies at its Perrysburg Distribution Center.    The

DEA informed Walgreens that its formula for reporting suspicious orders was insufficient and

---

[156] *Drilling Into the DEA's Pain Pill Database*, The Washington Post, (originally published July 16, 2019, updated July 21, 2019), https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/?utm_term=.f0cebd69c859.
[157] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1965-5 (WAGMDL00757776).
[158] *Id.* at Dkt. No. 1965-6 (WAGMDL00490964).

that the formula should be based on size, pattern, or frequency. Rather than design and operate a system to identify suspicious orders, Walgreens utilized the "three times" formula to generate a monthly "Suspicious Control Drug Orders" that were sent to the DEA, *after* the orders had already shipped. These reports were generated on a nationwide basis and were thousands of pages or more in length.[159] Walgreens did not halt shipment of these orders or perform any due diligence on them before shipment.[160]

229. Walgreens knew such post-shipment reports did not satisfy CSA requirements. Upon information and belief, Senior Walgreens employees attended a September 2007 Pharmaceutical Industry Conference at which the DEA reminded distributors that the CSA required reporting suspicious orders, not suspicious sales after the fact.

230. Until September 2010, Walgreens's monitoring program flagged certain orders as "suspicious" but did not reduce, block or report the orders.[161] In addition, there were numerous loopholes that limited the program's effectiveness.[162] For instance, the program only monitored orders Walgreens stores placed to Walgreens's own distribution centers. If a store hit its ceiling with Walgreens, the store could simply order more controlled substances through outside vendors like Cardinal Health.[163] Additionally, even when a Walgreens's store had hit its ceiling, the program permitted stores to order controlled substances outside those limits.[164]

---

[159] *Id.* at Dkt. No. 1965-14 (Stahmann Depo., 282:8–289:1).

[160] *Id.* at Dkt. No. 1965-15 (Bratton 30(b)(6) Depo., Erratum No. 3).

[161] *Id.* at Dkt. No. 1965-43 (WAGMDL00077017).

[162] *Id.* at Dkt. No. 1965-44 (Polster Depo., 157:9-18).

[163] *Id.* at, Dkt. No. 1965-15 (Bratton 30(b)(6) Depo., 258:8-17).

[164] *Id.* at, Dkt. No. 1965-49 (WAGMDL00705318).

231.     Walgreens was penalized for flagrant violations of the CSA.  In September 2012, the DEA issued an immediate suspension order ("ISO") regarding one of Walgreens three Schedule II distribution centers, finding Walgreens's distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the public interest."[165]  The ISO contained a "statement of [the DEA's] findings regarding the danger to public health or safety"[166] posed by Walgreens's distribution practices.  Therein, the DEA specifically considered the Suspicious Control Drug Order reports and made the following findings of fact and conclusions of law[167] regarding the reports and Walgreens's suspicious order monitoring system:

- "[Walgreens's] practice with regard to suspicious order reporting was to send to the local DEA field office a monthly report labeled 'Suspicious Control Drug Orders.'"[168]

- "[The Suspicious Control Drug] reports, consisting of nothing more than an aggregate of completed transactions, did not comply with the requirement to report suspicious orders as discovered, despite the title [Walgreens's] attached to these reports."[169]

- Upon review of an example of the Suspicious Control Drug Order report for December 2011, "[Walgreens's] suspicious order report for December 2011 appears to include suspicious orders placed by its customers for the past 6 months. The report for just suspicious orders of Schedule II drugs is 1712 pages and includes reports on approximately 836 pharmacies in more than a dozen states and Puerto Rico."[170]

---

[165] *Id.* at Dkt. No. 1910-1 at 108 (citing Dkt. No. 1965-16 (WAGMDL00387653)).

[166] 311 21 C.F.R. § 1301.36(e).

[167] Walgreens does not dispute that ISO contains final findings of fact and conclusions of law. *See* Brief of Petitioner [Walgreen Co.], *Walgreen Co. v. Drug Enforcement Administration, et al.*, CV No. 12-1397, Doc. #1411758 (D.C. Cir. Dec. 26, 2012) (ISO contains "'final determinations, findings, and conclusions' made by DEA") (citing 21 U.S.C. §877).

[168] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1965-17 (WAGMDL00387654).

[169] *Id.*

[170] *Id.*

- Finding that the reports failed to appropriately consider the population and area being served by the pharmacy: "This report from the Jupiter Distribution Center covers pharmacies in multiple states and Puerto Rico, yet the average order and trigger amount is the same for a particular drug regardless of the pharmacy's location, the population it serves, or the number of other pharmacies in the area."[171]

- "As made clear in 21 CPR§ 1301.74(b), *Southwood,* and the December 27, 2007 letter to distributors from the Deputy Assistant Administrator for the Office of Diversion Control, suspicious orders are to be reported *as discovered,* not in a collection of monthly completed transactions. Moreover, commensurate with the obligation to identify and report suspicious orders as they are discovered is the obligation to conduct meaningful due diligence in an investigation of the customer and the particular order to resolve the suspicion and verify that the order is actually being used to fulfill legitimate medical needs. This analysis must take place *before* the order is shipped. No order identified as suspicious should be fulfilled until an assessment of the order's legitimacy is concluded."[172]

- "Notwithstanding the ample guidance available, Walgreens has failed to maintain an adequate suspicious order reporting system and as a result, has ignored readily identifiable orders and ordering patterns that, based on the information available throughout the Walgreens Corporation, should have been obvious signs of diversion occurring at Respondent's customer pharmacies. *See* 21 C.F.R. § 1301.74(b); *see also Southwood Pharm., Inc.,* 72 Fed. Reg. 36,487 (2007)."[173]

- "DEA's investigation of [Walgreens] ... revealed that Walgreens failed to detect and report suspicious orders by its pharmacy customers, in violation of 21 C.F.R. §1301.74(b). 21 C.F.R. § 1301.74(b)."[174]

- "... DEA investigation of [Walgreen's] distribution practices and policies ... demonstrates that [Walgreens] has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. §§ 823(b)(l and (e)(l). [Walgreens] failed to conduct adequate due diligence of its retail stores, including but not limited to, the six stores identified above, and continued to distribute large amounts of controlled substances to pharmacies that it knew or should have known were dispensing those controlled substances pursuant to prescriptions

---

[171] *Id.*

[172] *Id.*

[173] *Id.*

[174] *Id.*

written for other than a legitimate medical purpose by practitioners acting outside the usual course of their professional practice."

- "[Walgreens has not] recognized and adequately reformed the systemic shortcomings discussed herein."

- "[DEA's] concerns with [Walgreens's] distribution practices are not limited to the six Walgreens pharmacies [for which DEA suspended Walgreens's dispensing registration]."[175]

232. The 2012 ISO ultimately led to the largest settlement in DEA history—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the CSA, including negligently allowing controlled substances such as oxycodone and other prescription painkillers to be diverted for abuse and illegal black market sales.[176]

233. The settlement resolved investigations into and allegations of CSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of opioids into illicit channels.[177]

234. Walgreens's Florida operations at issue in this multi-state settlement highlight its egregious conduct regarding diversion of prescription opioids. Walgreens's Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount.[178]

---

[175] *In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. No. 1965-17 (WAGMDL00387663).

[176] Press Release, U.S. Attorney's Office S. Dist. of Fla., *Walgreens Agrees To Pay A Record Settlement Of $80 Million For Civil Penalties Under The Controlled Substances Act*, U.S. Dep't of Just. (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-undercontrolled.

[177] *Id.*

[178] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreens Co.* (Drug Enf't Admin. Sept. 13, 2012).

235.    They increased their orders over time, in some cases as much as 600% in the

space of just two years, including, for example, supplying a town of 3,000 with 285,800 orders

of oxycodone in a one-month period. Yet Walgreens corporate officers turned a blind eye to

these abuses. In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of

prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate

prescriptions perhaps we should consider not documenting our own potential noncompliance,"

underscoring Walgreens's attitude that profit outweighed compliance with the CSA or the health

of communities.[179]

236.    Defendant Walgreens's settlement with the DEA stemmed from the DEA's

investigation into Walgreens's distribution center in Jupiter, Florida, which was responsible for

significant opioid diversion in Florida. According to the Order to Show Cause, Defendant

Walgreens's corporate headquarters pushed to increase the number of oxycodone sales to

Walgreens's Florida pharmacies, and provided bonuses for pharmacy employees based on

number of prescriptions filled at the pharmacy in an effort to increase oxycodone sales. In July

2010, Defendant Walgreens ranked all of its Florida stores by number of oxycodone

prescriptions dispensed in June of that year, and found that the highest-ranking store in

oxycodone sales sold almost 18 oxycodone prescriptions per day. All of these prescriptions were

filled by the Jupiter Center.[180]

---

[179] *Id.*
[180] *Id.*

237.     Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000) and Massachusetts ($200,000).[181] The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the opioid use of some Medicaid patients who were considered high-risk.

238.     In January 2017, an investigation by the Massachusetts Attorney General found that some Walgreens pharmacies failed to monitor patients' drug use patterns and didn't use sound professional judgment when dispensing opioids and other controlled substances—despite the context of soaring overdose deaths in Massachusetts. Walgreens agreed to pay $200,000 and follow certain procedures for dispensing opioids.[182]

### f.     Mallinckrodt

239.     As a leading manufacturer of generic and branded opioids, Mallinckrodt assiduously tracks the downstream distribution of its drugs.  Mallinckrodt thus knows when its downstream customers—often Distributor Defendants—fulfill suspicious orders.  And Mallinckrodt has a duty to report that suspicious activity.  Mallinckrodt has utterly failed to discharge this obligation.  Among Mallinckrodt's customers are at least five distributors who shipped suspicious quantities of Mallinckrodt products and had their licenses revoked by the DEA.[183]

240.     At no point in time has Mallinckrodt implemented effective controls against diversion—indeed, Mallinckrodt has acknowledged as much to the DEA.  In 2017, the DEA announced that Mallinckrodt agreed to pay $35 million to settle "nationwide claims that the

---

[181] *Walgreens to pay $200,000 settlement for lapses with opioids*, APhA (Jan. 25, 2017), https://www.pharmacist.com/article/walgreens-pay-200000-settlement-lapses-opioids.
[182] *Id.*
[183] *See In Re: National Prescription Opiate Litigation*, 17-md-2804 (N.D. Ohio), Dkt. Nos. 1957-26; 1957-27; 1957-28; 1957-29; 1957-30; 1957-33; 1957-35; 1957-36; 1957-37; 1957-38.

company did not meet its obligations to detect and notify DEA of suspicious orders of controlled substances such as oxycodone, the abuse of which is part of the current opioid epidemic."[184] The DEA alleged that Mallinckrodt "sold excessive amounts of the most highly abused forms of oxycodone, 30 mg and 15 mg tablets, placing them in the stream of commerce that would result in diversion."[185] Although "Mallinckrodt knew of the pattern of excessive sales of its oxycodone feeding massive diversion," the DEA alleged that "it continued to incentivize and supply these suspicious sales" while filing to "notify the DEA of the suspicious orders in violation of the CSA."[186] As part of its settlement with the DEA, Mallinckrodt admitted that "at certain times during the Covered Time Period prior to January 1, 2012, certain aspects of Mallinckrodt's system to monitor and detect suspicious orders did not meet the standards outlined in letters from the DEA Deputy Administrator, Office of Diversion Control, to registrants dated September 27, 2006 and December 27, 2007.[187]

241.    To identify suspicious orders, Mallinckrodt relies on a deficient threshold system that compares the size of a shipment against the average size over the prior 12 or 18-month period.  Initially, Mallinckrodt flagged shipments doubling the prior average, but arbitrarily raised the threshold so that only shipments tripling the average would be flagged.  This was done only to ease "administrative burden" associated with reviewing suspicious shipments.[188] Whatever the threshold, this system—entirely reliant on a rigid and one-dimensional formula—is plainly deficient under 2007 guidance from the DEA:

---

[184] DOJ July 11, 2017 Press Release, *Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations,* available at: https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

[185] *In Re: National Prescription Opiate Litigation,* 17-md-2804 (N.D. Ohio), Dkt. No. 1957-31 (Administrative Memorandum of Agreement between U.S. Department of Justice, Drug Enforcement Administration, Mallinckrodt plc and Mallinckrodt LLC (July 10, 2017) at 1).

[186] *Id.*

[187] Administrative Memorandum of Agreement, dated July 10, 2017, at 3-4, available at: https://www.justice.gov/usao-edmi/press-release/file/986026/download.

[188] *In Re: National Prescription Opiate Litigation,* 17-md-2804 (N.D. Ohio), Dkt. No. 1957-34 (Harper Depo., 321:11-25).

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributors.[189]

242.    A former DEA employee retained by Mallinckrodt advised the company that its reliance on a rigid formula was a concern that could "be unnecessarily exposing [Mallinckrodt] to potential liability."[190]   Mallinckrodt did not, however, revise its approach.

243.    Mallinckrodt's anti-diversion system suffered from numerous additional defects. *First*, Mallinckrodt's internal documents acknowledge that it "did not always perform due diligence on peculiar orders before shipping them."[191]   That is, Mallinckrodt shipped first and "investigated" later—a practice the DEA proscribes. *Second*, between 2008 and 2009, Mallinckrodt eliminated its threshold system and ceased to conduct *any* evaluation of whether orders were of suspicious size.  This means that, for an entire year, Mallinckrodt had no anti-diversion system at all. *Third*, Mallinckrodt relies on its sales force to investigate and clear suspicious shipments.  Mallinckrodt's sales personnel receive bonuses based on sales volumes, and those bonuses can  reach six figures.[192]   No bonuses are paid for halting suspicious orders. Although Mallinckrodt has internally recognized the inherent "conflict of interest" in giving sales personnel anti-diversion responsibilities, they have not ceased the practice.[193]   This is despite the feeble—and obviously suspect—justifications Mallinckrodt's sales personnel have provided for clearing customer orders.  Internal documents show, for example, that Mallinckrodt sales personnel have requested *and obtained clearance* to fulfill suspicious orders because they

[189] *Id.* at Dkt. No. 1957-39 (MNK-T1_0007146632).

[190] *Id.* at Dkt. No. 1957-41 (MNK-T1_0000269399).

[191] *Id.* at Dkt. No. 1957-34 (Harper Depo., 199:24-200:10).

[192] *Id.* at Dkt. No. 1957-45 (MNK-T1_0000315995).

[193] *Id.* at Dkt. No. 1957-48 (MNK-T1_0000280260).

wanted to keep the "momentum rolling" or because the customer could not obtain opioids elsewhere (a fact that should have raised, rather than disarmed, suspicions).[194]

244.   More troubling yet, Mallinckrodt's sales force has shown real disdain for their compliance role. By way of example, one of Mallinckrodt's most highly compensated salespeople was contacted by a distributor who, after receiving an overnight shipment of 1200 bottles of oxycodone from Mallinckrodt, remarked: "Keep'em comin'! Flyin' out of here. It's like people are addicted to these things or something. Oh, wait, people are . . . ."[195] The Mallinckrodt salesperson did not raise diversion concerns in response. Far from it, his response was "[j]ust like Doritos keep eating. We'll make more."[196]

245.   Against this backdrop, it is hardly surprising that Mallinckrodt's anti-diversion system was ineffectual. But the numbers shock the conscious. Between 2003 and 2011, Mallinckrodt shipped more than 53 million orders of opioids. Of these, Mallinckrodt identified 37,817 as "peculiar" (Mallinckrodt's term) and it stopped only *33*.[197] In other words, although Mallinckrodt maintained exactingly granular data on the downstream distribution of its drugs, it halted only .006 percent of its shipments at the peak of the opioid crisis.

### g.   Purdue

246.   In 2000, four years after it introduced OxyContin, Purdue acknowledged that it had an obligation to develop a system to monitor suspicious shipments. But from the outset, the system Purdue adopted focused not on preventing diversion, but on ensuring that customers placing large orders had the financial resources to pay for them. Tellingly, Purdue tasked its National Accounts department with implementing the system, even though it knew the divisions

---

[194] *Id.* at Dkt. No. 1957-54 (MNK-T1_0000297371).
[195] *Id.* at Dkt. No. 1957-58 (MNK-T1_0000559532).
[196] *Id.*
[197] *Id.* at Dkt. No. 1910-1 at 30-31.

"function is to sell, not police orders."[198]  Under Purdue's scheme, the factors to be considered

before releasing a potentially suspicious order included:

> The explanation for the order received from the customer. The customer's
> existing credit line; Purdue's credit line insurance limits; The customer's payment
> history; and, Any recent business developments that may have arisen since the
> customer's last credit review.[199]

These "creditworthiness" considerations have nothing to do with diversion. The concern

was only with respect to Purdue's bottom line.  Under this approach, Purdue rationalized the

release of massive opioid shipments not because they had conducted the diligence needed to rule

out diversion, but, for example, because the customer was "okay financially" and Purdue could

"[j]ustify a $5.0mm exposure."[200]

247.    In an interview with the *Los Angeles Times*, Purdue's senior compliance officer

acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take

action—even where Purdue employees personally witnessed the diversion of its drugs.  The

same was true of prescribers; despite its knowledge of illegal prescribing, Purdue did not report

until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1

million OxyContin tablets and that Purdue's district manager described internally as "an

organized drug ring."  In doing so, Purdue protected its own profits at the expense of public

health and safety.

248.    By approximately 2002, Purdue was evaluating suspicious prescribers using the

data obtained from third-party vendors and other sources.  Using these data, Purdue identified its

top 200 prescribers and created a list of "Region 0" prescribers who, based on their prescribing

patterns (e.g., high quantities of prescriptions paid for with cash, or for high dosage OxyContin)

---

[198] *Id.* at Dkt. No. 1957-72 (PDD8801146346).

[199] *Id.* at Dkt. No. 1957-88 (PPLPC004000119321).

[200] *Id.* at Dkt. No. 1957-77 (PPLPC004000119319).

should be considered "potential diverters."[201]  Purdue did not report a single one of these prescribers, nor did it do anything to restrict their supply of opioids.

249.    In 2009, Purdue adopted an algorithm-based system for flagging suspicious shipments, but it was not meaningfully implemented.  Purdue's chief security officer has acknowledged that from 2009 to the present, he can recall *only one* instance in which Purdue reduced or blocked an order because of its size, frequency or pattern.[202]

250.    The State of New York's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing.

### h.    Endo

251.    Endo, too, has been censured for its failure to set up an effective system for identifying and reporting suspicious prescribing.  In its settlement agreement with Endo, the State of New York found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list.

252.    Endo has acknowledged that, until 2014, its "system" for reviewing orders was "limited" and designed only to identify excessive orders from a commercial perspective.[203]  In May 2014, Endo developed an algorithm purportedly to identify suspicious orders in terms of quantity, size, and frequency.  But Endo never used the data at its fingertips to identify, as is required, suspicious shipments of its products in the downstream market—e.g., shipments from distributors to pharmacies.  Endo also never conducted due diligence through on-site visits of its customers.  And as with systems implemented by other manufacturers, Endo's was doomed to

---

[201] *Id.* at Dkt. No. 75 (Seid Depo. II, 363:11-16).

[202] *Id.* at Dkt. No. 1957-97 (Geraci Depo., 221:5-226:13).

[203] *Id.* at Dkt. No. 1960-14 (Walker Depo., 31:7-10; 31:24-32:2; 34:4-6; 35:7-11; 73:14-75:17); *See also id.* at Dkt. Nos. 1960-29 (ENDO-OPIOID_MDL-01239749) and 1960-30 (EPI000620553).

fail because it was administered by customer service personnel with a vested interest in expanding sales.

253. Endo's director of distribution has acknowledged that in her twenty years at Endo, she cannot recall a single order being identified as "suspicious" by Endo.[204] Over this period, Endo's monitoring system flagged tens of thousands of order line items as suspicious.[205] Endo did not block any of these orders. Endo did not report these orders to the DEA.[206]

### i. Actavis

254. Actavis's monitoring systems were first implemented by predecessor companies—namely Actavis Inc. ("Actavis Inc."), and Watson Pharmaceuticals, Inc. ("Watson")—that were consolidated through a series of acquisitions and mergers. These systems were manifestly deficient.

255. Actavis Inc.'s system was designed only to flag orders of unusual size, and even then orders could be cleared simply if an employee "reviewed (eyeball[ed]) the suspicious order report."[207] A senior Actavis Inc. employee acknowledged that its threshold system could not "prevent shipping excess product" because it did not look at orders cumulatively.[208] Actavis Inc.'s protocols were all the more deficient because they failed to evaluate, as required, the frequency and pattern of orders. Nor did Actavis utilize any of its downstream data tracking its products through the distribution chain to the retail level. Actavis Inc.'s then CEO testified in this regard that he did not "think we had responsibility for, accountability for preventing diversion . . . Once it goes outside of our chain of custody, we have no capability or responsibility or accountability."[209] Given this unlawfully constrained view of Actavis's

---

[204] *Id.* at Dkt. No. 1960-14 (Walker Depo., 54:12-18; 63:16-22; 65:20-66:4; 352:6-8).

[205] *Id.* at, Dkt. No. 1960-14 (Walker Depo., 79:13-122:8).

[206] *Id.* at Dkt. No. 1960-14 (Walker Depo., 55:5-11; 57:12-20; 66:4-67:18; 107:22-24; 118:16-24; 352:6-8; 630:15-23).

[207] *Id.* at Dkt. No. 1967-62 (ALLERGAN_MDL_02081243).

[208] *Id.* at Dkt. No. 1967-63 (ALLERGAN_MDL_02128035).

[209] *Id.* at Dkt. No. 1967-74 (Boothe Depo., 408-409).

responsibilities, it is little wonder that the manager of its customer services department could remember *only one* order between 2008 and 2017 that Actavis Inc. reported to the DEA.[210]

256.    Watson's monitoring system suffered from similar, and additional, flaws. The system was based on customer thresholds—a rigid formulaic approach that is patently deficient under the DEA's guidance. Like Actavis Inc., Watson also did not evaluate, as required, shipments of unusual frequency or pattern. Nor did Watson utilize downstream data showing suspicious shipments of its products down to the retail level. Perhaps more egregiously, Watson alerted customers when a particular shipment would be flagged as suspicious, thus giving the customer an opportunity to cancel or reduce the shipment to evade DEA detection.[211] The result was that Watson never reported a suspicious shipment.

257.    A consultant retained by Watson found that its monitoring system was "not consistent with specific requirements noted within regulations and guidance." Nevertheless, Watson changed nothing, and when Watson acquired Actavis Inc., the combined companies adopted Watson's deficient system, including its practice of warning customers of suspicious shipment flags so they could reduce order quantities to avoid any reporting duties.

258.    Today, Actavis admits that it has no system in place for monitoring suspicious shipments, claiming to be a "virtual manufacturer" unencumbered by the regulatory regime applicable to DEA registrants.[212] There is no such category under the CSA.

### j.    Cephalon

259.    Until August 2014, Cephalon had no written policies for identifying suspicious shipments. After a series of DEA investigations in the industry, in 2012 Cephalon hired consultants to review Cephalon's shipment monitoring system. The consultants reported that

---

[210] *Id.* at Dkt. No. 1967-65 (Baran Depo., 303:7-304:10).

[211] *Id.* at Dkt. No. 1965-68 (ALLERGAN_MDL_02166476).

[212] *Id.* at Dkt. No. 1910-1 at 69 (citing Dkt. No. 1967-91 (Acquired_Actavis_01843335)).

Cephalon's systems were "rudimentary," observing that Cephalon had not reported a single suspicious shipment to date.[213]

260.    In 2013, Cephalon hired Keven Kreutzer from AmerisourceBergen to develop a new monitoring system, but Kruetzer was promptly fired after he contacted a customer in respect to a potentially suspicious shipment.[214] Cephalon next hired Joe Tomkiewicz from AmerisourceBergen, even though just prior he had been visited at home by DEA agents who advised him to retain a lawyer in respect to investigations they were conducting of AmerisourceBergen.

261.    Tomkiewicz proceeded to devise a "monitoring" system called "DefOps"—or "Defensible Operations"—a name that was intended to deflect DEA attention because it "sounded good."[215] The system was approved in August 2014. Among its obvious failings, "DefOps" gave investigatory responsibilities to Cephalon's sales personnel, an assignment that Cephalon internally recognized presented "conflicts."[216] The system also gave Tomkiewicz complete and unbridled authority to clear suspicious shipments. And the program identified vanishingly few suspicious shipments to begin with. Cephalon reported its first ever suspicious shipment in February 2013, and then from 2013 to 2016, it reported *only 6* suspicious orders out of 600,000 (and not all were opioid shipments).[217]

### k.    Janssen

262.    Since 2005, Janssen has used the same formula to purportedly identify suspicious shipments: "A potentially suspicious or excessive controlled substance order can be defined as an order that exceeds the minimum order quantity requirements, and is above 3xs (300%) of the

---

[213] *Id.* at Dkt. No. 1957-98 (TEVA_MDL_A_01060005).

[214] *Id.* at Dkt. No. 1957-100 (Kreutzer Depo., 269:7-270:16).

[215] *Id.* at Dkt. No. 1910-1 at 41 (citing Dkt. No. 1957-8 (Tomkiewicz Depo.)).

[216] *Id.* at Dkt. No. 1910-1 at 41 (citing Dkt. No. 1960-5 (Tomkiewicz Depo. Ex. 15)).

[217] *Id.* at Dkt. No. 1910-1 at 43.

calculated, 12 month, per weekly order average."[218] This one-dimensional approach is inadequate under the CSA in several respects.

263. *First*, Janssen has openly acknowledged that while its algorithm attempts to calculate deviations in order size, it does not—as the CSA requires—evaluate orders of unusual frequency or pattern. Thus, the system is blind to customers who suspiciously place orders multiple times a month, or place orders for large quantities of opioids but no other controlled substances. *Second*, Janssen also failed to apply its monitoring system to its downstream sales data, which revealed the distribution of its products down to the retail level. By focusing myopically on the first step in the distribution chain, Janssen failed to discharge its CSA obligation. *Third*, Janssen's system simply stopped flagging suspicious orders after 3:45 pm. Orders placed after that could be flagged only if they were manually reviewed the next morning, and Janssen has acknowledged that because of this "an order can be released the next morning without being monitored in the program."[219]

264. Not only did Janssen fail to flag suspicious shipments, it failed to report the orders it did flag. In fact, Janssen *has never reported a suspicious shipment to the DEA*, even though its internal systems have identified many.[220]

### 3. Manufacturer and Distributor Defendants maintain granular prescribing data and knew suspicious shipments were directed into Salt Lake County.

265. As part of their business models, Manufacturer and Distributor Defendants carefully monitor where their products are being distributed and consumed. This information is not available to the public. It is collected by Manufacturer and Distributor Defendants' own systems and, by law, reported to the DEA through the Automation of Reports and Consolidated

---

[218] *Id.* at Dkt. No. 1960-74 (JAN-MS-03741172).

[219] *Id.* at Dkt. No. 1910-1 at 60 (citing Dkt. Nos. 1960-79 (JAN-MS-02987652) and 1960-82 (JAN-MS-02983578)).

[220] *Id.* at Dkt. No. 1910-1 at 61 (citing Dkt. No. 1960-92 (JAN-MS-05444648)).

Orders System ("ARCOS").[221] Self-distributing pharmacies, such as Walgreens and Walmart, all have visibility into distribution data from their own retail outlets.

266.    In addition, Manufacturer and Distributor Defendants purchase even more detailed and comprehensive data from vendors, which include IMS Health, QuintilesIMS, IQVIA, Pharmaceutical Data Services, Source Healthcare Analytics, NDS Health Information Services, Verispan, Quintiles, SDI Health, ArcLight, Scriptline, Wolters Kluwer, and/or PRA Health Science. By way of example, QuintilesIMS data—which Manufacturer and Distributor Defendants purchase—reportedly constitutes "one of the largest and most comprehensive collections of healthcare information in the world," comprising "more than 530 million comprehensive, longitudinal, anonymous patient records spanning sales, prescription and promotional data, medical claims, electronic medical records and social media."[222] The data include "over 85% of the world's prescriptions by sales value."[223]

267.    In addition to compiling their own data, and purchasing it from vendors, Manufacturer and Distributor Defendants share prescribing data with each other, including certain "chargeback" data that are provided by opioid distributors to manufacturers. These data show Manufacturer Defendants which "downstream registrants"—that is, pharmacies and other dispensaries—purchase their drugs from wholesalers and in what quantity and pattern. Distributor Defendants all track total sales of each manufacturer's products, broken down by the location and type of downstream customer (so-called "852" and "867" data). Distributor Defendants sell these data to opioid manufacturers, allowing them to track the flow of their products through the distribution chain.

268.    Collectively, these data sources—which drill down by locality to the prescriber and patient level—give Manufacturer and Distributor Defendants full visibility into any and all

---

[221] *See* 21 U.S.C. § 827(d)(l); 21 C.F.R. §§ 1304.33(d),(e).
[222] Form 10-K, Quintiles IMS Holdings, Inc., filed February 16, 2017, at 12.
[223] *Id.*

instances of overprescribing. They show which doctors are prescribing their drugs, and in what quantity. They likewise reveal which doctors are prescribing competitor products, and in what quantity. The data allow Manufacturer and Distributor Defendants to assiduously track prescribing patterns and trends by prescriber and county, identify rogue providers, "pill mills," and patients engaged in doctor shopping. In sum, Manufacturer and Distributor Defendants have at their disposal a vast database revealing virtually every suspicious opioid order placed in the country, including Salt Lake County.

269.    This wealth of information gave Manufacturer and Distributor Defendants a unique opportunity to curtail the diversion of opioids in Salt Lake County, as elsewhere. But rather than leverage their data to prevent opioid misuse and abuse, as is required, Manufacturer and Distributor Defendants negligently disregarded suspicious activity to reap extraordinary profits. Not only did the Manufacturer Defendants turn a blind eye to evidence of diversion, they affirmatively used their access to sophisticated data to focus their improper marketing practices on the doctors most likely to be writing illegitimate prescriptions—including high prescribers and doctors whom the Manufacturer Defendants knew or suspected to be writing improper prescriptions.

**4.    Manufacturer and Distributor Defendants failed to investigate and report suspicious opioid shipments into Salt Lake County.**

270.    Data from the DEA's ARCOS database[224] shows that the Defendants placed a huge volume of prescription opioids in Salt Lake County. In particular, between the years 2006 and 2012 alone, Distributor Defendants directed more than 225,000,000 prescription opioid pills

---

[224] This ARCOS data was previously produced by the DEA in *In Re: National Prescription Opiate Litigation*, 17-md-1804 (N.D. Ohio), an MDL in which diversion and other claims have been asserted against Manufacturer and Distributor Defendants. By Order dated April 11, 2019, and over Defendants' objection, the MDL Court authorized the DEA to distribute county-level ARCOS data to government entities pursuing similar claims in state courts across the country. Salt Lake County received ARCOS data related to distribution in this county on May 11, 2019. By Order dated July 15, 2019, the MDL Court lifted its protective order as to ARCOS data concerning shipment placed on or before December 31, 2012.

into Salt Lake County.[225] That is enough to supply every man, woman and child in the county with 200 pills a piece. This high volume of opioids alone should have alerted Defendants to the fact that the Distributor Defendants were filling suspicious orders that were to be diverted, as the amount of opioids they moved into Salt Lake County far exceeded what could be consumed for medically legitimate purposes. Yet Defendants failed to report and halt those orders.

271. Salt Lake County's analysis of recently produced ARCOS data further confirms that Manufacturer and Distributor Defendants named in this action are responsible for a large number of shipments that deviated—often substantially—in size, pattern, or frequency from shipments in preceding months. Although the Salt Lake County's analysis of the ARCOS data is ongoing, the pattern of suspicious shipments is immediately apparent, and startling.[226] Indeed, thousands of shipments fulfilled by Manufacturer and Distributor Defendants were of a quantity or frequency that exceeded the range established over the preceding six months, or otherwise deviated substantially from normal patterns. Shipments exhibiting such deviation from historic baselines are presumptively suspicious under the CSA.

272. Exercising reasonable care, Manufacturer and Distributor Defendants should have taken reasonable steps to monitor, investigate and, where warranted, report and halt suspicious orders to prevent diversion. Consistent with their prolonged failure to implement anti-diversion controls, Manufacturer and Distributor Defendants did not take these steps.

273. Defendants' failure to monitor, investigate, report, and halt suspicious orders of prescription opioids are a direct and proximate cause of the widespread diversion of prescription of opioids for non-medical uses in Salt Lake County. This unlawful diversion of prescription

---

[225] *Drilling into the DEA's pain pill database,* The Washington Post, (originally published July 16, 2019, updated July 21, 2019) https://www.washingtonpost.com/graphics/2019/investigations/dea-pain-pill-database/?utm_term=.f0cebd69c859.

[226] Because drugs diverted into the black market often travel across geographic boundaries, ARCOS data limited to Salt Lake County can support only the most conservative estimates of suspicious shipments affecting the region.

opioids is a direct and proximate cause and/or substantial contributing factor to the opioid epidemic and prescription opioid abuse, addiction, and death in Salt Lake County.

**F.     Defendants Fraudulently Concealed Their Misconduct.**

274.    At all times relevant to this Complaint, Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, Manufacturer Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of Manufacturer Defendants' false and deceptive statements about the risks and benefits of long-term opioid use for chronic pain. Manufacturer Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. Manufacturer Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their own direct role.

275.    Nor have Manufacturer Defendants revealed the extent to which they have funded KOLs and Front Groups. Many Front Groups selectively disclose donors or provide no information whatsoever concerning industry backers. After studying payments to opioid-advocacy Front Groups in the 2012-2017 period, the Senate concluded that neither pharmaceutical companies nor Front Groups "fully or routinely disclose the extent of their

financial relationships" and both the companies and the groups "fail to adequately disclose manufacturer contributions" resulting in a "lack of transparency."[227]

276.    Finally, Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by Salt Lake County.

277.    Manufacturer Defendants' KOLs, including Drs. Webster and Portenoy, similarly concealed the marketing scheme by dressing their promotional messages in a veneer of scientific legitimacy. Drs. Webster and Portenoy have falsely claim that their viewpoints on opioids are not influenced by Manufacturer Defendants or the substantial payments they have received from the opioid industry. But numerous studies show that doctors are influenced by payments they receive from pharmaceutical companies. Opioid manufacturers would not have bankrolled Dr. Webster and Dr. Portenoy if they did not believe it would inure to their benefit.

278.    Manufacturer and Distributor Defendants have also concealed their conduct by resisting the distribution of ARCOS and other data showing the staggering number of suspicious opioid shipments that have been directed into Salt Lake County. Having only recently obtained ARCOS data by court order, Salt Lake County had no prior means of confirming that these Defendants violated their obligation to monitor, report and halt suspicious shipments affecting Salt Lake County.

---

[227] Senate Homeland Security & Governmental Affairs Committee, Ranking Member McCaskill's Office, *Fueling the Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Feb. 2018), at 1, 2, 11.

279. Manufacturer and Distributor Defendants further concealed their misconduct by projecting an aura of corporate responsibility. In settling DEA investigations, these Defendants have made public commitments to carefully monitor the opioid supply chain to detect and report diversion. In reality, and as the data show, Manufacturer and Distributor Defendants did not honor these commitments.

280. In sum, all Defendants successfully concealed from the medical community, patients, and health care payers facts sufficient to arouse suspicion of the claims that Salt Lake County now asserts. Salt Lake County did not know of the existence or scope of Defendants' misconduct and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## G. Defendants Have Created a Public Nuisance.

### 1. Defendants' conduct foreseeably led to opioid abuse that has wrought havoc on Salt Lake County communities.

281. By deceiving doctors and failing to implement controls against diversion, Defendants have flooded Salt Lake County with opioids, resulting in widespread opioid addiction, overdose, and death. Staggeringly, in 2014, 910 opioid prescriptions were issued in Utah for every 1000 residents, and prescribing rates have remained at historic levels since.[228]

---

[228] Utah Department of Health, Violence & Injury Prevention Program, *Opioid Prescribing Practices in Utah, 2002-2015* (April 2016), at 10, available at: https://www.health.utah.gov/vipp/pdf/RxDrugs/PrescribingPracticeInUtah.pdf.



**Figure 3. Rate of Opioid Prescriptions Dispensed per 1,000 Population, Utah, 2002-2015**

282.    Even more problematically, the number of doses included within an average

opioid prescription has skyrocketed.  In 2002, 96,025,233 morphine milligram equivalents

(MME) of opioids were dispensed in Utah.[229]  Fast forward to 2015 when 169,423,298 MME

were dispensed in the state, a 76% increase.[230]  To contextualize that number, the CDC has

estimated that a daily opioid dose above 50 MME doubles the risk of overdose.[231]  There were

more than 3.3 million of these dangerous doses dispensed in Utah in 2015 alone, ***enough to***

***supply every man, woman and child living in the state with a dose each and still have some***

***300,000 doses to spare.***

283.    While the overprescription of opioids is a statewide (indeed, national) problem, it

is particularly acute in Salt Lake County.  Data maintained by the CDC shows that between 2006

and 2017, prescribing rates in Salt Lake County exceeded the Utah aggregate rate in every year

but 2017, when the Salt Lake County rate dipped below the state rate by less than a percentage

---

[229] *Id.* at 16.

[230] *Id.*

[231] CDC, Calculating Total Daily Dose of Opioids for Safer Dosage, available at:
https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.

point. Prescribing rates in Salt Lake County also exceeded the national average in every year over the same period, including by as much as 25%.[232]

284.    Misuse, abuse, and fatalities have followed.  Since 2002, drug poisoning deaths have increased at alarming rates in Salt Lake County and across the state of Utah.[233]



Figure 2. Rate of drug poisoning deaths per 100,000 population by county, Utah, 2002-2014 (age-adjusted)[3]

285.    Statewide, drug poisoning deaths now significantly outpace deaths caused by firearms, falls, and motor vehicle crashes.[234]

---

[232] CDC U.S. Prescribing Rate Maps, available at:  https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.
[233] Utah Department of Health, Prescription Opioid Deaths at 1, available at: https://health.utah.gov/vipp/pdf/RxDrugs/PDODeaths2015.pdf.
[234] *Id.*



**Rate of deaths per 100,000 population by injury type, Utah 1999-2015**


UTAH COALITION FOR
OPIOID OVERDOSE PREVENTION

Drug Poisoning, 22.8

Firearm, 12.4

Motor Vehicle Crash, 8.6

Fall, 8.5

From 2013-2015, Utah ranked 7th highest in the U.S.

Drug poisoning is the **leading cause** of injury deaths in Utah

286.     Prescription opioids are responsible for more of these drug poisoning deaths than any other drug category, and overwhelmingly so.[235]  In 2014, the Utah Department of Health reported that approximately 82% of all drug poisoning deaths in Utah were accidental and, of these, 74.8 involved opioids.[236]  In 2014 and 2015, a staggering 1,213 individuals in Utah overdosed on opioids and died—meaning that, on average, at least one person in Utah died from opioids every day for 730 consecutive days.[237]

287.     No county has been hit harder than Salt Lake.  Over the 2014 to 2015 period, approximately 44% of all opioid-related deaths in Utah occurred in Salt Lake County.[238]  And this was not merely a function of Salt Lake County's disproportionate share of the state's

---

[235] *Id.* at 2.

[236] Utah Department of Health, *Prescription Drugs in Utah* (Sept. 24, 2014), at 12, available at: http://ufsac.org/wp-content/uploads/2014/09/Fall-Substance-Abuse-Conference.pdf.

[237] Utah Department of Human Services, *Substance Abuse and Mental Health, Utah's Opioid Crisis Consequence and Resource Assessment* (July 2015), at 5, available at: https://dsamh.utah.gov/pdf/Utah%20STR%20State%20Level%20Needs%20Assessment%20July%2031%202017.pdf.

[238] *Id.* at 6. These and other overdose statistics referenced in this Complaint are based on reported overdoses.  They do not include opioid overdoses that go unreported.

population. The rate of opioid-related deaths in Salt Lake County was above the state average over the same period, and eighth highest in the state overall.[239]

| OPIOID DEATHS | | |
|---|---|---|
| COUNTY | 2014-2015 TOTAL | 2014-2015 RATE PER 100,000 |
| Carbon | 19 | 51.82 |
| Duchesne | 14 | 40.35 |
| Tooele | 39 | 33.96 |
| Emery | 6 | 28.97 |
| Morgan | 5 | 28.91 |
| Weber | 132 | 28.64 |
| Juab | 5 | 26.57 |
| Salt Lake | 531 | 24.68 |
| Kane | 4 | 24 |
| State Total | 1213 | 22.29 |
| Sanpete | 10 | 21.99 |
| Box Elder | 20 | 21.86 |
| Washington | 56 | 21.44 |
| Iron | 16 | 20.94 |
| Utah | 179 | 19.33 |
| Uintah | 12 | 18.69 |
| Davis | 108 | 17.4 |
| San Juan | 4 | 15.28 |
| Summit | 12 | 15.03 |
| Wasatch | 7 | 11.76 |
| Cache | 22 | 11.68 |
| Sevier | 4 | 9.58 |
| Beaver | * | * |
| Daggett | * | * |
| Garfield | * | * |
| Grand | * | * |
| Millard | * | * |
| Rich | * | * |
| Piute | 0 | 0 |
| Wayne | 0 | 0 |

[239] *Id.*

288.    In March 2019, the Utah Department of Health identified seven "hot spots" across Utah that have "significantly higher rates of opioid overdose deaths when compared to rates in other small areas and the state overall."[240] Four of these hot spots are in Salt Lake County—namely, the Glendale and Rose Park neighborhoods of Salt Lake City, South Salt Lake City, and Magna.[241]

289.    Opioid abuse is also a leading cause of non-lethal drug poisonings and associated medical treatments, which, frequently, are provided at public expense. Between 2005 and 2014, the number of emergency department encounters in Utah linked to opioids increased by 51%.[242] Here again, Salt Lake County has been disproportionately affected. Of the 3,458 opioid-related emergency department encounters in 2013 and 2014, more than a third (or 1,443) occurred in Salt Lake County.[243]

290.    In an effort to identify regional priorities, a working group of the Utah Department of Human Services analyzed opioid-related deaths and emergency department encounter data to rank counties on an "opioid mortality and morbidity index."[244] Salt Lake County ranks second on that index, topped only by Carbon County.[245]

291.    Tragically, the opioid epidemic in Utah has had a disproportionate impact on teenagers and young adults. In 2014, 4.18% of 12-17 year olds in Utah, and 7.02% of 18-25 year olds, reported using prescription painkillers for nonmedical use.[246] These figures eclipse the nonmedical use rate of Utah residents 26 years or older, which at approximately 3% already is

---

[240] Utah Department of Health, Utah Opioid Overdose Fatality Review Hot Spots Report, March 2019, available at: http://health.utah.gov/vipp/pdf/RxDrugs/OFRCHotSpots2019.pdf.
[241] *Id.* at 1.
[242] *Id.* at 3.
[243] *Id.* at 6.
[244] *Id.* at 7.
[245] *Id.*
[246] *Id.* at 2.

troublingly high.[247] No less than 48 Utah residents aged 24 or younger died from prescription opioids in 2015 alone, and these deaths accounted for more than 7% of all prescription opioid deaths in the state.[248]

292. Newborns, too, have been harmed. Between 2005 and 2014, the number of Utah newborns diagnosed with a drug withdrawal symptoms—known as neonatal abstinence syndrome ("NAS")— increased by 275%.[249] The Utah Department of Health has attributed elevated NAS rates to the increased use of opioids among pregnant women.[250] NAS is associated with increased incidence of seizures, respiratory problems, feeding difficulties and low birth weight, along with common symptoms of drug withdrawal, including diarrhea, excessive crying, fever, hyperactive reflexes, and sleeping difficulties.[251] For 2011 alone, the costs associated with treating Utah newborns exhibiting signs of NAS nearly reached $10 million.[252]

293. Prescription opioid abuse also has not displaced heroin, but rather triggered a resurgence in its use, imposing additional burdens on Salt Lake County agencies that address heroin use and addiction. Individuals who are addicted to prescription opioids often transition to

[247] Substance Abuse and Mental Health Services Administration, *2013-2014 National Survey of Drug Use and Health: Model-Based Prevalence Estimates (50 States and the District of Columbia)*, available at: https://www.samhsa.gov/data/sites/default/files/NSDUHsaePercents2014.pdf.

[248] Utah Dep't of Human Services, Substance Abuse and Mental Health, *Utah's Opioid Crisis, Consequence and Resource Assessment* (July 2017), at 4, available at: https://dsamh.utah.gov/pdf/Utah%20STR%20State%20Level%20Needs%20Assessment%20July%2031%202017.pdf.

[249] *Utah Women and Newborns Quality Collaborative: Strategies to Improve Care for Infants with Neonatal Drug Withdrawal* (November 2016), at 2, available at http://health.utah.gov/uwnqc/pages/documents/ChangePackageFinalDraft.pdf.

[250] Utah Dep't of Health, *Utah Health Status Update: Neonatal Abstinence Syndrome* (July 2013), at 2, available at: https://ibis.health.utah.gov/pdf/opha/publication/hsu/2013/1307_NAS.pdf.

[251] *Id.* at 1.

[252] *Utah Women and Newborns Quality Collaborative: Strategies to Improve Care for Infants with Neonatal Drug Withdrawal* (November 2016), at 2, available at http://health.utah.gov/uwnqc/pages/documents/ChangePackageFinalDraft.pdf.

heroin because it is a less expensive, readily available alternative that provides a similar high.[253] Nearly 80% of all people who began to abuse opioids in the 2000s, started with prescription drugs.[254]

294. The combined effects have contributed to an upsurge in chemical dependency that has overwhelmed Salt Lake County's public resources. The number of clients presenting in Salt Lake County treatment facilities with opioid-related diagnoses has spiked since 2008. A 2016 report by Utah's Department of Human Services indicates that 56,112 adults in Salt Lake County are in need of substance abuse treatment, but that space exists to treat only 6,575 of these individuals.[255] Another 4,077 Salt Lake residents aged 12-17 are in need of substance abuse treatment, but treatment space exists for only 636 of these endangered youths.[256] This means that, all told, nearly nine out of ten residents in Salt Lake County abusing opioids or other substances have nowhere to turn for treatment.

295. Opioid abuse also has contributed to an increase in drug-related crime occurring in Salt Lake County. Many of these crimes occur in Salt Lake City, which since 2010 has seen a decrease in many criminal offense types, but a dramatic spike in drug-related offenses.[257]

---

[253] JAMA Psychiatry, *The Changing Face of Heroin Use in the United States: A Retrospective Analysis of the Past 50 Years*, May 28, 2014, available at: https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874575.

[254] *Id.*

[255] Utah Department of Human Services, Division of Substance Abuse and Mental Health, Annual Report 2016, at 18, available at: https://dsamh.utah.gov/pdf/Annual%20Reports/2016%20Annual%20Report%20Web%20Final.pdf.

[256] *Id.*

[257] CityLab Report, What This Salt Lake City Heatmap Tells Us About Drug Crime (Aug. 11, 2017), available at: https://www.citylab.com/equity/2017/08/what-this-map-of-salt-lake-citys-drug-hotspot-really-show/536214/.



**Offense Description**

- All Other Larceny
- Burglary/Breaking & Entering
- Credit Card/Automatic Teller Machine Fraud
- Destruction/Damage/Vandalism of Property
- Drug Equipment Violations
- Drug/Narcotic Violations
- Intimidation
- Motor Vehicle Theft
- Shoplifting
- Simple Assault
- Theft From Building
- Theft From Motor Vehicle

**Drug Involvement**

- Drug
- Non-Drug

296.    As these data reflect, prescription opioid misuse, abuse and overdose have wide-ranging impacts. Beyond the tragic repercussions for addicted individuals—including overdoses, job loss, loss of custody of children, physical and mental health problems, homelessness and incarceration—opioid misuse causes instability in communities often already in economic crisis and contributes to increased demand on community services such as hospitals, courts, child services, treatment centers and law enforcement. Salt Lake County, like many communities across the nation, is reeling from these effects and the enormous burden they impose on precious county resources.

**2.    Defendants knew and should have known that their conduct would lead to overprescribing, diversion, and catastrophic human and economic costs.**

297.    Defendants knew and should have known about the harms that their conduct has caused. As set out above, Manufacturer and Distributor Defendants closely monitored their sales and the habits of prescribing doctors. Sales representatives, who visited doctors and attended

CMEs, knew which doctors were receiving their messages and how they were responding. Manufacturer and Distributor Defendants also had access to and watched carefully government and other data that tracked the explosive rise in opioid use, addiction, injury, and death. In short, Manufacturer and Distributor Defendants knew—and, indeed, intended—that their conduct was flooding Salt Lake County with opioids.

298. Dr. Webster was similarly aware of the harms caused through the deceptive marketing of opioids. Not only did he participate in the marketing scheme, he executed the scheme's faulty recommendations at the Lifetree Clinic, including by distributing increasingly aggressive opioid dosages to patients exhibiting overt signs of abuse. And he saw the results— 20 overdosed patients and untold numbers of additional patients battling addiction, misuse and abuse. Dr. Portenoy, too, saw the devastating consequences of his promotional activities, but continued to support chronic opioid therapy on Manufacturer Defendants' behalf.

299. Defendants also knew that patients were not the only ones harmed by their conduct. They knew that opioid dependency would place enormous burdens on government resources, including those of Salt Lake County.

**3. Defendants' conduct is not excused by the actions of any third parties.**

300. FDA approval of opioids for certain uses did not give Manufacturer Defendants license to misrepresent the risks and benefits of opioids. Indeed, Manufacturer Defendants' misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels. FDA approval similarly does not excuse Manufacturer and Distributor Defendants failure to report suspicious opioid shipments.

301. Nor is Defendants' causal role broken by the involvement of prescribing doctors. Manufacturer Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Manufacturer Defendants also were

able to harness and hijack what doctors wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

302.    Rogue prescribers likewise do not absolve Defendants.  Far from it, Manufacturer and Distributor Defendants have statutory and common law obligations to detect the suspicious orders that rogue prescribers generate.  Had these Defendants abided by those obligations, the supply of diverted opioids would have been constricted.  But instead, these Defendants ignored suspicious activity and the Manufacturer Defendants targeted suspicious prescribers to reap extraordinary profits.

**H.    Defendants' Conduct Has Caused Salt Lake County Substantial Economic Injury.**

303.    Salt Lake County has, through health plans and workers' compensation programs it administers, spent substantial sums on opioids that were produced by Manufacturer Defendants.  Salt Lake County would not have paid for many of these prescriptions if Manufacturer and KOL Defendants had told the truth about the risks and benefits of opioids in treating chronic pain.

304.    Salt Lake County also has expended millions of dollars combatting widespread opioid abuse, which is destroying Salt Lake County communities.  These costs have been incurred by an array of county agencies that play a role in law enforcement and public health.  By way of example, in 2016, Salt Lake County launched Operation Diversion, a collaborative program involving Salt Lake City government and local law enforcement agencies.  As part of this program, law enforcement ramped up arrests for opioid and other drug-related offenses occurring in downtown Salt Lake City.  With District Attorney approval, the county then dropped or lowered charges against the arrested individuals subject to their participation in community treatment programs.  Reflecting the scope of the opioid epidemic, more than 95% of the participants in Operation Diversion were diagnosed with an opioid-abuse disorder at their

initial clinical assessment. To care for these patients, Salt Lake County brought online 63 additional treatments beds, access to medication-assisted treatment drugs, clinical assessments, criminogenic risk screens, social detoxification services and other outpatient care.

305.    On the heels of Operation Diversion, Salt Lake County collaborated with the State to initiate Operation Rio Grande, which aimed to address the highly visible opioid and other drug abuse occurring in Salt Lake City's Rio Grande neighborhood. More than 1,000 arrests were made as part of this operation, forcing Salt Lake County to allocate additional resources to the county jail. After a period of incarceration, opioid addicts arrested as part of Operation Rio Grande were given a clinical assessment and certain high needs clients were permitted to participate in a special drug court program set up by Salt Lake County Criminal Justice Services. Through this program, clients received access to treatment, supervision, reduction of charges, and connection to employment training and housing referrals.

306.    As a result of these efforts, and an overall spike in opioid-related crime, Salt Lake County jail facilities have been inundated with opioid addicts who, upon detention, undergo dangerous opioid withdrawal. Treating these individuals is labor and cost intensive, with Salt Lake County nurses spending substantial portions of their work days in the jail's quarantine unit providing the necessary care. Patients experiencing severe withdrawal must be transported to and treated at area hospitals, all at the county's expense. To provide ongoing care to this endangered population, Salt Lake County established a pilot program in which incarcerated opioid addicts receive doses of Vivitrol, an injectable drug that can suppress opioid cravings and prevent relapse. Vivitrol is costly, must be administered monthly, and is most effective if treatment continues for at least a year.

307.    Salt Lake County's role also does not end when opioid addicts are released from county jails. In 2015, Salt Lake County collaborated with State government to implement the Intensive Supervision Probation program, which monitors individuals who are released from jails

with substance abuse disorders. More than 46% of the program's participants have identified opioids (including heroin) as their substance of abuse. Providing the intensive monitoring this at-risk population requires costs substantial sums—all told, the Intensive Supervision Program has received millions in State and county funds since inception.

308.   Salt Lake County also supports treatment for county residents who have not been processed through the criminal justice system. By way of example, Salt Lake County provides funding to Project Reality, which runs the only public methadone clinic in the region. Services at Project Reality include daily methadone or suboxone medications, case management, and outpatient treatments. Since 2008, there has been consistent growth in the number of opioid addicts seeking treatment at Project Reality.

309.   Salt Lake County also supports first-responders who provide services and medical interventions for opioid addicts. By way of example, since 2015, the Salt Lake County District Attorney's office has expended at least $50,000 on naloxone kits for local law enforcement agencies. Naloxone, when properly administered, can reverse an opioid overdose. Naloxone is costly however, and the drug has a shelf life, meaning naloxone supplies must be regularly replenished.

310.   The foregoing costs exemplify, but do not exhaust, the financial burden Defendants' conduct has imposed on Salt Lake County. For Salt Lake County to recover from this crisis, additional resources will be needed to re-educate providers, support community health programs, sponsor preventative education, fund Naloxone distribution, monitor opioid prescribing, safely dispose of unused pills, police opioid-related crime, and to process and rehabilitate opioid offenders through the criminal justice system.

## V. CAUSES OF ACTION

## FIRST CAUSE OF ACTION:

**PUBLIC NUISANCE**
**UTAH CODE ANN. § 76-10-801, *ET SEQ.***
**(AGAINST ALL DEFENDANTS)**

311. Utah realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

312. Under Utah law, a public nuisance "consists in unlawfully doing any act or omitting to perform any duty, which act or omission," *inter alia*, "annoys, injures, or endangers the comfort, repose, health or safety of three or more persons" or "renders three or more persons insecure in life or the use of property." Utah Code Ann. § 76-10-803(1).

313. Defendants, individually and in concert with each other, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of Salt Lake County residents and interferes with the comfortable enjoyment of life in violation of Utah law.

314. The public nuisance created by Defendants' actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.

315. Defendants knew or should have known that their promotion of opioids, and failure to monitor and report opioid diversion, would create a public nuisance.

316. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used. Defendants' actions were, at the least, a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

317. The health and safety of individuals in Salt Lake County, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to Salt Lake County.

318. Defendants' conduct has affected and continues to affect a considerable number of people within Salt Lake County and is likely to continue to cause significant harm to chronic pain patients who take opioids, their families, and the community at large.

319. Pursuant to Utah Code Ann. § 76-10-806, Salt Lake County seeks an order that provides for the abatement of the public nuisance Defendants have created, including by awarding damages equal to the cost of abatement, and enjoins Defendants from future violations of Utah Code Ann. § 76-10-801, *et seq.*

## SECOND CAUSE OF ACTION:

### PUBLIC NUISANCE
### UTAH COMMON LAW
### (AGAINST ALL DEFENDANTS)

320. Salt Lake County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

321. Defendants, individually and in concert with each other, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of Salt Lake County residents and interferes with the comfortable enjoyment of life in violation of Utah law.

322. The public nuisance created by Defendants' actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.

323. Defendants knew or should have known that their promotion of opioids, and failure to monitor and report opioid diversion, would create a public nuisance.

324. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used. Defendants' actions were, at the least, a substantial factor in

doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

325. The health and safety of individuals in Salt Lake County, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to Salt Lake County.

326. Defendants' conduct has affected and continues to affect a considerable number of people within Salt Lake County and is likely to continue to cause significant harm to chronic pain patients who take opioids, their families, and the community at large.

327. Salt Lake County seeks an order that provides for the abatement of the public nuisance Defendants have created, enjoins Defendants from creating future common-law nuisances, and awards Salt Lake County damages equal to the cost of abatement.

### THIRD CAUSE OF ACTION:

### UTAH CONSUMER SALES PRACTICES ACT ("UCSPA")
### UTAH CODE ANN. § 13-11-1, *ET SEQ.*
### (AGAINST MANUFACTURER DEFENDANTS)

328. Salt Lake County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

329. The UCSPA renders unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction." Utah Code Ann. § 13-11-4(1).

330. A "supplier commits a deceptive act or practice if," *inter alia*, "the supplier knowingly or intentionally (a) indicates that the subject of a consumer transaction has sponsorship approval, performance characteristics, accessories, uses, or benefits, if it does not; [or] (b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." Utah Code Ann. § 13-11-4(2).

331.     As alleged herein, each Manufacturer Defendant, at all times relevant to this

Complaint, violated the UCSPA by making deceptive representations about the use of opioids to

treat chronic non-cancer pain.  Each Manufacturer Defendant also omitted or concealed material

facts and failed to correct prior misrepresentations and omissions about the risks and benefits of

opioids.  Each Manufacturer Defendant's omissions rendered even their seemingly truthful

statements about opioids deceptive.

332.     Defendant Purdue made and/or disseminated deceptive statements, including, but

not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials distributed to Salt Lake County consumers that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Purdue's own unbranded publications and on internet sites Purdue operated that were marketed to and accessible by consumers;

- Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

- Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in

patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Exclusively disseminating misleading statements in education materials to Salt Lake County hospital doctors and staff while purportedly educating them on new pain standards; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing.333.

Defendant Endo made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high-risk patients;

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded publications and on internet sites Endo sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations—including over $5 million to the organization responsible for many of the most egregious misrepresentations—that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing.

334.    Defendant Janssen made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

- Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

- Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing.

335. Defendant Cephalon made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

- Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

- Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

- Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing and speakers bureau events, when such uses are unapproved and unsafe; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing and speakers bureau events.

336.    Defendant Actavis made and/or disseminated deceptive statements, including, but not limited to, the following:

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing;

- Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

- Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

337.    Defendant Mallinckrodt made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Directly disseminating deceptive statements through internet sites over which Mallinckrodt exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Mallinckrodt exercised final editorial control and approval;

- Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Mallinckrodt exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing.

338.    These deceptive representations and concealments were reasonably and willfully calculated to deceive, were made with the intent to deceive, and did in fact deceive Salt Lake County, a direct consumer of prescription opioids.

339. But for these deceptive representations and concealments, Salt Lake County would not have incurred millions of dollars in overpayments, nor would Salt Lake County have expended millions of dollars to address and abate the public health crisis Defendants' conduct has foreseeably caused in the region.

340. As a direct and proximate cause of Manufacturer Defendants' false representations and concealments, Salt Lake County has been injured.

341. Salt Lake County seeks all remedies authorized under the UCSPA, including declaratory relief (Utah Code Ann. § 13-11-19(1)(a)), injunctive relief (Utah Code Ann. § 13-11-19(1)(b)), costs and damages, (Utah Code Ann. § 13-11-19(2)), and attorney's fees (Utah Code Ann. § 13-11-19(5)).

## FOURTH CAUSE OF ACTION:

### COMMON LAW FRAUD
### (AGAINST MANUFACTURER AND KOL DEFENDANTS)

342. Salt Lake City realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

343. As alleged herein, Manufacturer and KOL Defendants engaged in false representations and concealments of presently existing material facts regarding the use of opioids to treat chronic pain.

344. Defendant Purdue made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials distributed to Salt Lake County consumers that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Disseminating misleading statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through Purdue's own unbranded publications and on internet sites Purdue operated that were marketed to and accessible by consumers;

- Distributing brochures to doctors, patients, and law enforcement officials that included deceptive statements concerning the indicators of possible opioid abuse;

- Sponsoring, directly distributing, and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of

opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Exclusively disseminating misleading statements in education materials to Salt Lake County hospital doctors and staff while purportedly educating them on new pain standards; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing.

345. Defendant Endo made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

- Creating and disseminating paid advertisement supplements in academic journals promoting chronic opioid therapy as safe and effective for long term use for high-risk patients;

- Creating and disseminating advertisements that falsely and inaccurately conveyed the impression that Endo's opioids would provide a reduction in oral, intranasal, or intravenous abuse;

- Disseminating misleading statements concealing the true risk of addiction and promoting the misleading concept of pseudoaddiction through Endo's own unbranded

publications and on internet sites Endo sponsored or operated;

- Endorsing, directly distributing, and assisting in the distribution of publications that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing needed financial support to pro-opioid pain organizations—including over $5 million to the organization responsible for many of the most egregious misrepresentations—that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing.

346. Defendant Janssen made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Directly disseminating deceptive statements through internet sites over which Janssen exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Janssen exercised final editorial control and approval;

- Promoting opioids for the treatment of conditions for which Janssen knew, due to the scientific studies it conducted, that opioids were not efficacious and concealing this information;

- Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Janssen exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Targeting the elderly by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

- Targeting the elderly by sponsoring, directly distributing, and assisting in the dissemination of patient education publications targeting this population that contained deceptive statements about the risks of addiction and the adverse effects of opioids, and made false statements that

opioids are safe and effective for the long-term treatment of chronic non-cancer pain and improve quality of life, while concealing contrary data;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy;

- Targeting veterans by sponsoring and disseminating patient education marketing materials that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing.

347.    Defendant Cephalon made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Sponsoring and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

- Providing significant financial support to pro-opioid KOL doctors who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain and breakthrough chronic non-cancer pain;

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain in conjunction with Cephalon's potent rapid-onset opioids;

- Providing needed financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of Cephalon's rapid-onset opioids;

- Directing its marketing of Cephalon's rapid-onset opioids to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists, and workers' compensation programs, serving chronic pain patients;

- Making deceptive statements concerning the use of Cephalon's opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing and speakers bureau events, when such uses are unapproved and unsafe; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing and speakers bureau events.

348. Defendant Actavis made and/or disseminated deceptive statements, including, but not limited to, the following:

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing;

- Creating and disseminating advertisements that contained deceptive statements that opioids are safe and effective for

the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

- Creating and disseminating advertisements that concealed the risk of addiction in the long-term treatment of chronic, non-cancer pain; and

- Developing and disseminating scientific studies that deceptively concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life while concealing contrary data.

349. Defendant Mallinckrodt made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating, sponsoring, and assisting in the distribution of patient education materials that contained deceptive statements;

- Directly disseminating deceptive statements through internet sites over which Mallinckrodt exercised final editorial control and approval stating that opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

- Disseminating deceptive statements concealing the true risk of addiction and promoting the deceptive concept of pseudoaddiction through internet sites over which Mallinckrodt exercised final editorial control and approval;

- Sponsoring, directly distributing, and assisting in the dissemination of patient education publications over which Mallinckrodt exercised final editorial control and approval, which presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs;

- Providing significant financial support to pro-opioid KOLs, who made deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing necessary financial support to pro-opioid pain organizations that made deceptive statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Endorsing and assisting in the distribution of CMEs containing deceptive statements concerning the use of opioids to treat chronic non-cancer pain;

- Directly distributing and assisting in the dissemination of literature written by pro-opioid KOLs that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain, including the concept of pseudoaddiction;

- Creating, endorsing, and supporting the distribution of patient and prescriber education materials that misrepresented the data regarding the safety and efficacy of opioids for the long-term treatment of chronic non-cancer pain, including known rates of abuse and addiction and the lack of validation for long-term efficacy; and

- Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Salt Lake County prescribers through in-person detailing.

350. Defendant Lynn Webster made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating and assisting in the distribution of CMEs and other physician education materials distributed in Salt Lake County that contained deceptive statements;

- Creating and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

- Creating and assisting in the distribution of publications that deceptively claimed that patients at risk of opioid addiction can be prescreened, including with the Opioid Risk Tool;

- Creating and assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

- Authoring scientific studies that misleadingly overstated the benefits of opioids in the treatment of chronic pain and minimized the risks;

- Authoring materials that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs; and

- Falsely denying the influence of consulting fees and other payments received from Manufacturer Defendants and other opioid manufacturers.

351. Defendant Russell Portenoy made and/or disseminated deceptive statements, including, but not limited to, the following:

- Creating and assisting in the distribution of CMEs and other physician education materials distributed in Salt Lake County that contained deceptive statements;

- Creating and assisting in the distribution of publications that promoted the deceptive concept of pseudoaddiction, even for high-risk patients;

- Creating and assisting in the distribution of publications that deceptively claimed that patients at risk of opioid addiction can be prescreened;

- Creating and assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

- Authoring scientific studies that misleadingly overstated the benefits of opioids in the treatment of chronic pain and minimized the risks;

- Authoring materials that presented an unbalanced treatment of the long-term and dose-dependent risks of opioids versus NSAIDs; and

- Falsely denying the influence of consulting fees and other payments received from Manufacturer Defendants and other opioid manufacturers.

352. Manufacturer and KOL Defendants knew these representations and concealments were false, or were made recklessly without factual support, with the intention of deceiving Salt Lake County, physicians and patients.

353. Salt Lake County, physicians and patients reasonably relied on these false representations and concealments of material fact and with ignorance of their falsity.

354. But for these false representations and concealments of material fact, Salt Lake County and its agencies would not have incurred millions of dollars in overpayments for opioids or additional millions combatting the opioid epidemic afflicting the region.

355.     As a direct and proximate cause of Manufacturer and KOL Defendants'

fraudulent conduct, Salt Lake County has been injured.

## FIFTH CAUSE OF ACTION:

## COMMON LAW NEGLIGENCE
## (AGAINST MANUFACTURER AND DISTRIBUTOR DEFENDANTS)

356.     Salt Lake City realleges and incorporates by reference each of the allegations

contained in the preceding paragraphs of this Complaint as though fully alleged herein.

357.     Under Utah law, a cause of action arises for negligence when defendant owes a

duty to a plaintiff and breaches that duty, and proximately causes the resulting injury.

358.     Manufacturer and Distributor Defendants owed a duty of care to Salt Lake County

and its citizens, including, but not limited to, exercise reasonable care in the supply and

distribution of highly addictive drugs like opioids.  Manufacturer and Distributor Defendants

knew or should have known that, unless they implemented effective anti-diversion controls, the

shipment of massive quantities of opioids into the State—shipments that Manufacturer and

Distributor Defendants either fulfilled or knew about—created an unreasonable risk of harm.

359.     Any entity exercising a reasonable amount of prudence would recognize that

filling suspicious orders for opioids, or failing to report or otherwise investigate them, would

result in misuse, addiction and overdose to Salt Lake County residents, along with contaminant

harms to Salt Lake County and its agencies providing health, treatment, and other services to the

population.  Given the manifest risk posed by prescription opioids, Manufacturer and Distributor

Defendants have publicly acknowledged their obligation to prevent the diversion of these

dangerous drugs.

360.     By supplying and distributing massive amounts of opioids without adopting

effective controls to prevent their diversion into illegitimate channels, Manufacturer and

Distributor Defendants breached their duty of reasonable care.

361. Manufacturer and Distributor Defendants' conduct was a proximate cause of increased opioid use and abuse along with the inevitable and foreseeable consequences and public harms.

362. As a direct and proximate cause of Manufacturer and Distributor Defendants' unreasonable and negligent conduct, Salt Lake County has suffered and will continue to suffer harm, and is entitled to damages in an amount determined at trial.

## SIXTH CAUSE OF ACTION:

### CIVIL CONSPIRACY
### (AGAINST DEFENDANTS PURDUE, JANSSEN, ENDO, CEPHALON, MALLINCKRODT, AND KOL DEFENDANTS)

363. Salt Lake County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

364. This claim is brought by Salt Lake County against Defendants Purdue, Janssen, Endo, Cephalon, Mallinckrodt, Lynn Webster, and Russell Portenoy. Throughout this Cause of Action only, "Defendants" refers to only these defendants.

365. Under Utah common law, the elements of a civil conspiracy are (a) a combination of two or more persons, (b) an object to be accomplished, (c) a meeting of the minds on the object or course of action, (d) one or more unlawful, overt acts, and (e) damages as a proximate result thereof.

366. As described more fully above, Defendants coordinated their efforts, as part of a shared plan and pursuant to a common agreement, to deceptively market opioids for chronic pain in Salt Lake County and across the nation.

367. To accomplish their unlawful objectives, Defendants, Front Groups, and KOLs, acting collectively, systematically misrepresented to the general public and Salt Lake County consumers—either affirmatively or through half-truths and omissions—the risks and benefits of using opioids for chronic pain. In particular, these conspirators concealed from the public and

Salt Lake County consumers the serious risks and lack of corresponding benefits of using opioids for chronic pain. These misrepresentations ensured that a larger number of opioid prescriptions would be written and filled for chronic pain in Salt Lake County and elsewhere.

368. The conspiracy was the product of a meeting of the minds, with Manufacturer Defendants controlling the representations made about their respective drugs. Lynn Webster and Russell Portenoy, along with other KOLs and Front Groups, participated knowing, but without disclosing, that others were involved in the same scheme. But for their agreement to participate in the conspiracy KOLs like Lynn Webster and Russell Portenoy, as well as Front Groups, would have been incentivized to disclose Defendants' deceit to their constituents and to protect patients. Instead, they joined the conspiracy with the expectation that the deceit would not be revealed by their co-conspirators.

369. As part of the conspiracy, Defendants engaged in a multitude of unlawful overt acts, including the herein alleged violations of Utah statutory and common law.

370. The conspiracy was reasonably calculated to deceive, and did in fact deceive, Salt Lake County, consumers and the physicians who prescribed opioids to patients for chronic pain and submitted the same for reimbursement from Salt Lake County.

371. But for the conspiracy, Salt Lake County would not have incurred millions of dollars in overpayments. Nor would Salt Lake County have expended millions of dollars to address and abate the public health crisis the conspiracy has foreseeably engendered in Salt Lake County.

372. As a direct and proximate cause of the conspiracy, Salt Lake County has been injured and seeks an order enjoining further operation of the civil conspiracy, damages in an amount to be determined at trial, and all other relief provided by law.

## SEVENTH CAUSE OF ACTION:

### CIVIL CONSPIRACY
### (AGAINST MANUFACTURER AND DISTRIBUTOR DEFENDANTS)

373.    Salt Lake County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

374.    This claim is brought by Salt Lake County against all Defendants other than Russell Portenoy and Lynn Webster.  Throughout this Cause of Action only, "Defendants" refers to only these defendants.

375.    Under Utah common law, the elements of a civil conspiracy are (a) a combination of two or more persons, (b) an object to be accomplished, (c) a meeting of the minds on the object or course of action, (d) one or more unlawful, overt acts, and (e) damages as a proximate result thereof.

376.    As described more fully above, Defendants coordinated their efforts, as part of a shared plan and pursuant to a common agreement, to circumvent their legal obligations to prevent diversion in order to increase their profits and revenues selling, distributing and dispensing opioids in Salt Lake County and across the nation.

377.    To accomplish their unlawful objectives, Defendants systematically failed to report suspicious orders of opioids in order to avoid regulatory scrutiny about those sales.  These failures ensured that a huge numbers of opioids would flood communities in Salt Lake County and elsewhere.

378.    The conspiracy was the product of a meeting of the minds.  But for their agreement to participate in the conspiracy, these Defendants, many of whom were direct competitors, would have been incentivized to disclose other Defendants' failures in order to obtain a competitive advantage.  Instead, they joined the conspiracy with the expectation that the deceit would not be revealed by their co-conspirators.

379. As part of the conspiracy, Defendants engaged in a multitude of unlawful overt acts, including the herein alleged violations of Utah statutory and common law.

380. But for the conspiracy, Salt Lake County would not have expended millions of dollars to address and abate the public health crisis the conspiracy has foreseeably engendered in Salt Lake County.

381. As a direct and proximate cause of the conspiracy, Salt Lake County has been injured and seeks an order enjoining further operation of the civil conspiracy, damages in an amount to be determined at trial, and all other relief provided by law.

## EIGHTH CAUSE OF ACTION:

### UNJUST ENRICHMENT
### (AGAINST MANUFACTURER DEFENDANTS)

382. Salt Lake County realleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged herein.

383. Under Utah law, unjust enrichment occurs when (a) a benefit is conferred on one person by another, (b) there is an appreciation or knowledge by the conferee of the benefit, and (c) it would be inequitable in the circumstances for the conferee to retain the benefit without payment of its value.

384. Through their deceptive and unlawful marketing of opioids for chronic pain, Manufacturer Defendants have been unjustly enriched at Salt Lake County's expense. Because of Manufacturer Defendants' scheme, Salt Lake County has overpaid for opioid prescriptions and permitting Manufacturer Defendants to retain overpayments it fraudulently procured would be inequitable.

385. In the event Salt Lake County lacks an adequate remedy at law, it seeks restitution of the sum, to be determined at trial, by which Manufacturer Defendants have been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays:

A.      That the acts alleged herein be adjudged and decreed to be unlawful in violation of Utah statutory and common law and that the Court enter a judgment declaring them to be so;

B.      That Manufacturer Defendants be enjoined from, directly or indirectly through KOLs, Front Groups or other third parties, continuing to misrepresent the risks and benefits of the use of opioids for chronic pain, and from continuing to violate Utah law;

C.      That Plaintiff recover all measures of damages allowable under the statutes identified herein and the common law, and that judgment be entered against Defendants in favor of Plaintiff;

D.      That Manufacturer Defendants make restitution in the amount they have been unjustly enriched at Plaintiff's expense;

E.      That Plaintiff recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorney's fees as provided by law;

F.      That Defendants be ordered to abate the public nuisance that they created in violation of Utah law, including by paying damages equaling the cost of abatement;

G.      That Defendants be ordered to pay punitive and treble damages as provided by law; and

H.      That the Court order such other and further relief as the Court deems just, necessary and appropriate.

## JURY DEMAND

Salt Lake County demands a trial by jury for all claims herein.

DATED this 26th day of July, 2019.

Respectfully submitted,

OFFICE OF SALT LAKE COUNTY
DISTRICT ATTORNEY
Sim Gill (Utah Bar No. 6389)
District Attorney
Bridget K. Romano (Utah Bar No. 6979)
Deputy District Attorney
35 East 500 South
Salt Lake City, Utah 84111
Telephone: (385) 468.7700
bromano@slco.org

By: /s/ Andrew R. Hale

Richard A. Kaplan (Utah Bar No. 13480)
Andrew R. Hale (Utah Bar No. 13725)
ANDERSON & KARRENBERG
50 West Broadway, Suite 700
Salt Lake City, Utah 84101
Telephone: (801) 639-0954
tkarrenberg@aklawfirm.com
rkaplan@aklawfirm.com
ahale@aklawfirm.com

Steve W. Berman
Anne F. Johnson
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
annej@hbsslaw.com

Ben M. Harrington
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Ave., Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
benh@hbsslaw.com

All out-of-state counsel to be admitted *pro hac vice*

*Of Counsel:*

Bret M. Hanna (Utah Bar No. 6885)
WRONA DUBOIS PLLC
1745 Sidewinder Drive
Park City, UT 84060
Telephone: (435) 649-2525
hanna@wdlawfirm.com

Mike Moore
MIKE MOORE LAW FIRM, LLC
P.O. Box 321048
Flowood, MS 39232
Telephone: (601) 933-0070
mm@mikemoorelawfirm.com

Grant Woods
GRANT WOODS LAW
650 North 3rd Avenue
Phoenix, AZ 85003
Telephone: (602) 258-2599
gw@grantwoodspc.net

Thomas L. Young
LAW OFFICE OF THOMAS L. YOUNG,
P.A.
320 West Kennedy Boulevard, Suite 650
Tampa, FL 33606
Telephone: (813) 251-9706
tyoung@tlylaw.com

S. Drake Martin
DRAKE MARTIN LAW FIRM, LLC
Post Office Box 4787
Santa Rosa Beach, FL 32459
Telephone: (850) 608-3140
drake@drakemartinlawfirm.com

John L. Davison
DAVIDSON BOWIE, PLLC
2506 Lakeland Drive, Suite 501
Post Office Box 321405
Flowood, MS 39232
Telephone: (601) 932-0028
jdavidson@dbslawfirm.net

James L. Ward, Jr.
MCGOWAN, HOOD & FELDER, LLC
321 Wingo Way, Suite 103
Mt. Pleasant, SC 29464
Telephone: (843) 388-7202
jward@mcgowanhood.com

Edward Robertson
BARTIMUS, FRICKLETON,
ROBERTSON & RADAR
11150 Overbrook Road, Suite 200
Leawood, KS 66211
Telephone: (913) 266-2300
chip.robertson@me.com

J.R. Whaley
WHALEY LAW FIRM
6700 Jefferson Highway
Building 12, Suite A
Baton Rouge, LA 70806
Telephone: (225) 302-8810
jrwhaley@whaleylaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of July, 2019, I caused a true and correct coy of the

foregoing **SECOND AMENDED COMPLAINT AND JURY DEMAND** to be served via the

Court's electronic filing system upon all counsel of record.

*/s/ Rachel L. Dodge*
Rachel L. Dodge, Legal Assistant